# EXHIBIT A TO KING DECLARATION:
## Second Amended Complaint

The Honorable Myron H. Thompson

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MUSCOGEE (CREEK) NATION, a federally recognized Indian tribe, HICKORY GROUND TRIBAL TOWN, and MEKKO GEORGE THOMPSON, individually and as traditional representative of the lineal descendants of those buried at Hickory Ground Tribal Town in Wetumpka, Alabama.

                                    Plaintiffs,

        v.

POARCH BAND OF CREEK INDIANS, a federally recognized tribe; STEPHANIE A. BRYAN, individually and in her official capacity as Chair of the Poarch Band of Creek Indians ("Poarch") Tribal Council; ROBERT R. MCGHEE, individually and in his official capacity as Vice Chair of Poarch Tribal Council; EDDIE L. TULLIS, individually and in his official capacity as Treasurer of the Poarch Band of Creek Indians Tribal Council; CHARLOTTE MECKEL, in her official capacity as Secretary of the Poarch Band of Creek Indians Tribal Council; DEWITT CARTER, in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; SANDY HOLLINGER, individually and in her official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; KEITH MARTIN, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; ARTHUR MOTHERSHED, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; GARVIS SELLS, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; BUFORD ROLIN, an individual; DAVID GEHMAN, an individual; LARRY HAIKEY, in his official capacity as Acting Poarch Band of Creek Indians Tribal Historic Preservation Officer; PCI GAMING AUTHORITY d/b/a WIND CREEK HOSPITALITY; WESTLY L. WOODRUFF, in his official capacity as board member of the PCI Gaming Authority;

2:12-cv-1079-MHT-CSC

SECOND AMENDED COMPLAINT AND SUPPLEMENTAL COMPLAINT

1

STUART MARK ALTMAN, in his official capacity as board member of the PCI Gaming Authority; VENUS MCGHEE PRINCE, in her official capacity as board member of the PCI Gaming Authority; TERESA E. POUST, in her official capacity as board member of the PCI Gaming Authority; TIMOTHY A. MANNING, in his official capacity as board member of the PCI Gaming Authority; MARTIN CONSTRUCTION, INC., an Alabama Corporation; THE DEPARTMENT OF THE INTERIOR; TARA MACLEAN SWEENEY, in her official capacity as Assistant Secretary of Indian Affairs; DAVID BERNHARDT, in his official capacity as Secretary of the United States Department of the Interior; DAN SMITH, in his official capacity as Acting Director of the National Park Service; and AUBURN UNIVERSITY;

Defendants.

## **CONTENTS**

INTRODUCTION .................................................................................................5
THE PARTIES ....................................................................................................7
    Plaintiffs...........................................................................................................7
    Poorch Band.....................................................................................................8
    Poorch Council Defendants ..............................................................................8
    PCI Gaming Authority .....................................................................................8
    PCI Gaming Authority Board Defendants..........................................................8
    Poorch Tribal Historic Preservation Officer ......................................................9
    Individual Defendants ......................................................................................9
    Martin Construction, Inc..................................................................................9
    Federal Defendants........................................................................................10
    Auburn University.........................................................................................10
JURISDICTION AND VENUE ...........................................................................11
GENERAL ALLEGATIONS................................................................................13
    A.      History Of Hickory Ground. ..............................................................13
    B.      Poorch Bought Hickory Ground With Federal Preservation Grant Funds
           After Promising to Preserve This Sacred Place................................17
    C.      Interior Illegally Takes The Hickory Ground Site Into Trust For Poorch. ...........20
    D.      Poorch Requests Delegation Of Federal Historic Preservation
           Responsibilities On The Eve Of Expiration Of The 20-Year Protective
           Covenant, And Then Begins To Desecrate Hickory Ground.................24
    E.      Poorch Builds A Casino Resort Over A Muscogee (Creek) Sacred Site....27
    F.      To Make Way For Its Casino Resort, Poorch Desecrates The Muscogee
           (Creek) Human Remains And Funerary Objects..................................30
    G.      Plaintiffs Repeatedly Request That The Hickory Ground Site Be Preserved
           As Poorch Promised..........................................................................32
    H.      Poorch Intentionally Excludes The Muscogee (Creek) Nation And Hickory
           Ground From Decisions About Their Ancestors' Reburial And Conducts
           The Reburial In Secret. ......................................................................34
    I.       Hickory Ground Today And The False Promise Of Preservation.......38
COUNT I: VIOLATION OF THE INDIAN REORGANIZATION ACT....................45
*OPERATIVE COUNTS IF THIS COURT RULES IN FAVOR OF PLAINTIFFS ON*
*COUNT I AND DETERMINES INTERIOR LACKED AUTHORITY TO TAKE THE*
*HICKORY GROUND SITE INTO TRUST FOR POARCH.*........................................46
        COUNT II: UNJUST ENRICHMENT (ALABAMA COMMON LAW) .......46
        COUNT III: PROMISSORY ESTOPPEL (ALABAMA COMMON LAW) .................48
        COUNT IV: OUTRAGE ........................................................................49
*OPERATIVE COUNTS IF THIS COURT RULES AGAINST PLAINTIFFS ON COUNT I* .........53
        COUNT V: UNJUST ENRICHMENT (FEDERAL COMMON LAW) ..........53
        COUNT VI: PROMISSORY ESTOPPEL (FEDERAL COMMON LAW) ....................53
        COUNT VII: VIOLATION OF THE NATIVE AMERICAN GRAVES
           PROTECTION AND REPATRIATION ACT ....................................53
        COUNT VIII: PORTIONS OF NAGPRA AND ARPA, IF CONSTRUED IN A
           MANNER THAT RESULTS IN A SUBSTANTIAL BURDEN ON

PLAINTIFFS' RELIGION, VIOLATE THE FIRST AMENDMENT, THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT, AND THE RELIGIOUS FREEDOM RESTORATION ACT ................... 59

COUNT IX: VIOLATION OF THE ARCHEOLOGICAL RESOURCES PROTECTION ACT ............................................................................. 61

*OPERATIVE COUNTS REGARDLESS OF RULING ON COUNT I* ......................................... 64

COUNT X: VIOLATION OF THE NATIONAL HISTORIC PRESERVATION ACT ............................................................................................. 64

    A.    Interior And Poarch Failed To Comply With Their Obligations To Meaningfully Consult With Plaintiffs. .................................................... 65

    B.    Interior And Poarch Failed To Take Into Account The Effect On The Hickory Ground Site Of Allowing Excavation And Construction Of A Casino Resort, And Interior Failed To Take Into Account The Effect On The Hickory Ground Site Of Delegating Historic Preservation Responsibilities To Poarch. ................. 66

    C.    Interior and Poarch Failed To Seek Ways To Avoid, Minimize, Or Mitigate The Harm To The Hickory Ground Site. .................................. 68

    D.    Poarch Violated Its Historic Preservation Responsibilities Under the NPS Agreement. ................................................................................ 69

    E.    Poarch's And The Federal Defendants' Violation Of Their Historic Preservation Responsibilities Has Caused Serious, Irreparable, And Ongoing Harm to Plaintiffs. ...................................................................... 69

    F.    The National Park Service Has Illegally Continued To Award Federal Preservation Funds to Poarch. .................................................... 70

COUNT XI: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT ............................................................................................. 72

PRAYER FOR RELIEF ............................................................................................. 76

## INTRODUCTION

1.      Defendant Poarch Band of Creek Indians ("Poarch") acquired Hickory Ground, a sacred historic site of the Muscogee (Creek) Nation that is located in Wetumpka, Alabama. Poarch claimed it was buying this culturally significant site to protect it from development and repeatedly promised to preserve it. Poarch broke those promises and desecrated the holy site, removing over 57 bodies of Plaintiffs' ancestors and thousands of sacred artifacts to build a casino with the help of a Poarch tribal member-owned construction company. The other Defendants violated statutory, common law, and contractual obligations when they failed to stop Poarch from paving over this important historic site and traditional burial ground. Plaintiffs seek redress for this greedy, tragic, outrageous, and illegal act.

2.      Hickory Ground is a parcel of land located near Wetumpka, Alabama. It is sacred to the Plaintiffs: it is part of the Muscogee (Creek) Nation's aboriginal lands, the location of the Muscogee (Creek) Nation's last capital before the tribe was forcibly removed from Alabama, and is a historic ceremonial ground and burial site. Direct ancestors of the current members of the Hickory Ground Tribal Town lived, died and are buried there.

3.      Poarch obtained Hickory Ground using federal preservation grant funds under the pretense that Poarch would protect the site from development. The site has been listed on the National Register of Historic Places since 1980.

4.      In its application for the federal funds, Poarch represented to the Muscogee (Creek) Nation, the federal government, and the Alabama State Historical Commission that Poarch would use the funds to purchase Hickory Ground to *save it* from being developed, and that it would protect the site "*without* excavation."

5.      Poarch then excavated Hickory Ground to make way for a $246 million casino resort called Wind Creek Wetumpka. Poarch exhumed at least 57 human burials and mistreated

the human remains. Some remains, and numerous archaeological artifacts have never been reburied and are being mishandled and improperly stored by Poarch and Auburn University.

6.    Poarch's construction of a casino over the Plaintiffs' sacred burial grounds, its removal of the Plaintiffs' ancestors from what was intended to be their final resting place, and its mistreatment of the remains and artifacts has caused, and continues to cause, harm to the Plaintiffs, in violation of the laws of the United States and Alabama.

7.    Statutes and contract impose upon the Department of the Interior ("Interior"), including the Bureau of Indian Affairs and the National Park Service, and their respective officials (listed in Paragraphs 26 to 32, *infra*) (collectively the "Federal Defendants") obligations to protect Plaintiffs' rights, including but not limited to duties to provide notice and consultation and obtain consent prior to allowing such damage to occur.

8.    Poarch and its officers and agents, including the third parties it hired to conduct the excavation of Hickory Ground and construction of the casino resort, also have statutory, contractual, and common law duties to protect Plaintiffs' rights and to avoid damaging their sacred burial grounds.

9.    Poarch has been unjustly enriched and continues to be unjustly enriched as a result of its wrongful and unlawful conduct. The actions of all Defendants have caused, and continue to cause, irreparable harm to the Plaintiffs, who bring this lawsuit to remedy past damage and stop further damage.

10.   Poarch promised to preserve the sacred Hickory Ground site forever. It should be held to its word.

## THE PARTIES

**Plaintiffs**

11.     Plaintiff Muscogee (Creek) Nation is a federally recognized Indian tribe based in Oklahoma, with over 87,000 tribal citizens. Before its people were forced to move to Indian Territory (now Oklahoma), the Muscogee (Creek) Nation existed as a confederacy of Tribal Towns throughout what is now the southeastern United States. For thousands of years before non-Indian contact, they inhabited what is now Alabama.

12.     Plaintiff Hickory Ground Tribal Town is a traditional Tribal Town and ceremonial ground of the Muscogee (Creek) Nation that is now located in Henryetta, Oklahoma. Before the Muscogee (Creek) Nation's removal from Alabama, Hickory Ground Tribal Town was located in what is now Wetumpka, Alabama.

13.     Tribal Town membership is matrilineal. The members of the modern Hickory Ground Tribal Town are directly tied historically, culturally and lineally to Hickory Ground in Wetumpka.

14.     Plaintiff George Thompson is the chief ("Mekko") of Hickory Ground Tribal Town. He has held that lifetime position for 42 years. He is a citizen of the Muscogee (Creek) Nation domiciled in Oklahoma, and brings this suit individually and as the traditional representative of all the lineal descendants of those buried at Hickory Ground under the Muscogee (Creek) Nation traditional matrilineal Tribal Town kinship system.

15.     Under Andrew Jackson's direction, the United States forcibly removed the Muscogee (Creek) Nation and its Tribal Towns, including Hickory Ground, from Alabama in the early 1800s. Some Creek individuals (often individuals of mixed heritage not living in tribal towns) helped Andrew Jackson fight against their brethren in Alabama, and in exchange they were allowed to stay in Alabama, on the condition they renounce their tribal citizenship, as *all* tribes were to be

removed from the area.

**Poarch Band**

16.     The Poarch Band is a group that was first recognized as an Indian tribe by the United States in 1984, after claiming to descend from a "settlement of 'half-bloods'"[1] who lived in Tensaw, Alabama.

17.     This group was not, and is not, a Muscogee (Creek) Tribal Town.

18.     The Muscogee (Creek) Nation did not, and does not, have "bands."

**Poarch Council Defendants**

19.     Defendants Stephanie A. Bryan, Robert R. McGhee, Eddie L. Tullis, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Garvis Sells are members of the Poarch Tribal Council and officials of Poarch (the "Poarch Council Defendants"). They are sued in their official capacities for violations of federal and state law for which Plaintiffs seek mandamus, declaratory and injunctive relief. Certain Poarch Council Defendants are also sued in their individual capacities. *See infra* ¶ 24.

**PCI Gaming Authority**

20.     Defendant PCI Gaming Authority is a commercial enterprise of the Poarch Band that is at least partly responsible for the gaming development and operations at Hickory Ground.

21.     PCI Gaming Authority is the principal gaming entity of the Poarch Band, and runs the Wind Creek Casino and Hotel Wetumpka.

**PCI Gaming Authority Board Defendants**

22.     On information and belief, Defendants Westly L. Woodruff, Stuart Mark Altman,

---

[1] The outdated term "half-bloods" in this excerpt from Poarch's petition for federal recognition refers to individuals who possessed half Indian, half non-Indian blood as of the mid-1800s.

Venus McGhee Prince, Teresa E. Poust, and Timothy A. Manning (the "PCI Gaming Authority Board Defendants") are members of the PCI Gaming Authority Board. They are sued in their official capacities for violations of federal and state law for which Plaintiffs seek mandamus, declaratory and injunctive relief. Timothy A. Manning is also sued in his individual capacity. *See infra* ¶ 24.

**Poarch Tribal Historic Preservation Officer**

23.     Defendant Larry Haikey is the Tribal Historic Preservation Officer for the Poarch Band of Creek Indians ("Poarch THPO"). He is sued in his official capacity for violations of federal and state law for which Plaintiffs seek mandamus, declaratory and injunctive relief.

**Individual Defendants**

24.     Defendants Buford Rolin and David Gehman are former members of the Poarch Tribal Council and are sued in their individual capacities for the tort of outrage that they personally committed against Mekko Thompson. Defendants Stephanie A. Bryan, Robert R. McGhee, Eddie L. Tullis, Sandy Hollinger, Keith Martin, Arthur Mothershed, Garvis Sells, and Timothy A. Manning are also sued in their individual capacities for the tort of outrage that they personally committed against Mekko Thompson. The defendants referred to in this Paragraph are collectively referred to as the "Individual Defendants." Mekko Thompson seeks equitable and monetary relief from the Individual Defendants for outrage.

**Martin Construction, Inc.**

25.     Defendant Martin Construction, Inc. is a corporation organized and existing under the laws of Alabama, with a principal place of business at 110 W. Louisville Avenue; Atmore, Alabama 36502.

**Federal Defendants**

26.     Defendant United States Department of the Interior is responsible for administration and management of federal lands, historic places, and Indian Affairs.

27.     The National Park Service and Bureau of Indian Affairs are agencies of the United States government, within the Department of the Interior. Among other things, the National Park Service administers and oversees historic preservation grants and delegations of historic preservation responsibilities. The Bureau of Indian Affairs is responsible for, among other things, administering and overseeing archaeological activities on Indian land and taking land into trust on behalf of Indian tribes.

28.     Defendant Tara MacLean Sweeney is the Assistant Secretary for Indian Affairs within the Department of the Interior, and is sued in her official capacity.

29.     Defendant Dan Smith is Acting Director of the National Park Service within the Department of the Interior, and is sued in his official capacity.

30.     Defendant David Bernhardt is Secretary of the United States Department of the Interior and is sued in his official capacity.

31.     Collectively, the Defendants listed in Paragraphs 26-30 are referred to herein as the "Federal Officer Defendants."

**Auburn University**

32.     Defendant Auburn University ("Auburn") is an educational institution in the State of Alabama that receives federal funding and, on information and belief, exercises, and has exercised, possession or control over cultural items excavated at Hickory Ground, including possession or control of human remains at the time of the filing of this Second Amended Complaint.

## JURISDICTION AND VENUE

33.     Plaintiffs' claims arise under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*; the Indian Reorganization Act, 25 U.S.C. §§ 461, *et seq.*; the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 100101 *et seq.* (formerly 16 U.S.C. §§ 470 *et seq.*); the Native American Graves Protection and Repatriation Act of 1990 ("NAGPRA"), 25 U.S.C. §§ 3001 *et seq.*; the Archeological Resources Protection Act ("ARPA"), 16 U.S.C. §§ 470aa *et seq.*; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 28 U.S.C. § 1361 (mandamus); federal common law; and supplemental state law claims.

34.     Plaintiffs also seek their reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the NHPA, 54 U.S.C. § 307105.

35.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 (federal question jurisdiction), 1361 (action to compel a governmental officer to perform his duty), 1362 (jurisdiction over civil actions brought by Indian tribes arising under the laws of the United States), 1367 (supplemental jurisdiction over state law claims forming part of the same claim or controversy); 25 U.S.C. § 3013 (jurisdiction over actions alleging violations of NAGPRA); and 54 U.S.C. § 307105 ("any interested person" may enforce NHPA).

36.     Pursuant to 28 U.S.C. § 1391(b)(2) & (e), venue is proper in this Court because this action relates to lands located within this judicial district and a substantial part of the events or  omissions giving rise to the claims occurred in this judicial district.

37.     Federal Defendants have waived their sovereign immunity against civil actions alleging harm arising from such agencies' actions or failures to act as required by law and seeking relief other than monetary damages. 5 U.S.C. § 702.

38.     The Court also has jurisdiction over the Federal Officer Defendants in their official

capacities because they are federal governmental officials against whom Plaintiffs seek declaratory and injunctive relief only in relation to continuing violations of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908).

39.   The Court has jurisdiction over the Poarch Council Defendants (listed in Paragraph 19), the PCI Gaming Authority Board Defendants (listed in Paragraph 22), and the Poarch THPO in their official capacities because they are tribal officials against whom the Plaintiffs seek declaratory and injunctive relief only in relation to continuing violations of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908).

40.   This Court has jurisdiction over the Individual Defendants because they committed the tortious actions alleged in this complaint in this judicial District.

41.   Martin Construction, Inc. ("Martin Construction") is subject to personal jurisdiction in this District because it has conducted, and does conduct, business in the United States and Alabama. Martin Construction is owned by a Poarch tribal member, and performed construction services to build the Wetumpka casino resort in this judicial District.

42.   The Court has jurisdiction over Auburn University under NAGPRA, 25 U.S.C. §§ 3001 *et seq.*, and ARPA, 16 U.S.C. §§ 470aa *et seq.*, as Auburn receives federal funds and, on information and belief, exercised, and continues to exercise, possession or control over remains and cultural items that Auburn excavated from Hickory Ground. Auburn is listed as a Defendant solely to the extent that this Court enters orders concerning the possession, custody, control, or relocation of the cultural items at issue.

## GENERAL ALLEGATIONS

**A.      History Of Hickory Ground.**

43.      For millennia before the Removal Treaty of 1832, the Muscogee (Creek) people inhabited most of what is now Alabama. The Muscogee (Creek) Nation was composed of Tribal Towns, including the Tribal Town site called *Ocevpofv* by the Muscogee (Creek) people, and known as "Hickory Ground Tribal Town" by English speakers.

44.      Hickory Ground is of major importance in the history of the Muscogee (Creek) Nation, Hickory Ground Tribal Town, and the United States. It was the last tribal capital of the Muscogee (Creek) Nation prior to removal. Hickory Ground was critical to the very formation of the United States.  When European nations questioned the sovereignty of the newly born United States, President George Washington lent legitimacy to the nascent country by signing treaties with Indian Nations, including the Muscogee (Creek) Nation, whose sovereignty had previously been affirmed through treaties with France, Spain, and England. Thus, in 1790, nearly two centuries before Poarch was recognized as a tribe, President George Washington executed a treaty with the Muscogee (Creek) Nation. The head of the Muscogee treaty delegation was from Hickory Ground.

45.      Tribal Town affiliation is matrilineal, and the current members of Hickory Ground Tribal Town in Oklahoma are the lineal descendants of the ancestors buried at the historic Hickory Ground in Wetumpka, Alabama.

46.      Each Tribal Town is led by its chief, or *mekko*. Mekko George Thompson is the *kosa mekko* of Hickory Ground, and has been since 1977. He is known as *kosa mekko*, or Coosa Chief, as Hickory Ground dates back to the first Tribal Town at the time of the beginnings, known as *kosa* or Coosa. Since time immemorial, Mekko Thompson's ancestors have served as Mekko of Hickory Ground Tribal Town.

13

47.     Hickory Ground is located on the east bank of the Coosa River, south of the present-day Wetumpka and approximately two miles north of Fort Toulouse.

48.     Under the terms of the Removal Treaty, the Muscogee (Creek) Nation ceded all of its land east of the Mississippi River, including Hickory Ground, and a new reservation for the Muscogee (Creek) Nation was established west of the Mississippi River. 7 Stat. 366, Arts. I & XIV (1832). To stay with their tribe, the members of the Muscogee (Creek) Nation were required to remove to what is now Oklahoma and leave behind their ancient villages and the many generations of their ancestors who were buried there.

49.     Hickory Ground Tribal Town, like all Tribal Towns of the Muscogee (Creek) Nation, contains a ceremonial ground (square ground), council house, plaza, burial sites, and individual graves containing human remains and funerary objects of the ancestors of the Plaintiffs. Hickory Ground has profound cultural and religious importance to the Plaintiffs.

50.     Hickory Ground is a state-registered archaeological site (1EE89) and is listed on the National Register of Historic Places. Hickory Ground was placed on the National Register of Historic Places in 1980, after the Alabama State Historic Commission applied for its placement on the Register on behalf of Poarch. The part of Hickory Ground listed on the National Register of Historic Places and currently considered to be trust or reservation land is referred to herein as the "Hickory Ground Site."

51.     In the Muscogee (Creek) culture and religion, there are specific burial places for those who held particular positions in Tribal Town traditional governance, and specific governance structures over Tribal Towns, including burials within those Tribal Towns.

52.     For example, Hickory Ground *mekkos* are buried under the *mekkos'* arbor (the east-facing arbor) in the ceremonial grounds.

53.     It was a common practice to bury family members who did not have a position in the ceremonial grounds in the earth underneath a family's home.

54.     The map of archaeological features at the Hickory Ground Site on the next page shows human burials concentrated under the arbors in the square ground and under house structures:



16

Kelly Ervin, *A Comparative Spatial Analysis of Two Communities from the Hickory Ground Site in Wetumpka, Alabama* 26 (Auburn University Thesis, December 13, 2014).

55.     It is the Plaintiffs' long-established religious belief that burial and ceremonial grounds are sacrosanct and must not be entered, let alone disturbed, without the proper religious protocol.

56.     It is also the Plaintiffs' long-established religious belief that their ancestors must be left at peace in their final resting places with their possessions (funerary objects), and are not to be disturbed, mistreated, or disrespected in any manner.

57.     Plaintiffs, as the living descendants and next of kin of the deceased, owe a religious duty to their ancestors to care for the graves and bodies of the deceased and to follow traditional religious protocol in such care.

58.     In the Muscogee (Creek) traditional religion, certain protocols must be followed in all burials. These protocols are based on Tribal Town and Clan religion and tradition.

59.     Because the *mekko* is the chief of the town, the *mekko* ultimately decides all Tribal Town issues, including treatment of the dead.

60.     It is viewed as heinous and extremely disrespectful in the Muscogee (Creek) traditional religion for any persons not belonging to the Muscogee (Creek) Nation or Tribal Town to exhume or rebury Muscogee (Creek) ancestors and their funerary objects, especially where those persons mistreat the remains and perform invented and non-traditional ceremonies accompanying reburial.

**B.     Poorch Bought Hickory Ground With Federal Preservation Grant Funds After Promising to Preserve This Sacred Place.**

61.     Poorch obtained the Hickory Ground Site in 1980 with $165,000 in federal preservation grant funds and a $165,000 donation from the landowner.

62.     In the same year, pursuant to standard terms of federal preservation grant awards, a protective covenant was placed on the property for 20 years.

63.     Poarch had never occupied Hickory Ground prior to 1980. *See* Poarch Federal Acknowledgement Memo., pp. 2, 3, 16, 64, 65 of 131 (1983), *available at* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ofa/petition/013_prchcr_AL/013_pf.pdf.

64.     Poarch represented to the Alabama Historic Commission, the Muscogee (Creek) Nation and the United States that its purpose in acquiring the Hickory Ground Site was to preserve the historic property for the benefit of all Creek Indians, including the "existing Hickory Ground tribal town in Oklahoma," and to preserve the Site "without excavation." Poarch Application for Historic Preservation Grant Re U.S. Department of the Interior (HCRS [Heritage Conservation and Recreation Service]) letter 712 at 2 (2/12/1980) ("Federal Preservation Grant Application"), attached hereto as Exhibit A.

65.     The Muscogee (Creek) Nation and Hickory Ground Tribal Town were the intended third  party beneficiaries of Poarch's agreement to preserve Hickory Ground.

66.     In its application for the $165,000 federal preservation grant to purchase the Hickory Ground Site, Poarch (then calling itself the "Creek Nation East of the Mississippi"), stated that "Hickory Ground (site no. 1-Ee-89) is of major importance in the history of the Muscogee (Creek) Nation. It has supplied many of the important leaders in Creek history." *Id.* at 1. "Hickory Ground was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836," including significant battles fought by Andrew Jackson. *Id.* at 1-2.

67.     In the section of its Federal Preservation Grant Application titled "The Use Of The Land," Poarch unequivocally represented and promised that "[a]cquisition of the property is

principally a protection measure. Acquisition will prevent development on the property…. [P]lans will be developed to minimize continued destruction of the archaeological resources." *Id.* at 2. "The property will serve as a valuable resource for cultural enrichment of Creek people…. The Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. **There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved…. The Hickory Ground site will continue to enhance their understanding of their history, without excavation**." *Id.* (emphasis added).

68.     In the section of Poarch's Federal Preservation Grant Application titled "Specific Standards of Protection," Poarch stated that the site "will be maintained almost entirely by minority groups," including the Creek Nation Foundation, Inc. in Oklahoma, representing the Muscogee (Creek) Nation in Oklahoma. *Id.* at 3. "[T]he property will be jointly owned by both groups of Creeks." *Id.* An attorney for the Creek Nation Office of Justice in Oklahoma would handle the legal matters for the Muscogee (Creek) Nation. *Id.* at 4. A trained anthropologist would "act as an advisor to the tribal councils on plans for permanent protection of the site." *Id.* "Specific end products of the project is to provide protection for a particularly important site in Creek History…. **Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home**." *Id.* at 3 (emphasis added). "**Destruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people**." *Id.* at 5 (emphasis added). "In order to halt the destruction planned for the site and to insure [sic] against future destruction, funds for acquisition of fee simple title are requested. As the landowner is very much interested in developing the property for commercial purposes it is felt acquisition of fee simple title is **necessary to prevent destruction of the site**." *Id.* at 2-3 (emphasis added).

69.     Poarch corresponded with representatives of the Muscogee (Creek) Nation

19

regarding its preservation plans for the Hickory Ground Site.

70.     Additionally, in a 1983 Congressional Hearing in which both the Chief of the Muscogee (Creek) Nation and Poarch Chairman Eddie Tullis testified regarding a bill governing disbursement of Indian Claims Commission awards, the Poarch Chairman testified that, as Poarch was "in ownership of one of the last historical sites of the Creek nation before the removal to Oklahoma," Poarch "propose[d] to use part of this money to make that site, not only available to all of our people, but to the general public as well." S. Hrg. 98-200 at 21-22 (5/26/1983).

71.     The Poarch Chairman's written testimony that was submitted to Congress and included in the hearing record added more detail to this proposal: "Preservation of a historical site: Along with [Poarch's] effort to join the mainstream of American life there is a strong desire among our people to preserve and share our unique history. To this end our tribe has acquired titled [sic] to 'Hickory Ground', one of the most important Creek historical sites. We propose to use fifty percent of the proceeds of S. 1224 to preserve and to present to both Indian and non-Indian this unique and historical site." S. Hrg. 98-200 at 24 (5/26/1983).

72.     Relying on Poarch's unqualified assurances that it would perpetually protect the Hickory Ground Site, the Muscogee (Creek) Nation did not object to Poarch's acquisition of the Site, either in fee or trust.

## C.     Interior Illegally Takes The Hickory Ground Site Into Trust For Poarch.

73.     On June 11, 1984, the Department of the Interior extended federal recognition to the Poarch Band of Creek Indians. 49 Fed. Reg. 24083 (June 11, 1984). Effective April 12, 1985, the United States wrongfully accepted legal title to a majority of the Hickory Ground Site in trust for the benefit of Poarch, 50 Fed. Reg. 15502 (April 18, 1985); 50 Fed. Reg. 19813 (May 10, 1985), purportedly pursuant to the Indian Reorganization Act of 1934.

74.     Under the Indian Reorganization Act, 25 U.S.C. § 5123 *et seq.*, a tribe must have been "under federal jurisdiction" in 1934 in order for Interior to have authority to take land into trust for the tribe. *See also Carcieri v. Salazar*, 555 U.S. 379 (2009).

75.     The Solicitor for the Department of the Interior has construed "under federal jurisdiction" to involve a two-part inquiry into whether (1) the United States took actions reflecting federal obligations, duties, responsibility for, or authority over a tribe in or before 1934, and (2) that relationship continued through 1934. Sol. Op. M-37029, *available at* https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37029.pdf.

76.     Poarch and the federal government have correctly and repeatedly recognized that Poarch was not under federal jurisdiction within the meaning of the Indian Reorganization Act.

a.     In 2005, Poarch submitted a letter through its legal counsel to the National Indian Gaming Commission stating that "the federal government clearly ended its relationship with Poarch Creek following removal [in 1832]. . . . [T]he historical record amply demonstrates that the federal government terminated the government-to-government relationship with the Creek in Alabama through a broad course of dealings that included express statements by top federal officials disclaiming any federal relationship with the Tribe - and that this termination of federal recognition extended back almost 150 years prior to Poarch Creek regaining federal recognition in 1984." Letter from W. Perry, Sonosky Chambers, to K. Zebell, National Indian Gaming Commission ("NIGC"), at pp. 10-11 (June 3, 2005), attached as Exhibit B hereto.

b.     The Department of the Interior Solicitor's Office, Division of Indian Affairs, stated in 2008 that it "does not believe that the Poarch Creek Band ever had a government-

to-government relationship with the United States until it was [recognized in 1984].… [T]he **record simply does not support the Band's existence as a separate tribal entity with a governmental relationship with the United States**." Letter from David Bernhardt, then-Interior Solicitor, to Hogen, NIGC Chairman, p. 1 (June 13, 2008) (emphasis added), attached as Exhibit C hereto.

c.   The National Indian Gaming Commission in 2008 agreed that, after the Muscogee (Creek) Nation's removal from Alabama in the 1830s, "the United States specifically and repeatedly disclaimed any relationship with the Poarch Band" until 1984. Letter from NIGC Acting General Counsel to Bernhardt, p. 2 (July 30, 2008), attached as Exhibit D hereto.

d.   In 1951, in seeking to intervene in proceedings relating to compensation from the United States for lands ceded in past treaties with the Creek Nation, Poarch (then calling itself the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians") stated that it was "but a **newly formed** band of descendants of the original Creek nation." Perdido Band Memo. In Supp. Of Mot. To Intervene, p. 4 (1951) (emphasis added), attached as Exhibit E hereto.

e.   Later that year, Chairman Calvin McGhee and Secretary Ruby Weatherford signed a resolution changing the name of the band to the "Creek Nation East of the Mississippi." Ex. A to Mot. To Change Record Name Of One of Movants for Leave to Intervene (8/29/1951), attached as Exhibit F hereto.

f.   Poarch (by this time going by the name Creek Nation East of the Mississippi) stated in November 1951 in a United States Court of Claims appellate brief that "they possessed no territory and were **not dealt with by the United States as a group**"

since removal. Creek Nation East of the Mississippi's Appellate Br. re Intervention in Muscogee (Creek) Nation ICC Case, p. 137 (11/6/1951) (emphasis added), attached as Exhibit G hereto.

g.  The brief also stated that "**the Federal Government had no dealings with those east of the Mississippi**, as a group," who, "unlike the Creeks in Oklahoma, had no organization, occupied no bounded grant of territory and **were not under the guardianship of the Federal Government**." *Id.* p. 152 (emphasis added).

h.  In 1952, the United States submitted an appellate brief in the United States Court of Claims stating that "those [Creeks] who remained in the East [after removal] abandoned their tribal relationships; and **they never continued a tribal government recognized by the United States and they entered into no treaties or other political arrangements with the United States** … and only recently organized themselves, apparently for the purpose of this suit." US Appellate Br. Opposing Creek Nation E. of the Mississippi's Intervention in Muscogee (Creek) Nation ICC Case, p. 2 (Jan. 1952) (emphasis added and footnote omitted), attached as Exhibit H hereto.

i.  The United States' 1952 brief also stated that the Creeks who remained east of the Mississippi "are not recognized by the administrative or legislative arm of the Government…." *Id.* at 16.

j.  The Court of Claims found that the United States had "no occasion for further dealings with [those Creeks who remained east of the Mississippi] since 1832." *McGhee v. Creek Nation*, 122 Ct. Cl. 380, 391 (1952), *cert. denied*, 344 U.S. 856 (1952).

77.     Where a tribe is not "under federal jurisdiction" under the Indian Reorganization Act, Interior has no authority to take land into trust for that tribe.

78.     Because Poarch was not "under federal jurisdiction" within the meaning of the Indian Reorganization Act, the Hickory Ground Site is not properly held in trust for Poarch.

**D.     Poarch Requests Delegation Of Federal Historic Preservation Responsibilities On The Eve Of Expiration Of The 20-Year Protective Covenant, And Then Begins To Desecrate Hickory Ground.**

79.     The 20-year protective covenant on the Hickory Ground Site expired in July 2000.

80.     The year before the covenant expired, Poarch requested that the National Park Service delegate historic preservation responsibilities to Poarch on "all lands within the exterior boundaries of [Poarch's] Reservation," which included the Hickory Ground Site. The National Park Service agreed.

81.     The National Park Service's June 10, 1999 agreement with Poarch (the "NPS Agreement," attached hereto as Exhibit I) requires that:

   a.   Poarch follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800 *et seq.* (NPS Agreement § 5), which mandates consultation with any tribe that attaches religious and cultural significance to a historic site (*see* 16 U.S.C.S. §§ 470a(d)(6), 470f; 36 C.F.R. § 800.1 *et seq.*).

   b.   The Poarch THPO "will, in accordance with Section 101(d)(4)(C) [of the NHPA], provide for … consultation with representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation," and "will periodically solicit and take into account comments on the program from all those individuals and groups who may be affected by the program's activities" (NPS Agreement § 7);

24

c. "In any case where an action arising pursuant to the Act may affect the traditional lands of another Tribe, the [Poarch THPO] will, on an as-needed basis, seek and take into account the views of that Tribe." NPS Agreement § 7.

82.     The National Park Service could not and would not have delegated the historic preservation duties to Poarch without Poarch's agreement to undertake the enumerated duties.

83.     The Hickory Ground Site is in the traditional lands of the Muscogee (Creek) Nation.

84.     The Hickory Ground Site contains the ceremonial grounds and burials of members of the Hickory Ground Tribal Town.

85.     Plaintiffs were intended third party beneficiaries of the NPS Agreement.

86.     Under the NPS Agreement, at least every four years the National Park Service was obligated to "carry out a periodic review of the Tribe's program pursuant to the Act, to ensure that the Tribe is carrying out the program consistent with the agreement." NPS Agreement § 14. NPS could terminate the Agreement if Poarch did not "carr[y] out its assumed responsibilities in accordance with this agreement, the Act, or any other applicable Federal statute or regulation." NPS Agreement § 15; *see also* 54 U.S.C. § 302108.

87.     At the time the National Park Service approved of and executed the NPS Agreement with Poarch, Poarch's Office Of Cultural And Historic Preservation Field Methodology had a policy that "[u]nder no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to **any** examination or testing. Burial sites take precedence over any project or program plan." Poarch Field Methodology Policy, p. 6 (April 1999) (emphasis in original), attached hereto as Exhibit J.

88.     The Poarch Field Methodology Policy also emphasized: "AGAIN! **THE POARCH BAND OF CREEK INDIANS TRIBAL ARCHAEOLOGICAL AND HISTORIC**

**RESOURCES CODE EMPHASIZES AVOIDANCE AND PRESERVATION OF FEATURES RATHER THAN EXCAVATION**." *Id.* (emphasis in original).

89.     On information and belief, after the National Park Service delegated historic preservation responsibilities to Poarch, Poarch reversed these policies with respect to the Hickory Ground Site.

90.     In 2001, various parties complained to the Bureau of Indian Affairs and others that Poarch was disturbing the Hickory Ground Site.

91.     In response to these complaints, the Bureau of Indian Affairs Archaeologist and Federal Preservation Officer recommended that the Bureau of Indian Affairs conduct an investigation at the site to determine whether ground-disturbing activity was damaging archaeological resources in violation of ARPA. Briefing Statement to Assistant Secretary for Indian Affairs (10/1/2001).

92.     The Bureau of Indian Affairs concluded as of March 2002 that no burials or archaeological resources had *yet* been disturbed on trust land.

93.     The complaints—which continued through 2001 and 2002, notified the Bureau of Indian Affairs, the Secretary of Interior, and the Assistant Secretary of Indian Affairs that continued ground-disturbing activity *would* result in irreparable damage to the Site in violation of applicable law on lands that Interior considered to be trust lands.

94.     The complaining parties included the Alabama Historical Commission, the Governor of Alabama, then-Senator Jeff Sessions, Dr. Craig Sheldon with Auburn University (who had authored several archaeological reports on the Hickory Ground Site), and the City of Wetumpka (via a lawsuit). *See* Letter from L. Warner, Exec. Director of Alabama Historical Commission, to Secretary of Interior (10/26/2001); Letter from D. Siegelman to Secretary of

Interior (11/14/2001); Letter from C. Sheldon to Alabama Historical Commission (1/28/2002); Letter from L. Warner, Exec. Director of Alabama Historical Commission, to Hon. Jeff Sessions (3/14/2002); City of Wetumpka Amended Complaint, Civil Case No. 01-A-1146-N (M.D. Ala. 11/9/2001).

95.    The Alabama State Historic Commission also listed Hickory Ground as a "place in peril" in the year 2000, and listed yet another Poarch casino site in Montgomery as a "place in peril" in 2002, as Poarch's construction of a casino in that location also threatened Muscogee (Creek) burial mounds.

96.    Despite these warnings, Interior (including the National Park Service) failed to conduct the required reviews of Poarch's compliance with the NPS Agreement and failed to enforce federal law.

97.    Such reviews should have taken place by 2004, 2008, and 2012.

98.    The National Park Service did not conduct any such reviews.

99.    If it had, it would have discovered that Poarch violated the NPS Agreement and other federal laws.

**E.    Poarch Builds A Casino Resort Over A Muscogee (Creek) Sacred Site.**

100.    After the 20-year covenant expired in July 2000 and Poarch secured delegation of historic preservation responsibilities, Poarch caused a significant portion of the Hickory Ground Site to be destroyed to make way for its second casino resort (Poarch already had one in Atmore).

101.    At Poarch's direction, archaeologists affiliated with Auburn University conducted a phase III excavation of the Hickory Ground Site.

102.    On information and belief, this excavation commenced in the years following delegation by the National Park Service to Poarch of historic preservation responsibilities, and

27

ended in 2011.

103.    Phase III excavations are designed to record the data a site contains before a project proceeds and the site is lost.

104.    Collecting this data involves the archaeologists disturbing remains, funerary objects, and additional cultural materials through the excavation of soil across the site. After the items are excavated and collected, they are taken to a laboratory where the materials are washed and analyzed. Analysis for the funerary objects and other cultural materials and soil may also include Accelerator Mass Spectrometry dating (carbon-14 dating), chemical analysis, organic residue analysis, and other examinations.

105.    Not all cultural items are removed during a phase II excavation and before construction. Generally, the task of phase III investigators is to record archaeological information about the site before development. Archaeologists remove some material, but other cultural items are left at the site. This means that the construction at Hickory Ground likely destroyed many cultural items forever.

106.    On information and belief, no phase III excavation of the Hickory Ground Site had taken place before the excavation ordered by Poarch after the protective covenant expired.

107.    However, earlier investigations commissioned by Poarch concluded at least as early as 1990 that "well defined and undisturbed cultural remains," including human burials, were abundant at the Site.

108.    To perform the phase III excavation, Auburn University, at the behest of Poarch, obtained archaeological permits under the Archaeological Resources Protection Act. At least some, if not all, of these permits required that the permittee:

    a.    Abide by the "Archaeological Resources Protection Act … and its regulations …

and interdepartmental regulations (25 CFR 261) as to Indian lands";

b. Abide by "the Native American Graves Protection and Repatriation Act of 1990 [and] the regulations for the curation of Federally-owned and administered archaeological collections (36 CFR 79)";

c. Follow special permit conditions requiring that any "[e]xcavation or removal of any Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony must be preceded by consultation or, in the case of tribal lands, consent of the appropriate Indian tribe or Native Hawaiian organization. Consultation should be conducted with the lineal descendants, tribal land owners, Native American representatives, and traditional religious leaders of all Indian tribes and Native Hawaiian organizations that can reasonably be assumed to be culturally associated with the cultural items"; and

d. "[W]ithin approximately 6 weeks of the conclusion of field work," submit "a preliminary report of work performed under th[e] permit, illustrated with representative photographs and listing new and significant collected materials" to the Bureau of Indian Affairs.

109.   Poarch did not comply with the prerequisite conditions listed in the permits.

110.   Poarch did not consult with, or obtain consent from, the Muscogee (Creek) Nation, Hickory Ground Tribal Town, or Mekko Thompson, the recognized traditional religious leader of Hickory Ground Tribal Town, before commencing the phase III excavation at Hickory Ground.

111.   Nor did Poarch submit the required report of work performed under the permits to the Bureau of Indian Affairs.

112.   Likewise, none of the Federal Defendants consulted with, or obtained consent from,

29

the Muscogee (Creek) Nation, Hickory Ground Tribal Town, or Mekko Thompson prior to granting each permit allowing the phase III excavation to take place.

113.    Nor did Interior "ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit," as the permit stated it would do.

114.    With the grant of each ARPA permit, Interior performed a new application of its unauthorized decision to take lands into trust for Poarch, as the ARPA permits only allowed excavations to take place "on lands under the jurisdiction of the Department of Interior."

**F.    To Make Way For Its Casino Resort, Poarch Desecrates The Muscogee (Creek) Human Remains And Funerary Objects.**

115.    The graves at Hickory Ground are abundant and unmarked.

116.    According to Auburn's archeologists who performed initial archaeological investigations at the Hickory Ground Site on behalf of Poarch, "[i]n almost all tested areas evidence of well defined and undisturbed cultural remains were discovered." Sheldon et al., *Additional Archaeological Investigations of the Hickory Ground Site*, p. 27 (1990). "[I]t is virtually impossible to undertake any construction activities without a high probability of seriously damaging the many irreplaceable archaeological deposits, artifacts, and human graves remaining at Hickory Ground." Declaration of Craig Sheldon, p. 3 (9/27/2001).

117.    At least 57 sets of human remains along with their associated funerary objects were exhumed during the phase III excavation.

118.    These human remains represent the direct lineal ancestors of Hickory Ground members. Under Muscogee (Creek) tradition and religion, Mekko George Thompson, as Chief of Hickory Ground, represents those members, including in decisions on the appropriate actions to take with regard to the remains.

119.   Numerous other artifacts were removed from the Site.

120.   On information and belief, Poarch directed that the cultural items from the Hickory Ground Site be stored in a manner that caused, and is continuing to cause, further damage to the items.

121.   Some cultural items, including human remains, are still in storage.

122.   On information and belief, the containers and buildings in which the items were stored (and in which some items, including human remains, are still stored) did not (and still do not) have proper ventilation, did not (and still do not) have temperature controls, improperly separated (and continue to improperly separate) funerary objects from the human remains with which they were buried, and did not (and still do not) otherwise meet minimum curatorial standards.

123.   This manner of storage can cause mold and accelerate decomposition.

124.   This manner of storage is viewed as abhorrent in the Muscogee (Creek) religion.

125.   Over 7,000 archaeological features, representing historic and ancient Muscogee (Creek) buildings, houses, ceremonial locations, and other sacred locations, were recorded during the phase III excavation and then destroyed by the excavation and later construction of the casino.

126.   The remains and artifacts removed from the site were subjected to archaeological examination.

127.   In the Muscogee (Creek) religion, archaeological examination violates the sanctity of tribal ancestors and destroys the ancestors' spiritual existence until they are put back at peace using appropriate religious protocol.

128.   In the Muscogee (Creek) religion, the soil that surrounds a body is considered part of the body, because as the remains decompose, they are absorbed into the soil. Thus, removing

the soil from around the body is akin to removing a limb in the Muscogee (Creek) religion.

129.   On information and belief, Poarch failed to instruct Auburn to treat the soil surrounding human remains as part of the body during the excavation by removing the surrounding soil along with the bones.

130.   As a result, the excavations and subsequent construction resulted in parts of the bodies being permanently removed from the remains and spread across undisclosed locations.

131.   The casino resort was likely built on top of these body parts.

132.   Martin Construction, a construction company owned by a Poarch Band member, performed construction services to build the Wetumpka casino resort from 2012 to 2014.

133.   Martin Construction undertook the majority of these activities *after* Plaintiffs filed a complaint emphasizing the religious and cultural importance of the Site, notifying Defendants of violations of applicable law, and requesting immediate injunctive relief to halt these activities. *See* Dkt. Nos. 1 & 57.

134.   On information and belief, Poarch and/or Martin Construction failed to maintain adequate records of inadvertent discovery of cultural items during construction activities.

135.    On information and belief, Poarch and Martin Construction failed to stop activity when cultural items were discovered.

136.   Constructing a building on a site prevents non-invasive analysis of whether remains are still present under the building.

**G.   Plaintiffs Repeatedly Request That The Hickory Ground Site Be Preserved As Poarch Promised.**

137.   On information and belief, Poarch first notified the Muscogee (Creek) Nation of the phase III excavation in 2006.

138.   By that time, some human remains from the Hickory Ground Site had already been

exhumed and archaeologically examined as part of the phase III excavation.

139.    Beginning in 2006, Plaintiffs engaged in a years-long effort to persuade Poarch not to excavate and desecrate the remains of Plaintiffs' ancestors and other cultural items and to return any cultural items already excavated from Hickory Ground to their original resting place.

140.    This leader-to-leader effort is the traditional way that the Muscogee (Creek) Nation and Hickory Ground attempt to resolve disputes.

141.    This effort to negotiate methods for enforcing the common law and statutory protections of Plaintiffs' rights regarding Hickory Ground eventually failed in 2011.

142.    After visitation and discussion with Poarch and Auburn University in 2006 and 2007 regarding human remains and associated funerary objects that were being exhumed at Hickory Ground, Mekko George Thompson, on behalf of Plaintiffs, sent a letter dated March 12, 2008 to the Director of the National Park Service relaying eight allegations regarding NAGPRA violations arising from disturbance and/or removal of human remains and funerary objects from the Hickory Ground Site.

143.    These allegations were based upon personal observations of Mekko Thompson and other members of Hickory Ground during their visits to the Hickory Ground Site.

144.    In an April 21, 2009 letter from the Department of the Interior to Auburn University, which was copied to Plaintiff Mekko Thompson, Interior conveyed its determination that Plaintiff Thompson's claims and allegations of violations under NAGPRA "have not been substantiated," based on eight factual findings and legal conclusions.

145.    Interior's determination was based largely on its incorrect determination that Poarch retained legal interest in the "NAGPRA items from the Hickory Ground site."  With this determination, Interior once again performed a new application of its unauthorized decision to take

33

lands into trust for Poarch, as the determination relied not only on an incorrect application of NAGPRA, but on the presumption that the lands were "tribal lands" belonging to Poarch within the definitions in NAGPRA.

146.    However, under NAGPRA, Poarch never had either ownership or the right of control over the disposition of the excavated human remains and associated funerary objects. 25 U.S.C. §§ 3002(a), (c)(2)-(3).

147.    Instead, Mekko Thompson, as the representative of all lineal descendants of the ancestors buried at Hickory Ground under the Muscogee (Creek) traditional kinship structure, has ownership and right of control over the disposition of such remains and objects.

148.    Plaintiffs repeatedly requested that the remains of their ancestors and associated funerary objects be reinterred in their original resting places, that no further exhumations occur, that the construction and excavation stop, and that Hickory Ground be preserved in a natural state.

149.    Poarch, through its officials, eventually refused all these requests. Upon information and belief, Poarch never intended to comply with Plaintiffs' requests.

## H.    Poarch Intentionally Excludes The Muscogee (Creek) Nation And Hickory Ground From Decisions About Their Ancestors' Reburial And Conducts The Reburial In Secret.

150.    After the years-long excavations were completed, and with the knowledge that Plaintiffs' religion required the cultural items to be placed in their original and intended final resting place, Poarch hurriedly reburied most of those remains and objects *away from* their final resting places in 2012.

151.    Poarch did so while avoiding having any Muscogee (Creek) or Hickory Ground members present for the reburial.

152.    Poarch accomplished this by unilaterally deciding to rebury the remains in April

2012 without consulting with the Muscogee (Creek) Nation or Hickory Ground Tribal Town, and then purposefully providing late notice of the planned reburial to Mekko Thompson and the Muscogee (Creek) Nation.

153.    On Wednesday, April 4, 2012, Buford Rolin (then-Chair of the Poarch Band) sent letters via hardcopy mail to the P.O. Box addresses for Mekko Thompson and the Muscogee (Creek) Nation Principal Chief. The letters stated that Poarch council members "hope that we" (Mekko Thompson, the Muscogee (Creek) Nation, and Poarch) can "work together regarding re-interment," and asked that Mekko Thompson and the Principal Chief "[p]lease let us know as soon as possible if you would like to join us" for the reburial. Letter to Mekko Thompson attached as Exhibit K hereto.

154.    The letters made no mention of the date of reinterment.

155.    The Principal Chief of the Muscogee (Creek) Nation did not receive the letter, only learning of it after Mekko Thompson brought a copy to his office.

156.    Once the Principal Chief learned about the letter, representatives of the Muscogee (Creek) Nation immediately called Rolin's office and the Poarch Band attorney.

157.    On Friday, April 13, 2012, the Principal Chief of the Muscogee (Creek) Nation, on behalf of the Muscogee (Creek) Nation and Mekko Thompson, sent a response to Rolin via facsimile and mail (attached hereto as Exhibit L) requesting a "Tribal Leader to Tribal Leader" discussion "as soon as possible."

158.    On Tuesday, April 17, 2012, Rolin sent another hardcopy letter (attached hereto as Exhibit M) to Mekko Thompson and the Principal Chief of the Muscogee (Creek) Nation, stating that "[w]hen we did not immediately hear from you in response to our April 4th letter, we assumed you did not wish to participate in the reinterment process" and that "[l]ast week we proceeded with

the reinterment" of the remains and objects "in the manner to which we agreed during prior discussions."

159.   In other words, after six years of negotiations, Poarch sent ambiguous letters to Muscogee (Creek) Nation and Hickory Ground stating that it intended to rebury the remains and objects at some unidentified date in the future. Poarch then unilaterally reinterred the remains and objects without waiting for a response. It conducted the reinterment *less than 10 days* after sending the letters to Mekko Thompson and Chief Tiger.

160.   At no point did any Plaintiff agree to reinterment away from the remains' and associated funerary objects' original resting place.

161.   At the time of the reburial, Poarch was aware that Mekko Thompson and the Muscogee (Creek) Nation wanted the remains and associated funerary objects to be reinterred in their original resting place.

162.   For example, in a letter to the Muscogee (Creek) Nation and Mekko Thompson in November 2010 (attached hereto as Exhibit N), Rolin acknowledged that "the beliefs and customs of the [Hickory Ground ceremonial grounds leadership]" required "reinterment in [the original resting] place," and that Hickory Ground had requested reburial in such places.

163.   At the time of the reburial, Poarch was aware that the remains and associated funerary objects that it was reburying would have to be exhumed again if they were to be reinterred in their original resting place.

164.   During reinterment, Poarch officials performed ceremonies viewed as abhorrent in the Muscogee (Creek) religion because they violate religious protocol, further desecrating and disrespecting the remains of the Hickory Ground people.

165.   On or about July 11, 2012, Poarch announced plans to construct a $246 million

casino resort on Hickory Ground.

166.    Poarch moved forward with casino construction in October 2012, issuing a press release (attached hereto as Exhibit O) stating that "we are being faced with demands to remove ancestral remains that have already been reinterred. . . . We cannot change the fact that remains were found and removed. Those remains are now reinterred and we cannot support disturbing those remains again. . . . [N]o one cares more about the sanctity of our land . . . than we do."

167.    The press release falsely stated that the remains "have been reinterred at Hickory Ground Town [sic] in a manner previously agreed to by traditional leaders in Oklahoma."

168.    In response to continuing objections from the Plaintiffs to the desecration of their sacred site and their ancestors' burial sites, Defendant Stephanie Bryan, on behalf of Poarch, mailed a letter to tribal leaders nationwide.

169.    On information and belief, this letter was sent in 2013.

170.    In the letter (attached hereto as Exhibit P), Bryan attached a "fact sheet" containing statements indicating that Poarch believes that applicable law allows it to destroy and mistreat Muscogee (Creek) human remains and other cultural items on trust lands without notice to, consultation with, or consent from the Muscogee (Creek) Nation.

171.    The letter falsely states that Poarch "is under no legal obligation to negotiate with any other sovereign Indian nation" about activities on its trust lands.

172.    The letter falsely states that the "Wind Creek Wetumpka development protects our past."

173.    The letter also falsely states that "[Poarch] is in compliance with all applicable federal historic and cultural preservation laws pertaining to the property."

174.    The letter also misrepresents the importance, quality, and quantity of the

archaeological resources at the Site, falsely suggesting that they were not well-preserved or significant.

175.    The letter falsely states that it was "consistent with the Muskogee [sic] Tribe's [sic] Constitution" to reinter the remains away from their original resting places "with prayer and ceremony."

176.    The letter falsely states that the remains were "reintered [sic] with dignity and honor."

177.    The letter makes no mention of the phase III excavation or removal of human remains or funerary objects pursuant to the phase III excavation.

178.    The statements listed in Paragraphs 171 to 177 are false and misleading, and highlight the outrageous disrespect with which Poarch treated the religious and cultural beliefs of the Plaintiffs.

**I.     Hickory Ground Today And The False Promise Of Preservation.**

179.    In 1988, the Hickory Ground Site looked like this:



Figure 1. Aerial View of 1EE89. Photo Taken in 1988.

Cameron Wallace Gill, *Ceramic Analysis of Proto-Historic Domestic Structures from 1EE89: A Transitional Culture on the Coosa* 2 (Auburn University Thesis, December 13, 2010).

180.    The Hickory Ground Site looked like this by September 2012 (see next page):



Google Earth Image (9/23/2012).

181.    The numerous archaeological features and cultural items found throughout the Site are shown on the next page:



41

Kelly Ervin, *A Comparative Spatial Analysis of Two Communities from the Hickory Ground Site in Wetumpka, Alabama* 26 (Auburn University Thesis, December 13, 2014).

182.   The archaeological features and cultural items relative to the casino resort are shown below:



*Id.* at 28.

183.   Today, the Hickory Ground Site looks like this:



Google Maps Image (2019).

184.    Poarch's wrongful actions are not only continuing, they are capable of repetition and evading review.

185.    There are still Muscogee (Creek) burials, funerary objects, and other cultural items in the lands at the Hickory Ground Site.

186.    There are also significant Muscogee (Creek) burials, funerary objects, and other cultural items in Poarch's Montgomery lands—which Interior also incorrectly and without authority took into trust.

187.    Under Poarch's stated interpretation of the law, it can destroy these sites and any burials contained therein without notifying the Muscogee (Creek) Nation.

188.    Poarch's conduct demonstrates that it is more than willing to act unilaterally, in breach of its preservation promises made to obtain the land and without regard to the requirements under the NPS Agreement and federal law. Prior to the phase III excavation, Poarch knew that Hickory Ground held historical, cultural, and spiritual significance to the Muscogee (Creek) Nation and Hickory Ground, and that any destruction or unearthing of remains at Hickory Ground would, in Poarch's own words from its preservation grant application, "destroy[] the cultural history of Creek people."

189.    Plaintiffs seek to restore, to the extent possible, the Hickory Ground Site to the condition it was in before the wrongful excavation and construction of the casino resort, to compel Poarch to abide by its agreement to preserve Hickory Ground "without excavation," to hold the Defendants responsible for the outrageous harm they caused to the Plaintiffs, and to declare Defendants' responsibilities under applicable law to prevent continuing violations of the Plaintiffs' rights.

## COUNT I: VIOLATION OF THE INDIAN REORGANIZATION ACT

190.    Under the Indian Reorganization Act, 25 U.S.C. § 5123 *et seq.*, a tribe must have been "under federal jurisdiction" in 1934 in order for Interior to have authority to take land into trust for the tribe. *See also Carcieri v. Salazar*, 555 U.S. 379 (2009).

191.    Because Poarch was not under federal jurisdiction in 1934, *see* Paragraph 76, the Secretary did not have authority to take the Hickory Ground Site into trust for Poarch. Thus, the trust transaction was unlawful, *ultra vires*, and void *ab initio*.

192.    Because the Hickory Ground Site was not validly taken into trust, Interior did not have authority to grant permits allowing the phase III archaeological excavations.

193.    The gaming at the Hickory Ground Site is illegal under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, because such gaming can only occur on certain trust lands. Because it was taken into trust in violation of the Indian Reorganization Act, the Hickory Ground Site does not constitute trust land where gaming can legally occur.

194.    The Hickory Ground Site is properly considered fee land owned by Poarch that is subject to state, not federal, law.

195.    Given Poarch's representations to the Muscogee (Creek) Nation that Poarch would always protect the Hickory Ground Site, Plaintiffs had no reason to believe they would be harmed by Interior's acceptance of the Hickory Ground Site in trust for Poarch in 1985.

196.    It was not until 2006 that Poarch notified the Muscogee (Creek) Nation that Poarch was not protecting the Hickory Ground Site from development "without excavation," as it had promised it would do.

197.    This Court should declare that Interior lacked authority to take land into trust because Poarch was not "under federal jurisdiction," and therefore Interior's taking of the Hickory Ground Site into trust for Poarch was void *ab initio*.

45

198.     Because the trust transaction is void, the Hickory Ground Site is not tribal reservation or federal land. Instead, Poarch retains fee simple title to the Hickory Ground Site.

199.     Gaming on the Hickory Ground Site is thus not legal under applicable Alabama law and the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* (authorizing gaming on "Indian lands" only).

## *OPERATIVE COUNTS IF THIS COURT RULES IN FAVOR OF PLAINTIFFS ON COUNT I AND DETERMINES INTERIOR LACKED AUTHORITY TO TAKE THE HICKORY GROUND SITE INTO TRUST FOR POARCH*

200.     Counts II-IV of this Complaint present claims that are applicable only if the Court determines that the Department of the Interior lacked authority to take the Hickory Ground Site into trust for Poarch.

## COUNT II: UNJUST ENRICHMENT (ALABAMA COMMON LAW)

201.     Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

202.     Poarch unjustly enriched itself by acquiring the Hickory Ground Site at no cost to Poarch and without objection from Plaintiffs based on promises that it would perpetually protect the Site. Instead of preserving the Site in accordance with its promises, Poarch has further unjustly enriched itself by destroying a large part of the Site to make way for a multimillion-dollar casino resort that is generating hundreds of millions of dollars in gambling and resort revenues for Poarch each year.

203.     In its application for federal preservation grant funds, Poarch expressly assured that its acquisition of the Hickory Ground Site would result in the "existing Hickory Ground tribal town in Oklahoma…. know[ing] their home in Alabama is being preserved," "without excavation"; that Poarch would provide "permanent protection of the site"; and that "Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral

46

home." Poarch warned that "[d]estruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people."

204.    Poarch continued to make promises of protection of Hickory Ground in the presence of Muscogee (Creek) Nation prior to Poarch's recognition.

205.    Poarch's bid for federal recognition was accompanied by a proposal to take Hickory Ground into trust as part of Poarch's initial reservation.

206.    Had the Muscogee (Creek) Nation known that Poarch would desecrate Hickory Ground, it would have taken steps to prevent Poarch from acquiring the land and would have opposed Poarch's bid for federal recognition.

207.    In justifiable reliance on Poarch's promises in the federal preservation grant application, including promises that Poarch would provide "permanent protection of the site," "without excavation," so that "Creeks from Oklahoma may return and visit their ancestral home," the Muscogee (Creek) Nation did not object to Poarch's acquisition of Hickory Ground in fee or in trust. Instead, the Muscogee (Creek) Nation supported Poarch's bid for recognition.

208.    Thus, Poarch not only acquired the Hickory Ground Site at no cost, it also gained the benefit of the Muscogee (Creek) Nation's support in its federal recognition bid and the Nation's lack of objection to Poarch acquiring the Hickory Ground Site.

209.    Poarch further unjustly enriched itself by expediting the construction and opening of the casino through (1) knowingly and intentionally breaching the NPS Agreement by *avoiding* providing notice to, or consulting with, Plaintiffs or involving the Plaintiffs in any way with respect to the exhumation or reburial of their deceased family members; and (2) choosing to continue construction after Plaintiffs repeatedly demanded that Poarch cease all plans for development of the Site and return the human remains, funerary objects, and other cultural items to their original

resting places.

210.    Poarch knew that it would not have obtained the preservation funds, the Muscogee (Creek) Nation's support and lack of objection to acquisition of the Site, or the National Park Service's Agreement to entrust it with historic preservation responsibilities if it had disclosed that it would desecrate, damage and destroy large portions of the Site in the future.

211.    It would be inequitable for Poarch, who benefited from acquiring the Hickory Ground Site (at no cost) based on its promises of permanent protection, to profit to the tune of billions of dollars in gambling revenues by breaching those promises and irreparably harming those who trusted that it would keep its promises.

212.    The Court should impose equitable remedies, among other things, requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to abide by Poarch's promises and restore the property, to the greatest extent possible, to its pre-excavation and pre-construction condition.

213.    The Court should order the Federal Officer Defendants to take any actions that may be necessary to implement the above-described equitable remedies.

## COUNT III: PROMISSORY ESTOPPEL (ALABAMA COMMON LAW)

214.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

215.    Poarch promised the Muscogee (Creek) Nation and Hickory Ground that it would preserve the Hickory Ground Site in perpetuity.

216.    The Muscogee (Creek) Nation relied on that promise to its detriment in not objecting to Poarch's acquisition of the property, either in fee or trust, and in supporting Poarch's federal recognition.

217.    Poarch was aware that, had the Muscogee (Creek) Nation known that Poarch would

not protect the Hickory Ground Site as it promised and instead would destroy Plaintiffs' sacred burial grounds and religious sites, the Muscogee (Creek) Nation would have objected immediately to Poarch's acquisition of the land in any status (fee or trust) and made efforts to prevent the acquisition.

218.    The injustice of Poarch enriching itself by breaking its promises and thereby causing irreparable harm to the Muscogee (Creek) Nation and Hickory Ground can only be avoided by enforcing those promises. *See Beatty v. Kurtz*, 27 U.S. 566, 584-85 (1829); *Bessemer Land & Sykes v. Payton*, 441 F. Supp. 2d 1220, 1224 (M.D. Ala. 2006); *Improv. Co. v. Jenkins*, 111 Ala. 135, 148 (1895).

219.    The Court should impose equitable remedies, among other things, requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and Poarch THPO to abide by Poarch's promises and restore the property, to the greatest extent possible, to its pre-excavation and pre-construction condition.

220.    The Court should order the Federal Officer Defendants to take any actions that may be necessary to implement the above-described equitable remedies.

## COUNT IV: OUTRAGE
### (Plaintiff Mekko Thompson Against The Individual Defendants And Defendant Martin Construction)

221.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.  Plaintiff Mekko Thompson is the only Plaintiff asserting a claim under this Count.

222.    Under Alabama law, outrage occurs where the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.

223.    The Individual Defendants, knowing that Hickory Ground and the human remains and funerary objects buried there were sacred in the culture and traditional religion of Mekko Thompson, intentionally and outrageously caused the desecration of Hickory Ground by ordering that the bodies and funerary objects buried there be exhumed, disassociated, dismantled, analyzed, and reinterred in a manner considered abhorrent in the Muscogee (Creek) traditional religion.

224.    Plaintiffs were robbed of the promise they relied upon—that Poarch would always protect the Hickory Ground Site so that it would "be a place where Creeks from Oklahoma may return and visit their ancestral home" and so that the Muscogee (Creek) Nation and Hickory Ground members would "know their home in Alabama is being preserved."

225.    As the living descendants of the deceased, Plaintiffs, including Mekko Thompson, owe a moral and religious duty to their ancestors under Plaintiffs' traditional religion to care for the graves and bodies of the deceased. Failing in that duty is considered to be a failure to one's ancestors, Tribal Town, Clan, and culture. As traditional chief of Hickory Ground Tribal Town, Mekko Thompson has a heightened responsibility to fulfill this duty on behalf of all Hickory Ground Tribal Town members. The Individual Defendants' desecration of Plaintiffs' deceased family members at Hickory Ground has caused and is continuing to cause Mekko Thompson abject pain, sorrow, anguish, torment, suffering, helplessness, grief, and anger.

226.    The remains of the Hickory Ground members' deceased family members were placed in newspaper and plastic bins and left in a non-air conditioned shed through numerous hot Alabama summers. The Individual Defendants even authorized the bodies of infants to be exhumed. Bodies of Plaintiffs' deceased family members were left exhumed, exposed, ill-attended, and disregarded for years before Poarch wrongfully reinterred them away from their final resting places. Some remains, funerary objects, and cultural items have not been reinterred and are still

50

being stored in this manner.

227.    The Individual Defendants intentionally concealed what was happening to Plaintiffs' ancestors from Plaintiffs, including Mekko Thompson. The fact that such a terrible tragedy occurred without their knowledge has imposed an enduring feeling of helplessness and fear in Mekko Thompson that this will happen again. Mekko Thompson, as chief of Hickory Ground Tribal Town, has not been able to assure the children and young people of the Tribal Town, or other related Clan members or Tribal Towns, that the Individual Defendants will be held accountable for their egregious actions, or that Poarch will not commit similar atrocities in the future.

228.    The Individual Defendants further caused emotional distress to Mekko Thompson by exhibiting blatant carelessness about the religious, historical, and cultural importance of the Site to Plaintiffs, and by affirmatively and repeatedly lying about what happened at Hickory Ground. It would have been unthinkable to the Plaintiffs, including Mekko Thompson, that the Individual Defendants would commit such a sacrilege against the ancestors of any people or the desecration of any people's hallowed ground.

229.    The Muscogee (Creek) Nation trusted Poarch and Poarch's leadership, who claim to be Creek people, to understand the Muscogee (Creek) members' religious and cultural duties to their ancestors. Plaintiffs trusted Poarch to protect Hickory Ground forever, just as Poarch promised to do. Instead, the Individual Defendants intentionally prevented Mekko Thompson, and Plaintiffs generally, from fulfilling Plaintiffs' duties to their deceased family members and sacred grounds, and caused Mekko Thompson the irreparable anguish of knowing that the ancestors were wrenched from what was intended to be their final resting places, disrespected, and grotesquely mistreated.

230.    Martin Construction, having notice of the Hickory Ground Site's religious and cultural significance to Plaintiffs and to Mekko Thompson specifically through having been served with Plaintiffs' Complaint, *see* Dkt. Nos. 1 & 57, proceeded with construction on the Hickory Ground Site.

231.    On information and belief, Martin Construction desecrated Plaintiffs' ancestors' remains by dismembering them through removing and discarding soil—part of those ancestors' bodies.

232.    On information and belief, Martin Construction also failed to stop construction even after cultural items were discovered, intentionally desecrating gravesites of extreme religious and cultural importance to Plaintiffs.

233.    The Individual Defendants' and Martin Construction's intentional, extreme, and outrageous behavior caused Mekko Thompson emotional distress so severe that no reasonable person should be expected to endure it. The harm and emotional distress from the Individual Defendants' wrongful actions is, and will be, continuing until such time as Poarch is required to take appropriate remedial measures.

234.    Plaintiffs do not seek monetary damages against any tribal or federal defendant in his or her official capacity. Mekko Thompson seeks monetary damages against the Individual Defendants in their individual capacities, and against Martin Construction, for the tort of outrage that they personally committed against him.

235.    This Court should order the Individual Defendants and Martin Construction to pay damages to Mekko Thompson for the extreme emotional distress they have caused him to suffer.

### *OPERATIVE COUNTS IF THIS COURT RULES AGAINST PLAINTIFFS ON COUNT I*

236.    Counts V-IX of this Complaint present claims that are applicable if the Court determines that the Department of the Interior had authority to, and properly did, take the Hickory Ground Site into trust for Poarch.

### COUNT V: UNJUST ENRICHMENT (FEDERAL COMMON LAW)

237.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

238.    Because the elements of unjust enrichment under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 202 through 213 above without repeating them here.

### COUNT VI: PROMISSORY ESTOPPEL (FEDERAL COMMON LAW)

239.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

240.    Because the elements of unjust enrichment under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 215 through 220 above without repeating them here.

### COUNT VII: VIOLATION OF THE NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT

241.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

242.    Enacted in 1990, NAGPRA safeguards the rights of Native Americans by protecting tribal burial sites and rights to items of cultural and religious significance to Native Americans. Cultural items protected under NAGPRA include Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony. 25 U.S.C. § 3001(3). NAGPRA

was intended to protect the dignity of the human body after death by ensuring that Native American graves and remains be treated with respect.

243.    NAGPRA confers jurisdiction to federal courts over "any action brought by any person alleging a violation of this Act." 25 U.S.C. § 3013.

244.    Under NAGPRA, the intentional removal or excavation of Native American cultural items from Federal or tribal lands is permitted only if:

a.  Such items are excavated or removed pursuant to a permit issued under section 470cc of Title 16, which states that, before any permit is issued, "any Indian tribe which may consider the site as having religious or cultural importance" be notified and meaningfully consulted if such issuance "may result in harm to, or destruction of, any religious or cultural site";

b.  Such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate Indian tribe under 25 U.S.C. § 3002(c), 43 C.F.R. § 10.5, 25 C.F.R. § 262.5(d) (providing that "[d]etermination as to which tribe is the appropriate tribe shall be made in accordance with § 262.8(a)"), and 25 C.F.R. § 262.8(a) (listing lineal descendants as having the highest priority);

c.  The custody (ownership and right of control) of the disposition of such items is compliant with the priority order provided in NAGPRA, 43 C.F.R. § 10.6; *and*

d.  Proof of consultation or consent is shown to the Federal agency official responsible for the issuance of the required permit.

25 U.S.C. § 3002(c); 43 C.F.R. §§ 10.3, 10.5, 10.6; 25 C.F.R. § 262.5(d); and 25 C.F.R. § 262.8(a).

245.    Sections 5 and 7 of the NPS Agreement likewise require Poarch to consult with Indian tribes on whose traditional lands the planned activity will occur, along with associated

54

individuals and groups who would be affected by Poarch's activity on such lands.

246.    As a delegee of federal functions, Poarch and its officials performing the delegated functions are federal actors, liable as federal officials.

247.    The following paragraphs allege multiple independent violations of NAGPRA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

248.    Neither Poarch nor the Federal Defendants followed any of the requirements listed in Paragraph 244.

249.    Likewise, Poarch violated the NPS Agreement by failing to consult with Plaintiffs prior to authorizing excavations and construction on the Hickory Ground Site.

250.    NAGPRA and its associated provisions in ARPA require consent from the Muscogee (Creek) Nation, as *parens patriae* representative of the lineal descendants at the Site and as the tribe with the closest cultural and religious connection to the Site, prior to excavation of Native American cultural items from the Hickory Ground Site. *See* 25 C.F.R. § 262.5(d), 262.8(a).

251.    As the traditional kinship system representative of lineal descendants of those buried at the Hickory Ground Site, Mekko Thompson has the right to custody of the human remains and associated funerary objects at the Hickory Ground Site. *See* 25 U.S.C. § 3002; 43 C.F.R. §§ 10.6, 10.14.   As the tribe most closely culturally and religiously affiliated with the Hickory Ground Site, the Muscogee (Creek) Nation has the right to custody over all other cultural items at the Site. *Id.*; *see infra* Paragraphs 262-270.

252.    In violation of NAGPRA and ARPA, neither Poarch nor the Federal Defendants have given custody of (1) the human remains and funerary objects excavated at the Hickory

Ground Site to Mekko Thompson; or of (2) the other cultural items found at the Site to the Muscogee (Creek) Nation. 25 U.S.C. § 3002; 43 C.F.R. § 10.3; 25 C.F.R. § 262.5(d); 25 C.F.R. § 262.8(a).

253.     The National Park Service also violated NAGPRA by failing to establish a preservation program for the protection of historic properties that ensures that the agency's procedures for compliance with Section 106 of the NHPA "provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of [NAGPRA]." 25 U.S.C. § 3002(c).

254.     No final inventory or report regarding the cultural items recovered at the Hickory Ground Site has been prepared, nor was the Muscogee (Creek) Nation consulted regarding such report, as required by NAGPRA.

255.     Furthermore, on information and belief, Poarch and Martin Construction violated NAGPRA by failing to follow its mandatory procedures regarding inadvertent discoveries of cultural items. On information and belief, no report of such discoveries was made to the appropriate officials, and even if there were such reports, Poarch and Martin Construction failed to stop the construction activity and take reasonable steps to protect the cultural items before resuming activity. *See* 25 U.S.C. § 3002(b)-(c) and 43 C.F.R. § 10.4.

256.     Had Poarch and the Federal Defendants complied with the consultation requirements of NAGPRA, they would have been informed that the Muscogee (Creek) religion requires the following:

     a.   That no destructive scientific study take place on the cultural items, as such testing violates the Muscogee (Creek) religious beliefs that the dead should remain undisturbed;

b.  That, if disturbance is absolutely unavoidable, all parts of the human remains, including the surrounding soils, be removed and held together during excavation;

c.  That, if disturbance is absolutely unavoidable, the excavated remains and funerary objects be stored together in a certain fashion;

d.  That, if disturbance is absolutely unavoidable, Mekko Thompson, as religious and ceremonial leader of Hickory Ground, prescribe removal and reburial procedures that must be followed for the cultural items under Muscogee (Creek) religious protocol, including protocol for bundling of the remains and funerary objects;

e.  That, if disturbance is absolutely unavoidable, Mekko Thompson and other representatives of the Muscogee (Creek) Nation be present during handling of any remains or funerary objects, for any purpose, to ensure that such treatment conformed with, to the greatest extent possible, the Muscogee (Creek) religion.

257.    Had Poarch and the Federal Defendants complied with NAGPRA, the Muscogee (Creek) Nation would have refused consent for the excavation of the Hickory Ground Site.

258.    Even if the Muscogee (Creek) Nation's advance consent were not required prior to any excavation and construction (it was), NAGPRA still required Poarch and the Federal Defendants to meaningfully consult with the Muscogee (Creek) Nation prior to excavation or construction. If Poarch and the Federal Defendants had consulted with Plaintiffs as they were required to do under NAGPRA, they could have avoided tragedies such as the permanent separation of body parts from the human remains of Plaintiffs' deceased family members.

259.    Further, if Poarch and Martin Construction had followed NAGPRA's procedures for inadvertent discoveries, further tragedies such as the permanent loss of remains and other cultural items could have been avoided.

260.   NAGPRA gives this Court the "authority to issue such orders as may be necessary to enforce" the statute. 25 U.S.C. § 3013.

261.   To enforce the statute, this Court should issue an injunction requiring Poarch Council Defendants, the PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants to obtain consent from the Muscogee (Creek) Nation for the excavation and construction of the casino resort, and, if the Muscogee (Creek) Nation does not consent:

  a.   Requiring the Poarch Council Defendants, Poarch THPO, and PCI Gaming Authority Board Defendants to undo, to the greatest extent possible, the unconsented-to actions and restore the Site to its prior condition, to the greatest extent possible;

  b.   Requiring the Federal Officer Defendants and Auburn to make such approvals and take such actions as may be necessary to accomplish reversal of the unconsented-to actions and restoration of the Site;

  c.   Requiring Poarch Council Defendants, the Poarch THPO, the PCI Gaming Authority Board Defendants, the Federal Officer Defendants, and Auburn to involve the Muscogee (Creek) Nation throughout this process, including abiding by the Muscogee (Creek) Nation's instructions regarding how all cultural items should be handled at all stages of the process; and

  d.   Ordering such relief against Martin Construction as may be appropriate given its violations of NAGPRA's provisions regarding inadvertent discoveries and its continuation of construction despite Plaintiff's lawsuit.

**COUNT VIII: PORTIONS OF NAGPRA AND ARPA, IF CONSTRUED IN A MANNER THAT RESULTS IN A SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGION, VIOLATE THE FIRST AMENDMENT, THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT, AND THE RELIGIOUS FREEDOM RESTORATION ACT**

262.     Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

263.     The First Amendment of the United States Constitution prohibits Congress from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof."

264.     Similarly, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibits the government from imposing or implementing "a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B)  is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.S. § 2000cc.

265.     Likewise, the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*,  was enacted in 1993 and requires that federal governmental action that substantially burdens a tribe's religious practice or exercise must  promote a compelling interest (rather than simply having a rational basis). Its protections encompass tribal religious beliefs. *See* American  Indian Religious  Freedom  Act,  42 U.S.C. §§ 1996, *et seq*.

266.     NAGPRA and related provisions in ARPA are laws specifically directed at religion and religious practice, and establish rules governing whether intentional removal or excavation of Native American cultural items from Federal or tribal lands can take place. If such excavation *can* take place, NAGPRA establishes a priority preference regarding who should be given the excavated cultural items.

267.     Specifically, excavation of Native American cultural items from tribal lands is not

permitted without the consent of the "appropriate Indian tribe." *See supra* ¶ 244. If excavation is allowed, NAGPRA provides that the cultural items be given to, in order of priority: first, the lineal descendants; second, the tribal landowner (in the event lineal descendants cannot be ascertained); third, the tribe who aboriginally occupied the subject lands; and fourth, the tribe with the "strongest cultural relationship" with the cultural items.

268.    As discussed in greater detail above, Plaintiffs owe a moral and religious duty to their ancestors under Plaintiffs' traditional religion to ensure protection of the graves, bodies, and cultural items of the deceased. If those graves, bodies, or cultural items are disturbed, Plaintiffs are required by their religion to bring such remains or items back to peace with the appropriate religious protocol. Government action that does not allow them to do so forces them to choose between either abandoning their religious beliefs or facing civil or criminal sanctions for fulfilling their religious duty to their ancestors.

269.    To the extent that the requirement of consent of the "appropriate Indian tribe" under ARPA and the related provisions in NAGPRA are interpreted to allow any tribe other than the Muscogee (Creek) Nation to provide consent for excavation or removal of cultural items with respect to the Hickory Ground Site, (1) there is no compelling governmental interest, or even rational basis, justifying the attendant burden on Plaintiffs' religion, (2) the law does not use the least restrictive means to further the governmental interest; and (3) these provisions violate the First Amendment as applied to the Muscogee (Creek) Nation, and irreconcilably conflict with the Religious Land Use and Institutionalized Persons Act and Religious Freedom Restoration Act.

270.    To the extent that NAGPRA and the related provisions in ARPA are interpreted to provide higher priority of ownership of the excavated cultural items in any entity other than Mekko Thompson or the Muscogee (Creek) Nation, (1) there is no compelling governmental interest, or

even rational basis, justifying the attendant burden on Plaintiffs' religion, (2) 25 U.S.C. § 3002(a)(2) and associated provisions do not use the least restrictive means to further the governmental interest; and (3) 25 U.S.C. § 3002(a)(2) and associated provisions (i) violate the First Amendment as applied to Plaintiffs, who have an inviolable religious and cultural right to the remains and other cultural items, and (ii) irreconcilably conflict with the Religious Land Use and Institutionalized Persons Act and Religious Freedom Restoration Act.

## COUNT IX: VIOLATION OF THE ARCHEOLOGICAL RESOURCES PROTECTION ACT

271.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

272.    Under ARPA, "[n]o person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is pursuant to a permit issued under [16 U.S.C. § 470cc]." 16 U.S.C. § 470ee; *see also* 25 C.F.R. § 262.3(a).

273.    16 U.S.C. § 470cc(c), 25 C.F.R. § 262.5, 25 C.F.R. § 262.7, and the permits obtained by Auburn to excavate at the Hickory Ground Site require that, at least 30 days before issuing the permit, the Federal land manager notify all Indian tribes which may consider the site as having religious or cultural importance if the permit may result in harm to, or destruction of, any religious or cultural site, as determined by the Federal land manager.

274.    The following Paragraphs allege multiple independent violations of ARPA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

275.    On information and belief, Poarch officials falsely represented that no religious or cultural site would be harmed or destroyed by the proposed work at Hickory Ground, in violation

61

of ARPA, 25 C.F.R. § 262.5(c); the NPS Agreement; and Poarch's agreement to perpetually preserve Hickory Ground.

276.   ARPA also requires consent from the Muscogee (Creek) Nation, as *parens patriae* of the lineal descendants of those buried at the Site and as the tribe with the closest cultural and religious connection to the Site, prior to excavation of Native American cultural items from the Hickory Ground Site. *See* 25 C.F.R. §§ 262.5(d), 262.8(a).

277.   The Federal Defendants did not notify, consult with, or get consent from the Muscogee (Creek) Nation prior to issuing the ARPA permits, and did not ensure Poarch notified, consulted with, or obtained consent from the Muscogee (Creek) Nation, in violation of ARPA, the permit conditions, the NPS Agreement, and the Federal Defendants' trust responsibility to the Muscogee (Creek) Nation.

278.   Even if it were legal to issue such permits without the Muscogee (Creek) Nation's consent (it is not):

    a.   Poarch did not meet the conditions precedent of those permits;

    b.   The Bureau of Indian Affairs issued permits allowing excavation of Hickory Ground without verifying that the conditions precedent were met;

    c.   Neither Poarch nor the Federal Defendants notified or consulted with the Muscogee (Creek) Nation to discuss its interests, including ways to avoid or mitigate potential harm or destruction, prior to the Bureau of Indian Affairs issuing the permits, in violation of ARPA;

    d.   The activities pursuant to the permits were "inconsistent with a[] management plan"—specifically, the NPS Agreement and Poarch's agreement to perpetually preserve the Hickory Ground Site;

e. Poarch failed to curate the archaeological resources in accordance with 36 C.F.R. § 79;

f. The Bureau of Indian Affairs did not "ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit."

*See* Permit Conditions, *supra* Paragraph 108; 16 U.S.C. § 470cc(b)(4); 43 C.F.R. § 7.7; 25 U.S.C. § 3002(c).

279. Furthermore, on information and belief, Poarch (and/or Auburn at the behest of Poarch) obtained some permits under section 470cc of Title 16, but such permits did not cover the full time period during which the phase III excavations were performed under Poarch's direction on the Hickory Ground Site.

280. Thus, Poarch also violated ARPA by causing the excavation, removal, damage, alteration and defacement of archaeological resources at the Hickory Ground Site without a valid permit, as Poarch failed to meet the permit conditions precedent listed in Paragraph 108.

281. Because the above ARPA provisions are incorporated into NAGPRA, this Court has the "authority to issue such orders as may be necessary to enforce" those provisions. 25 U.S.C. § 3013.

282. To enforce these provisions, this Court should issue an injunction requiring the Poarch Council Defendants, the PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants to obtain consent from the Muscogee (Creek) Nation for the excavation and construction of the casino resort, and, if the Muscogee (Creek) Nation does not consent, issue an injunction:

a. Requiring the Poarch Council Defendants, the PCI Gaming Authority Board

Defendants, and the Poarch THPO to undo, to the greatest extent possible, the unconsented-to actions and restore the Site to its prior condition, to the greatest extent possible; and

b. Requiring the Federal Officer Defendants and Auburn to make such approvals and take such actions as may be necessary to facilitate reversal of the unconsented-to actions and restoration of the Site.

### ***OPERATIVE COUNTS REGARDLESS OF RULING ON COUNT I***

283.    Counts X through XI present claims that are applicable regardless of how the Court rules on Count I, which relates to the authority of the Department of the Interior to take the Hickory Ground Site into trust for Poarch.

### <u>COUNT X: VIOLATION OF THE NATIONAL HISTORIC PRESERVATION ACT</u>

284.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

285.    The Hickory Ground Site is subject to protection under the NHPA because it is listed as a historic property on the National Register of Historic Places.

286.    On information and belief, the Hickory Ground Site is currently considered to include both tribal land (reservation lands, 54 U.S.C. § 300319) and federally-controlled land (trust land, 54 U.S.C. § 306101) as defined in the NHPA.

287.    The Secretary of Interior and the National Park Service are responsible for delegations of their historic preservation responsibilities, including consulting with tribes whose aboriginal land may be affected by such delegation. 54 U.S.C. § 302702. Despite any such delegation, the National Park Service and Bureau of Indian Affairs retain all non-delegable responsibilities arising from the trust relationship between the United States and the Muscogee (Creek) Nation. *See* 36 C.F.R. § 800.2(c)(2)(ii)(B)-(C).

288.    When the National Park Service delegates its authority, the delegee carries out the delegated responsibilities on behalf of the National Park Service. Poarch's assumption of responsibility under the NHPA pursuant to federal law means that Poarch acts as a *de facto* government agency with respect to the delegated responsibilities.

289.    Poarch's, the National Park Service's, and the Bureau of Indian Affairs' performance of (and failure to perform) their historic preservation responsibilities regarding the Hickory Ground Site are an "undertaking" within the meaning of 54 U.S.C. § 300320.

a.    Poarch received federal financial assistance to carry out its historic preservation responsibilities. *See, e.g.*, 2011 Preservation Grant Announcement, *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/press_release/pdf/idc014222.pdf (awarding Poarch over $30,000).

b.    The excavation and construction at the Hickory Ground Site also required prior Bureau of Indian Affairs' approval under ARPA, the excavation permit conditions, NAGPRA, and the trust responsibilities arising therefrom. Furthermore, the gaming at the Hickory Ground site required the approval of gaming ordinances by Interior—an approval that is dependent on the land validly being held in trust.

290.    The following Paragraphs allege multiple independent violations of NHPA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

**A.    Interior And Poarch Failed To Comply With Their Obligations To Meaningfully Consult With Plaintiffs.**

291.    The NHPA requires Interior to consult with "any Indian tribe … that attaches religious and cultural significance to" a historic property. 54 U.S.C. § 302706.

292.    This consultation duty extends through the entire NHPA Section 106 process. *See*

36 C.F.R. §§ 800.2, 800.4(a)(4), 800.4(d)(2), 800.5(a), 800.5(d)(2), 800.6.

293.   Interior never consulted with the Muscogee (Creek) Nation regarding the excavation or construction of a casino resort on the Hickory Ground Site, or the reburial of the human remains and associated funerary objects, in violation of the aforementioned provisions and its trust responsibilities to the Muscogee (Creek) Nation.

294.   The Federal Defendants and Poarch also failed to invite the Advisory Council on Historic Preservation to participate in the Section 106 process regarding Poarch's planned activities prior to those activities being undertaken, as required by the NHPA.

295.   Poarch did not consult with the Muscogee (Creek) Nation prior to authorizing the phase III excavation; actively avoided consulting with the Muscogee (Creek) Nation regarding the reburial of the human remains and associated funerary objects; and did not meaningfully consult with the Muscogee (Creek) Nation regarding the construction of the casino resort, as Poarch made no adjustments to its plans in response to the adverse effects the construction would clearly have on the Hickory Ground Site.

296.   The National Park Service has never consulted with the Muscogee (Creek) Nation regarding the continued delegation to Poarch of historic preservation responsibilities, despite the continuing threat to Muscogee (Creek) religious and cultural sites caused by the continuing delegation. These failures violate the 54 U.S.C. §§ 302702 & 302706, the NPS Agreement, and the National Park Service's trust responsibilities to the Muscogee (Creek) Nation.

**B.     Interior And Poarch Failed To Take Into Account The Effect On The Hickory Ground Site Of Allowing Excavation And Construction Of A Casino Resort, And Interior Failed To Take Into Account The Effect On The Hickory Ground Site Of Delegating Historic Preservation Responsibilities To Poarch.**

297.   The NHPA requires Interior to "take into account the effect of [any] undertaking" on any National Register-listed site, in consultation with all tribes that "attach[] religious and

cultural significance" to the site. 54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.5.

298.    Poarch is required to do the same under the NPS Agreement.

299.    The Bureau of Indian Affairs did not take into account, or consult with the Muscogee (Creek) Nation regarding, the effect of approving/licensing Poarch's excavation of the Hickory Ground Site before granting permits for the excavation, and did not take into account the effect of Poarch's construction of a casino resort over the Hickory Ground Site before approving the gaming operation at the Site.

300.    Poarch likewise did not take into account, or consult with the Muscogee (Creek) Nation regarding, the effect of Poarch's excavation of cultural resources and construction of a casino resort over the Hickory Ground Site.

301.    The National Park Service failed to take into account the effect of delegating preservation responsibilities to Poarch on the Hickory Ground Site before executing such delegation, and has failed to take into account the effect of *continuing* to delegate such responsibilities after Poarch failed to comply with the NPS Agreement and other applicable law.

302.    The National Park Service further violated the NPS Agreement and the NHPA by failing to perform the required reviews of Poarch's performance under the Agreement and by failing to perform required reviews of the threats to the Hickory Ground Site. *See* NPS Agreement Section 14; 54 U.S.C. §§ 302108.

303.    Had the National Park Service timely performed evaluations of Poarch's compliance with the NPS Agreement, it would have "determine[d] that a major aspect of [the tribal] program is not consistent with" the NHPA, obligating the Secretary to "disapprove the program and suspend in whole or in part any contracts or cooperative agreements … until the program is consistent with [the NHPA]." 54 U.S.C. § 302302; *see* also NPS Agreement § 15.

**C.**   **Interior and Poarch Failed To Seek Ways To Avoid, Minimize, Or Mitigate The Harm To The Hickory Ground Site.**

304.    36 C.F.R. § 800.6 required Interior and Poarch (through the NPS Agreement) "to seek ways to avoid, minimize, or mitigate the adverse effects" of the casino project on the Site through, in part, (1) consulting with the Muscogee (Creek) Nation and (2) inviting the Advisory Council on Historic Preservation to participate in the Section 106 process.

305.    The excavation of, and construction of a casino resort at, the Hickory Ground Site and the reburial of excavated human remains and associated funerary objects had numerous foreseeable adverse effects, including but not limited to violations of the Muscogee (Creek) religion, physical destruction and desecration of part of a Muscogee (Creek) sacred site; a change of the character of the property's use or of physical features within the Site's setting that contribute to its historic significance; and introduction of visual, atmospheric, and audible elements that diminish the integrity of the Site's significant historic features. 36 C.F.R. § 800.5(a).

306.    Neither Poarch nor Interior sought ways to avoid, minimize, or mitigate the adverse effects to the Hickory Ground Site prior to commencement of:

      a.    The phase III excavation;

      b.    The reburial of human remains and associated funerary objects; or

      c.    The construction on the Site.

307.    No memorandum of agreement was executed or implemented with respect to the Hickory Ground Site. 36 C.F.R. § 800.6.

308.    Even if it were legal to excavate the Hickory Ground Site without the consent of the Muscogee (Creek) Nation (it is not), the Poarch Council Defendants', PCI Gaming Authority Board Defendants', and Martin Construction's decision to proceed with the casino project without first completing the required historic preservation review process foreclosed options that would

provide greater—and crucial—protection to burials and the Site, including a no-build alternative and alternative locations.

309.    To the extent that Federal Defendants have concluded that any effects of the phase III excavation, construction, or reburial would be acceptable or adequately mitigated, such conclusion represents a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and thus a violation of the NHPA and the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

**D.    Poarch Violated Its Historic Preservation Responsibilities Under the NPS Agreement.**

310.    Poarch's failure to notify and consult with Plaintiffs or take into account Plaintiffs' views on its planned actions that would affect the traditional lands (i.e., the Hickory Ground Site) of the Muscogee (Creek) Nation violated Poarch's responsibilities under Section 7 of the NPS Agreement.

311.    Poarch's failure to follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800, including its failure to consult with the appropriate federal agencies in accordance with Section 106, violated Poarch's responsibilities under Sections 1(G) and 5 of the NPS Agreement.

**E.    Poarch's And The Federal Defendants' Violation Of Their Historic Preservation Responsibilities Has Caused Serious, Irreparable, And Ongoing Harm to Plaintiffs.**

312.    Had the Federal Defendants or Poarch timely consulted the Muscogee (Creek) Nation regarding the planned activities at the Hickory Ground Site, destruction of a holy site of cultural and religious significance to the Nation could have been avoided, or, even if the activities had continued, Plaintiffs could have in the very least instructed the Federal Defendants and Poarch regarding how to treat the cultural items excavated at the site to avoid further mistreatment of the items in violation of the law and the Muscogee (Creek) religion.

313.    Had the Federal Defendants and Poarch timely involved the Advisory Council on Historic Preservation prior to excavation and construction of a casino resort over the Hickory Ground Site, the Advisory Council would have alerted the Federal Defendants and Poarch of the dire effects of the planned undertaking on Hickory Ground and the necessity of consulting with the Muscogee (Creek) Nation.

314.    When the Advisory Council on Historic Preservation was finally notified of Poarch's excavation activities in 2006, it opined that the actions undertaken by Poarch had "adversely affected the National Register-listed property," and that "the archaeological surveys and data recovery were not carried out in compliance with Section 106 of the NHPA." Letter from ACHP to National Indian Gaming Commission NEPA Compliance Officer, p. 1 (Nov. 14, 2006), attached hereto as Exhibit Q.

315.    The Advisory Council concluded that Section 106 had been violated because "there was no Federal agency review of the archaeological investigations carried out by the Poarch Band … [and] no consultation with any other Indian tribe, particularly the Muscogee Creek Nation. The initial notification of the ACHP (see 36 CFR 800.6(a)(1)) did not occur until after the destruction of the site. Furthermore, there is no indication that the public has been notified about the nature of the undertaking and its effects on historic properties (36 CFR 800.3(e))." *Id.* at 2. "Since the Section 106 process must be initiated by a Federal agency *prior to* the initiation of project activities, it is unclear why the applicant, a tribe with a tribal historic preservation office approved by the National Park Service pursuant to Section 101(d)(2) of the NHPA, proceeded with project planning and archaeological investigations." *Id.* at 1 (emphasis added).

**F.    The National Park Service Has Illegally Continued To Award Federal Preservation Funds to Poarch.**

316.    Section 110(k) of the NHPA prohibits a Federal agency from granting "assistance

70

to an applicant who, with intent to avoid the requirements of Section 106, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed such significant adverse effect to occur." 36 C.F.R. § 800.9.

317. Poarch "intentionally significantly adversely" affected the Hickory Ground Site, over which it was delegated federal historic preservation responsibilities, with intent to avoid the requirements of Section 106, and had the legal power to prevent such adverse effects but instead allowed the adverse effects to occur.

318. Interior has continued to award federal preservation grants to Poarch in violation of Section 110(k) of the NHPA. *See, e.g.*, 2019 Preservation Grant Announcement, *available at* https://www.nps.gov/orgs/1207/shpo_thpo_2019.htm (awarding Poarch $55,000); 2018 Preservation Grant Announcement, *available at* https://www.doi.gov/pressreleases/interior-and-national-park-service-announce-more-60-million-historic-preservation (awarding Poarch over $56,000); 2011 Preservation Grant Announcement, *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/press_release/pdf/idc014222.pdf (awarding Poarch over $30,000).

319. This Court should order that the Federal Officer Defendants terminate their delegation of historic preservation authority to Poarch and to cease awarding any historic preservation grants to Poarch.

320. This Court should issue an injunction requiring the Poarch Council Defendants, PCI Gaming Authority Board Defendants, Poarch THPO, and the Federal Officer Defendants to comply with the NHPA and consult with the Muscogee (Creek) Nation to avoid or mitigate further adverse effects to the Hickory Ground Site during restoration of the Site in accordance with the requested relief in this Complaint.

71

## COUNT XI: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

321.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding Paragraphs.

322.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*, was enacted in 1993 and requires that federal governmental action that substantially burdens a tribe's religious practice or exercise must promote a compelling interest (rather than simply having a rational basis). Its protections encompass tribal religious beliefs. *See* American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq*.

323.    Hickory Ground is a significant and sacred place to the Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Mekko George Thompson. Hickory Ground is a sacred site unique to the Plaintiffs and the religious significance of it and the activities that occur there cannot be replicated elsewhere.

324.    Hickory Ground also is a significant and sacred place to Plaintiffs because the remains of their ancestors were ceremonially buried there. The ceremonial ground located there is regarded as a sacred place for prayer.

325.    Under Plaintiffs' religion, they owe a moral and religious duty to their ancestors to care for the graves and bodies of the deceased. Living tribal members—descendants of the deceased—will fail in that duty if they are not permitted to complete required religious protocol and return the bodies of their ancestors, along with their funerary objects, to their intended final resting places. Government action that does not allow them to fulfill this duty forces them to choose between either abandoning their religious beliefs or facing civil or criminal sanctions for fulfilling their religious duty to their ancestors. Indeed, when Muscogee (Creek) citizens and Hickory Ground Tribal Town members tried to comply with their religious duties at the Hickory Ground Site in 2013, they were arrested and charged with crimes. *See, e.g.,* Casey Toner, *Ancient*

72

*Indian burial ground dispute at Wind Creek Casino set for Wednesday trial*, AL.com, Jan. 14, 2015, *available at* https://www.al.com/news/2015/01/poarch_creek_muscogee_wind_cre.html.

326.    Under Plaintiffs' religion, their ancestors are not and will not be at peace unless properly buried in accordance with Plaintiffs' traditional religious protocol.

327.    Under Plaintiffs' religion, the ceremonial grounds cannot be entered or altered without prior authorization and cleansing rituals. Poarch has allowed, and continues to allow, access to the ceremonial grounds by unauthorized persons who desecrate the ceremonial grounds by not following these rituals and by altering the grounds in violation of Plaintiffs' religion.

328.    It is sacrilegious in the Muscogee (Creek) traditional religion to have alcohol anywhere near ceremonial grounds. In violation of this belief, the casino serves alcohol at all times the casino is open, in close proximity to the ceremonial grounds. Indeed, the front page of the Wind Creek Wetumpka site prominently features alcohol:





Wind Creek Wetumpka site, https://windcreekwetumpka.com/ (last visited May 22, 2019).

329.    Excavation and construction of the casino, buildings, parking lots, and other facilities at Hickory Ground, and Poarch's and the Federal Defendants' exclusion of Plaintiffs during the handling, treatment, and reburial of their ancestors' remains and funerary objects, substantially burden Plaintiffs' exercise of their religious practices because these actions have, and will continue to:

      a.  Prevent Plaintiffs from fulfilling their ongoing religious obligations to their ancestors to ensure that their deceased family members' bodies are left at peace in their original resting places and treated with respect and the proper religious protocol;

      b.  Actively desecrate the ceremonial grounds site and the bodies buried there by leaving them where (1) persons unqualified and unauthorized to bury the bodies failed to observe the required protocol and thus left the bodies perpetually disturbed; and (2) prohibited substances and practices (such as the proximity of alcohol, intoxicated patrons, and entrance into the ceremonial grounds by unauthorized persons who have not performed the required rituals) continue to desecrate the ceremonial grounds;

      c.  Desecrate and damage a hallowed ground for practitioners of Muscogee (Creek) traditional religion.

330.    The above-listed actions will prevent Plaintiffs—absent acts of civil or criminal disobedience—from exercising their religious obligations to their ancestors unless and until the bodies and their associated funerary objects are placed back into their final resting places following the proper religious protocol and the active desecration of the ceremonial grounds ceases.

331.    No compelling government interest makes destruction of the Hickory Ground Site or continued operation of a third casino resort for Poarch necessary. The public interest, as expressed in NAGPRA, ARPA, the NHPA, the ARPA permit conditions, the NPS Agreement, is to *preserve* sites of historic, cultural, and religious importance, with paramount importance placed on consultation with affected tribes. Especially here, where Poarch's own promises to the Muscogee (Creek) Nation, the federal government and the public at large indicated that Poarch and the federal government *knew* the religious and cultural importance of Hickory Ground to Plaintiffs and indicated that Poarch had no plans to *ever* build a commercial development on the Hickory Ground Site (and instead acquired the Site to *prevent* this), there is no indicia that there is any public interest in having a commercial development at the Site.

332.    The federal government has at its disposal other, less restrictive means to serve any compelling interest it has while permitting Plaintiffs' to fulfill their religious duties.

333.    The Federal Defendants and Poarch have substantially burdened Plaintiffs' religious  freedoms by preventing them from fulfilling their religious duties to their ancestors and by illegally allowing excavation and construction of a casino resort over a large portion of a sacred site of critical religious importance to the Plaintiffs.

334.    This Court should order that the Federal Officer Defendants, Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO cease preventing Plaintiffs from fulfilling their religious obligations. Specifically, this Court should order that the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO cause the Hickory Ground Site to be restored, to the greatest extent possible, to the condition it was in prior to the phase III excavation, construction, and reburial, and that the Federal Officer Defendants and Auburn take the necessary actions to facilitate this process.

## PRAYER FOR RELIEF

WHEREFORE, incorporating, restating, and re-alleging all preceding Paragraphs, the Plaintiffs respectfully request that this Court:

(a) Enter a judgment declaring that Interior lacked authority to take the Hickory Ground Site into trust for Poarch, and an order in the nature of mandamus requiring that Secretary Bernhardt take the Hickory Ground Site out of trust;

(b) If this Court enters the judgment and order described in Paragraph (a):

   i. Enter a judgment declaring that Poarch should be held to its promises to perpetually preserve the Hickory Ground Site under the Alabama common law doctrines of unjust enrichment and promissory estoppel;

   ii. Enter an order imposing a remedy of constructive trust over the Hickory Ground Site as relief for Poarch's breach of its promises to the Muscogee (Creek) Nation;

   iii. Enter a judgment declaring that the Individual Defendants' and Martin Construction's actions constituted outrage, and an order awarding appropriate monetary damages to Mekko Thompson;

   iv. Enter a judgment declaring that Poarch violated the NHPA and the NPS Agreement;

   v. Enter an order in the nature of mandamus requiring Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO to abide by the NHPA with respect to the Hickory Ground Site;

   vi. Enter an order in the nature of mandamus requiring that Federal Officer Defendants comply with the NHPA by terminating any delegations of historic preservation authority to Poarch and ceasing awarding federal

76

preservation grants to Poarch.

(c) In the alternative, if this Court does not enter the judgment and order described in Paragraph (a), it should:

    i.  Enter a judgment declaring that Poarch should be held to its promises to perpetually preserve the Hickory Ground Site under the federal common law doctrines of unjust enrichment and promissory estoppel;

    ii.  Enter an order in the nature of mandamus requiring Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO to cause the Hickory Ground Site to be protected perpetually in accordance with its promises to the Muscogee (Creek) Nation, including through restoration of the property, to the greatest extent possible, to its pre-excavation and pre-construction condition, and requiring the Federal Officer Defendants to take any necessary actions to implement these remedies;

    iii.  Enter a judgment declaring that Poarch Council Defendants, PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Defendants violated NAGPRA, ARPA, the NHPA, RFRA, and the NPS Agreement; and that, with respect to Federal Defendants and Poarch representatives acting as federal officers under the NPS Agreement, their actions violated the Administrative Procedures Act;

    iv.  Enter an order in the nature of mandamus requiring Poarch Council Defendants, PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants to abide by NAGPRA, ARPA, the

NHPA, RFRA, and the NPS Agreement in the future with respect to the Hickory Ground Site;

v. Enter an order in the nature of mandamus requiring that Federal Officer Defendants comply with the NHPA by terminating any delegations of historic preservation authority to Poarch and ceasing awarding federal preservation grants to Poarch;

vi. Enter a judgment declaring that Martin Construction violated NAGPRA's provisions regarding inadvertent discovery of cultural items, and an order awarding such relief against Martin Construction as may be appropriate given its violations of NAGPRA and its continuation of construction despite Plaintiffs' lawsuit.

(d) Whether or not the Court enters an order and judgment consistent with that described in Paragraphs (b) or (c) above, the Court should also:

i. issue a Permanent Injunction enjoining Poarch Council Defendants, PCI Gaming Authority Board Defendants, the Poarch THPO, and the Federal Officer Defendants from substantially burdening Plaintiffs' religious exercise by undertaking or providing assistance for any further ground disturbing, clearing, grading, leveling, or construction activity at the Hickory Ground Site, except that required to comply with (ii) below;

ii. Issue a Permanent Injunction ordering the Poarch Council Defendants, PCI Gaming Authority Board Defendants, and the Poarch THPO to cause the Hickory Ground Site to be returned to the condition it was in prior to construction of the casino resort and the phase III excavation, including

returning the excavated cultural items to their original burial locations; requiring Poarch to consult with and involve the Plaintiffs before, during, and after this process to ensure the proper processes are followed; and requiring the Federal Officer Defendants and Auburn to fully cooperate to facilitate this process, including making the necessary approvals, returning any human remains and associated funerary objects to Mekko Thompson, returning any other cultural items to the Muscogee (Creek) Nation for reburial in accordance with the Muscogee (Creek) culture and religious protocols, and completing the archaeological report regarding the phase III excavation;

iii.   Order all Defendants except Auburn to pay for Plaintiffs' reasonable attorney's fees and costs for prosecuting this action;

iv.   Permit amendment of the pleadings pursuant to Fed. R. Civ. P. 15(b) and 54; and

v.   Order such further relief as allowed under Fed. R. Civ. P. 54(c) and as this Court may deem just and equitable.

DATED this 5th day of June, 2019.

OF COUNSEL
Lauren J. King
Email: lauren.king@foster.com
Foster Pepper, PLLC
1111 Third Avenue, Suite 3000
Seattle, WA 98101
Tel: 206-447-6286
*Counsel for Plaintiffs*
(*Admitted Pro Hac Vice*)

s/ William J. Baxley
William J. Baxley (ASB-7219-A59W)
Email: BBaxley@baxleydillard.com

Stewart Davidson McKnight, III (ASB-6258-G63S)
Email: dmcknight@baxleydillard.com
Baxley, Dillard, McKnight, James & McElroy
2700 Highway 280
Suite 110 East
Birmingham, AL 35223
Tel: 205-271-1100
*Counsel for Plaintiffs*