**EXHIBITS TO SECOND AMENDED COMPLAINT**

<u>Exhibit No.</u>                                    <u>Description</u>

A.       Poarch Application for Historic Preservation Grant Re U.S. Department of Interior (Feb. 1980)

B.       Letter from W. Perry, Sonosky Chambers, to K. Zebell, NIGC (June 3, 2005)

C.       Letter from Bernhardt, Interior Solicitor, to Hogen, Chairman of the National Indian Gaming Commission (June 13, 2008)

D.       Letter from NIGC Acting General Counsel to Bernhardt (July 30, 2008)

E.       Perdido Band Memorandum In Support Of Motion To Intervene (1951)

F.       Motion To Change Record Name Of One of Movants for Leave to Intervene (8/29/1951)

G.       Creek Nation East of the Mississippi's Appellate Brief re Intervention in Muscogee (Creek) Nation ICC Case (11/6/1951)

H.       US Appellate Brief Opposing Creek Nation E. of the Mississippi's Intervention in Muscogee (Creek) Nation ICC Case (Jan. 1952)

I.       The National Park Service's June 10, 1999 Agreement with Poarch (the "NPS Agreement")

J.       Poarch Field Methodology Policy (April 1999)

K.       Letter from Buford Rolin to Mekko George Thompson (April 4, 2012)

L.       Letter from Principal Chief George Tiger to Buford Rolin (April 13, 2012)

M.       Letter from Buford Rolin to George Tiger and Mekko Thompson (April 17, 2012)

N.       Letter from Buford Rolin to Mekko Thompson and Second Chief Alfred Berryhill (Nov. 8, 2010)

O.       Poarch Press Release (Oct. 31, 2012)

P.       Poarch Tribal Leader Letter and "Fact Sheet" (2013)

Q.       Letter from ACHP to National Indian Gaming Commission NEPA Compliance Officer (Nov. 14, 2006)

# EXHIBIT A

*Feb 12, 1980*

TO:     F. Lawerence Oaks
        Executive Director
        Alabama Historical Commission
        725 Monroe St.
        Montgomery, Alabama    36130

FROM:   Creek Nation East of the Mississippi Inc.
        Poarch Band of Creeks
        Route 3, Box 243-A
        Atmore, Alabama    36502

Re:     U. S. Department of Interior (HCRS) letter 712

Dear Sir;

        Application is hereby made for funds from the Historic Preservation
Discretionary Fund Grant-in-Aid program. This application should be
considered under Category #1 as the proposed undertaking both assists
in preserving part of a historic district of Native Americans and results
in the direct participation of Native American Groups.

        Hickory Ground (1-Ee-89) is of major importance in the history
of the Muscogee (Creek) Nation. It has supplied many of the important
leaders in Creek history. One of particular note was Alexander McGillvray.

        "O-Che-au-po-fau"; from the Muskogean "Oche-ub", a hickory tree,
and "po-fau", in or among, called by the traders "Hickory Ground"(Owen
1921:1088). Hickory Ground was located on the east bank of the Coosa
River, south of the present-day Wetumpka approximately two miles above
the French Fort Toulouse(Pickett 1962:229,343,357; Owen 1921:1088; Hemperly
1969:224; Brewer 1955:25; Swanton 1952:162).

        Hickory Ground was an Upper Creek town and by tradition was originally
inhabited by the Coosa or Abihkas(Corkran 1967:307; Owen 1921:1088; Swanton
1922:242). It was here that Lachland McGillvray married Sehoy Marchand
in 1745, and established a trading house(Brewer 1955:15; Debo 1967:38;
Swanton 1922:242). Lachland and Sehoy were the parents of Alexander
McGillvray an  important Creek leader having special trade relationships
with the Panton Leslie and Company trading house in Pensacola.

        With the French established at Ft. Toulouse McGillvray's residence
at Hickory Ground was the center of Spanish, French, British and American
intrigue. Don Pedro Olivier, a frenchman in the Spanish Service, spent
many months at Hickory Ground(Debo 1967:52; Pickett 1962:413). Hickory
Ground was loyal to the British during the revolutionary war, and was
a place of refuge for many loyalists(Brewer 1955:25-26; Corkran 1967:307-308).
President Washington sent Col. Willett to Hickory Ground to encourage
Alexander McGillvray to come to the capitol at New York for treaty negotiations
(Brewer 1955:27; Pound 1951:58). Hickory Ground was visited by Benjamin

Hawkins, the first american agent to the Creeks, many times(Pound 1951:111; Hemperly 1969:224; Owen 1921:1088; Swanton 1952:154).

During the Creek War of 1813-1814, Otchiapofa was listed as a hostile Creek town, and was visited by Tecumseh. Here he was able to enlist more followers (Halbert and Ball 1969:68,79,99-100; Pickett 1962:511). As a hostile Creek town Hickory Ground was not un-noticed by Andrew Jackson. The Jackson Trace was opened primarily so Jackson could move his army to Hickory Ground(Brewer 1955: 15; Pickett 1962:592).

From the above it is apparent that Hickory Ground was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836. With the proper techniques and data recovery methods Creek involvement in these events can be studied. More importantly the effects of these activities upon the Creek Nation can be understood. Hickory Ground has the potential of measuring changes in the political, social, and economic structures of the Creek people in pre-removal times.

As outlined by the Secretary of the Interior this project is designed to meet the general and specific standards for acquisition as applies to this particular site.

## THE USE OF THE LAND

Acquisition of the property is principally a protection measure. Acquisition will prevent development on the property. All historic structures on the site have been destroyed. What is left consists of below surface remains. Through proper archaeological methods and techniques these below surface features can reveal a tremendous amount of information about the Creek way of life in the late 1700's and early 1800's. Upon gaining fee-simple title to the land as called for in this proposal plans will be developed to minimize continued destruction of the archaeological resources. Prior to any type of development of the property a scientifically sound archaeological program will be conducted to mitigate or minimize effects upon the historic resources.

The property will serve as valuable resource for cultural enrichment of Creek people. The site can serve as a place where classes of Creek culture may be held. The Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved. The site may serve as an open air classroom where Creek youth can learn of their heritage. Interpretive programs can be developed around the vast array of history connected with Hickory Ground. The Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) has already conducted CETA sponsored training in archaeological methods for Creek youth. The Hickory Ground site will continue to enhance their understanding of their history, without excavation.

## SPECIFIC STANDARDS OF PROTECTION

For most cases land in the hands of Realtors and developers is veiwed from the prospective of income producing property. At this location in order to have

a commercial development the land will have to be cleared and leveled. In order to halt the destruction planned for the site and insure against future destruction, funds for acquisition of fee simple title are requested.

As the landowner is very much interested in developing the property for commercial purposes it is felt acquisition of fee simple title is necessary to prevent destruction of the site. The land was scheduled for commercial development. Plans for development called for construction of Recreation facilities and multi-family dwellings.

To the immediate east of the property is existing commerical property. These commerical properties include a Hardees and local resturant. To the immediate south ajoining the land of the site, a contract has been entered into with an option to by agreed upon between Aeronov Corporation and the land-owner, Mr. W. D. DeBardeleben. This agreement is based upon Aeronov's plans for construction /a Kmart store upon the property.

Mr. Gary Skaret and the landowner have plans for constructing apartments for low-income and handicapped persons upon the land to the immediate west of the proposed Kmart and to the immediate south of the Hickory Ground site.

From the forgoing it is evident that the surrounding area, and indeed the land, the site itself, is prime development land and may very well be bulldozed and cleared soon.

The property is in the process of being nominated to the National Register of Historic Places. The Alabama State Historic Perservation Officer has determined the property eligible and the required forms are now being processed by the Keeper of the National Register.

Project does conform to Secretary of Interior Standard for Historic preservation projects. Specific end products of the project is to provide protection for a particularly important site in Creek History, while providing a foundation for innovative educational programs. Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home.

Upon approval of the proposal the site will be maintained almost entirely by minority groups. One half the appraised value will be donated to Creek Nation Foundation, Inc. in Oklahoma. The grants-in-aid proposal is designed to be awarded to Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks). Both are Native American groups. The Creek Nation Foundation, Inc. represents western Creeks that were removed to Oklahoma from Alabama. While Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) represents a group of Creeks that were excluded from removal and remained in Alabama in the Mobile Region.

Under this plan the property will be jointly owned by both groups of Creeks. They will be equally responsible for the protection and care of the site. This is an opportunity for the Creek people to enter into cultural resource management by guarding and preserving a site directly connected with their culture history.

The significant aspect of this project is the protection by acquisition of a historic Creek site by Creeks. Archaeological resources, directly related to Native Americans have for the most part been managed and investigated by non-Native Americans. This is an apportunity for Native Americans to manage their archaeological records. Presently on staff with the Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) is Larry D. Haikey who has a Master's degree in Anthropology. Mr. Haikey is well trained and aware of the proper management of archaeological resources. He will act as advisor to the tribal councils on plans for permanent protection of the site.

Time for complete acquisition of the site is not expected to take longer than forty-five days. This time schedule includes time necessary for mailing contracts between Oklahoma and Alabama. Both tribal groups will have adequate time for review by respective lawyers and approval of council meetings.

The Creek Nation East of the Mississippi, Inc. (Poarch Band of Creeks) agrees to the provisions of covenants and letter of agreements. They are also aware of the information needed for an acquisition Project Completion Report. A detailed completion report will be the responsibility of Creek Nation East of the Mississippi, Inc., and will be done by Mr. Haikey as a part of his normal job activities, at no cost to the Hertiage Conservation and Recreation Service (HCRS) Project.

Consultant and technical assistance will be in the nature of legal services. The property deed and other agreements will need to be legally sound with respects to the by-laws and intents of the corporations. These legal services will be the responsibilities of the respective tribal groups.

Mr. John Charloe, Attorney for Creek Nation Office of Justice, will handle legal matters for Creek Nation Foundation, Inc. in Oklahoma. Mrs. Hollis Geer, Legal Services Corporation of Alabama, will handle matters for Creek Nation East of the Mississippi, Inc. Technical advice concerning the site as to maintaining its archaeological integrity will be handled by Larry Haikey and other archaeologists with interest in Creek cultural history.

Hickory Ground fits in a historic preservation district which includes the area of Wetumpka, Alabama. There have been numerous maps of Creek sites referenced in historic documents as being located in this area (Swanton 1922; Owen 1921). Swanton (1922) provides numerous maps of Creek Tribal town locations at various times in their history. One, (Appendix A) is partially reproduced for enclosure with this proposal, it shows the location of Hickory Ground as concerns this project and in the time period for which the site has been dated. As is evidenced by the other town locations on the map the area was heavily populated by Creek in the pre-removal period. Some of the other towns have been located and are on record in Alabama archaeological site files. An item of importance concerning Hickory Ground is the immediacy of its near destruction. The others that have been located are not as close to destruction at this time.

A matter of great importance about this project is the involvement of Creek People through their government in the management and protection of their

archaeological resources. It can be safely said that anthropology and archaeology have had a bad name among Native American groups. This has stemmed from the arch- aeologists being more concerned in the research potential of the sites rather than the significance as they relate to Native Americans. The excavation and research has been carried out without very much returned to the Indian community, causing Native Americans to distrust the motives of archaeologists.

The Creek Nation is attempting to take an active role in management of their cultural resources. In the winter of 1978 and 1979 the Creek Nation East of the Mississippi cooperated with the University of Alabama in Birmingham on an arch- aeological excavation to test an area of burial remains. Attention was called to the site after treasure hunters removed a couple of burials.

In the summer of 1979 the Creek Nation East of the Mississippi conducted a  CETA Title VI training program in archeaology. The main emphasis of this program was to train young Creek people in the proper techniques of archaeology. It was hoped that some of these young people would continue into the field and help preserve Creek archaeological resources.

Destruction of archaeological resources in Alabama adversely effects the profession of Archaeology, while destroying the cultural history of Creek people. There is an increased recognition in the field of archaeology of the need for Native Americans and archaeologists to work together in the cultural resource management area (Lipe 1977:22-23; Schiffer and Gumerman 1977:586). Creek People feel that this proposed project would do a great deal toward bridging the communication gap between archaeology and Native Americans.

Enclosed appendix  contains information documenting the two Creek groups as legal entities:

| Appendix A | Map of towns of the Creek confederacy, 1818 |
| Appendix B | Organizational chart of Creek Nation East of the Mississippi and list of Tribal Council |
| Appendix C | Articles of Incorporation of Creek Nation East of the Mississippi |
| Appendix D | Constitution of the Muscogee (Creek) Nation in Oklahoma |
| Appendix E | Minutes of Creek Nation East of the Mississippi, Inc., (PBC) tribal council meeting giving approval to apply for HCRS grant |
| Appendix F | Certificate of Assurances & Certifications |
| Appendix G | Budget |

# EXHIBIT B

LAW OFFICES
## SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP
1425 K STREET, NW, SUITE 600
WASHINGTON, DC 20005
TEL (202) 682-0240 | FAX (202) 682-0249
WWW.SONOSKY.COM

MARVIN J. SONOSKY (1909-1997)
HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER
DOUGLAS B. L. ENDRESON
DONALD J. SIMON
MYRA M. MUNSON (AK)*
ANNE D. NOTO
MARY J. PAVEL
DAVID C. MIELKE
JAMES E. GLAZE
GARY F. BROWNELL (NM)*
COLIN C. HAMPSON
JAMES T. MEGGESTO

MARISSA K. FLANNERY (AK)*
MELANIE B. OSBORNE (AK)*
VANESSA L. RAY-HODGE
AARON M. SCHUTT (AK)*
HEATHER WHITEMAN RUNS HIM (NM)*
WALTER VIAR III (CA)*
WILLIAM F. STEPHENS (CA)*
ADDIE C. ROLNICK (CA)*

OF COUNSEL
ARTHUR LAZARUS, JR., P.C.
ROGER W. DUBROCK (AK)*
KAY E. MAASSEN GOUWENS (AK)*
MATTHEW S. JAFFE
DOUGLAS W. WOLF
RICHARD D. MONKMAN (AK)*

*NOT ADMITTED IN DC

June 3, 2005

By Hand

Katherine L. Zebell, Esq.
National Indian Gaming Commission
1441 L Street N.W., Suite 9100
Washington, D.C. 20005

Re:    Poarch Band of Creek Indians – Tallapoosa Site

Dear Ms. Zebell:

In connection with our request for a restored lands determination for the Tallapoosa Site, you have asked that we provide to the NIGC evidence that the federal government took affirmative action, at a time prior to acknowledgment, to terminate its relationship with the Poarch Band of Creek Indians.[1]  Your request, which you indicated relates to the issue of whether Poarch Creek is a "restored" tribe under section 20 of IGRA, seemed to focus on the question of whether there was a specific document (or set of documents) in which the federal government expressly "terminated" the Tribe.  This letter responds to your request by addressing three points:  1) the proper test for determining whether a tribe is a "restored" tribe under IGRA, 2) the significant

---

[1]  The Tribe's request to the NIGC was submitted on March 29, 2004.  Supplemental submissions, responding to NIGC requests for additional information, were provided to the NIGC on September 3, 2004 and November 2, 2004.

Katherine L. Zebell, Esq.
June 3, 2005
Page 2

differences between the circumstances regarding Poarch Creek and those that were
involved in the *Karuk* case, and 3) the documentation demonstrating that, based on the
totality of the circumstances, Poarch Creek clearly is a "restored" tribe.

## I.    The proper test for determining whether a tribe lost its federal recognition.

We understood the premise of your request to be that additional documentation of
the kind you referenced, if available, could strengthen Poarch Creek's submission to the
NIGC regarding the status of the Tallapoosa Site. While we agree with that proposition,
and we provide such documentation along with this letter, we do so in support of our
strongly held view that a determination of whether a tribe is "restored" to federal
recognition under section 20 of IGRA depends on the totality of the circumstances. While
documentation of a federal action expressly disavowing the federal relationship with a
tribe can be probative in this regard, that is not the only way to demonstrate that a tribe is
"restored." It is the broadly defined course of dealings by the federal government with
regard to a tribe – and not simply whether there is an express disclaimer of a federal-tribal
relationship – that controls the determination of whether a tribe lost its federal
recognition. No particular written document, and certainly no magic words by the federal
government, are necessary. If the government failed, on a continuing basis, to treat the
tribe as it treats other recognized tribes – in terms of providing benefits to tribal members
based on their membership in the tribe and other factors – the tribe lost its recognition.
Such a tribe, when it regains federal recognition (by administrative or congressional
action), is a "restored" tribe under section 20 of IGRA.

To the extent your inquiry is intended to suggest a per se rule – to the effect that a
tribe could be a "restored" tribe under section 20 of IGRA only if it can provide
documents expressing termination of the tribe by the federal government – we
respectfully submit that such a rule is not warranted under IGRA. Most fundamentally,
the language of section 20 contains no such requirement. To the contrary, section 20
neither speaks in terms of termination, nor mandates that a tribe provide an express
statement of any kind from the federal government regarding the loss of the tribe's
recognized status.

Instead, the relevant provision states that gaming is permitted on lands acquired
after the effective date of IGRA where those lands are part of the "restoration of lands for

Katherine L. Zebell, Esq.
June 3, 2005
Page 3

an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).
As noted in our March 29, 2004 letter to NIGC Chairman Hogen and U.S. Attorney
Canary, it is well settled that these terms are to be given their normal meaning. March 29,
2004 letter, at 6-9. *See Grand Traverse Band of Ottawa and Chippewa Indians v. Office
of the U.S. Attorney*, 369 F.3d 960, 965 (6th Cir. 2004). The term "restore" has ordinary,
dictionary meanings including: "to give back, return, make restitution, reinstatement,
renewal and reestablishment." *Id*. at 967. The term "federal recognition," in the context
of federal dealings with Indian tribes, means an entity that is eligible for special programs
and services, and that enjoys certain privileges and immunities under federal law, by
virtue of being an Indian tribe. *See, e.g.,* 25 U.S.C. § 479a-1(a) ("Publication of list of
recognized tribes"); 25 U.S.C. § 476(f) (privileges and immunities). So, under section 20
of IGRA, for a tribe to be "restored to federal recognition," it must meet three
requirements – it must have been previously recognized, it must have lost its recognized
status, and then it must be returned to recognized status. *See Grand Traverse Band,* 369
F.3d at 967 (a restored tribe is one that has a "history of governmental recognition,
withdrawal of recognition, and then reinstatement of recognition").

 The courts have rejected all arguments seeking to limit "restored" tribes to those
which lost or regained their recognized status only in particular ways. For example, the
courts have soundly rejected the contention that only those tribes that regain their
recognized status through an Act of Congress can be "restored" tribes under section 20.
*E.g., Grand Traverse Band,* 369 F.3d at 970; *TOMAC v. Norton*, 193 F. Supp. 2d 182,
194 n.8 (D.D.C. 2002). This is so, notwithstanding the fact that section 20 contains a
separate provision to enable after-acquired land to be taken into trust as "the initial
reservation of an Indian tribe acknowledged by the Secretary under the Federal
acknowledgment process." 25 U.S.C. § 2719(b)(1)(B)(ii). Concluding that "nothing in
the statute suggests that Congress prohibited such a result," the courts give full effect to
the plain meaning of the restored lands provision, while harmonizing it with the "initial
reservation" provision. *E.g., Grand Traverse Band of Ottawa and Chippewa Indians v.
United States Attorney*, 198 F. Supp. 2d at 933. The courts have uniformly been
unwilling to put any gloss or construction on the word "restored" that would have the
effect of excluding tribes that fit within the normal meaning of the term.

 Just as a tribe can regain its recognized status in various ways, so a tribe can lose
its recognized status – for purposes of section 20 analysis – by legislative or

Katherine L. Zebell, Esq.
June 3, 2005
Page 4

administrative means. In *Grand Traverse*, the State argued that a tribe that claimed to have lost its recognized status through an action of the executive branch could not be a "restored" tribe under section 20, because only Congress has the authority to extinguish the trust relationship. *Grand Traverse Band,* 369 F.3d at 967. In rejecting the State's argument, the Court stated:

> There is no dispute that only Congress had the *legal* right to terminate the Band's recognition because Congress originally had recognized the Band. But the relevant question is whether a termination nevertheless took place because the executive branch of the government *illegally* acted as if the Band's recognition had been terminated, as evidenced by its refusal to carry out any trust obligations for over one hundred years.

*Id.* at 968. Having framed the question to include the possibility that a tribe may lose its recognized status by federal government inaction (that is, by the government's "refusal to carry out" its obligations to the tribe), the Court further noted that:

> A prominent treatise on federal Indian law states that federal recognition of a tribe requires (1) a legal basis for recognition (i.e. Congressional or Executive action) *and* (2) the empirical indicia of recognition, namely, a "continuing political relationship with the group, such as by providing services through the Bureau of Indian Affairs." Cohen, Handbook of Federal Indian Law 6 (1982). . . . The implication of Professor Cohen's two-part test, which we adopt today, is that the empirical acts that are tantamount to the termination of tribal recognition are analytically distinct from the legality of those acts, just as the empirical act of terminating an individual's employment (e.g., being told to leave the workplace and never to return) is distinct from the legality of that act (e.g., breach of contract).

*Id.* The Court thereby endorsed the understanding that recognition (and loss of recognition) is based on the totality of the circumstances ("empirical indicia") – the most

Katherine L. Zebell, Esq.
June 3, 2005
Page 5

basic of which is whether the federal government provided services to the tribe. Applying this analysis to the facts of that case, the Court found that:

> The State has conceded that "[t]he United States unilaterally ceased to treat the Band as a federally-recognized tribe commencing in 1872, when Secretary of the Interior Columbus Delano improperly severed the government-to-government relationship between the United States and the Band." In other words, acting through the Secretary of the Interior, the federal government terminated the political relationship with the group, in particular, the provision of services. Because the Department of Interior refused to recognize the Band as a political entity, "the Band experienced increasing poverty, loss of land base and depletion of the resources of its community," particularly when compared to those tribes that appeared on the Department of Interior's list of federally recognized tribes. *Grand Traverse Band II*, 198 F. Supp. 2d at 924. Thus, the undisputed facts show that the federal government withdrew the Band's recognition in 1872 under the second factor of the Cohen test.

*Id.* at 968-969.

As *Grand Traverse* makes clear, the key to determining whether a tribe is recognized is whether it has a continuing political relationship with the federal government – the best evidence of which is whether the federal government is providing services to the tribe and its members. Likewise, in determining whether a tribe has had its recognition taken away, the fundamental question is whether the political relationship and, "in particular, the provision of services" have ceased. *Id.*

While it is true that in the case of *Grand Traverse,* there was an express repudiation of the government-to-government relationship by the Secretary of the Interior in 1872, that can not properly be viewed as the only circumstance under which tribal recognition can be lost by administrative means. As the Sixth Circuit framed it, the question in *Grand Traverse* was not whether the Secretary had expressly disclaimed the tribe's recognized status, but was instead whether the executive branch had conducted

Katherine L. Zebell, Esq.
June 3, 2005
Page 6

itself "as if the Band's recognition had been terminated, as evidenced by its refusal to
carry out any trust obligations for over one hundred years." *Id.* at 968. As this language
underscores, it is the broad course of conduct of the government over time, and not the
presence or absence of a particular document stating how the government is viewing the
tribe's status, that is central to the inquiry. Thus, as the Sixth Circuit found, a tribe
"which has had its federal recognition terminated by administrative action or inaction, can
be restored to federal recognition through the administrative acknowledgment process."
*Id.* at 970 (emphasis supplied). In short, *Grand Traverse* supports the proposition that the
way in which the federal government relates to a tribe – whether through actions and
express statements or through inaction and neglect – determines whether the tribe has lost
its recognized status. What federal officials say in the form of express disclaimers of
tribal recognition can be probative in this regard, but it is what the federal government
does (or fails to do), and not just what it says, that in the end is determinative.

This principle – that loss of federal recognition can be demonstrated by federal
action or inaction – finds further support in the purpose of the restored lands provision.
The provision of section 20 concerning restored lands along with the provision regarding
initial reservations for acknowledged tribes

> appear to be intended to place tribes that are belatedly
> acknowledged or restored in the same or similar position as
> tribes recognized by the United States earlier in their history.
> The statute expressly provides that lands located within or
> contiguous to the tribe's reservation on the effective date of the
> IGRA are exempt from the procedures of § 2719(b). *See* 25
> U.S.C. § 2719(a)(1). Tribes which are belatedly recognized or
> acknowledged, however, have not had the ability to have lands
> placed in trust by the Secretary for the purpose of establishing
> or preserving a reservation. As a result, the statute appears to
> allow belatedly recognized tribes to have lands exempted by
> way of certain other exceptions.

*Grand Traverse Band,* 198 F. Supp. 2d at 931. So, the restored lands provision is
intended to authorize tribes that have been "belatedly recognized" – and that therefore in
the absence of some special provision would not benefit from the IGRA's general

Katherine L. Zebell, Esq.
June 3, 2005
Page 7

application to Indian tribes with Reservations that pre-dated IGRA – to participate reasonably in the economic development benefits of IGRA. That purpose would be undermined if some of the tribes that meet the ordinary definition of "restored" were excluded simply because they lost their recognized status by an unbroken course of federal inaction and neglect, rather than through an express document purporting to terminate the tribe's federal recognition.

Moreover, it would be unreasonable to ascribe to Congress an intent to make such a distinction in the restored lands provision. This is illustrated by the following example. Assume that there were two tribes. Each tribe entered a treaty with the United States and had a full government-to-government relationship with the federal government into the mid-nineteenth century. Each tribe, from the same date in the mid-nineteenth century, was consistently treated by the federal government as though it was no longer a tribe. Among other things, no services were provided to either tribe from that day forward, for over 150 years. In all respects, except one, the entire course of dealings between each of these tribes and the federal government was essentially the same for over 150 years. The only difference was that one tribe had a letter from the Secretary of the Interior stating that it was no longer recognized as a tribe – while the other Tribe had no such letter. Each Tribe was, in the late twentieth century, recognized through the administrative process under 25 C.F.R. § 83. It strains credulity to suggest that Congress, in enacting section 20 of IGRA, somehow intended that one of these tribes could be a "restored" tribe, while the other could not. There is simply no foundation for ascribing to Congress such an absurd result.

## II.     NIGC's lands opinion on the Karuk Tribe arose in very different circumstances than those here.

The governing principle – that loss of federal recognition depends on the totality of the circumstances and can be supported by evidence of both federal action and inaction – is not undermined by the NIGC's lands ruling on the Karuk Tribe of California. *See* Letter from Penny Coleman, Acting General Counsel, NIGC to Bradley G. Bledsoe Downes, Esq. of Oct. 12, 2004 (hereafter "Karuk Opinion"). Rather, the Karuk Opinion simply suggests that, in the particular circumstances involved there, that tribe did not show that its recognition had been terminated. But the circumstances in Karuk were very different than those here.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 8

First, while Poarch Creek was recognized through the rigorous Federal Acknowledgment Process under 25 C.F.R. § 83, the same was not true for the Karuk Tribe. Rather, in seeking to establish eligibility as a "restored" tribe under section 20 of IGRA, the Karuk Tribe pointed to a one-page Interior Department memorandum from 1979. *See* Memorandum of the Assistant Secretary for Indian Affairs to the Sacramento Area Director 1 (Jan. 15, 1979), Exhibit 61. That memorandum indicates that based on a staff-level field trip by BIA personnel, "the continued existence of the Karoks [sic] as a federally recognized tribe of Indians has been substantiated." *Id*. The language of that memorandum – speaking in terms of "revitalization" and "continued existence" – is consistent with the view that the Karuks never lost their recognized status. At a minimum, the language of that 1979 memorandum is ambiguous in this regard and does not provide solid evidence of the Karuk tribe's prior loss of recognized status.

In contrast, Poarch Creek – although it applied for federal recognition prior to the effective date of the Department's regulations on federal recognition[2] – was considered under the Department's regulations in 25 C.F.R. § 83. As the regulations in effect at the time of Poarch Creek's recognition make clear, recognition is a "prerequisite to the protection, services and benefits from the Federal Government available to Indian tribes." 25 C.F.R. § 83.2 (1983), Exhibit 24. Further, by the time Poarch Creek gained recognition pursuant to the regulations, the Department had been publishing, on an annual basis, a list of recognized tribes – and Poarch Creek was not on the list until after its recognition petition was granted. *Compare* Exhibits 4 and 5.[3] The Department's consideration of Poarch was extensive, as reflected in the Summary of Evidence and Technical Reports issued by the Department. *See* Exhibits 25 and 26. Thus, in connection with Poarch Creek's recognition, the Department's course of conduct – not listing Poarch Creek on its list of all recognized tribes, allocating substantial resources to apply the part 83 regulations, and determining that Poarch Creek met the standards for recognition – all reflect action by the Department that only makes sense if Poarch Creek had previously lost its recognized status. Unlike the situation in Karuk, the Department took actions with

---

[2] The effective date was October 2, 1978. *See* Exhibit 62.

[3] At the time of the Department's "Revitalization" memo on Karuk, Exhibit 61, the Interior Department's practice of officially listing tribes was just beginning – so Karuk, unlike Poarch Creek, had no ongoing history of being left off of a list of recognized tribes.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 9

respect to Poarch Creek which reflect the Department's unambiguous understanding that Poarch Creek had earlier lost its recognized status.

Second, while prior to recognition in 1984 Poarch Creek members received no benefits or services from the federal government, the same was not true for the members of the Karuk Tribe prior to the 1979 "Revitalization" memo. As described below, once the majority of Creek were removed from Alabama in the 1830's and 1840's, the Creek who remained in Alabama were not provided with ongoing federal services that the United States provided to recognized tribes. In contrast, the record before the NIGC reflected that the opposite was true for Karuk, as to which "the United States provided benefits to individual tribal members." Karuk Opinion at 4. Since the provision of federal services and benefits to tribes and their members is among the most significant factors relating to federal recognition, the fact that Karuk received federal benefits and Poarch Creek did not strongly supports the view that Karuk is not controlling (or even persuasive) on the issue of whether Poarch Creek lost its recognized status.

Third, Karuk arose in the unique circumstances of the California Indians – who, from the time gold was discovered in 1848, were dealt with by the federal government harshly and unevenly. With regard to many California tribes, that special history left considerable uncertainty regarding federal recognition. That special history of the California Indians provides a backdrop for the Karuk Opinion, but is not properly part of the analysis of Poarch Creek.

Based on an unusual confluence of circumstances, the record before the NIGC regarding Karuk apparently did not clearly establish whether the Karuk Tribe had ever lost its federal recognition at all. The peculiar history of the California Indians, the preservation over time of federal benefits for the members of the Tribe, and the absence of any formal administrative process regarding recognition all added to the uncertainty in this regard. In that context, the NIGC stated that:

> the Tribe provided no evidence of any affirmative action by the United States to terminate the relationship with the tribe. In other words, we have no evidence supporting a conclusion that the United States withdrew its recognition of the Tribe.

Katherine L. Zebell, Esq.
June 3, 2005
Page 10

Karuk Opinion at 4. Thus, the Karuk Opinion means that where the record before the NIGC points toward a Tribe having never lost its recognized status, the NIGC needs clear evidence in the other direction to support a finding that the Tribe lost its recognized status and can therefore (if other requirements are met) be deemed a "restored" tribe.

The Karuk Opinion does not suggest that such a finding would have been impossible to make in the Karuk case itself – if the Tribe had provided appropriate evidence that on balance outweighed the evidence that was already in the record (such as continued federal benefits) suggestive of continued, never-terminated federal recognition. Further, Karuk does not suggest that other ways of demonstrating the loss of federal recognition – in addition to evidence of affirmative action by the United States – are not properly part of the analysis. Rather, Karuk simply reinforces the point that where the record is devoid of any clear indication that a tribe lost its federal recognition – and, to the contrary, all factors in the record are consistent with continued federal recognition – such a tribe has not been shown itself to be a "restored" tribe under IGRA. Accordingly, the Karuk Opinion both suggests the need for a factual basis in the determination by the NIGC, and supports the notion that the loss of tribal recognition depends on the totality of the circumstances for that tribe. As we discuss below, Poarch Creek clearly meets this test.

III.   **Evidence demonstrating that Poarch Creek's status as a recognized tribe was lost prior to 1984.**

As we demonstrate above, the determination of whether a tribe lost its recognized status is a fact-based inquiry, and the facts arising in the Karuk Tribe's case are far removed from the facts here. Accordingly, in our view the proper analysis here regarding the loss of federal recognition by Poarch Creek turns not on how the NIGC viewed Karuk (or any other tribe), but rather on consideration of the federal course of dealings with Poarch Creek – including both federal action and inaction. Under this standard, the federal government clearly ended its relationship with Poarch Creek following removal, as we show below. In any event, even if a narrower view of the proper inquiry is taken – such that consideration would be limited only to affirmative actions or statements by federal officials indicating an intent to "terminate" relations with the Tribe – Poarch Creek would easily meet that test as well. This is so because the historical record amply demonstrates that the federal government terminated the government-to-government

Katherine L. Zebell, Esq.
June 3, 2005
Page 11

relationship with the Creek in Alabama through a broad course of dealings that included express statements by top federal officials disclaiming any federal relationship with the Tribe – and that this termination of federal recognition extended back almost 150 years prior to Poarch Creek regaining federal recognition in 1984. [4]

The 1832 Treaty between the United States and the Creeks underscored the intent of the federal government to end, within a few short years, its relationship with the Creek in Alabama. Treaty with the Creeks, Mar. 24, 1832, 7 Stat. 366, Exhibit 3. As the Treaty recited, "[t]he United States are desirous that the Creeks should remove to the country west of the Mississippi, and join their countrymen there . . . ." *Id.* at Art. XII. To facilitate this goal of removal of the Creeks from Alabama, the Treaty provided for a cession by the Creeks of all land east of the Mississippi. *Id.* at Art. I. The Treaty also provided various payments for those Creek who removed to Oklahoma – for removal expenses and subsistence expenses for a year, *id.* at Art. XII, for rifles and blankets, *id.* at Art. XIII, and for education and blacksmiths, *id.* Perhaps most tellingly in this regard, the 1832 Treaty expressly provided for permanent federal protection of Creek Tribal lands in Oklahoma:

> The Creek country west of the Mississippi shall be solemnly guarantied to the Creek Indians, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them.

*Id.* at Art. XIV.

In contrast, the Creek who stayed in Alabama received no payments for subsistence, rifles, blankets, education or blacksmiths. Moreover, the Treaty provided not for federal protection but rather for the cession of all Creek lands in Alabama, with only

---

[4] We note that, despite the federal government's longstanding treatment of Poarch Creek as not federally recognized, the Tribe maintained its continuous political existence as a Tribe throughout this period as demonstrated and confirmed by the acknowledgment decision the Tribe received in 1984. *See* Exhibits 1 and 25.

Katherine L. Zebell, Esq.
June 3, 2005
Page 12

parcels of fee land to be conveyed to principal Chiefs and the heads of families. *Id.* at
Art. II. Those fee lands could be conveyed by the Indians. *Id.* at Art. III. Intruders were
to be removed from these land selections, but only for five years. *Id.* at Art. V. Nothing
in the 1832 Treaty provided any ongoing federal role with respect to the Creek in
Alabama, beyond that five-year period.

Further, while the Treaty expressly recognized the right of the Creek in Oklahoma
"to govern themselves," no such recognition appears in the Treaty with respect to the
Creek in Alabama. So, under the 1832 Treaty, permanent federal protection and federal
acknowledgment of Tribal self-government were promised to the Creek who moved to
Oklahoma, but not the Creek who remained in Alabama. In expressly mentioning these
rights but only for the Oklahoma Creek, the Treaty clearly suggests the absence of such
rights to the Alabama Creek.

Furthermore, to the extent the 1832 Treaty might be viewed as suggesting a
vestigial federal role associated with the fee lands conveyed to Creek Indians in Alabama,
Congress later expressly disclaimed such a construction of the Treaty. In 1912, Congress
enacted a measure releasing all possible federal interest in these lands. The 1912 Act
stated:

> That the United States of America hereby forever relinquishes,
> releases, and quitclaims all right, title, and interest in and to all
> the lands now held under claim or color of title by individual or
> private ownership or municipal ownership and situated in the
> State of Alabama which were reserved, retained, or set apart to
> or for the Creek Tribe or Nation of Indians or any member or
> members thereof, under and by virtue of the treaties entered into
> between the United States of America and the Creek Tribe or
> Nation of Indians on the ninth day of August, eighteen hundred
> and fourteen, and at Washington on the twenty-fourth day of
> March, eighteen hundred and thirty-two, by which all the lands
> of said Creek Tribe or Nation of Indians east of the Mississippi
> River were ceded to the United States of America . . . .

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 13

Act of June 4, 1912, ch. 151, Pub. L. No. 62-177, 37 Stat. 122, Exhibit 63. This Act was intended to remove all doubt about the status of lands that were conveyed under the 1832 Treaty, but as to which, for whatever reason, patents had not issued. *See.* H. R. Rep. No. 62-357 (Feb. 26, 1912) (Title to Creek Indian Lands in Alabama), Exhibit 64. The Act negated any notion that the federal government had an ongoing role regarding Creek lands in Alabama arising from the 1832 Treaty.

While the 1832 Treaty was unquestionably an instrument of the federal government's removal policy, it nevertheless stopped short of mandating the immediate removal of all Creek from Alabama. As the Treaty stated, "this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please." Exhibit 3 at Art. XII. Despite this provision, the federal government in fact soon removed most of the Creek from Alabama by forced, military action. First, the government failed to protect the individual Creek fee lands conveyed under the 1832 Treaty:

> Despite its promises to evict intruders, the federal government in fact was unwilling or unable to do so, and the Creek lands were quickly overrun. Moreover, the Indians, unused to handling financial matters, were victimized by speculators, who moved in to gain title to the allotments and force the Indians off the land. The frauds were spectacular and widespread, making a mockery of the treaty intentions, and the government seemed impotent to stem the speculators' chicanery. The commissioner of Indian affairs, on receiving the report of a commission sent to investigate, declared in exasperation in 1838: "It is shocking to reflect on the disclosures elicited. They embrace men of every degree. Persons, heretofore deemed respectable, are implicated in the most disgraceful attempts to defraud those who are incapacitated from protecting their own interests; whose presence, as far from being any interruption to the plundering of themselves, was sometimes sought, as their instrumentality was used to effect their own ruin. This conduct, derogatory to civilized men, was not inaptly termed 'land stealing.'"

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 14

F. Prucha, The Great Father, at 222, Exhibit 12. These gross land frauds soon erupted into violence, with the U.S. Army being sent into Alabama against the Creeks to "subdue them, and force their removal to the West." *Id.* at 223. The Army succeeded in its objective, leading to the harsh removal of most of the remaining Creeks in Alabama:

> The subdued Creeks were now removed to the West. Dejected warriors, handcuffed, chained, and guarded by soldiers, left Fort Mitchell on July 2, followed by wagons and ponies carrying the children and old women and the sick . . . . [and] embarked at Montgomery and conveyed down the Alabama River to Mobile, thence to New Orleans and up the rivers to the western lands of the Creeks. The remainder of the hostiles left Montgomery on August 2. The friendly Creeks soon followed their brothers west.

*Id.* Surely any notion that the federal government continued to recognize the Creeks in Alabama was effectively terminated by the military action physically removing the Creeks to Oklahoma. Forced removal is inconsistent with continued federal recognition for those Creek who remained.

This point – that upon completion of removal, the federal government ended its governmental relationship with the Creeks in Alabama – has been reaffirmed by the statements and conduct of the federal officials most responsible for Indian Affairs. For example, this termination of the federal recognition of Poarch Creek is reflected in the Annual Reports of the Commissioner of Indian Affairs.[5] These Reports summarize, generally on a state-by-state (or territory-by-territory) basis, the activities of the federal government with respect to all recognized tribes. The Reports describe both the manner in which federal Indian policy was implemented, and the general conditions of each recognized tribe, during that year.

---

[5] We have examined the Annual Report of the Commissioner of Indian Affairs for each year from 1841 – 1912. The one exception was the 1907 Annual Report which was not available in the library of the Interior Department.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 15

During the 1840's, the Annual Reports note the diminishing number of Creeks remaining in Alabama, and the imminence of their removal to Oklahoma. *E.g.*, 1845-1846 Annual Report of the Commissioner of Indian Affairs at 1 ("The few remaining Creeks in Alabama . . . , amounting in number to about one hundred and sixty, including slaves, are prepared to remove."). By 1849, the removal policy regarding the Creek was deemed essentially completed, and the Commissioner reported that, from the next year forward, the federal government would not be responsible for Creek Indians who remained in Alabama:

> Within the last year, forty-four of the few Creek Indians remaining in Alabama, and five hundred and forty-seven Choctaws from the State of Mississippi, have removed to the country of their brethren west, leaving about two thousand five hundred of the latter people still east of the Mississippi river, notwithstanding the great exertions and the large expenditures that have been made for some years past in endeavoring to effect their emigration. These Indians were made citizens by the laws of the States where they are, and the effort to remove them was an obligation voluntarily assumed by the government for their benefit and the advantage of those States. New arrangements have been adopted for a final effort to effect that object, which it is hoped will be attended with success. <u>All that can be induced to go will probably be removed within another year, at the end of which all further proceedings and expenses should be terminated, and those that shall then remain be permitted to do so in the quiet enjoyment of their rights as citizens</u>.

Annual Report of the Commissioner of Indian Affairs (1849) at 948, Exhibit 65 (emphasis added). This is an explicit statement, from the highest federal official in Indian affairs, disclaiming any further federal role ("all further proceedings and expenses should be terminated") with respect to the Creek in Alabama.

Subsequent Annual Reports confirm that the 1849 Report accurately depicted the end of federal recognition of the Creek in Alabama. The Annual Reports from 1850 to 1912 (the years we reviewed) all report on the Creek – but only with regard to the Creek

Katherine L. Zebell, Esq.
June 3, 2005
Page 16

in Indian territory (Oklahoma).  There are no separate reports, in any Annual Report in
this period, regarding the Creek in Alabama.[6]  Indeed, after 1871, the Annual Reports
contain no mention at all of the Creek in Alabama.  There simply could not have been a
recognized tribe that escaped the notice of the Commissioner in his comprehensive
reports to Congress over such an extended period of time.  This unbroken record of no
federal involvement for a long period of time – following a clear statement in 1849
indicating that no further federal involvement was to take place – clearly shows that the
federal government terminated its relationship with Poarch Creek.

      This pattern – federal neglect of Poarch Creek, coupled with express federal
disclaimers of any federal relationship with Poarch Creek – was a recurring theme in the
Tribe's history thereafter.  For example, in 1906 an attorney named John D. Beck wrote to
the President of the United States seeking federal help for the Creek Indians in Alabama.
The letter was forwarded to the Office of Indian Affairs.  The Acting Commissioner of
Indian Affairs responded to Beck's letter by stating

> this Office knows of no band of Indians located in the southern
> part of Alabama.  It is possible, of course, that there are persons
> of Indian or part Indian blood located in Alabama, as there are
> in many other States, but these people are in no way connected
> with the tribes of Creeks, Chickasaws and Cherokees that are
> located in the Indian Territory.  The Creeks, Chickasaws and
> Cherokees that are now in the Indian Territory located there
> many years ago by virtue of treaties made between their leaders
> and the United States, and the individual members of such tribes
> that may have elected to and did remain east of the Mississippi

---

      [6] During this entire period, there were only two instances in which the Annual Reports
even mention the Creeks outside of Oklahoma.  In one instance, there is a passing reference to
the sale of 34 sections of lands of Creek Indians, presumably the fee lands conveyed under the
1832 Treaty.  1856 Annual Report at 19.  In one Report, the Commissioner noted "It is reported
to me that there are also some indigent Creeks remaining in Alabama, who would like to be again
incorporated with their tribe in its western home."  1871 Annual Report at 576.  This reference
both suggests that the Commissioner has no direct dealings with the Creek in Alabama ("it is
reported to me"), and underscores that the Commissioner views a Creek being "incorporated" in
their "Tribe" as being something that could only take place in Oklahoma.

Katherine L. Zebell, Esq.
June 3, 2005
Page 17

> River when the general emigration of the tribes took place, surrendered any right to share in the property of the tribes as at present constituted in the Indian Territory.  <u>Such Indians as may be found in southern Alabama at the present time are the descendants of those who chose to remain there rather than emigrate to what is now the Indian Territory, and so far as this Office is concerned, are citizens of that State and are entitled to no consideration not due to other citizens who may be of white blood.</u>

Letter to John D. Beck from Acting Commissioner of Indian Affairs (Dec. 31, 1906) at 1-2, Exhibit 66 (emphasis added).  The Acting Commissioner's point was clear – as of 1906 the federal government recognized no Tribe in Alabama, and the federal relationship with individual Creeks in Alabama was no different than its relationship with non-Indians.

Even during the era of the Indian Reorganization Act – when federal policy overall sought to promote Tribal self-sufficiency and self-government – the federal government continued to refuse requests to help Poarch Creek.  In 1931, Reverend Edgar Van W. Edwards, an Episcopal clergyman who was working among the Creek near Atmore, Alabama, wrote to the Commissioner of Indian Affairs stating "I have become interested in a small tribe of Indians located near here, and I want to make an appeal to you and through you to the Indian Bureau to see if something of a permanent nature can be done for them."  Letter to Charles J. Rhoads, Commissioner of Indian Affairs, from Rev. Edgar Van W. Edwards (Sept. 10, 1931), Exhibit 67.  Reverend Edwards asked for land for the Creek and for "some reliable person who would act as agent, to protect them."  *Id.*  The Assistant Commissioner of Indian Affairs replied that, with regard to Reverend Beck's reference to 200 acres of Creek land in Alabama, "[n]o record has been found of a tribal reserve of 200 acres having been set apart by the Government for these Indians."  Letter to Rev. Edgar Van W. Edwards from Henry J. Scattergood, Assistant Commissioner of Indian Affairs (Sept. 25, 1931), Exhibit 68.  Further, since the June 4, 1912 Act, "we [the federal government] have had little or nothing to do with any Creek Indians in Alabama."  *Id.*  Scattergood concluded that the federal government is "not in a position to grant the relief requested."  *Id.*

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 18

Despite this clear rebuff, Reverend Edwards continued his efforts to gain federal assistance for the Poarch Creek. On March 19, 1936, Reverend Edwards again wrote, this time to the Bureau of Indian Affairs. In his letter, Reverend Edwards stated "[o]ff and on for nearly six years I have been writing to the Indian Affiars [sic] Depart. To our Senators and others, in behalf of a small group of Indians near here, and it seems impossible to get action." Letter to Hon. Willard Walcott Beatty from Rev. Edgar Van W. Edwards (March 19, 1936), Exhibit 69. Reverend Edwards again asked whether the Bureau would "help me help these helpless people?" *Id.*

John Collier, the Commissioner of Indian Affairs, responded to Edwards. Although he was a strong advocate for tribal rights and improving tribal social and economic conditions, Collier stated that "[t]here is reason to doubt whether this Office has authority to assume jurisdiction over the affairs of the Indians of Alabama . . . ." Letter to Rev. Edgar Van W. Edwards from John Collier, Commissioner of Indian Affairs (April 21, 1936), Exhibit 70. With regard to the Bureau's delay in replying to Reverend Edwards' previous requests, John Collier said:

> We assure you of our appreciation of the good work you are doing, and that the delay in replying to your letter is because <u>at present we would have to refuse all help on the basis of information now available</u>. We are withholding a decision in order that all the possibilities may be thoroughly reviewed and we may be sure that our final decision is in accordance with the law and its fairest interpretation.

*Id.* (emphasis added). While holding out the possibility that someday something could be done, Collier's answer – like that of every other federal official – was no. Federal assistance was not available for Poarch Creek.

Similarly, in 1938, in response to more requests for assistance for Poarch Creek, the BIA's Director of Education, Willard W. Beatty, wrote to Reverend Edwards expressing unwillingness to aid the Indians in Alabama. Letter to Rev. Edwin [sic] Edwards from Willard W. Beatty, Director of Education, Bureau of Indian Affairs (May 27, 1938), Exhibit 71. According to Mr. Beatty:

Katherine L. Zebell, Esq.
June 3, 2005
Page 20

rejected on the ground that there was no federally recognized tribe in Alabama. Federal officials uniformly told all those who asked that, as far as the federal government was concerned, there was no Poarch Band of Creeks in Alabama, and that the educational and other needs of the Tribe had to be met through non-federal sources.

This pattern continued until the Tribe gained recognition in 1984. As the Tribe's long-time Chairman, Eddie L. Tullis, notes:

> I have been active in the political, social and economic activities of the Tribe since 1964. From 1964 until the Tribe gained federal recognition in 1984, the federal government did not provide to Poarch Creek or its members the programs, benefits and services that the government provided to tribes that were federally recognized and their members. For example, during this period the Bureau of Indian Affairs provided no funds to the Tribe, and no services to our people, for any purpose. Likewise, our tribal members received no health care services from the Indian Health Service, and the Tribe received no federal funding to run its own health programs. Further, the Tribe received no funding from HUD for purposes of establishing or implementing a Tribal housing program. While the Administration for Native Americans (ANA) provided the Tribe with a small amount of grant funds in this period, those were specifically limited to tasks relating to our efforts to gain federal recognition – further demonstrating the government's understanding that Poarch Creek's recognition had previously been removed and that work was needed to restore the Tribe to recognized status. So, based on my own experience and knowledge of the Tribe's dealings, the Tribe and tribal members received no funds appropriated by Congress for purposes of serving federally recognized tribes during the period from 1964 until recognition in 1984. In fact, this pattern by the federal government of not treating Poarch Creek as it treated all federally recognized tribes extended back to the time of removal in the 1840's.

73264.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 21

Supplemental Affidavit of Eddie L. Tullis at ¶ 2 (May 26, 2005), Exhibit 73.

Even a 1975 request by Governor George Wallace urging the federal government to take land into trust for Poarch Creek – for a school – did not spur any action by the federal government:

> In 1975, Governor George C. Wallace of Alabama wrote to Morris Thompson, the Commissioner of Indian Affairs of the U.S. Department of the Interior. Governor Wallace stated that Alabama wished to transfer a parcel of land in Escambia County to the Tribe – and specifically requested that the parcel be held in trust for the Tribe by the United States. No action was taken on this request at the time, because the Tribe was not federally recognized. In 1980, Governor Fob James wrote to William E. Hallet, the new Commissioner of Indian Affairs. Governor James addressed the same request to have land taken into trust for the Tribe, stating that "we would like to see them [Poarch Creek] extended Federal recognition and this land [that is, the parcel Governor Wallace offered to transfer in trust for the Tribe] in their possession." The parcel involved in this correspondence was finally taken into trust – but only after the Tribe gained federal recognition. The parcel is referred to as Parcel 1, and it is the site of a school house and pow-wow grounds. This example regarding the State's attempt to transfer land in trust to the Tribe – and the federal government's refusal to accept the land in trust prior to recognition – further demonstrates that during this period the federal government treated the Tribe as an unrecognized tribe.

*Id.* at ¶ 3.[7]

---

[7] *See* letter to Morris Thompson, Commissioner of Indian Affairs from George C. Wallace, Governor of Alabama (Sept. 15, 1975), Exhibit 74; letter to William E. Hallet, Commissioner of Indian Affairs from Fob James, Governor of Alabama (May 27, 1980), Exhibit 75.

73114.1

Katherine L. Zebell, Esq.
June 3, 2005
Page 22

## Conclusion

In sum, long before it recognized the Tribe in 1984, the federal government terminated its relationship with Poarch Creek. The 1832 Treaty promoted removal and provided funds and permanent protection only for those Creek who removed to Oklahoma. Those Creek who remained in Alabama received no promise of an ongoing federal role and, to the contrary, the 1832 Treaty provided for no continuing federal role regarding the Poarch Creek after 5 years. The Treaty's intent to remove the Creek from Alabama was implemented by the U.S. military – an overt action fundamentally at odds with continued federal recognition for Poarch Creek. By 1849, the Commissioner of Indian Affairs had expressly disclaimed any federal responsibility for the Poarch Creek. This was followed by a lack of dealings by the federal government and the absence of federal services for the Tribe and its members for well over a century. During this long time period, whenever they were asked to provide assistance to Poarch Creek, federal officials uniformly declined – on the ground that the federal government recognized no tribe in Alabama. This was true, as the documents referenced here demonstrate, in 1849, 1906, 1931, 1936, 1938, 1975 and 1980.

The totality of these circumstances – federal action, inaction and express statements – convincingly demonstrates that the federal government terminated its relationship with Poarch Creek and that the Tribe remained unrecognized for almost 150 years. Having been federally recognized in Treaty times, having had that recognition removed by the federal government as described here, and having regained it in 1984 through the Federal Acknowledgment Process, Poarch Creek is a "restored" tribe under IGRA. We urge NIGC to so find.

Respectfully submitted,

*/s/ William R. Perry*
William R. Perry

cc:     Eddie L. Tullis, Chairman

# EXHIBIT C

06/13/2008  11:25 FAX                                                            ☒002



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

IN REPLY REFER TO:

## JUN 1 3 2008

Honorable Phillip N. Hogen
Chairman, National Indian Gaming Commission
1441 L St., NW
Suite 9100
Washington, DC 20005

Dear Chairman Hogen,

I am writing in regard to your May 19, 2008 letter to former Assistant Secretary – Indian
Affairs Carl Artman and Deputy Associate Solicitor, Division of Indian Affairs, Edith
Blackwell enclosing your May 19, 2008 Indian lands opinion for the Poarch Band of
Creek Indians, which purports to recognize the Band's right to game on the Tallapoosa
Site in Alabama. In the letter, you informed Mr. Artman and Ms. Blackwell that you
were issuing the Indian lands opinion despite the fact that your Office of General Counsel
(OGC) and the Solicitor's Office Division of Indian Affairs (DIA) had not reached
agreement on whether the Tallapoosa Site is restored lands and thus covered by an
exception to the general prohibition on gaming on lands acquired after October 17, 1988.

On January 14, 2008, the Deputy Associate Solicitor provided your Acting General
Counsel with a letter of non-concurrence in the National Indian Gaming Commission's
(NIGC's) draft Indian lands opinion. The January 14, 2008 letter provided specific
details as to why DIA disagreed with the draft opinion. The non-concurrence focused on
the restored tribe analysis. Generally, DIA does not believe that the Poarch Creek Band
ever had a government-to-government relationship with the United States until it was
acknowledged through the Part 83 process in 1983. The Deputy Associate Solicitor
concluded that the record simply does not support the Band's existence as a separate
tribal entity with a governmental relationship with the United States, nor does it support
that the United States terminated this governmental relationship. The Deputy Associate
Solicitor also questioned the Band's relationship with the Creek burial grounds located at
the Tallapoosa Site. Your May 19, 2008 opinion does not address any of the concerns
raised in our January 14, 2008 letter.

Given that the legal conclusions reached by OGC are inconsistent with the legal views of
the Office of the Solicitor, and that, as discussed below, NIGC has no statutory mandate
to issue Indian lands opinions independently, the Secretary has directed me to inform you
that he is invoking his authority referenced in 43 C.F.R. § 4.5 to review your decision and
has asked me to assist him in that review. Accordingly, in accordance with 43 C.F.R. §
4.5(c), please provide me with the administrative record supporting your May 19, 2008

06 13 200 14:25 FAX &#8202;&#8202;@003

decision. Pending this review, you may not take any further action to implement your
May 19, 2008 decision.

I understand that the matter concerning the Poarch Creek Band first arose in November
2003, when the Assistant Attorney General for the State of Alabama questioned the
Band's gaming activities on three parcels. From what I understand, NIGC reviewed two
of those parcels and determined that they met the initial reservation exception in 25
U.S.C. § 2719(b)(1)(B)(ii). The third gaming location, the Tallapoosa Site, remained at
issue, however, because the land was taken into trust in 1995 and is not within the Band's
initial reservation. The Band has continued its gaming operation on the Tallapoosa Site
during the pendency of NIGC's review.

While the request from the Assistant Attorney General came to NIGC in November 2003,
it was not until January 2006 that the DIA received OGC's first draft of its Poarch Creek
Indian lands opinion. Attorneys in DIA expressed their concern with the Poarch draft as
early as February 2006. OGC attorneys and DIA attorneys met in May, October, and
December 2006 to discuss DIA's concerns with the draft opinion. After the December
12, 2006 meeting, OGC agreed to revise the January 2006 draft opinion. DIA attorneys
and OGC attorneys met together with the Tribe on March 13, 2007 to discuss the
unresolved issues. On March 26, 2007, the Band's attorneys provided OGC and DIA
with their response to the restored lands issues raised at the March 13 meeting. It was not
until September 24, 2007 that OGC provided DIA with a revised draft dated July 18,
2007.

After receipt of the July 18, 2007 draft, attorneys in OGC and DIA tried to reach
consensus on the legal position. On December 27, 2007, OGC notified DIA that it
wanted DIA's response prior to December 31, 2007. On January 3, 2008, the Deputy
Associate Solicitor sent OGC a short letter expressing DIA's non-concurrence with the
July 18, 2007 draft. On January 7, 2008, you, the Deputy Solicitor, and attorneys from
OGC and DIA met via a conference call to discuss the unresolved issues. At that time,
OGC requested a detailed written non-concurrence.

On January 14, 2008, the Deputy Associate Solicitor provided a six-page letter that
detailed most of the rationale for the non-concurrence to OGC's July 18, 2007 opinion.
Since its receipt of the January 14, 2008 letter, OGC has made no efforts to resolve the
issues raised by DIA. As previously noted, the May 19, 2008 opinion you signed made
no reference to the concerns raised in the January 14, 2008 letter.

Generally, the Office of the Solicitor and the OGC have worked cooperatively on Indian
lands opinions since the inception of your Office of General Counsel. In March 2000, the
cooperative process was memorialized in a Memorandum of Understanding signed by the
Associate Solicitor, DIA and General Counsel, NIGC. In 2006, it became apparent that a
new Memorandum of Understanding needed to be negotiated. I signed a Memorandum
of Agreement (MOA) on May 31, 2006, for a six-month period. That agreement was
renewed in February 2007 for another six-month term. While it expired in August 2007
and has not been renewed, OGC and DIA have both expressed a willingness to continue

06/18/20   14:26 FAX                                                                          ☑001

to abide by its terms. Inexplicably, the NIGC took no steps after receiving the
January 14, 2008 non-concurrence to attempt to follow the MOA's process for resolution
of non-concurrence issues. For example, no effort was made to have further discussions
with DIA or senior Solicitor's Office officials, including discussions whether to refer the
matter to the Office of Legal Counsel, as was expressly provided in the MOA.

Generally, when OGC attempts to draft an Indian lands opinion, it typically writes a
broad and wide-ranging opinion that touches on issues not unique to gaming. NIGC
Indian lands opinions discuss a tribe's jurisdiction over lands, a tribe's governmental
authority, the boundaries of a tribe's reservation, and the history of a tribe. In NIGC's
Indian lands opinion regarding the restored land for a restored tribe exception, OGC
extensively delves into the history of the tribe's relationship with the United States,
especially with the Secretary of the Interior. OGC also looks at the history of the tribe's
occupation of certain lands and communications between the Department of the Interior
and the tribe. DIA has in the past questioned the need for delving into such issues that
are not specific to gaming. While the Solicitor's Office and OGC have reached
consensus on all Indian lands opinions prior to the Poarch Creek decision, it has not been
without controversy. DIA has on several occasions agreed with NIGC's conclusions but
not with its analysis. For the Poarch Creek decision, as the January 14, 2008 letter sets
out, my Office did not agree that the Poarch Creek Band is a restored tribe for Indian
Gaming Regulatory Act (IGRA) purposes.

As the chief legal officer for the Department of the Interior, it is incumbent on me to
ensure that all legal opinions are consistent and sound. Nothing in IGRA changes my
role as the principal legal adviser to the Secretary and the chief legal officer of the
Department. Congress expressly placed the NIGC "within the Department of the
Interior."[1]  It is my responsibility to supervise the legal work of the Department.[2]

What is at issue is only the Poarch Creek Band's Indian lands opinion and the prospective
drafting, review, and approval of Indian lands opinions.[3]  The Department is not seeking
to review previously issued NIGC Indian lands opinions through this process. In
addition, DIA and OGC worked together to draft language in the 25 C.F.R. Part 292
regulations that provided that the regulations do not apply to final agency actions based
on legal opinions issued prior to the effective date of the regulations. Nor is the
Department calling into question the overall good work of the NIGC. NIGC's role in the
regulation of Indian gaming has been and will continue to be positive and important. The
Secretary has no desire to intrude in NIGC's statutory role for the regulation of Indian
gaming.

---

[1] 25 U.S.C. § 2704(a).

[2] *See* 109 DM 3.1; 110 DM 2.2; 209 DM 3.

[3] My Office defines Indian lands opinions as legal opinions that analyze whether gaming is authorized on
particular lands. These include opinions on whether lands meet the definition of Indian lands; whether a
tribe is exercising jurisdiction and governmental authority over those lands; whether gaming is authorized
under 25 U.S.C. § 2719; and a legal analysis of 25 C.F.R. Part 292.

05/20/20 4 14:26 FAX                                                                             ☐005

However, IGRA does not vest all authority for Indian gaming in one entity. IGRA is not an example of a statute that transferred all responsibility out of the Department. The scope and parameters of the NIGC's power are established and limited by the language of IGRA, the NIGC's sole source of statutory authority. In the purpose section of IGRA,[4] Congress clearly stated its intent to establish the NIGC as a commission to regulate Indian gaming. However, the scope of the power granted to the NIGC is not determined by the ultimate purpose of regulating Indian gaming. Rather, the scope of the NIGC's power is based upon the specific means prescribed by Congress to achieve that ultimate purpose.[5] IGRA sets out in detail the specific means to be employed by the NIGC to carry out its discrete powers to issue orders of temporary closure of gaming activities; levy and collect civil fines; approve tribal ordinances or resolutions; approve management contracts for Class II and Class III gaming;[6] and monitor, inspect, and examine Class II gaming activities.[7]

IGRA grants authority over other aspects of Indian gaming to the Secretary, Indian tribes, and the States. Therefore, it is evident from the plain language of IGRA that, although Congress established the NIGC as a commission for the purpose of regulating Indian gaming, it did not grant the NIGC the power to regulate, interpret, or decide all aspects of Indian gaming or matters related to Indian gaming.

As with the NIGC, it is clear that Congress did not grant the Secretary the power to regulate, interpret, or decide all aspects of Indian gaming. The Secretary has limited authority over those aspects of gaming that are assigned by IGRA to the NIGC, Indian tribes, or the States. Unlike the NIGC, the Secretary has authority for Indian gaming matters and matters related to Indian gaming that are not expressly assigned to any entity under IGRA. This authority is based upon statutes other than IGRA that give the Secretary broad authority to manage matters of Indian affairs and implement the laws governing Indians, and specific authority over Indian lands and tribal governments. Thus, the scope of the Secretary's authority is much broader than that of the NIGC and includes many general matters.

The authority of the NIGC is strictly limited to the discrete powers that are expressly assigned to it by Congress in IGRA. While it may interpret the statute and fill gaps with respect to its specific powers, the NIGC has no general authority over the regulation of Indian gaming based on the ultimate purpose of its authorizing statute. By contrast, the scope of the Secretary's authority extends broadly to most matters of Indian affairs and includes implementing many of the laws governing relations with tribes and individual Indians. Moreover, based on longstanding and specific authority under the Indian Reorganization Act and other generally applicable Indian law, the Secretary has the specific authority and subject matter expertise to decide issues concerning Indian lands and tribal jurisdiction. Thus, it is the Secretary, not the NIGC, who has the implicit authority to interpret any ambiguities and fill any gaps in IGRA, particularly with respect

---

[4] 25 U.S.C. § 2702(4).
[5] *See MCI v. AT&T Co.*, 512 U.S. 218, 231 (1994)
[6] 25 U.S.C. § 2705(a).
[7] 25 U.S.C. § 2706(b).

06 28 20   14:27 FAX                                                                        ☒006

to ambiguities or gaps that concern what constitutes Indian lands and the scope of tribal jurisdiction.

Indian lands opinions are by definition legal opinions that analyze whether lands are eligible for gaming. Indian lands opinions include issues such as whether lands meet the definition of Indian lands; whether a tribe is exercising jurisdiction and governmental authority over those lands; whether gaming is authorized under 25 U.S.C. § 2719; and a legal analysis of 25 C.F.R. Part 292. Resolution of these questions has not been delegated to the NIGC. Moreover, resolution of these issues relies on the particular expertise of the Solicitor's Office regarding overall Indian issues and not just Indian gaming concerns.

I am sending a copy of this letter to all parties copied on your May 19, 2008 opinion.

Sincerely,

David L. Bernhardt
Solicitor

cc:     Buford L. Rolin, Tribal Chairman
        William Perry, Sonosky, Chambers, Sachse, Endreson, & Perry
        Cindy Altimus, Region Director
        Troy King, Attorney General, State of Alabama

5

# EXHIBIT D



July 30, 2008

David L. Bernhardt, Solicitor
United States Department of the Interior
Office of the Solicitor
Mail Stop 6352
Washington, DC 20240

Dear Mr. Bernhardt:

We received your June 13, 2008 letter that seeks to review the National Indian Gaming
Commission (NIGC or Commission) Chairman's decision to continue regulating the Poarch
Band of Creek Indians' (Tribe) gaming facility in Tallapoosa, Alabama. You also request a copy
of the administrative record on which the Chairman relied. We will provide the record to you as
a matter of courtesy under separate cover. I respectfully and categorically reject, however, your
assertions that the Secretary of the Interior (Secretary) has the authority to review and approve or
disapprove the Chairman's decision. I also strongly disagree with your characterization of the
respective authorities of the NIGC and the Secretary under the Indian Gaming Regulatory Act
(IGRA).

## Background

This matter began when the State of Alabama wrote to the NIGC expressing concern over the
eligibility of the Tallapoosa site for gaming. *See* Letter from Jack Park, Assistant Attorney
General for the State of Alabama to Penny Coleman, Acting General Counsel (Nov. 20, 2003).
The Tribe operates a Class II gaming facility regulated by the NIGC. That regulation includes,
among other things, conducting site visits to determine compliance with IGRA, processing
fingerprints and reviewing background investigation reports for key employees and primary
management officials, accepting fees for regulating, accepting and reviewing audit and agreed
upon procedures reports, and providing such technical assistance as may be required.

Upon receipt of the State's inquiry, the Chairman reviewed the Tallapoosa site's status to
determine its eligibility for gaming and whether an enforcement action might be necessary. To
accomplish this review, NIGC sought records and documentation from the Department of the
Interior (Department), particularly focusing on information the Department had relied on to
recognize the Tribe and to acquire the Tallapoosa site into trust. Unfortunately, the Department
was not able to timely comply with NIGC's record request. Therefore, the Commission's review
was delayed. The factual record, which was ultimately compiled by NIGC, was extensive and
included the Department's acknowledgement and land-into-trust records; Bureau of Indian
Affairs' (BIA) land records; historical records, maps, archaeological reports; and other
documentation from the Tribe.

That record reflects a long and difficult history. It establishes that the Poarch Band was a part of a large confederacy that was the historic Creek Nation, most of which was moved out of what is now the State of Alabama in the first half of the nineteenth century. Before the forced resettlement to the Indian Territory, ancestors of the Poarch Band allied with the United States to fight against the other Creeks. Thereafter, they were rewarded with land grants and were allowed to remain in Alabama. As a result of the forced resettlement, what was once the Creek Nation of Alabama now exists as the Poarch Band, the Muskogee (Creek) Nation in Oklahoma and certain recognized tribal towns.

The Tribe's government-to-government relationship with the United States ended under the terms of an 1832 treaty, which terminated United States' protection over the Tribes's lands in 1837. Subsequently, the United States specifically and repeatedly disclaimed any relationship with the Poarch Band. It was not until the Tribe was recognized under the Department of Interior's recognition regulations in 1984 did the Tribe once again enjoy a government-to-government relationship with the United States.

Because of the complexity of the issues presented by the Band's history, the Commission's review was careful, comprehensive, and included many discussions with the Office of the Solicitor, Division of Indian Affairs (Division). As the review progressed and issues were raised, both the Office of General Counsel (OGC) and the Division asked the Tribe to provide additional documentation and views to address these issues. Given the different views presented and the extensive factual record compiled, the OGC exercised great care in its restored lands analysis.

In the end, the OGC's last draft legal opinion sent to the Division supported a conclusion that the Tribe could conduct gaming on the Tallapoosa site. That opinion was based specifically on a theory recommended by the Department's attorneys. OGC was dismayed, therefore, when the same attorneys then refused to concur with the draft opinion. OGC requested the non-concurrence in writing.

In reviewing the non-concurrence, we determined that the Division's analysis failed for several reasons. The analysis (1) failed to remain consistent with previous interpretations of the Indian Gaming Regulatory Act; (2) failed to take into account the Indian canon of construction, which requires that an ambiguous statute must be interpreted in favor of tribes; (3) was inconsistent with case law that the NIGC cited in previous determinations; and (4) was contrary to case law because it recognized only Congressional termination and not administrative termination of the government-to-government relationship. We also realized that there were weaknesses in the General Counsel's draft and addressed those issues during the first few months of 2008. Regrettably, as we struggled with those weaknesses, we did not continue to collaborate as we developed our views.

During that time, we were advised by tribal representatives that the Commission's hesitation was adversely affecting the Tribe's business dealings. The Department of the Interior also indicated its intent to issue regulations governing the applicability of 25 U.S.C. § 2719 when the Secretary acquires lands into trust. Those regulations were not immediately effective, and the Chairman recognized that if he relied upon them, he might have to start the review process over again.

Therefore, because the Tribe had waited for over four years for the Commission's views and because the Chairman believed that he had a thoroughly researched and well-reasoned basis for a decision, the Chairman chose to issue his decision. Consequently, on May 19, 2008, the Chairman concluded that he would not take an enforcement action against the Tribe, and the Commission would continue to regulate the Tallapoosa Entertainment Center.

Additionally, I note that throughout your June 13, 2008 letter, you refer to the decision as an "opinion," suggesting that it was merely advisory and issued by the OGC. On the contrary, the May 19, 2008 letter was a decision by the Chairman pursuant to the enforcement authority granted to him under IGRA. 25 U.S.C. § 2713. As such, his decision is an agency action with legal effect. It is reviewable only by the Commission and the federal courts. Further, even if his May 19 decision had been an opinion of the OGC, the opinion would be reviewable only by the Chairman.

## ANALYSIS

### I.     The Secretary's authority under IGRA is strictly limited.

Your statements that the "Secretary has authority for Indian matters and matters related to Indian gaming that are not expressly assigned to any entity under IGRA" and that the Secretary has the power to "fill any gaps in IGRA" ignore the plain and unambiguous language of IGRA. It is well settled that the proper interpretation of an unambiguous statute requires nothing else. *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms".) (*quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (*in turn quoting Caminetti v. United States*, 242 U.S. 470, 485 (1917)). Contrary to your claims, section 2709 of IGRA specifically and unambiguously transfers all of the Secretary's powers over gaming to the NIGC. 25 U.S.C. § 2709. Accordingly, the Secretary retains only those powers that he has been specifically delegated under IGRA.

Section 2709 states that the Secretary's general authority over gaming was expressly taken from him and given to the Commission:

> Notwithstanding any other provision of this chapter, the Secretary shall continue to exercise those authorities vested in the Secretary on the day before October 17, 1988, relating to supervision of Indian gaming until such time as the Commission is organized and prescribes regulations. . . .

This section is clear and unambiguous. The Secretary was able to exercise his authority over gaming until the Commission prescribed the bulk of its regulations in 1993. *See* 57 Fed. Reg. 12382 (April 9, 1992) and 58 Fed. Reg. 5802 (January 2, 1993). Consequently, any authority the Secretary may have had over gaming vested with the Commission by 1993.

To the same effect is section 2711(h), which removed from the Secretary the power to approve management contracts under 25 U.S.C. § 81 and vested it in the Commission:

> The authority of the Secretary under section 81 of this title [25 U.S.C. § 81], relating to management contracts regulated pursuant to this Act, is hereby transferred to the Commission.

25 U.S.C. § 2711(h).

Therefore, when Congress granted the Department authority under 25 U.S.C. § 2719(b)(1), it was not a general grant of authority. Rather, under § 2719, Congress granted the Secretary authority to act only in specifically delimited circumstances: to determine whether gaming on certain parcels may be in the best interest of an Indian tribe and not detrimental to the surrounding community, 25 U.S.C. § 2719(b)(1)(A); to identify the former reserves in Oklahoma 25 U.S.C. § 2719(a)(2)(A)(i); and to determine reservation status, 2002 Dep't of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, § 134, 115 Stat. 414, 442-43 (2001). In the balance of IGRA, the Secretary's authority is limited to approving tribal revenue allocation plans so as to allow per capita payments from net gaming revenue, 25 U.S.C. § 2710(b)(3)(B); approval of tribal-state compacts, 25 U.S.C. § 2710(d)(8); and issuance of procedures in lieu of a tribal-state compact under specified conditions, 25 U.S.C. § 2710(d)(7)(B)(vii).

Contrary to your claim, it is the NIGC and not the Department that administers IGRA, and it is the NIGC and not the Department that fills any "gaps" that exist in IGRA. This, the courts have made abundantly clear, is why Congress delegated to the Commission and not to the Department the authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions" of IGRA. 25 U.S.C. § 2706(b)(10). "NIGC is the agency expressly charged by Congress with administering the IGRA" by virtue of 25 U.S.C. 2706(b)(10). *Citizens Against Casino Gambling in Erie County (CACGEC) v. Kempthorne*, 471 F. Supp. 2d 295, 321 (W.D.N.Y 2007). *See also*, *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1023 (10th Cir. 2003) ("NIGC's broad powers include inspecting tribes' books and records… levying and collecting civil fines, monitoring and shutting down unauthorized tribal games, and promulgating regulations and guidelines to implement IGRA."); *Shakopee Mdewakanton Sioux Community v. Hope*, 16 F.3d 261, 263 (8th Cir. 1994) ("IGRA established the Commission to regulate Indian gaming, and specifically authorized the Commission to promulgate regulations and guidelines necessary to implement the provisions of the Act."); *CACGEC*, 471 F. Supp. 2d at 322 (grant of rulemaking authority carries with it "the primary authority to interpret any ambiguous phrases or terms contained in the IGRA.").

What is more, NIGC's role as the administrator of IGRA carries with it the ability to make Indian lands determinations. *See, e.g., Grand Traverse Band of Ottawa & Chippewa Indians v. United States Atty.*, 46 F. Supp. 2d 689, 707 (W.D. Mich. 1999) (the question of restored land is within the NIGC's "special competence."); *County of Amador, California v. United States DOI*, 2007 U.S. Dist. LEXIS 95715 at *17, n. 7 (E.D. Cal. Dec. 12, 2007) ("[O]utside the context of the trust application, NIGC retains the authority for determining whether the restored lands exception applies."); *CAGEC*, 471 F. Supp. 2d at 303 ("the Indian lands determination is one that

Congress placed in the NIGC's hands..."). As shown more fully below, the language of IGRA makes this so.[1]

## II. Congress specifically delegated to the NIGC the authority to determine the status of Indian lands as part of its oversight of Indian gaming.

That NIGC is responsible for administering IGRA means, under IGRA's plain terms, that NIGC has oversight authority over Indian gaming. *Kansas v. United States*, 249 F.3d 1213, 1218 n. 1 (10th Cir. 2001) ("Although the NIGC is nominally part of … Interior, Congress has given the NIGC exclusive authority to regulate Indian gaming conducted pursuant to IGRA"); For example, IGRA provides NIGC with the authority to monitor and inspect the premises on which gaming takes place. 25 U.S.C. § 2706(b)(1)-(2). Moreover, IGRA specifically requires the Chairman to review and approve tribal gaming ordinances that authorize gaming on Indian lands. 25 U.S.C. § 2710(b)(2) and (d)(1)(A). It also requires the Chairman to review and approve management contracts for tribal gaming operations. 25 U.S.C. § 2711. Further, IGRA permits the Chairman to take enforcement action against the operators of tribal gaming facilities that violate any section of IGRA, NIGC regulations, or approved tribal gaming ordinances. 25 U.S.C. § 2713; 25 C.F.R. parts 573 and 575. Appeals from the Chairman's actions are heard by the full Commission, which is authorized to hold hearings on appeal and to request all witnesses and documents needed to make its decision. 25 U.S.C. §§ 2715 and 2716; 25 C.F.R. parts 539 and 577; 25 U.S.C. §§ 2706(b)(4), (8), 2713(a)(2-3), and 2715(a) and (d). Finally, the Chairman's enforcement actions are reviewable only by the Commission or the courts. 25 U.S.C. §§ 2713(c), 2714.

That said, Indian gaming is only permissible on *Indian lands*, which IGRA defines as:

> All lands within the limits of an Indian reservation; and any lands title to which is
> either held in trust by the United States for the benefit of any Indian tribe or
> individual subject to restriction by the United States against alienation and over
> which an Indian tribe exercises governmental power.

25 U.S.C. § 2703 (4). In other words, IGRA expressly provides for Indian gaming only where land qualifies as *Indian lands* under the Act. *See, e.g., State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701 (1st Cir. 1994) (finding that the Act's key provisions are limited to any Indian tribe having jurisdiction over Indian lands and to Indian lands within such tribe's jurisdiction). IGRA's "on Indian lands" requirement is integrally woven throughout the regulatory tapestry of the Act. 25 U.S.C. § 2710(a)(1-2), (b)(1), (d)(1), (d)(3)(A-B)(permitting Class II and Class III gaming *only* on Indian lands). As Congress established NIGC to oversee

[1] We do not mean to suggest, however, that the Secretary cannot decide the status of Indian lands under his own separate authority to acquire land into trust. *County of Amador*, 2007 US Lexis 95715 at *7-*8 ("While NIGC regulates gaming, DOI analyzed whether gaming would be permissible on the land, because, under regulations implementing Section 5 of the IRA, DOI must take into account the purpose for which the land will be used. 25 C.F.R. §151.11. This is not to suggest, however, that DOI's analysis is subsequently binding upon the NIGC.")

Indian gaming, the regulatory authority of the Chairman and the Commission may only be exercised on Indian lands.

As the agency head specifically tasked under the statute with the duty to monitor gaming, approve management contracts, approve ordinances, and take enforcement action, the Chairman must have the power to first determine the extent of his agency's jurisdiction. As that jurisdiction is necessarily coextensive with Indian lands, IGRA necessarily grants the Chairman the authority to make Indian lands determinations in the process of exercising these powers. It is beyond question that administrative agencies have the authority to determine their own jurisdiction prior to taking action. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 647 (1972); *Newport News Shipbuilding & Dry Dock Co. v. Schauffler*, 303 U.S. 54, 57 (1938). *See also United States v. Morton Salt Co.*, 338 U.S. 632, 641-643 (1950) ("When investigative duties are delegated by statute to an administrative body, it . . . may . . . inform itself as to whether there is a probable violation of the law."); *United Transp. Union-Illinois Legislative Bd. v. Surface Transp. Bd.*, 169 F.3d 474, 476 (7th Cir. 1999) (agency's determination of its own jurisdiction not entitled to *Chevron* deference upon judicial review).

Put slightly differently, where a statute vests an administrative agency with authority to oversee a particular industry or subject matter, it necessarily confers on that agency the authority to determine whether particular activities, actions or entities fall within its jurisdiction. *See, e.g., Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 508-509 (1943) (Secretary of Labor empowered to determine which employees and government contracts fall within Walsh-Healey Public Contracts Act, mandating minimum wages in government contracts and allowing sanctions for violations and non-compliance.); *Reliable Automatic Sprinkler Co., Inc. v. Consumer Product Safety Commission*, 324 F.3d 726 (D.C. Cir. 2003) (whether sprinkler heads are "consumer products" within statutory jurisdiction of Consumer Products Safety Commission).

### A. The NIGC Chairman has exclusive authority to make, and is required to make, an Indian lands determination when presented with a tribal gaming management contract.

Congress gave the NIGC Chairman the authority to review and approve gaming management contracts, 25 U.S.C. § 2711, which he is required to do before such a contract is valid. Again, in giving the Chairman this power, Congress stripped it from the Secretary. 25 U.S.C. § 2711(h).

Management contracts have certain submission and content requirements set forth in IGRA and NIGC regulations. 25 U.S.C. § 2711(a)-(c), (g); 25 C.F.R. §§ 531.1, 533.1, and 533.3. Among these requirements is that a management contract must relate to a specific gaming site that qualifies as Indian lands. To determine whether to approve a management contract, therefore, the Chairman must determine whether the desired gaming will occur on Indian lands that meet IGRA's requirements. 25 U.S.C. §§ 2703(4), 2719. To make this determination, the Chairman must conduct an Indian lands analysis prior to contract approval. In light of this, your suggestion that the Chairman must request land opinions from your office when reviewing a management contract is inconsistent with federal law.

In fact, the District Court of Kansas emphasized this point:

> The IGRA created the NIGC to, among other things, review management
> contracts for class II gaming.... Part of that responsibility included determining
> whether or not a tribe exercises governmental authority over the land on which it
> seeks to conduct gaming....

*Miami Tribe of Oklahoma v United States*, 927 F. Supp. 1414, 1423 (D. Kan. 1996).

The Ninth Circuit Court of Appeals echoed this sentiment in *AT&T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899, 902 (9th Cir. 2002), when it addressed the Chairman's approval of a management contract for a tribal telephone lottery:

> The NIGC is statutorily obliged to reject any lottery proposal that does not
> conform to IGRA . . . In fact, the NIGC has previously refused to approve
> management agreements when it believed the proposed gaming activity will not
> be conducted "on Indian lands" for IGRA purposes.

295 F.3d at 909 (*citing Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1218 (D. Kan. 1998)). Thus, the NIGC Chairman has the exclusive authority to determine Indian lands for the purpose of gaming when he reviews and approves management contracts.

### B. The NIGC Chairman has exclusive authority to make, and is required to make, an Indian lands determination when presented with a site-specific tribal gaming ordinance.

Next, as with management contracts, Congress gave the Chairman the authority to review tribal gaming ordinances to determine whether they meet IGRA's requirements. The Chairman must approve an ordinance before it is valid. 25 U.S.C. §§ 2710(b)(2) and (d)(1)(A). While IGRA requires ordinances to include certain provisions, 25 U.S.C. § 2710(b)(2)-(4); 25 C.F.R. § 522.4, and parts 556 and 558, tribes often exercise their sovereign legislative powers and include additional provisions that are not mandated by IGRA. A common additional provision is a clause authorizing gaming on a specific parcel of land creating a so-called *site-specific ordinance*. To date, the Chairman has reviewed over 23 site-specific ordinances and continues to receive such requests for approval. The plain and unambiguous language of IGRA requires the Chairman to make an Indian lands determination when faced with a site-specific ordinance authorizing Class II gaming:

> The Chairman shall approve any tribal ordinance or resolution concerning the
> conduct, or regulation of Class II gaming on the Indian lands within the tribe's
> jurisdiction if such ordinance or resolution provides that . . . .

25 U.S.C. § 2710(b)(2). By incorporating this language by reference for Class III gaming, IGRA requires this same determination for a site-specific Class III ordinances. 25 U.S.C. § 2710(d)(1)(A)(ii).

That is, IGRA only authorizes the Chairman to approve a site-specific ordinance if it authorizes gaming on *Indian lands*, as IGRA defines the term. Without confirmation that the site-specific ordinance authorizes gaming on Indian lands eligible for gaming, the Chairman would have to disapprove the ordinance. To approve an ordinance that specifically permitted gaming on ineligible lands would authorize a tribe to offer gaming that IGRA prohibits. *AT&T Corp.*, 295 F.3d at 908 ("the statutory framework suffices to demonstrate that the NIGC must consider the legality of Class III gaming before approving compacts, resolutions, ordinances, and management contracts . . . ").

Federal courts recognize the NIGC's authority to issue land opinions in connection with ordinance reviews:

> The NIGC is charged with interpreting and applying the IGRA to Indian lands for gaming. *See Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1422 (D. Kan. 1996) (holding that NIGC had the authority to determine whether particular lands were within the tribe's jurisdiction for purposes of determining whether they constituted "Indian lands" within the meaning of the statute).

*Grand Traverse*, 46 F. Supp. 2d at 707. Further, the District Court for the Western District of New York insisted that the Chairman must complete such a determination as part of his duties:

> Having fully considered the purpose and structure of the IGRA, and the authority delegated to the NIGC by Congress, this Court rejects Defendants' contention that the NIGC Chairman is not required to make "Indian lands" determinations when he acts on a tribal gaming ordinance. To the contrary, whether Indian gaming will occur on Indian lands is a threshold jurisdictional question that the NIGC must address on ordinance review to establish that: 1) gaming is permitted on the land in question under the IGRA, and 2) the NIGC will have regulatory and enforcement power over the gaming activities occurring on that land.

*CACGEC*, 471 F. Supp. 2d at 303. In fact, the court in *CACGEC* vacated the Chairman's ordinance approval because the Chairman did not make an Indian lands determination on a site-specific compact: "Because the Indian lands determination *is one that Congress placed in NIGC's hands*, the NIGC's 2002 ordinance approval is vacated . . . ." *Id.* at 303 (emphasis added).

The statutory obligation to review and approve site-specific ordinances grants the NIGC Chairman the exclusive authority in those instances to determine Indian lands for the purpose of gaming.

**C. The NIGC Chairman has the exclusive authority to make, and is required to make, an Indian lands determination prior to the initiation of an enforcement action.**

Lastly, Congress gave the Chairman authority to bring enforcement actions against any tribal gaming operator or manager that violates IGRA's provisions, NIGC regulations, or tribal gaming ordinances. 25 U.S.C. § 2713. To assist the Chairman in an enforcement investigation, the Commission may use its power to request witnesses and documents and issue subpoenas. 25 U.S.C. § 2715(a). Additionally, the Commission may order depositions with proper notice to the parties. 25 U.S.C. § 2715(d). For violations of IGRA, the Chairman may assess civil fines of up to $25,000 per day or closure of all or part of a gaming operation. 25 U.S.C. § 2713(a)-(b).

IGRA's specific language is:

> The Chairman shall have the authority to levy and collect appropriate civil fines, not to exceed $25,000 per violation, against the tribal operator of an Indian game or a management contractor engaged in gaming for any violation of this chapter, any regulation prescribed by the Commission pursuant to this chapter, or tribal regulations, ordnances, or resolutions approved under section 2710 and 2712 of this title.

25 U.S.C. § 2713(a).

The Chairman may only bring enforcement actions against those operations that come within the Commission's jurisdiction, and as explained above, the Commission's jurisdiction extends only to Indian lands. Accordingly, the Chairman must have the ability to determine whether the operations are on Indian lands in order to be able to bring an enforcement action in the first place.

Once again, courts recognize this. The District Court for the Western District of Washington recently held that "tribal gaming under IGRA must occur on 'Indian lands' and the NIGC is the agency charged with ensuring this happens." *North County Community Alliance v. Kempthorne*, No. C07-1098-JCC, slip op. at 14 (W.D. Wash. Nov. 16, 2007).

Again, then, the Chairman's statutory authority to bring enforcement actions for IGRA violations necessarily gives him the exclusive authority in those instances to determine Indian lands for the purpose of assessing his jurisdiction. For the same reasons, the Chairman also has exclusive authority to make an Indian lands determination as part of investigating whether a tribe is gaming on Indian lands where gaming is prohibited under IGRA. This was the essence of the Chairman's Poarch Band determination. He acted under the authority expressly granted to him under IGRA, 25 U.S.C. §§ 2705(a)(1)-(2), 2713(a), and responded to the State of Alabama's concern that the Tribe was gaming on lands in violation of IGRA. The Chairman issued a decision concluding that no enforcement action was warranted because the Tribe was gaming in compliance with IGRA. The Chairman's decision was squarely within this statutory enforcement authority.

III.  **Due to its status as an independent regulatory agency, the Secretary does not have the authority to order the NIGC to take actions on whether to regulate gaming**

All of that said, the Secretary lacks the authority to oversee the Chairman's Poarch decision for other, equally sufficient reasons. NIGC's nominal placement "within" the Department of the Interior is insufficient to give the Secretary any authority over NIGC decisions. Congress, courts, and other federal agencies have all acknowledged NIGC as an independent agency. Your analysis ignores this. It also ignores IGRA's language and legislative history, case law that specifically addresses the NIGC's independence, the course of dealing between the Department and NIGC that treated the NIGC as independent, and the history of the treatment of the NIGC as independent by other offices of the Executive branch and the Congress.

### A. The NIGC Meets All of the Characteristics of Independent Agencies

Justice Sutherland described the independent agency:

[It is] a body of experts who shall gain experience by length of service — a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government.

*Humphrey's Ex'r v. United States*, 295 U.S. 602, 624, 625-626 (1935) (internal citations omitted), cited in Breger & Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 ADMIN. L. REV. 1112, 1113. (Fall 2000).

Numerous other law review articles and treatises have been written on the subject of independent agencies and their identifying characteristics. *See, e.g., Symposium: The Independence of Independent Agencies*, 1988 DUKE L.J. 215; *A Symposium on Administrative Law: The Uneasy Constitutional Status of the Administrative Agencies*, 36 AM. U. L. Rev. 277 (1987); Geoffrey P. Miller, *Independent Agencies*, 1986 SUP. CT. REV. 41; Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573 (1984); and Bernard Schwartz, *Administrative Law* § 1.10 at 20 (3d ed. 1991). The Breger & Edles article is noteworthy here, however, not only because it explains those identifying characteristics but also because it analyzes the NIGC as part of its survey of 32 independent agencies. Breger & Edles at 1139, 1272-1273.

The following are the fundamental characteristics of agencies that are independent of executive authority:

- A multi-member commission whose members serve fixed terms.

- Protection against removal except "for cause."

    The defining characteristic of the 32 agencies discussed in Breger and Edles's article is that at least one member of the agency is appointed by the President to a full-time, fixed term position with the advice and consent of the Senate

and has protection against summary removal by some form of "for cause" restriction on the President's authority. *Id.* at 1113.

This "for cause" removal feature continues to be a critical criterion by which scholars typically distinguish between "independent" and executive branch agencies. *See, e.g.,* Davis & Pierce, *Administrative Law* § 2.5 at 46 (3d ed. 1994) ("The characteristic that most sharply distinguishes independent agencies is the existence of a statutory limit on the President's power to remove the head (or members) of an agency." Schwartz, §1.10 at 20 ("The key to independence is security of tenure."); and Peter L. Strauss, *An Introduction to Administrative Justice in the United States* 15 (1989) ("Because [independent commission] members are appointed for fixed terms from which they cannot be dismissed without formal cause, they are more remote from presidential influence and control than the more usual 'executive' agency.").

- Possess a combination of rulemaking, enforcement, and adjudication powers and functions.

- Members generally appointed by the President with the advice and consent of the Senate.

  This is not always the case as Breger and Edles noted with the NIGC: "For example, the chairman of the National Indian Gaming Commission is appointed by the President with the advice and consent of the Senate, but the other two members are appointed by the Secretary of the Interior. All members serve three-year terms and can only be removed from office for good cause." Breger and Edles at 1139.

- Typically, agency statutes require political balance, *i.e.* no more than a bare majority of members may come from the same political party.

- Agency has specialized mandate directing it to focus either on particular industry or on specific cross-cutting problems.

- Agency makes its own submissions to Congress.

- Agency chairperson is the chief executive and appoints and supervises staff and prepares the agency's budget and expenditure of funds.

*Id.* at 1112, 1138-1142, 1115 and 1165.

The NIGC possesses all of these hallmarks of an independent agency:

- The Commission is a multi-member body whose members serve fixed terms. 25 U.S.C. § 2704 (b)(4)(A).

- Commission members enjoy secure tenure. Commissioners are removable only for cause. 25 U.S.C. § 2704(b)(6).

- The Commission possesses a combination of rulemaking, enforcement and adjudication powers and functions. *See, e.g.,* 25 U.S.C. § 2706(b)(10) (the Commission "shall promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this Act"); 25 U.S.C. § 2706(b)(1)-(4) (Commission to monitor gaming, inspect gaming facilities, conduct background investigations and audits); 25 U.S.C. § 2715(a) (subpoena and deposition authority for any matter under investigation); 25 U.S.C. §§ 2705(a)(2), 2713(a) (Chairman has authority to assess civil fines of $25,000 per day); 25 U.S.C. § 2705(a)(1), 2713(b) (Chairman has authority to order temporary closure of casino); 25 U.S.C. § 2706(b)(8) (Commission may hold hearings and take testimony as necessary); 25 U.S.C. § 2713(a)(2) (appeal of Chairman's civil fine assessment to full Commission); and 25 U.S.C. § 2713(b)(2) (appeal of Chairman's closure order to full Commission).

- The Chairman is appointed by the President with the advice and consent of the Senate. 25 U.S.C. § 2704(b)(1)(A).

- Appointments to the Commission are limited by political party and tribal membership. Specifically, no more than two commissioners may be from the same political party and at least two commissioners must be enrolled members of an Indian tribe. 25 U.S.C. § 2704 (b)(3).

- Congress delegated powers to the Commission in furtherance of a specific mandate, namely the oversight and protection of Indian gaming and the promotion of tribal economic development, tribal self sufficiency, and strong tribal government. 25 U.S.C. §§ 2701, 2702.

- The Commission is required to submit its own report to Congress with information on its funding, recommendations for amendments to IGRA, and any other matters considered appropriate by the Commission. 25 U.S.C. § 2706(c).

- The Chairman is the chief executive of the NIGC. He appoints the General Counsel, 25 U.S.C. § 2707(a), and appoints and supervises other staff of the Commission. 25 U.S.C. § 2707(b). At the request of the Chairman, "the head of any federal agency is authorized to detail of the personnel of such agency to the Commission . . . ." 25 U.S.C. § 2707(d). The Chairman and the Commission prepare and adopt the agency's budget. 25 U.S.C. § 2706(a)(1).

Moreover, other executive departments have independent agencies "within" or "in" them. For example, the Federal Energy Regulatory Commission's (FERC) enabling legislation describes it as an "independent regulatory commission" within the Department of Energy. Notwithstanding its location, courts treat FERC as an entity independent of the Department of Energy. *Consumer Energy Council of America v. FERC,* 673 F.2d 425, 472 (D.C. Cir. 1982) (identifying FERC as

functionally independent of the Executive Branch due to tenure of commissioners and finding that the Supreme Court has upheld "the constitutionality of such agency independence"). Additionally, the legislation creating the Surface Transportation Board states that "[t]here is hereby established within the Department of Transportation the Surface Transportation Board." 49 U.S.C. § 701(a). *See also Commonwealth of Pennsylvania v. Surface Transportation Board,* 290 F. 3d 522, 524 (3rd Cir. 2002) ("The Surface Transportation Board is the independent federal agency established by Congress within the Department of Transportation and has the responsibility for the economic regulation of the country's railroads."). Likewise, the legislation creating the United States Parole Commission provides that "[t]here is hereby established an independent agency in the Department of Justice. . . ." 18 U.S.C. § 4202. *See also U.S. v. Coyer,* 732 F.2d 196, 200 (1984) (describing the Parole Commission as "an independent agency of the Executive subject to the supervisory oversight of the Congress . . .").

### B. IGRA's Statutory Provisions and Legislative History Show that NIGC is an Independent Agency

Congress explicitly made the NIGC an independent agency. IGRA states, "the purpose of this chapter is . . . to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands . . . and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(3)). While this language could be construed to create authority independent of tribes and states rather than to create a regulatory body independent of the Executive, a review of the legislative history dispels this notion.

Again, where "the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Toibb v. Radloff,* 501 U.S. 157, 162 (1991), *citing Blum v. Stevenson,* 465 U.S. 886, 896 (1984). Here, the Senate report accompanying the passage of IGRA provides Congress's intention clearly and unambiguously: the bill "established a National Indian Gaming Commission as an independent agency within the Department of Interior." S. Rep. No. 100-446, at 1 (1988). This language clarifies, beyond any doubt, Congress's intention to create the NIGC as an independent agency. Lest there be any doubt, however, Congress reiterated its intention when it amended IGRA in 2005:

> Additionally, it is to be noted that the NIGC is an independent regulatory agency. This status has ramifications, including, that the agency is not governed by Executive Order 13175, which compels agencies other than independent regulatory agencies to consult tribal officials in the development of regulatory policies that have tribal implications. The Executive Order encourages independent agencies to observe its precepts, however, and the Committee notes with approval that the Commission, through its current consultation policy, has endeavored to do so.

S. Rep. No. 109-122 at 3 (2005).

C. Courts Recognize the NIGC as an Independent Agency

Several courts have held that NIGC is an independent agency. In 1991, shortly after IGRA was passed and before the NIGC was fully functional, the Tenth Circuit Court of Appeals recognized that under IGRA, gaming "is subject to the supervision of a newly created, independent regulatory authority – the National Indian Gaming Commission – established to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." *United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1176 (10th Cir. 1991), *quoting* 25 U.S.C. §§ 2702(3), 2704. IGRA was described by this court as "a comprehensive and pervasive piece of legislation that in many respects preempts other federal laws that might apply to gaming." *Id., quoting Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 743 F. Supp. 645, 648 (D.Wis. 1990). Likewise, in two separate cases, the Seventh Circuit noted NIGC's independence. *United States ex rel. Hall v. Tribal Dev. Corp.*, 49 F.3d 1208 (7th Cir. 1995) (the NIGC is a "three-member independent agency within the Department of Interior."); *United States ex rel. Mosay v. Buffalo Bros. Management*, 20 F.3d 739 (7th Cir. 1994) ("Congress enacted the Indian Gaming Regulatory Act, which establishes a three-member independent agency within the Department of Interior, the National Indian Gaming Commission, to supervise Indian gambling.").

### D. The Course of Dealing Between the Department and NIGC Supports NIGC's Independent Authority.

I note that the your current claim stands in stark contrast not only to the court opinions discussed above, but to the Department's own position as stated in *Sac and Fox Nation v. Norton*, 240 F.3d 1250, 1265 n. 12 (10th Cir. 2001) ("Although the Commission is nominally part of the Department of the Interior, the Secretary conceded at oral argument that the Commission functions as an independent entity.").

You cite to the Departmental Manual for support of your new claim that the Department must supervise the work of the NIGC. *See* Letter from Bernhardt to Hogen of 6/13/08. This fails to acknowledge the true nature of the relationship: the Department is obligated through contractual relationship to provide NIGC with administrative services. By statute, the NIGC is free to contract elsewhere for such services, though the Department is obligated to provide them upon request. 25 U.S.C.
§ 2707(e).

In particular, NIGC contracts with the Department for support services such as personnel services and hearing officials for administrative appeals before the Commission. The NIGC pays for all services it receives, and the Department provides these services at NIGC's request because it is required to do so under IGRA. 25 U.S.C. § 2707(e). If the NIGC were simply part of the Department, a Congressional mandate of services would be unnecessary. Thus, despite this relationship of contractual service, IGRA indicates that the NIGC is independent from the Secretary, and it stretches the imagination to think this relationship could give the Secretary any authority over the NIGC.

Further, contrary to your assertion that the Commission must seek its legal advice from the Department, IGRA specifically directs the Chairman to appoint a General Counsel. 25 U.S.C. § 2707(a). If Congress had intended the Chairman to rely on the Department for advice, it would not have provided for a separate General Counsel who is answerable only to the Chairman. In fact, Congress underscored the importance of independent legal advice by making the General Counsel the only staff position specifically designated within IGRA. What is more, given that IGRA gives to the Chairman the authority to appoint a general counsel, the legal advice given by the general counsel's office is for the use and approval of the Chairman and the Commission alone. They, and only they, are OGC's clients. As such, even if the Chairman's May 19 Poarch Band decision was an opinion of the OGC, neither the Secretary nor your office has the ability to review, approve, or reject it.

Looked at slightly differently, Congress has tasked the NIGC with providing technical assistance to the tribes. 25 U.S.C. § 2706(d)(2). Technical assistance encompasses a broad range of activities, and one particular way that the Commission meets this obligation is to provide legal opinions through the OGC on matters over which the Commission exercises jurisdiction. These opinions may clarify various matters under IGRA from game classifications to Indian lands status. The Secretary's interpretation of IGRA, however, would deny the Commission's ability to opine on Indian lands generally. This runs afoul of the requirement to provide technical assistance and would improperly prevent NIGC from fulfilling its statutory mandates.

On occasion, the NIGC does require legal advice in matters of general law. Pursuant to a memorandum of understanding with the Office of the Solicitor, the NIGC formally requests advice and pays for the service. *See* Memorandum of Understanding, from Tadd Johnson, Chairman of NIGC, to Robert More, Director of Administration, Department of the Interior (undated). As with the administrative services, the Department provides occasional legal advice only through a contractual relationship and the NIGC is free to adopt such advice or obtain it elsewhere. As such, when the NIGC seeks to do business with the Department of Interior, it frequently does so through a memorandum of understanding or other cooperative agreement, not through any perceived chain of command.

### E. Congress Treats the NIGC as an Independent Agency

After all these years of functioning as an independent agency, one would think Congress would let the NIGC know if it did not intend for it to be one. To the contrary, however, Congress interacts with the NIGC as an independent agency and recently reiterated its independence. Again, in 2005, when Congress raised the cap on the amount of fees the NIGC can collect from tribal gaming revenue, the Senate report accompanying the legislation noted the NIGC's status as an independent regulatory agency. S.Rep. No. 109-122 at 3 (2006).

Further, NIGC makes its own submissions to Congress. Pursuant to IGRA, the NIGC issues its own biannual reports to Congress. 25 U.S.C. § 2706(c). The Commission has submitted reports for fiscal years 1998, 1999, 2000, 2003 and 2004. Since passage of NIGC fees legislation in 2005, the NIGC is required to comply with the Government Performance and Results Act of 1993 (GPRA). 31 U.S.C. § 1115 *et. seq.* Furthermore, the NIGC Chairman testifies directly

before the Senate Indian Affairs Committee and the House Natural Resources Committee when it holds NIGC oversight hearings.

### F. The Department of Justice and the National Archives and Records Administration Treat the NIGC as an Independent Agency

The Department of Justice (DOJ) also recognizes the NIGC as an independent agency. The NIGC is involved in litigation in its own name. *See, e.g.*, *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 2007 U.S. App. LEXIS 1651 (D.C. Cir. Jan. 23, 2007); *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1021 (10th Cir. 2003); *JPW Consultants, Inc. v. Nat'l Indian Gaming Comm'n*, 1999 U.S. App. LEXIS 11022 (D.C. Cir. Apr. 29, 1999); *Cabazon Band of Mission Indians v. National Indian Gaming Comm'n*, 304 U.S. App. D.C. 335 (D.C. Cir. 1994); *Citizens for Responsibility & Ethics in Wash. v. Nat'l Indian Gaming Comm'n*, 467 F. Supp. 2d 40, 45 (D.D.C. 2006).

Furthermore, in the Unified Agenda listing published twice a year by the National Archives and Records Administration, which summarizes the rules and proposed rules that each federal agency expects to issue during the next six months, the NIGC is listed separately from the Department and with all of the other independent agencies. *See* http://www.gpoaccess.gov/ua/browse1204.html. Congress, the courts, the Department, and other federal agencies have all acknowledged NIGC's independence from the Department. Therefore, the Secretary's claims of authority over NIGC are unfounded.

### V.     The Secretary cannot grant himself more power through regulation than Congress has granted through statute.

Finally, you claim that the Secretary has power to review Commission decisions under the Department's regulation 43 C.F.R. § 4.5(a). Yet IGRA specifically states that decisions of the Chairman are reviewable only by the Commission and federal courts. 25 U.S.C. §§ 2713, 2714. You may not interpret 43 C.F.R. § 4.5 in a way that allows you to usurp the authority that Congress expressly granted to the Commission. "An agency literally has no power to act . . . unless and until Congress confers power upon it. . . . An agency may not confer power upon itself." *La. Public Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

Section 4.5 gives the Secretary the authority "to review any decision of any employee . . . of the Department . . . or to direct any such employee . . . to reconsider a decision . . . ." In carrying out this authority, the Secretary will issue a written notice, request the administrative record, and subsequently issue a new written decision on the matter. 43 C.F.R. § 4.5(c). While this rule clarifies the Secretary's authority to review decisions made by his subordinate divisions, it does not grant him power to review the decisions of those outside his chain of command. *MCI Telecom. v. AT&T*, 512 U.S. 218, 231 (1994); *see also Massachusetts v. EPA*, 127 S.Ct. 1438, 1462 (2007). Thus, the Department's regulation in section 4.5 (or any other regulation) does not give the Secretary the authority to review or overturn decisions of the NIGC Chairman.

The Secretary may only review those decisions under section 4.5 that he has the authority to review. The Chairman is expressly granted enforcement authority over IGRA violations. 25

U.S.C. §§ 2705, 2713. The Chairman's decision in the Poarch matter was not an opinion but a determination of NIGC jurisdiction and a conclusion that the Tribe was not violating IGRA. To decide whether the Tribe was violating IGRA, the Chairman had to determine whether the lands constituted Indian lands on which the Tribe could conduct gaming. The Chairman's decision was a precursor to an enforcement action over which the Secretary can claim no authority.

Allowing the Secretary to review the Chairman's exercise of his statutory powers would directly contravene the express will of Congress. "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do." *La. Public Serv. Comm'n v. FCC*, 476 U.S. at 374-375.

CONCLUSION

After thorough review of your letter, statutes, and case law, I conclude that the Secretary does not have the broad authorities you claim. Congress created the NIGC as an independent agency to administer IGRA and thereby vested regulatory authority for Indian gaming with the Chairman. The Department's authority under IGRA is limited to that expressly authorized by statute. Where IGRA is silent in delegation, that authority must necessarily rest with the administrator of the statute, the NIGC. Further, IGRA grants NIGC the power to determine its jurisdiction to monitor Indian gaming and to take action on site-specific ordinances, management contracts, and enforcement. This necessarily grants the agency the power to issue Indian lands decisions in those contexts. The Chairman acted within his statutory enforcement authority when he investigated the complaint of the State of Alabama and ultimately determined that the Poarch Band was properly gaming on lands within the definition of IGRA. The Chairman's decisions are reviewable only by the Commission and the federal courts. Any review by the Secretary would fail to account for NIGC's status as an independent agency and directly contravene express statutory language transferring the Secretary's authority over gaming to the Commission.

For all these reasons, you do not have the authority to review the Chairman's Poarch Band decision or to order the Commission not to act in compliance with that decision. Consequently, the Commission will continue to regulate the Tallapoosa site as mandated under IGRA.

Sincerely,

Penny J. Coleman

Penny J. Coleman
Acting General Counsel

cc: Buford L. Rolin, Poarch Band Tribal Chairman
    William Perry, Sonosky, Chambers, Sachse, Endreson & Perry
    Troy King, Attorney General, State of Alabama

# EXHIBIT E



RG279  Records of the Indian Claims
Commission

Closed Docketed Case Files, 1947-82

Docket # 21

Box 319                    Entry  11UD

318

MU001252



MU001253

3267

BEFORE THE INDIAN CLAIMS COMMISSION

| | | |
|---|---|---|
| THE CREEK NATION, | ) | (TITLE OMITTED) |
|     Petitioner, | ) | |
| | ) | |
| VS. | ) | DOCKET NO. 21 |
| | ) | |
| THE UNITED STATES, | ) | |
|     Defendant. | ) | |

STATEMENT OF SPECIFIC POINTS OF LAW AND AUTHORITIES
IN SUPPORT OF MOTION FOR LEAVE TO INTERVENE.

I.

THIS COMMISSION CAN AND SHOULD GRANT INTERVENTION IN PROCEEDINGS BEFORE
IT ON A PROPER SHOWING.

1.  The right to intervene is one well-recognized by federal tribunals as
a fundamental right; no express statutory authority is required.

a.  While in some jurisdictions the authority of courts to allow
intervention is not recognized in the absence of statute, it has been
recognized for many years in federal tribunals as a fundamental power of
courts not dependent on statute.  See Moore, Federal Practice and Procedure,
Section 24.

b.  Rule 24 of the Federal Rules of Civil Procedure now provides for
intervention in federal district courts as follows:

> (a)  "Intervention of Right.  Upon timely application anyone
> shall be permitted to intervene in an action.  (1)  When

- 1 -

MU001254

> a statute of the U. S. confers an unconditional
> right to intervene; or (2) when the representation
> of the applicant's interest by existing parties is
> or may be inadequate and the applicant is or may be
> bound by a judgment in the action; or (3) when the
> applicant is so situated as to be adversely affected
> by a distribution or other disposition of moneys in
> the custody of the court or of an officer thereof.

> (b)   "Permissive Intervention. Upon timely application
> anyone may be permitted to intervene in an action:
> (1) When a statute of the U. S. confers a conditional
> right to intervene; or (2) when an applicant's claim
> or defense and the main action have a question of
> law or fact in common. In exercising its discretion
> the court shall consider whether the intervention
> will unduly delay or prejudice the adjudication of the
> rights of the original parties.

### *******************"

c.  While the Federal Rules are not directly applicable to procedure

before this Commission, Rule 24 is a clear statement of the rule in all

federal tribunals, even in the absence of statute or any specific rule of

court. For, as the Committee Note, written at the time of promulgation of

the Rules, states concerning Rule 24:

> "This rule amplifies and restates the present federal
> practice in law and in equity".

2.  In line with its broad jurisdiction and powers, this Commission has

the authority to grant intervention.

a.  The Act creating this Commission gives it an exceedingly broad

jurisdiction over Indian claims, with the avowed purpose, as shown by the

language of the Act and by the Committee Reports, of enabling the Commission to

determine finally all claims of Indian groups. (Act of August 13, 1946, 60 Stat.

1049; Report No. 1466 of the Committee on Indian Affairs of the House of

Representatives, 79th Congress, 2d Session; Report No. 1715 of the Senate

- 2 -

MU001255

3267

*start with folio*

*11*
*12*
*25*

Committee on Indian Affairs, 79th Congress, 2d Session).

b.  The grant of this broad jurisdiction necessarily implies the grant of authority to permit these claims to be brought and adjudicated in the most expeditious and just manner.

c.  The Act gives the Commission the power to establish its own rules of procedure.  (Act of August 13, 1946, 60 Stat. 1049, Section 9).  The Commission is thus the master and not the servant of its written rules of procedure, which were doubtless promulgated by the Commission for its convenience and that of claimants, and not to define the limits of the procedural authority of the Commission.

3.  The Commission should grant intervention where it will avoid multiplicity of actions or prevent injustice.

a.  It is obviously to the interest of the Commission as well as of claimants before it to apply rules of procedure granting intervention, everywhere recognized by statute or court decision as promoting a just, equitable and expeditious handling of causes.

II.

APPLICANTS FOR INTERVENTION HEREIN ARE A TRIBE, BAND OR OTHER IDENTIFIABLE GROUP WITHIN THE MEANING OF THE INDIAN CLAIMS COMMISSION ACT.

1.  Applicants are members of, claiming on the relation of, the Perdido Band, a band of Creek Indians, duly organized.

2.  Applicants claim under the rights of the Creek nation as constituted at the time of the injury, prior to the migration of a number of its members.

- 3 -

3267

3. While the Perdido Band is but a newly formed band of descendants of the original Creek nation, the effect of granting intervention will be to place before this Commission the claim of the entire Creek nation as it existed in 1814, and the right of all living descendants of its members to recover.

4. The original Creek nation of Indians is a readily identifiable tribe or nation whose aboriginal territory was in Alabama, Georgia and Florida. An official census of its members, known as Parsons' and Abbott's census, was taken in 1832.

## III.

APPLICANTS FOR INTERVENTION HAVE SUCH AN INTEREST IN THE CONTROVERSY THAT THEY SHOULD BE ALLOWED TO INTERVENE.

1. Where the interest of a party is of such direct and immediate character that he will either gain or lose by the direct legal operation and effect of judgment, he is entitled to intervene. (39 Am. Jur 935).

2. The injury for which relief is sought in this proceeding is one inflicted on the Creek nation in 1814 by the taking of its lands. (Petition, Paragraphs 4 to 19, inclusive).

3. These lands were held as communal property. (U. S. vs. the Cherokee Nation, (1906) 202 U. S. 101, 26 S. Ct. 588, 599, affirming (1905) 40 Ct. Cl. 252.).

4. The right of compensation for the taking belonged to all then members of the nation. U. S. v. Cherokee Nation, supra, 26 S. Ct. at p 599, quoting with approval from the opinion of the Court of Claims, as follows:

> "While the United States have always, or nearly always, treated the members of an Indian tribe as communal owners, they have never required that all the communal owners shall

- 4 -

MU001257

3267

join in the conveyance of cession of the land.
From the necessities of the case, negotiations have
been with representatives of the owners. The chiefs
and head men have ordinarily been the persons who
carried on the negotiations and who signed the treaty.
But they have not formed a body politic or a body
corporate, and they have not assumed to hold the title
or be entitled to the purchase money. They have simply
acted as representatives of the owners, making the cession
on their behalf, but allowing them to receive the considera-
tion per capita. In the present case the Cherokee Nation
takes the place, so far as communal ownership is involved,
of the chiefs and head men of the uncivilized tribes. This,
too, is consonant with the usage of nations. The claims of
individuals against a foreign power are always presented,
not by them individually, but by their government. The
claims are pressed as international, but the money received
is received in trust, to be paid over to the persons entitled
to it."

5. Any recovery was distributable per capita to these members. (U. S. v.
Cherokee Nation, supra, 26 S. Ct. at p. 600).

6. The organization of the Creeks in what is now Oklahoma has never been
recognized as the full successor to the original Creek nation. The fact that
this organization represents only those Creeks migrating westward and settling
in the Indian Territory in what is now Oklahoma is commonly recognized in treaties
and Acts of Congress.

a. In the Treaty of February 14, 1833, adjusting the boundaries of the
Creek lands in the west, it was recognized that the Creek representatives signing
the Treaty were authorized to act only for Creeks west of the Mississippi. The
contracting Creeks were described as those "west of the Mississippi" and it
was stated that their Chiefs had "full power and authority to act for their
people west of the Mississippi". The parties to the Treaty also recognized that
the greater body of the Creek nation as of that time remained "on the east side
of the Mississippi." (7 Stat. 417).

b. The description of the organization of the Creeks of the Indian
Territory appearing in treaties and statutes has commonly recognized the limited

- 5 -

MU001258

3267

character of petitioner by describing it as the Creek tribe "west of the
Mississippi River" (Treaty of August 7, 1856, 11 Stat. 699), or as the
"Creek Nation in the Indian Territory" (Act of June 28, 1898, 30 Stat. 495;
Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500).

7. This right passed to their descendants regardless of whether they
became members of the part of the nation residing in Indian Territory. U. S. v.
Cherokee Nation, supra, 26 S. Ct. at p. 600, quoting with approval from the
opinion of the Court of Claims, as follows:

> "As to those Cherokees who remained in Georgia and
> North Carolina, in Alabama and Tennessee, they owe
> no allegiance to the Cherokee Nation, and the nation
> owes no political protection to them. But they, as
> communal owners of the lands east of the Mississippi,
> at the time of the treaty of 1835, were equally
> interested, with the communal owners who were carried
> to the West, in the $5,000,000 fund which was the
> consideration of the cession, so far as it was to be
> distributed per capita. The Cherokee Nation was not
> bound to prosecute their claims against the United
> States for the unpaid balance of the $5,000,000 fund,
> but their rights were inextricably interwoven with
> the rights and equities of the Cherokees who were
> citizens of the nation, and the nation properly made
> no distinction when parting with the Outlet, but
> demanded justice from the Cherokee point of view for all
> Cherokees who had been wronged by the nonfulfilment of
> the treaty of New Echota. As to these Eastern nonresident
> Cherokee aliens the nation acted simply as an attorney
> collecting a debt. In its hands the moneys would be an
> implied trust for the benefit of the equitable owners."

8. Recognition by the United States of the tribal organization of the
migrating Creeks as the political body of the Creek nation could not constitutionally
operate to deprive your applicants and others similarly situated of their rights.

9. These rights were specifically guaranteed by the Act of February 8,
1887 and the Act of May 8, 1906 (24 Stat. 388, Section 6; 34 Stat. 182). The
latter act amended the earlier act to read in part as follows:

- 6 -

MU001259

10/104
2

"Sec. 6. That at the expiration of the trust period and
when the lands have been conveyed to the Indians by patent
in fee, as provided in section five of this act, then each
and every allottee shall have the benefit of and be subject
to the laws, both civil and criminal, of the State or
Territory in which they may reside; and no Territory shall
pass or enforce any law denying any such Indian within its
jurisdiction the equal protection of the law. And every
Indian born within the territorial limits of the United States
to whom allotments shall have been made and who has received
a patent in fee simple under the provisions of this act, or
under any law or treaty, and every Indian born within the
territorial limits of the United States who has voluntarily
taken up within said limits his residence, separate and apart
from any tribe of Indians therein, and has adopted the habits
of civilized life, is hereby declared to be a citizen of the
United States, and is entitled to all the rights, privileges,
and immunities of such citizens, whether said Indian has been
or not, by birth or otherwise, a member of any tribe of Indians
within the territorial limits of the United States without in
any manner impairing or otherwise affecting the right of any
such Indian to tribal or other property: ******************"

"And provided further, That the provisions of this act shall
not extend to any Indians in the Indian Territory." *******"
(34 Stat. 137)

10.  Applicants, as Creek Indians and descendants of members of the original

Creek nation, are entitled to share per capita in any recovery with all others

similarly situated.

11.  Applicants therefore have a direct and immediate interest in this

proceeding.

12.  This interest is not being adequately represented by Petitioner,

representing Oklahoma Creeks, which claims exclusive right for its enrolled

members and their descendants to any recovery obtained.

IV.

THIS MOTION FOR LEAVE TO INTERVENE IS TIMELY.

1.  39 Am. Jur. 943 states:

- 7 -

MU001260

> "In the absence of statute, if the trial of a suit
> will not be delayed thereby, a person may, with leave
> of court, intervene at any time before the issues are
> fully determined between the plaintiff and the defendant,
> and it is said to be within the discretion of the court
> to permit an intervention, even though the defendant is
> in default, where the application is made at the earliest
> possible opportunity. The tendency of the courts, however,
> is to exercise their discretion in favor of the diligent
> only."

2.   In fact, intervention will be granted even after judgment were it
in the interest of justice. (39 Am. Jur. 943). The defense of laches is
expressly denied to the United States in claims before this Commission (60 Stat.
1049, Section 2).

3.   The claim for which recovery is sought originated in 1814.

4.   It is thus the sense of the Congress and the logic of the claim before
this Court that your applicants should not be penalized for any delay in
prosecuting their claim.

5.   No party will be prejudiced by any delay in applicants' having presented
their claim.

    a.   The basic issue in the proceeding remains the same.

    b.   No new trial of this issue is sought or will be required.

    c.   Any issues presented concerning the interest of applicants in the
recovery will not require extensive additional proof.

6.   Applicants have acted with due diligence to bring this motion upon
learning of the claim of the Petitioner.


V.


A SERIOUS INJUSTICE WILL RESULT IF INTERVENTION IS NOT GRANTED.

1.   Since the unlined right asserted is one belonging to the entire Creek

- 8 -

MU001261

3267

nation, great injustice will result if applicants are not permitted to intervene
and assert the right of all Creeks to participate per capita in the recovery
which should properly be granted to the original Creek nation.

- 9 -

MU001262

# EXHIBIT F



RG279  Records of the Indian Claims
Commission

Closed Docketed Case Files, 1947-82

Docket # 21

Box 319                                    Entry  11UD

318

MU001701



MU001702



FILED
AUG 29 1951
Clerk
INDIAN CLAIMS COMMISSION

(FILE ENDORSEMENT OMITTED)

BEFORE THE INDIAN CLAIMS COMMISSION

(TITLE OMITTED)

THE CREEK NATION,
            Petitioner,

    vs.

THE UNITED STATES,
            Defendant.

)
)
)
)          DOCKET NO. 21
)
)

MOTION TO CHANGE RECORD NAME OF ONE
OF MOVANTS FOR LEAVE TO INTERVENE – Filed Aug. 29. 1951

        Come now C. W. MCGHEE, RUBY Z. WEATHERFORD, JOHN V. PHILLIPS and
JOHN WILLIAMS, as members of and on the relation of The Perdido Friendly
Creek Indian Band of Alabama and Northwest Florida Indians, by their
attorney, C. LeNoir Thompson, and move this Commission that the group on
the relation of which said individual movants are appearing before this
Commission be changed on the records of this Commission so as henceforth
to appear as: THE CREEK NATION EAST OF THE MISSISSIPPI, and as grounds
for said motion state that:

        1. Prior to August 4, 1951, the group on the relation of
which the individual movants are appearing was known by the name of "The
Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians"
which name had been duly adopted by the members of said group.

        2. On August 4, 1951, at a general meeting of the members
of said group, the members of said group, by unanimous resolution duly passed
in accordance with the by-laws of said group, changed the name of said group
to "THE CREEK NATION EAST OF THE MISSISSIPPI".

        3. At this meeting the membership confirmed, ratified and
adopted all actions taken by the group occurring prior to the change of name.

- 1 -

MU001703

3267

4. A certified copy of the minutes of said meeting, including the two above described resolutions, is attached hereto as Exhibit "A" and made a part hereof.

5. No change in the organization or composition of the group resulted from or accompanied the change in name.

6. A change in the record in this proceeding is necessary in order to reflect the above described change of name.

7. No hearing is requested on this Motion for the reason that it appears to be one which may be acted upon ex parte under Section 5 (c) of the rules of this Commission.

WHEREFORE, it is prayed that this motion be granted.

C. LeNOIR THOMPSON,
ATTORNEY FOR C. W. MCGHEE,
RUBY Z. WEATHERFORD, JOHN V.
PHILLIPS AND JOHN WILLIAMS,
AND THE CREEK NATION EAST OF
THE MISSISSIPPI, FORMERLY THE
PERDIDO FRIENDLY CREEK INDIAN
BAND OF ALABAMA AND NORTHWEST
FLORIDA INDIANS
Bay Minette, Alabama

- 2 -

MU001704

✓ Exhibit "A" to Motion

BE IT REMEMBERED THAT THIS DAY upon the call of Calvin McGhee, permanent chairman, the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, has assembled in a meeting duly and regularly called.

That on a motion made by J. C. Webb, AND SECONDED BY John Williams, the following resolution authorizing the name of the band be changed from the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, to the Creek Nation East of the Mississippi, was voted upon and was unanimously adopted.

And that on a motion made by Willie B. Olsen, and seconded by Thelman Webb, adopting, ratifying and confirming the present officers and attorneys and all actions, agreements, contracts and proceedings of the band by its former name, and of its Council, was voted upon and unanimously adopted.

Ruby Weatherford
Secretary to Council.

Approved:

C.W. McGhee
Permanent Chairman.

Be it hereby resolved that we as members of The Creek Nation East of the Mississippi do hereby accept, adopt and confirm those actions done, contracts made and agreements entered into by the band under its former name of The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and we do hereby accept, adopt and confirm those actions, agreements and contracts entered into or done by the Permanent Chairman and by the Council of the band under its former name and we do hereby adopt confirm and ratify the designation of the four members of the band designated and authorized to represent the band in the several courts of the United States which members are Ruby L. Weatherford, C. W. McGhee, John Williams and John V. Phillips.

And be it further resolved that we do hereby adopt confirm and ratify the agreement entered into by the said authorized representatives of the band under its former name with the following named attorneys: C. LeNoir Thompson, Hugh Rozelle, and Frank Horne, which agreement was authorized on the 9th day of January, 1951 at a Council meeting regularly called in which the attorneys herein named were authorized and empowered to associate by assignment the Honorable Claude Pepper as an attorney of record in behalf of the band.

That we do authorize and empower each of our duly named officers and representatives and our specifically named attorneys to continue all proceedings instituted in the name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida by amending such proceedings and continuing them in the name of The Creek Nation East of the Mississippi.

That we do authorized our chairman and secretary toformard copies of the resolutions adopted here at this meeting to the proper officials of the United States Government and we do instruct our several officers named herein to lend all aid and service possible toward furthering our claims against the United States Government under that special act of Congress approved August 13, 1946 (60 Stat. 929, 25 U.S.C. 70).

Done at Poarch, Escambia County, Alabama on this the 4th day of August, 1951.

C. W. McGhee
Permanent Chairman

MU001706

former name of The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and we do hereby accept, adopt and confirm those actions, agreements and contracts entered into or done by the Permanent Chairman and by the Council of the band under its former name and we do hereby adopt confirm and ratify the designation of the four members of the band designated and authorized to represent the band in the several courts of the United States which members are Ruby A. Weatherford, C. W. McGhee, John Williams and John V. Phillips.

And be it further resolved that we do hereby adopt confirm and ratify the agreement entered into by the said authorized representatives of the band under its former name with the following named attorneys: O. LeNoir Thompson, Hugh Rozelle, and Frank Horne, which agreement was authorized on the 9th day of January, 1951 at a Council meeting regularly called in which the attorneys herein named were authorized and empowered to associate by assignment the Honorable Claude Pepper as an attorney of record in behalf of the band.

That we do authorize and empower each of our duly named officers and representatives and our specifically named attorneys to continue all proceedings instituted in the name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida by amending such proceedings and continuing them in the name of The Creek Nation East of the Mississippi.

That we do authorized our chairman and secretary toforward copies of the resolutions adopted here at this meeting to the proper officials of the United States Government and we do instruct our several officers named herein to lend all aid and service possible toward furthering our claims against the United States Government under that special act of Congress approved August 13, 1946 (60 Stat. 929, 25 U.S.C. 70).

Done at Poarch, Escambia County, Alabama on this the 4th day of August, 1951.

C.W. McGhee
Permanent Chairman

Ruby Weatherford
Secretary of Council.

MU001707

Be it hereby resolved that we, descendants by blood of the original Creek Nation which resided in what is now known as the states of Alabama, Georgia and Florida having on the 19th day of October, 1950 organized ourselves into a band in accordance with and in compliance with a certain act of Congress approved August 13, 1946 (60 Stat. 959, 25 U. S. C. 70) which band was known as the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and that we have here met in an official meeting of the band after having given due notice to those on the membership rolls of said band for the purpose of changing the name of our band from that of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida to the name, "The Creek Nation East of the Mississippi," which was our original name and the name of our Indian foregathers. Which meeting is now held this 4th day of August at the consolidated Indian School at Poarch Community, seven miles from Atmore, Alabama.

Be it further resolved that we do hereby change our name as of this date to be known henceforth and hereafter as "THE CREEK NATION EAST OF THE MISSISSIPPI," and our band shall by this name be hereafter known and called.

Adopted this August 4, 1951 at a general meeting assembled on the grounds of the consolidated Indian School in the Poarch Community, Escambia County, Alabama, and that having adopted as our proper and official name the designation "The Creek Nation East of the Mississippi" and unamiously confirm their election as such officials. Those who were elected by the band under its former name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, and that said officials and their offices are as follows: Calvin McGhee, permanent chairman, Ruby L. Weatherford, Secretary of Council, Roberta Sells, Recording Secretary, Council Members: Ruby Weatherford, Leola Lanac, Kenzie McGhee, John Williams, Dave Presley, Arthur Reid, John Phillips, J. C. Webb, Tom Weatherford, Brooks Rolin, Claude Colbert, and Roberta Sells.

C. W. McGhee
Permanent Chairman.

MU001708

Creek Nation which resided in what is now known as the states of Alabama, Georgia and Florida having on the 19th day of October, 1950 organized ourselves into a band in accordance with and in compliance with a certain act of Congress approved August 13, 1946 (60 Stat. 959, 25 U. S. C. 70) which band was known as the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida and that we have here met in an official meeting of the band after having given due notice to those on the membership rolls of said band for the purpose of changing the name of our band from that of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida to the name, "The Creek Nation East of the Mississippi," which was our original name and the name of our Indian foregathers. Which meeting is now held this 4th day of August at the consolidated Indian School at Poarch Community, seven miles from Atmore, Alabama.

Be it further resolved that we do hereby change our name as of this date to be known henceforth and hereafter as "THE CREEK NATION EAST OF THE MISSISSIPPI," and our band shall by this name be hereafter known and called.

Adopted this August 4, 1951 at a general meeting assembled on the grounds of the consolidated Indian School in the Poarch Community, Escambia County, Alabama, and that having adopted as our proper and official name the designation "The Creek Nation East of the Mississippi" and unanimously confirm their election as such officials. Those who were elected by the band under its former name of the Perdido Friendly Creek Indian Band of Alabama and Northwest Florida, and that said officials and their offices are as follows: Calvin McGhee, permanent chairman, Ruby A. Weatherford, Secretary of Council, Roberta Sells, Recording Secretary, Council Members: Ruby Weatherford, Leola McNac, Kensie McGhee, John Williams, Dave Presley, Arthur Reid, John Phillips, J. C. Webb, Tom Weatherford, Brooks Rolin, Claude Colbert, and Roberta Sells.

C. W. McGhee
Permanent Chairman.

Ruby Weatherford
Secretary of Council.

MU001709

# EXHIBIT G

*Received by mail.*
*Nov. 7, 1951.*

IN THE

# United States Court of Claims

Appeal Docket No. 14.

C. W. McGhee, Ruby Z. Weatherford, John V. Phillips and John Williams, as Members of and on the Relation of the Creek Nation East of the Mississippi, *Appellants,*

v.

The Creek Nation and The United States, *Appellees.*

## BRIEF FOR APPELLANTS.

Claude Pepper,
  Cafritz Building,
  Washington, D. C.,
  *Attorney for Appellants.*

C. LeNoir Thompson,
  Bay Minette, Alabama,
Frank G. Home,
  Atmore, Alabama,
Hugh Rozelle,
  Atmore, Alabama,
  *Of Counsel.*

Press of Byron S. Adams, Washington, D. C.

MU003649



## INDEX.

Page

Statement of Facts ........................... 130

Statement of the Case ....................... 137

Questions Presented ......................... 140

Argument .................................... 141

The Indian Claims Commission Committed Reversible Error in Denying Appellants' Amended Motion for Leave to Intervene.... 141

I. The Indian Claims Commission Erred in Determining that ''the Petitioner in this Case Has ('The Creek Nation' of Oklahoma) the Exclusive Right to Prosecute the Claim Here Asserted'' ................................ 141

   A. The Injury Inflicted by the United States in Exacting and Enforcing the Treaty of 1814 was Suffered by all Creeks, Not Simply Those Now in Oklahoma ........... 141

   B. Petitioner-appellee ''the Creek Nation'' of Oklahoma is Not Identical with the Original Creek Nation Which Existed at the time of the Asserted Injury ........ 143

   C. Appellants and Other Creeks Did Not Lose Their Rights in the Claim in Issue by Not Emigrating to Settle in Oklahoma 146

   D. Petitioner-appellee ''the Creek Nation'' of Oklahoma is Not Entitled to Represent the Entire Creek Nation in Prosecuting Claims Before the Indian Claims Commission ...................................... 151

II. The Commission Erred in Determining that Appellants Are Not Members of a ''Tribe, Band or Other Identifiable Group of Indians'' Entitled to Have Their Claim Determined by the Commission .............. 153

MU003650

ii          Index Continued.

Page

III. The Commission Erred in Determining that
    it Did Not Have Jurisdiction to Define the
    Group Entitled to Recovery on a Claim Be-
    fore It ................................ 157

Conclusion ................................. 161

Appendix ..............................163-169

## TABLE OF AUTHORITIES.

CASES:

Choctaw Nation, Ind. Cl. Com. Dkt. No. 16, op. ent.
    July 14, 1950 .............................. 154
Eastern Band of the Cherokee Indians v. United
    States, 117 U. S. 288 (1886)................. 146
Fort Sill Apaches, Ind. Cl. Com. Dkt. No. 30, op.
    ent. May 6, 1949 ...................154, 158, 161
Kaw Tribe of Indians ex rel Keenan Pappan
    et al., Ind. Cl. Com. Dkts. Nos. 33, 34, 35, op. ent.
    September 26, 1950 ......................... 158
Lewis et al. ex rel. the Creek Freedmen Associa-
    tion, Ind. Cl. Com. Dkt. No. 31, op. ent.
    August 4, 1949 ............................ 153
Loyal Creek Band or Group of Creek Indians,
    Ind. Cl. Com. Dkt. No. 1, op. ent. May 6, 1949
                                         153, 162
McCauley ex rel. the Kaw Tribe of Indians, Ind.
    Cl. Com. Dkts. Nos. 33, 34, 35, op. ent. Septem-
    ber 17, 1951 .............................. 154
Oakes v. United States, 172 F. 305 (C.C.A. 8th,
    1909) ..................................... 149
Pawnee Indian Tribe of Oklahoma, Ind. Cl. Com.
    Dkt. No. 10, op. ent. July 14, 1950............ 154
Red Lake, Pembina and White Earth Bands, Ind.
    Cl. Com. Dkt. No. 18-A, op. ent. September 17,
    1951 ..................................155, 162
Snake or Piute Indians of the Former Malheur
    Reservation in Oregon, Ind. Cl. Com. Dkt. No.
    17, op. ent. December 29, 1950............... 162

Index Continued.          iii

Page

Thompson et al. ex rel. Indians of California, Ind.
    Cl. Com. Dkt. No. 31, op. ent. December 15, 1950  153
United States ex rel. Besaw v. Work, 6 F. 2d 694
    (App. D.C., 1925) ......................... 149
United States v. Cherokee Nation, 202 U. S. 101
    (1906) .................................... 147

STATUTES:

24 Stat. 333, Section b ...................... 134
25 Stat. 757 (1889) .......................... 134
27 Stat. 645 (1893) .......................... 135
29 Stat. 321 (1896) .......................... 135
30 Stat. 495 (1898) ..............134, 135, 136, 145
31 Stat. 861 (1901) ................134, 135, 145
32 Stat. 500 (1902) ....................134, 145
34 Stat. 137 (1906) ................136, 145, 168
60 Stat. 959 (1946), 25 U.S.C. 70 ......130, 137, 161

TREATIES:

Treaty of August 7, 1790, 7 Stat. 35 ........131, 142
Treaty of August 9, 1814, 7 Stat. 120 ..........  131
Treaty of January 24, 1826, 7 Stat. 286.....144, 165
Treaty of March 24, 1832, 7 Stat. 366.......144, 165
Treaty of February 14, 1833, 7 Stat. 417
                                         134, 165, 167
Treaty of August 7, 1856, 11 Stat. 699......134, 145
Treaty of June 14, 1866, 14 Stat. 785.......... 134

MU003651

**129**

IN THE

# United States Court of Claims

———

Appeal Docket No. 14.

———

· C. W. McGhee, Ruby Z. Weatherford, John V. Phillips and John Williams, as Members of and on the Relation of the Creek Nation East of the Mississippi, *Appellants,*

v.

The Creek Nation and The United States, *Appellees.*

———

### BRIEF FOR APPELLANTS.

———

This proceeding is one of brother against brother. Creeks in Oklahoma, suing to repair an injury inflicted upon the common ancestor, seek to deny the right of their brother Creeks elsewhere to share in the recovery.

This appeal is from an Order of the Indian Claims Commission entered June 4, 1951, in its docket number 21, *The Creek Nation v. The United States,* denying appellant Creeks' Amended Motion for Leave to Intervene as parties plaintiff therein. The proceeding be-

MU003652

low, in which intervention was sought and denied, was one brought against the United States before the Indian Claims Commission under the Indian Claims Commission Act (60 Stat. 959, 25 U. S. C. 70) by "The Creek Nation", a political body of Creek Indians inhabiting the Creek reservation in Oklahoma, to recover damages for the wrongful taking of lands in what is now Alabama and Georgia in 1814 from the original Creek nation of Indians.

## STATEMENT OF FACTS.[1]

Appellants, C. W. McGhee, Ruby Z. Weatherford, John V. Phillips, and John Williams, are Creek Indians, descendants of Creeks who were members of the Creek nation of Indians on August 9, 1814, when by a certain treaty between the United States and the Creek nation the latter ceded to the United States a vast tract of land in what is now Alabama and Georgia, and members themselves by blood of that nation. (R. 88).

The original Creek nation of Indians, once known as the Muskogee Confederation was a great and powerful confederation of Indian tribes who were the aboriginal inhabitants of a large area in what is now the southeastern United States, including nearly all of Alabama and Georgia and parts of Florida and Mississippi. (R. 2, 89) On August 7, 1790, the Creek nation entered into a treaty of friendship with the United States, whereunder it placed itself under the protection of the United States, ceded certain lands to the United States,

[1] Since no findings of fact have been made in this proceeding, no evidence taken on appellants' amended motion, and the evidence in the principal proceeding is not a part of the record on appeal, the facts are taken from undenied allegations of the pleadings and motions herein, from the Commission's opinion and from the United States Statutes-at-Large. Much that is historical appears a proper subject of judicial notice.

and in return was guaranteed all its lands within boundaries defined in that treaty. (R. 89, 7 Stat. 35)

During the War of 1812, certain of the Creeks were persuaded to assist the British. Much the greater number of the Creeks remained loyal to the United States, and in fact, fought against the rebellious Creeks, incurring great casualties, much suffering, and serious losses. Finally, of course, with the assistance of the United States, the uprising was put down. (R. 4, 5, 6)

In purported retaliation for this incident, the United States sent its emissaries to complete a new treaty with the Creek nation under which, on August 9, 1814, the Creek nation was compelled, by duress and threats of force, to convey to the United States 23,267,600 acres of its domain without receipt of any consideration therefor. (7 Stat. 120) (R. 6, 7, 8, 89)

It is the claim of petitioner-appellee "The Creek Nation" of Oklahoma, as well as of appellants, that the taking of these lands by the United States under this treaty was an unfair imposition by the United States upon the Creek nation and inflicted an injury upon it for which recovery is authorized under the Indian Claims Commission Act. (R. 13, 93)

Subsequent to this treaty, as the white settlers of the United States desired more and more room for expansion, it became the policy of the United States to move as many Indians as possible westward. (R. 90)

As the Commission found: "On January 24, 1826, 7 Stat. 286, the Creek Nation concluded a treaty with the United States by which it ceded an area of its domain located in Georgia and lying on the east side of the Chattahoochee river. A portion of the tribe wished to move west of the Mississippi river and the treaty pro-

MU003653

vided (Art. 6) for a 'deputation of five persons' to select a country west of the river as a home for that part of the Creek Nation desiring to move west.'' (R. 114) The area, located in what shortly became the Indian Territory and is now part of Oklahoma, was duly selected and a number of the members of the tribe migrated.

The pressure of the Federal Government on the Creeks to move westward continued.  As the Commission found: ''On March 24, 1832, 7 Stat. 366, by treaty of that date, the Creeks ceded 'all their land, East of the Mississippi river' to the United States. This treaty contained this provision (Art. XII):

'The United States are desirous that the Creeks should remove to the country west of the Mississippi, and join their countrymen there; and for this purpose it is agreed, that as fast as the Creeks are prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes— Provided however, *that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.'*  (Italics added.)

''Article II thereof required the United States to survey the ceded area and allowed 'ninety principal chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for a term of five years, unless sooner disposed of by them.' Provisions were also made for taking a census of the persons making selections and for making selection of twenty sections for the benefit of or-

phan children of the Creeks.  Article III authorized the sale of the selections, and Article IV provided:

'At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee simple, from the United States.'

''Article XII of this treaty quoted above discloses the desire of the United States to move all Creeks west of the Mississippi river, and as an inducement to move, agreed to pay the expenses of removal, provide subsistence during removal and for a year after their arrival west.  However, such removal was not compulsory as to individual Creeks, for the article, as shown above, contained the proviso 'that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.' '' (R. 115, 116)

On February 14, 1833, the ''Muskogee or Creek nation of Indians, west of the Mississippi'' represented by ''chiefs and head-men of the said Muskogee or Creek Indians, having full power and authority to act for their people west of the Mississippi,'' entered into a treaty with the United States in which title to the territory in Oklahoma was confirmed and guaranteed by the United States.  The treaty provided that these lands ''be taken and considered the property of the whole Muskogee or Creek nation, as well as of those now residing upon the land, as the great body of said nation who still remain on the east side of the Mississippi.''  Only those settling in the territory have ever derived any benefit from these lands. Grants of money also agreed upon in the treaty were expressly stated to be ''intended solely for the use and benefit of that

MU003654

portion of the Creek nation, who are now settled west of the Mississippi." (7 Stat. 417)

History does not record how many Creeks migrated to Oklahoma and how many remained in the Southeast, but it appears that the number staying behind was so substantial that it might fairly be said that the Creek nation was divided by the migration. (R. 91, 92)

The migrating Creeks formed an organization for the management of their affairs in the Indian Territory and were first called in treaties "the Creek tribe of Indians west of the Mississippi" (Treaty of August 7, 1856, 11 Stat. 699), sometimes simply "The Creek Nation" (Treaty of June 14, 1866, 14 Stat. 785) and later generally, in treaties and Acts of Congress, "The Creek Nation in the Indian Territory" (Act of March 1, 1889, 25 Stat. 757; Act of June 28, 1898, 30 Stat. 495; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500). All of these treaties and laws related to affairs of the Creeks in Oklahoma.

Commencing in the 1880s, in preparation for the admission of Oklahoma to statehood, it became the policy of the United States to do away with the local self-government of the tribes in the Indian Territory, as well as the communal ownership of lands by these tribes. By a series of laws commencing with the Act of February 8, 1887, Congress provided for eventual citizenship of the Indians who were members of these tribes and for the allotment of the tribal lands to the individual members. The Act of 1887, in granting citizenship to Indians leaving their tribes, expressly guaranteed the existing rights to tribal or other property of all Indians, including those who had theretofore left their tribes. (24 Stat. 388, Section 6.)

In pursuance of the federal policy to extinguish tribal rights in lands in the Indian Territory, a Com-

mission to the Five Civilized Tribes was created by Act of March 3, 1893 (27 Stat. 645). By Act of June 10, 1896, this Commission was empowered and directed to make rolls of the citizens in the Indian Territory of these tribes to afford the basis of allotment of the tribal lands in the Indian Territory and division of tribal moneys arising from the sale of lands. (29 Stat. 321) This allotment was further implemented by the Act of June 28, 1898, which made additional provisions for enrollment, and provided that, for the purpose of this allotment, "No person shall be enrolled who has not heretofore moved to and in good faith settled in the nation in which he claims citizenship." (30 Stat. 495)

A subsequent agreement of March 8, 1900, between the United States and "The Creek Nation in the Indian Territory," confirmed by the Act of March 1, 1901, prescribing further terms for the allotment of Creek lands in the Indian Territory, restricted enrollment to those persons living in the Creek area in the Indian Territory. (31 Stat. 861.)

By Act of May 8, 1906, Congress re-affirmed its guarantee of the rights of Indians who had left their tribes and become citizens of the United States, amending the Act of February 8, 1887, to provide in part:

> "Sec. 6. That at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section five of this act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside; and no Territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits

MU003655

of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this act, or under any law or treaty, *and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States,* and is entitled to all the rights, privileges, and immunities of such citizens, *whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property: * * ***
"And provided further, That the provisions of this act shall not extend to any Indians in the Indian Territory. * * * *" (Italics ours.) (34 Stat. 137.)

This series of agreements and Acts of Congress provided for eventual abolition of the jurisdiction of the Indian tribes over the local affairs of their members, and of the tribal title to lands, abolished the enforcement of tribal laws, did away with the power of the tribes to collect money for account of the members or for their account and in general diminished and provided for eventual abolition of the power and authority of the tribal organizations. All moneys awarded on claims to be distributed per capita to members or descendants of members of tribes are distributed directly to these members by the Secretary of the Interior. (Act of June 28, 1898, 30 Stat. 495) (R. 91, 92)

"The Creek Nation" of Oklahoma still maintains its tribal organization. (R. 2)

Appellants and the thousands of other Creeks they represent are descended from that portion of the Creek nation which remained East of the Mississippi. Because they possessed no territory and were not dealt with by the United States as a group, they did not retain a general tribal organization, although various groups of them have resided together in small close-knit communities and preserved their tribal ties and certain of their customs. (R. 83)

Appellants and other Creeks in the Southeastern States have recently joined together for their common benefit in an organization known first as the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians"; its name has now been changed to "The Creek Nation East of the Mississippi" as more appropriate to its scope. The sole requirement for membership is that one be a lineal descendant of a member of the original Creek nation and be not enrolled in petitioner-appellee. (R. 88, 120)

## STATEMENT OF THE CASE.

The Indian Claims Commission is a statutory tribunal; proceedings before it are based upon the Indian Claims Commission Act (60 Stat. 959, 25 U.S.C. 70) which authorizes the Commission to hear and determine all claims of "any Indian tribe, band, or other identifiable group of American Indians" against the United States for injuries inflicted upon them by the United States.

The proceeding below was begun by "The Creek Nation" of Oklahoma on January 29, 1948, by the filing of a petition with the Indian Claims Commission, claiming damages for the taking of lands of the Creek nation by the United States under the Treaty of Au-

gust 9, 1814. (R. 55) A trial of the issues on the
merits was held on October 17 and 19 and November
16, 1949, and January 24, 1950, and arguments were
heard on November 29, 1950, and the issues are now
awaiting decision by the Commission.

On January 5, 1951, the "Perdido Friendly Creek
Indian Band of Alabama and Northwest Florida In-
dians" filed a "Motion to Intervene", with a "Peti-
tion for Leave to Intervene" attached. (R. 65, 67)
Thereafter, on January 15, 1951, petitioner-appellee
"The Creek Nation" filed its objections to this motion
and on January 23, 1951, defendant-appellee, the
United States, filed its objections. (R. 72, 81) On
April 4, 1951, appellants, as members of and on the
relation of the Perdido Friendly Creek Indian Band of
Alabama and Northwest Florida Indians, filed an
"Amended Motion for Leave to Intervene", attaching
a "Petition of Intervenors" and a "Statement of Spe-
cific Points of Law and Authorities in Support of Mo-
tion for Leave to Intervene". (R. 83, 88, 95) Objec-
tions to said amended motion were duly filed by peti-
tioner-appellee, "The Creek Nation" of Oklahoma, on
April 17, 1951. (R. 104) The amended motion was
argued on April 18, 1951, before the Indian Claims
Commission. Appellants filed a "Supplement to
Statement of Specific Points of Law and Authorities
in Support of Motion for Leave to Intervene" on May
14, 1951. On June 4, 1951, the Commission entered its
Order denying the amended motion, and filed its *per
curiam* opinion. (R. 112, 113)

Thereafter, on appellants' motion, an Order was en-
tered noting in the record the change of the name of
the "Perdido Friendly Creek Indian Band of Alabama
and Northwest Florida Indians" to "The Creek Na-
tion East of the Mississippi". (R. 125)

On September 4, 1951, appellants filed their Notice
of Appeal with the Indian Claims Commission and on
September 6, 1951, the record on appeal was duly filed
with the Clerk of this Court. (R. 126, 128)

The grounds upon which appellants sought to inter-
vene as parties petitioner in the proceedings below are
stated in their Amended Motion, Petition and State-
ment of Points and Authorities. Appellants' basic
premise is that the injury inflicted by the United States
in 1814 was to the Creek nation as then constituted and
that the right to recover therefor belongs to that na-
tion, to be enjoyed by all its members. Their position
is that petitioner-appellee "The Creek Nation" of
Oklahoma, whose membership is restricted to Creeks in
Oklahoma, is not identical with or the full successor
of the Creek nation, and that it improperly claims to
be, thus denying rather than representing the rights
of appellants. Appellants brought their amended mo-
tion to intervene on the relation of the "Perdido
Friendly Creek Indian Band of Alabama and North-
west Florida Indians" now "The Creek Nation East
of the Mississippi", whose rolls are open to all those
who can prove lineal descent from the members of the
orginal Creek nation, as the appropriate way of as-
suring that the original Creek nation be in effect made
the petitioner in the proceeding below, so that judg-
ment may be entered in its favor rather than petition-
er's. In appropriating for this judgment and provid-
ing for its distribution, Congress may then appropri-
ately direct that rolls be created of all those now mem-
bers by blood of the original Creek nation or succeed-
ing to the rights of its members.

The position of petitioner-appellee "The Creek Na-
tion" of Oklahoma is that it is identical with the orig-

**140**

inal Creek nation, the successor to its rights, and solely entitled to recover for the injury. It further contended below that intervention was procedurally impossible before the Commission, that the motion was not timely, and that appellants are not members of a "tribe, band or other identifiable group" entitled under the Indian Claims Commission Act to have their claims determined by the Commission.

The reasons given by the Commission in its *per curiam* opinion for its denial of appellants' amended motion may be summarized as follows:

1. Appellants are not members of a "tribe, band or other identifiable group" within the meaning of the Indian Claims Commission Act in that they do not have a "common claim".

2. Petitioner-appellee has the exclusive right to prosecute the claim for the 1814 injury to the Creek nation.

3. The jurisdiction of the Commission does not extend to defining identity of the group entitled to recover on any claim placed before it.

It is appellants' position that the denial of the motion was error and that all of the above grounds for it are erroneous.

### QUESTIONS PRESENTED.

1. Are appellants members of a "tribe, band or other identifiable group of American Indians" within the meaning of the Indian Claims Commission Act?

2. Do appellants have a "common claim" within the meaning of the decisions imposing this requirement for jurisdiction of the Commission?

**141**

3. Is Petitioner-appellee "The Creek Nation" of Oklahoma the proper petitioner solely entitled to assert the claim for the injury inflicted upon the Creek nation under the authority of the Treaty of 1814?

4. Did the Indian Claims Commission have jurisdiction to determine whether petitioner-appellee is the party entitled to recover on the claim asserted or whether another group should be added or substituted as petitioner for the purposes of judgment?

### ARGUMENT.

### THE INDIAN CLAIMS COMMISSION COMMITTED REVERSIBLE ERROR IN DENYING APPELLANTS' AMENDED MOTION FOR LEAVE TO INTERVENE.

#### I.

**The Indian Claims Commission Erred in Determining that "The Petitioner In This Case ['The Creek Nation' of Oklahoma] Has the Exclusive Right to Prosecute the Claim Here Asserted."**

A. *The Injury Inflicted by the United States in Exacting and Enforcing the Treaty of 1814 was Suffered by all Creeks, Not Simply Those Now in Oklahoma.*

One hundred thirty-seven years ago when a grievous wrong was done to the Creek nation in depriving it of a large part of its territory in Alabama and Georgia without compensation, it was a homogeneous people. It is doubtful if there was anyone of the Creek blood anywhere who was not privileged to call himself a member of the nation and to share in the enjoyment of its common lands and goods. It enjoyed independence

MU003658

**142**

and sovereignty. While the encroachments of the white settlers had begun, only 24 years had passed since the United States had guaranteed its boundaries and promised protection. (7 Stat. 35)

The burden of the taking of over 23 million acres fell upon all the Creeks equally, because of their common ownership. It made all of them and all of their descendants poorer, by depriving them of their enjoyment of the land and of the fruits of its use or sale through the succeeding years down to the present generation.

The time has at last come when it appears that the United States may make reparation for its mistreatment of the Creeks, as well as of other Indian groups. There would appear to be no question that the repayment must be for the benefit of all Creeks, since all Creeks were injured. Yet petitioner-appellee contends that it alone is entitled to the relief for the injury to all, for the benefit of its members, and the Indian Claims Commission has agreed that it alone can prosecute the claim.

Those now members of "The Creek Nation" of Oklahoma are not all, or even nearly all, the members by blood of the original Creek nation. They are simply those whose ancestors decided to migrate to the Indian Territory and were there granted new lands and allotments, and who have since enjoyed the bounty and guardianship of the federal government. They are, if anything, less injured because of the wrong and less deserving of recompense than the thousands of others whose ancestors stayed behind to make their own way on the small allotments parcelled out to them and accepted the responsibilities of full citizenship.

**143**

Compelling arguments should be required to support the denial of relief for this ancestral wrong to the nation as a whole and the granting of relief only to those Creeks who happened to reside on a reservation in Oklahoma on certain dates in the early 1900s when a roll was made of those so residing.

The Commission appears to have reached this inequitable decision as a result of three erroneous conclusions. The first is that "The Creek Nation" of Oklahoma is nothing but the original Creek nation transplanted to Oklahoma. The second is that, because it has maintained a continuous organization, dealt with by the Federal Government, and because it bears the name "The Creek Nation", it is the sole representative of Creek people qualified to present their claims to the Commission. The third is that, conversely, because appellants have been members of no continuous political organization of Creeks recognized by the government, they must be denied the right to present claims.

B. *Petitioner-appellee "The Creek Nation" of Oklahoma Is Not Identical With the Original Creek Nation Which Existed at the Time of the Asserted Injury.*

The Indian Claims Commission was apparently misled by the identity of the name of the present "Creek Nation" of Oklahoma with that of the original Creek nation into stating in its opinion that appellants, in effect, concede petitioner-appellees' exclusive right to prosecute the claim in issue by asking that "the members of the Creek Nation" be granted recovery. (R. 117). Appellants did and do ask that the Creek nation be granted relief but strongly affirm that petition-

MU003659

er-appellee is *not* the Creek nation in a generic sense nor the Creek nation which sustained injury in 1814.

The Creek nation, as a national entity, was disorganized and divided as a result of events occurring shortly after the Treaty of 1814. These events are related in detail in the statement of facts, *supra*. They resulted from the pressure of the inland movement of the whites along the eastern seaboard. In 1814 the Creek nation had ceded land to the United States. In 1826 it ceded more land, and a group of its members, desiring to move westward to avoid the white man, obtained permisson to send 5 delegates to the West to select land, which the United States promised to give them and to which it promised to move them within 24 months. (7 Stat. 286) In 1832 the Creek nation ceded all its land east of the Mississippi, and encouragement was offered all Creeks to emigrate to the territory west of the Mississippi. At the same time, it was expressly agreed that they were not compelled to go, and detailed provision was made for a survey, a census and for allotment of sections and half-sections of land to those electing to remain. (7 Stat. 366)

As might be expected, many chiefs and heads of families elected to remain in their native surroundings. One need only to check Parsons & Abbotts' Census of the Creeks in 1832 in the National Archives, subsequent censuses of the Southeastern States and local land and birth records, or the membership rolls of "The Creek Nation East of the Mississippi", to gain an idea of their great number, alleged in appellants' original motion to be approximately 10,000.

In the first treaty made by the United States with those migrating westward, the latter were identified as "the Creek nation of Indians west of the Mississippi",

it being stated that the signatory chiefs had "full power and authority to act for their people west of the Mississippi". It was also recited in the treaty that the great body of the Creek nation as of that time remained "on the east side of the Mississippi".

The political organization of the Creeks in the area granted to them in the Indian Territory used the name "The Creek Nation", but this name was almost always accompanied by restrictive language limiting it to those Creeks in the Indian Territory (Treaty of August 7, 1856, 11 Stat. 699; Act of June 28, 1898, 30 Stat. 495; Act of March 1, 1901, 31 Stat. 861; Act of June 30, 1902, 32 Stat. 500; Act of April 26, 1906, 34 Stat. 137.)

The rolls of "The Creek Nation" of Oklahoma were closed in 1907.

The rolls made at that time were created for the express purpose of effecting the allotment of the Creek lands in the Indian Territory in Oklahoma. (Act of June 28, 1898, 30 Stat. 495.) Appellants and other Creeks like them cannot now be enrolled. They were never entitled to gain enrollment, except by taking up residence in the Creek territory in Oklahoma, for enrollment was expressly restricted to those residing in the Creek reservation or who moved to it prior to a given date. (Act of June 28, 1898, 30 Stat. 495.) Thus the very limitations on membership prove the limitations of the organization, which was for the purpose of governing affairs of the Creek Indians in Oklahoma, the division of lands located there and the handling of other administrative and financial matters pertaining to that group. This, together with the repeated recognition in treaties and Acts of Congress of the restrictive character of petitioner-appellee, conclusively

proves that "The Creek Nation" of Oklahoma is not the same as the original Creek nation or even a full successor to it, but a restricted organization for the government of those Creeks in Oklahoma.

To make this restricted organization the successor to all rghts of parent nation and membership in it the basis of enjoyment of relief granted for the wrong to the parent not only will ignore the history of the Creek nation, but will work a grave injustice upon many of those who are blood members of it.

### C. *Appellants and Other Creeks Did Not Lose Their Rights in the Claim in Issue by Not Emigrating to Settle in Oklahoma.*

Petitioner-appellee urged very strongly in its objections to appellants' original and amended motions that appellants and other similar descendants of members of the injured Creek nation had forfeited their rights in the claim by electing not to go west and become members of the group there whose descendants comprise petitioner-appellee. (R. 75-78, 106-110) In support of this position it cited and quoted *Eastern Band of the Cherokee Indians* v. *United States,* 117 U. S. 288 (1886) (R. 77). The language quoted might be somewhat persuasive were it not for the fact that the facts there are so easily distinguishable from those at issue here. In that case, unorganized Eastern Cherokees who had failed to migrate westward were attempting to claim a share in funds arising from the sale of the lands *in Oklahoma* which the migrating Cherokees had settled, and from commutation of annuities granted in exchange for surrender of those Oklahoma lands. They were properly denied the right to share. Obviously appellants would have no right,

nor do they claim any, to share in lands or moneys or claims arising out of the affairs of petitioner-appellee in Oklahoma. But appellants have not, simply by not going to Oklahoma, surrendered their rights to the claim in issue, arising out of an injury to their nation in the east prior to the migration. This is made clear in *United States* v. *Cherokee Nation,* 202 U. S. 101, 26 S. Ct. 588 (1906) wherein the unorganized eastern Cherokees were claiming to be entitled to share in funds owing by the United States to the Cherokee Nation under the Treaty of New Echota of May 23, 1836. The Supreme Court said (26 S. Ct. at 599-600), quoting with approval from the opinion of this Court:

> "While the United States have always, or nearly always, treated the members of an Indian tribe as communal owners, they have never required that all the communal owners shall join in the conveyance or cession of the land. From the necessities of the case, the negotiations have been with representatives of the owners. The chiefs and head men have ordinarily been the persons who carried on the negotiations and who signed the treaty. But they have not formed a body politic or a body corporate, and they have not assumed to hold the title or be entitled to the purchase money. They have simply acted as representatives of the owners, making the cession on their behalf, but allowing them to receive the consideration *per capita.* In the present case the Cherokee Nation takes the place, so far as communal ownership is involved, of the chiefs and head men of the uncivilized tribes. This, too, is consonant with the usage of nations. The claims of individuals against a foreign power are always presented, not by them individually, but by their government. The claims are pressed as international, but the money received is received in trust, to be paid over to the persons entitled to it.

"As to those Cherokees who remained in Georgia and North Carolina, in Alabama and Tennessee, they owe no allegiance to the Cherokee Nation, and the nation owes no political protection to them. But they, as communal owners of the lands east of the Mississippi, at the time of the treaty of 1835, were equally interested, with the communal owners who were carried to the West, in the $5,000,000 fund which was the consideration of the cession, so far as it was to be distributed *per capita*. The Cherokee Nation was not bound to prosecute their claims against the United States for the unpaid balance of the $5,000,000 fund, but their rights were inextricably interwoven with the rights and equities of the Cherokees who were citizens of the nation, and the nation properly made no distinction when parting with the Outlet, but demanded justice from the Cherokee point of view for all Cherokees who had been wronged by the nonfulfillment of the treaty of New Echota. As to these Eastern nonresident Cherokee aliens the nation acted simply as an attorney collecting a debt. In its hands the moneys would be an implied trust for the benefit of the equitable owners.

"After a careful consideration of the circumstances and conditions of these cases, the court is of the opinion that the moneys awarded should be paid directly to the equitable owners."

The rights of those in the position of appellants were expressly saved and guaranteed by the Act of February 8, 1887, 24 Stat. 390, as amended March 3, 1901, 31 Stat. 1447 and May 8, 1906, 34 Stat. 182:

"Every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this Act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has

voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, *whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property.*" (Italics ours)

In discussing this statute and the general trend of government policy toward the Indians and Indian tribes, the Court of Appeals of the District of Columbia, in *United States ex rel. Besaw v. Work,* 6 F. 2d 694, 698 (1925), quoting with approval from *Oakes v. United States,* 172 F. 305 (C.C.A. 8th, 1909), said:

"On this point the court said: 'For many years the treaties and legislation relating to the Indians proceeded largely upon the theory that the welfare of both the Indians and the Whites required that the former be kept in tribal communities separated from the latter, and while that policy prevailed, effect was given to the original rule respecting the right to share in tribal property; but Congress later adopted the policy of encouraging individual Indians to abandon their tribal relations and to adopt the customs, habits, and manners of civilized life, and, as an incident to this change in policy, statutes were enacted declaring that the right to share in tribal property should not be impaired or affected by such a severance of tribal relations, whether occurring theretofore or thereafter.'

"After citing and quoting from a number of the acts of Congress, the court said: 'These acts dis-

**150**

close a settled and persistent purpose on the part
of Congress so to broaden the original rule re-
specting the right to share in tribal property as to
place individual Indians who have abandoned
tribal relations, once existing, and have adopted
the customs, habits, and manners of civilized life,
upon the same footing, in that regard, as though
they had maintained their tribal relations.  Not
only this, but these acts, omitting that of 1865, are
general and continuing in their nature, and there-
fore are as applicable to the Chippewas in Minne-
sota as to other Indians, unless the act of 1889 dis-
closes, either expressly or by necessary implica-
tion, that Congress intended otherwise.  In our
opinion that act does not thus disclose such an in-
tention.' ''

\*  \*  \*  \*  \*  \*  \*  \*  \*

''Confusion seems to have arisen through failure
to distinguish between membership in an Indian
tribe and the mere severance of tribal relations.
The breaking or severance of tribal relations oc-
curs where a member of the tribe abandons the
tribal life, removes from the tribal habitation, and
by marriage, exercise of the homestead right, or
otherwise, establishes a residence elsewhere and
adopts the habits and customs of civilized life.
But membership in an Indian tribe is based upon
the firm foundation of right by blood inherited
from Indian ancestry.

''Nor is the test one of citizenship.  In the ab-
sence of a treaty or an act of Congress conferring
citizenship upon Indains, who already had, or who
would in the future, abandon tribal life and adopt
the habits and customs of civilized life, expressly
reserved to such Indians all their rights in tribal
property held in common for the benefit of the
membership of the tribe.  Hence the mere transfer
of citizenship is not important, so far as the ques-
tion of the rights in tribal property is con-
cerned. \* \* \* ''

**151**

Thus neither in fact nor in legal fiction is petitioner-
appellee the full successor to the Creek nation, entitled
to exclude descendants of its members not presently
enrolled in petitioner-appellee from participation in
any recovery.

D. *Petitioner-appellee ''The Creek Nation'' of Okla-
homa Is Not Entitled to Represent the Entire
Creek Nation in Prosecuting Claims Before the
Indian Claims Commission.*

Petitioner-appellee, the political organization of the
Creeks in the Creek territory of Oklahoma, is not rep-
resentative of all the Creek nation, as demonstrated
above.  It removes any lingering possibility of its be-
ing considered the organization entitled to represent
all by expressly disclaiming the right or obligation.  It
denies, in its ''Objections to Amended Motion to Inter-
vene'', that the portion of the Creek nation including
appellants is entitled to repreesntation before the Com-
mission, or to participate in any recovery.  (R. 104-
111)

The Commission appears to have determined that
the long-continued existence of petitioner-appellee and
its record of dealings with the federal government, as
contrasted with appellants' lack of formal organiza-
tion for many years and lack of treaty dealings, vested
it with the right to represent the nation.  In determin-
ing that ''the petitioner in this case has the exclusive
right to prosecute the claim here asserted,'' the Com-
mission states that after 1833:

'' \* \* \* all dealings of the Federal Government
were made with the Creeks in Oklahoma, and we
find no treaties, contracts or other transactions
with those members of the tribe who remained

MU003663

east, or that defendant ever recognized those remaining east as the Creek Nation.

"There are other instances by which the United States recognized the tribal government of the Creeks in Oklahoma, notably the Act of April 26, 1906, 34 Stat. 137, section 28, of which 'continued in full force and effect for all purposes, authorized by law' the Creek tribal government." (R. 117)

It is interesting that the Commission selected the 1906 Act as an instance of recognition by the United States of petitioner-appellee. For that act is entitled "An act to provide for the final disposition of the affairs of the Five Civilized Tribes *in the Indian Territory,* and for other purposes" (Italics ours), petitioner-appellee is referred to as the "Creek Tribe *in the Indian Territory*" (Italics ours) and the act deals exclusively with matters relating to the Indian Territory.

The fact that the Federal Government recognized and dealt with the political organization of the *Creeks in Oklahoma* in regard to *Oklahoma affairs* is of course no indication that it regarded it as representative of *all Creeks.* Furthermore, the fact that the Federal Government had no dealings with those east of the Mississippi, as a group, is equally of no significance, since the latter, unlike the Creeks in Oklahoma, had no organization, occupied no bounded grant of territory and were not under the guardianship of the Federal Government.

The fact that petitioner-appellee is recognized by the Federal Government, whereas appellants can point to no organization recognized as representing *all* Creeks, is certainly no basis for granting petitioner-appellee the representation of all Creeks, or denying appellants

the right to appear and represent themselves and that portion of the nation *not* represented by petitioner-appellee. If there existed a recognized organization representative of the entire Creek nation, it would doubtless have exclusive right of representation. But certainly the existence of a recognized organization representative of only part of the nation, which, moreover, takes the position that the remaining unorganized portion has no claim, cannot preclude the remaining unorganized portion of the larger group from being represented.

## II.

### The Commission Erred in Determining that Appellants are not Members of a "Tribe, Band, or Other Identifiable Group of Indians" Entitled to Have Their Claim Determined by the Commission.

The Commission Determined that Appellants Are Not Members of Any "Tribe, Band, or Other Identifiable Group". In doing so, the Commission ruled that in order to be an identifiable group under the Act, it is necessary that petitioners have "a common claim." The Commission held that appellants have no common claim but present instead "a common suit for individual claims." (R. 118)

The Commission's ruling that the essential for suit before the Indian Claims Commission is that the Indians suing have a common claim was in accordance with its earlier decisions. *The Loyal Creek Band or Group of Creek Indians,* Ind. Cl. Com. Dkt. No. 1, opinion entered May 6, 1949; *Lewis et al. ex rel. the Creek Freedmen Association,* Ind. Cl. Com. Dkt. No. 25, opinion entered August 4, 1949; *Thompson et al. ex rel. Indians of California,* Ind. Cl. Com. Dkt. No. 31, opin-

ion entered December 15, 1950. But it committed clear error in holding that appellants are not members of a group having a common claim.

The Commission itself has held an individual claim to be one for a direct injury to an individual, sustained in his individual capacity. In *The Fort Sill Apaches,* Ind. Cl. Com. Dkt. No. 30, opinion entered May 6, 1949, in denying the petitioner the right to sue for the alleged false imprisonment of 450 of its members, the Commission said:

> "* * * The rights violated were those of the individuals and who in turn experienced the 'harm, suffering and humiliation' as a result of the alleged wrong. Thus it would seem that a personal or individual wrong has been inflicted on each Indian which damaged him individually and even though all the individual members sustained their respective injuries by the same common incident (arrest and imprisonment at the same time and place), the rights of each individual for the injury so sustained would be and remain several and independent of each other."

On the other hand, a common claim is one for injury to a group right as distinguished from an individual right. The Commission has repeatedly held that a claim for the taking of tribal lands is a common claim. *The Choctaw Nation,* Ind. Cl. Com. Dkt. No. 16, opinion entered July 14, 1950; *McCauley ex rel. the Kaw Tribe of Indians,* Ind. Cl. Com. Dkt. Nos. 33, 34 and 35, opinion entered September 17, 1951; *Pawnee Indian Tribe of Oklahoma,* Ind. Cl. Com. Dkt. No. 10, opinion entered July 14, 1950.

On the basis of these cases, there can be no question that the Indian Claims Commission is wrong and that appellants have a common claim of a group character.

The claim presented is one for injury to the Creek nation as it existed in 1814 from the taking of its communal lands. Any judgment of the Indian Claims Commission must therefore be in favor of the Creek nation. Appellants are thus not asserting individual claims of themselves or the other Creeks, but are asserting as descendants of members of the Creek nation the common claim possessed by the nation which, because of the lack of present organization, can only be presented in a representative suit by individuals.

It does not matter whether the Creek nation be regarded as still in existence through blood ties or whether, because of the scattering of many of its members, it be regarded as having ceased to exist as a nation. In one event, appellants and those similarly situated whom they represent, who have for common protection formed "The Creek Nation East of the Mississippi", are members of the nation; in the other event they are members of an identifiable group in that they prosecute the common claim of the Creek nation descended to the present Creeks through lineal descent.

One of the Commission's own decisions, entered subsequent to its decision on appellants' amended motion, demonstrates this conclusively. In *Red Lake, Pembina and White Earth Bands,* Ind. Cl. Com. Dkt. No. 18-A, opinion entered September 17, 1951, one of the claims was that of the "Pembina Band" for the taking of lands under an 1863 treaty. The United States defended on the ground that it was not a "tribe, band or other identifiable group" at the time of the suit, although it had been at the time of the injury. The issue, the facts and the Commission's decision are best presented in its own language:

> "The defendant takes the position that a tribe, band or other group must be an existing political

entity in order to have its claim determined by this Commission. Counsel for defendant does not deny the existence of the Pembina Indians as an organized band and its recognition as such by the United States at the time the treaty of October 2, 1863 was concluded with said band and the lands involved in this claim were ceded by it to the Government, but counsel contends that such a band of Indians as the Pembina Band no longer exists and has not existed since 1891, at which time its members were merged with either the Red Lake or White Earth Bands of Chippewa Indians, and are enrolled as members of those bands.

"A similar contention was made by the defendant in the case of The Loyal Creek Band or Group of Creek Indians v. The United States, Docket No. 1, decided May 6, 1949. In that case this Commission decided that the three classes of *claimants who are permitted to assert claims* under the Indian Claims Commission Act, namely, a 'tribe, band, or other identifiable group' *do not have to be existing political groups in order to be heard by the Commission. The controlling question is whether the claimant group can be identified and have a common claim.* We believe that the decision in that case applies to the contention made by the defendant in the present suit.

"As the plaintiffs concede that the Pembina Indians are no longer organized as a band, *the question then is whether members, or descendants of members of the Pembina Band as it existed and was recognized at the time of the 1863 treaty, can be identified.* If they can be so identified, then any one of their group is authorized by express statute to present this claim as a representative of all the members, as provided by Section 10 of the Indian Claims Commission Act (25 U.S.C. 70a), which provides that: 'any claim within the provisions of this Act may be presented to the

Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members. * * * " (Italics ours)

Similarly, in the instant case, the Creek nation was organized and recognized at the time of the Treaty of 1814, it now lacks a comprehensive organization, but the descendants of its members can be identified through blood lines.

### III.

### The Commission Erred in Determining that it did not Have Jurisdiction to Define the Group Entitled to Recovery on a Claim Before it.

The Commission appears to have misunderstood the basic question it was called upon to decide on appellants' motion. In doing so it abrogated a necessary part of its jurisdiction, which is part of the jurisdiction of any tribunal authorized to hear and determine claims. In performing its duty to determine claims of any Indian "tribes, bands or other identifiable group" against the United States, it must determine not only whether a claim exists against the United States and in favor of someone, but whether the group suing is, in fact, the injured group or has otherwise acquired title to the claim. The United States defended petitioner-appellee "The Creek Nation's" case on the ground that no injury had been inflicted on anyone. It could as well have asserted the additional defense that "The Creek Nation" of Oklahoma was not the proper claimant, not being the full successor of the original Creek Nation nor entitled to recover full damages for any injury to it, nor properly representative of the entire

MU003666

Creek Nation, the proper claimant. If this had been done, we doubt that the Commission would have questioned its own power to determine this issue. *Cf. The Kaw Tribe of Indians ex rel. Keenan Pappan et al.,* Ind. Cl. Com. Dkts. Nos. 33, 34, 35, opinion entered September 26, 1950.

In *The Fort Sill Apaches,* Ind. Cl. Com. Dkt. No. 30, opinion entered May 6, 1949, this precise question was presented on motion to dismiss of the United States, on the ground that necessary parties had been omitted. The Fort Sill Apaches, formerly members of the Chiricahua and Warm Spring bands of Apaches, were suing on a claim for the taking of the reservation of the Warm Springs band. The United States contended that other descendants of the Chiricahua and Warm Spring bands were living at Mescalero reservation and were entitled to a portion of the claim. While declining to determine the question on the United States' motion because of the issues of fact presented, the Commission recognized the materiality of the issue and its obligation to determine it, saying:

> "* * * This contention of the Respondent may be correct in the event the petitioner fails to establish by its proof that it is the legal successor of the two bands, but we believe that it is only after proof of all the relevant facts and circumstances has been received on this issue that the Commission may, in view of the allegations of the petition, determine petitioner's right to maintain this action for the claim of the Warm Spring band of Apache Indians."

Since the United States failed to raise this question in the instant proceeding, it became necessary for appellants to do so. This they might appropriately do, since

their interests are those affected. Their amended motion and petition raised this question and presented an issue which the Commission should have determined, probably, in the light of the foregoing decision, by granting appellants' motion and taking evidence on the issue presented by its petition and the answers to be filed to it by the other parties as to "petitioner's right to maintain this action for the claim of 'the Creek nation'." Yet the Commission appears to have doubted its power to determine whether the entire Creek nation or only petitioner-appellee and its members were entitled to prosecute the claim. For it stated that by its amended motion "the Perdido Band is in reality asking us to determine the individual Indians who may participate in any award that may be made." (R. 118)

Appellants contributed to the Commission's error in requesting, in the prayer for relief of the "Amended Petition of Interveners", that "Interveners be declared entitled to share in said recovery on a per capita basis with all others who come before this Commission and establish that they are descendants of the members of the original Creek nation or, in the alternative, that a commission be created to determine and make a roll of the living descendants of members of the original Creek nation, in order to determine who shall be entitled to share in any recovery." It is doubtful that the Commission possesses the power to do this or that it is a part of its function to determine the specific individuals to whom an award is to be distributed. This may be left to the Secretary of the Interior under the direction of Congress once a judgment has been entered making it clear that the claim and consequent judgment are the property of the original

MU003667

Creek nation to be enjoyed by their descendants. It will then be a matter for each individual to establish his descent.

But even if erroneous, this prayer of appellants does not, under established rules of pleading, deprive them of the right to that relief to which they are entitled. The allegations of appellants' amended motion tendered an issue as to the proper petitioner to prosecute the claim before the Commission:

"5. The injury for which relief is sought in this proceeding is the taking of lands in Alabama and Georgia by the United States from the Creek nation under the Treaty of August 9, 1814 between the United States and the Creek nation.

"6. The injury was thus one to the Creek nation, as then constituted, and the right to recover therefor passed to the descendants of all its members, who possessed communal rights to its lands, and the right to participate in any recovery for their taking.

"7. Because of the division of its members, and the present lack of any formal organization representing all members of the Creek nation, it must be regarded for the purpose of claims before this Commission under the Act of August 13, 1946, arising out of events prior to the westward migration of a portion of its members, as an unorganized tribe or other identifiable group of Indians.

"8. Even if the organization of the Oklahoma Creeks be regarded as the political successor of the earlier Creek nation, and thereby entitled to sue in a representative capacity for wrongs inflicted on the Creek nation, any recovery would be the rightful property of the original Creek nation, distributable to the descendants of those who were its members as of the time of the Treaty of 1814.

"9. The organization of the Oklahoma Creeks, petitioner herein, does not purport to represent any Creeks other than those of the Indian Territory. It claims that its members and their descendants, as shown by its rolls, are entitled to recover and keep the full damages for the 1814 injury to the Creek nation. Its interests are thus to this extent adverse to those of your Applicants for leave to intervene, who claim the right, with all other descendants of the original Creek nation, to participate in any recovery.

"10. The interest of the Perdido Band and its members and other Creeks similarly situated, not enrolled or descendants of those enrolled in the organization of the Oklahoma Creeks, are thus not presently represented in this proceeding, in which they have a direct and immediate financial interest." * * *

Consistent with its own later decision in the *Fort Sill Apaches* case, *supra*, the Commission possessed the power to determine the issue presented as to the right of appellants to representation, and should have done so.

## CONCLUSION.

The unsatisfied claims of Indians for abuses practiced by the United States upon them have been a source of discontent among Indians everywhere and a source of proper shame to our government for many years. In creating the Indian Claims Commission, Congress' avowed purpose was to provide a forum for the remedy of all wrongs done to Indian groups, whether legal wrongs or simply those based upon a breach of principles of "fair and honorable dealings." (60 Stat. 959, 25 U.S.C. 70)

MU003668

**162**

Appellants and the claim they assert surely fall within this Congressional purpose.

They are Creek Indians. They are descendants of those who were the Creek nation at the time of the unconscionable treaty which took its lands. They are not a few stragglers, but thousands. They present not a bundle of individual claims, but a claim for injury to the nation. Theirs is a claim which, but for the existence of petitioner-appellee, the Commission, consistent with its decision in *Red Lake, Pembina and White Earth Bands, supra; Loyal Creek Band or Group of Creek Indians, supra,* and *Snake or Piute Indians of the Former Malheur Reservation in Oregon,* Ind. Cl. Com. Dkt. No. 17, opinion entered December 29, 1950, would certainly have heard.

Why, then, should the existence of petitioner-appellee be a bar to appellants' rights? Certainly membership or non-membership in a group in Oklahoma cannot have been intended by Congress to be a ground for distinction among those who are all commonly descended from the injured group. Certainly petitioner-appellee cannot be held solely entitled to represent the Creeks when it disclaims its representation of appellants and the very existence of their claim.

The decision of the Commission violates the purposes of the Indian Claims Commission Act and its own precedents. It should be reversed and appellants permitted to intervene so that the rights of all descendants of members of the injured nation not members of petitioner-appellee can also be represented and a determination made of the group entitled to recover.

CLAUDE PEPPER,
Cafritz Building,
Washington, D. C.,
*Attorney for Appellants.*

**163**

## APPENDIX.

BEFORE THE INDIAN CLAIMS COMMISSION

Dockets No. 21

THE CREEK NATION, *Petitioner,*

v.

THE UNITED STATES, *Defendant.*

### Order Denying Motion to Intervene.

On the 5th day of January, 1951, a group of Indians, designated as the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," filed a motion in the above-entitled cause for leave to intervene therein, and thereafter, and on April 4, 1951, the same petitioners filed an amended motion accompanied by a changed petition of intervention, and a hearing was had upon said amended motion and the petition attached thereto, on April 18, 1951, and after argument of counsel for the applicant, the petitioner and the defendant before the Commission, the same was taken under advisement, and the Commission being now fully advised in the premises adjudges that said amended motion for leave to intervene in the above-entitled cause should be denied.

IT IS THEREFORE ORDERED AND ADJUDGED by the Commission that the amended motion for leave to intervene, filed herein on the 4th day of April, 1951, by said "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," be and the same is hereby denied.

MU003669

**164**

Dated at Washington, D. C., this 4th day of June, 1951.

EDGAR E. WITT
*Chief Commissioner*
LOUIS J. O'MARR
*Associate Commissioner*
WM. M. HOLT
*Associate Commissioner*

BEFORE THE INDIAN CLAIMS COMMISSION

Docket No. 21

THE CREEK NATION, *Petitioner,*

v.

THE UNITED STATES, *Defendant.*

### Opinion of Commission.

PER CURIAM. On January 5, 1951, a group of Creek Indians, designated as the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," filed a motion in the above-entitled cause for leave to file a petition of intervention, which accompanied the motion. Thereafter, and on April 4, 1951, the same petitioners, who will hereafter be referred to as the Perdido Band, filed an amended motion accompanied by another, considerably changed petition of intervention, and a hearing was had on the amended motion and the petition attached thereto, on April 18, 1951.

The Perdido Band, according to the statements contained in the amended motion and the petition accompanying it, is composed of descendants of members of the Creek Nation of Indians who remained in Alabama, Georgia and North Florida under the treaties of January 4, 1826 and March 24, 1832, between the United States and the Creek Nation. Neither the peti-

**165**

tioner, the Creek Nation, nor defendant denies these statements.

The petition of intervention also states that enrollment in the Perdido Band is limited to those Indians who are descendants of members of the original Creek Nation, and this allegation is not questioned.

The Perdido Band is not asking for an award independently of that sought in the above case; on the contrary, they are supporting the pending claim. What they are demanding is that they and all other descendants of members of the original Creek Nation be recognized as having the right to participate in any award that might be made in the above case even though they are not enrolled as members of the petitioner, Creek Nation, as now constituted.

Without going into the history of the Creek Nation in much detail, it may be stated that this tribe was one of the larger Indian tribes and originally occupied a large territory in Georgia, Alabama and Florida. On January 24, 1826, 7 Stat. 286, the Creek Nation concluded a treaty with the United States by which it ceded an area of its domain located in Georgia and lying on the east side of the Chatahoochee river. A portion of the tribe wished to move west of the Mississippi river and the treaty provided (Art. 6) for a "deputation of five persons" to select a country west of the river as a home for that part of the Creek Nation desiring to move west. The country was selected and the selection confirmed by treaty, as will be shown later. Treaty of Febr. 14, 1833, 7 Stat. 417.

On March 24, 1832, 7 Stat. 366, by treaty of that date, the Creeks ceded "all their land, East of the Mississippi river" to the United States. This treaty contained this provision (Art. XII):

MU003670

**166**

"The United States are desirous that the Creeks should remove to the country west of the Mississippi, and join their countrymen there; and for this purpose it is agreed, that as fast as the Creeks are prepared to emigrate, they shall be removed at the expense of the United States, and shall receive subsistence while upon the journey, and for one year after their arrival at their new homes—Provided however, *that this article shall not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please.*" (Italics added.)

Article II thereof required the United States to survey the ceded area and allowed "ninety principal chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for a term of five years, unless sooner disposed of by them." Provisions were also made for taking a census of the persons making selections and for making selection of twenty sections for the benefit of orphan children of the Creeks. Article III authorized the sale of the selections, and Article IV provided:

"At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee simple, from the United States."

Article XII of this treaty quoted above discloses the desire of the United States to move all Creeks west of the Mississippi river, and as an inducement to move, agreed to pay the expenses of removal, provide subsistence during removal and for a year after their arrival west. However, such removal was not compulsory as to individual Creeks, for the article, as shown above, contained the proviso "that this article shall

**167**

not be construed so as to compel any Creek Indian to emigrate, but they shall be free to go or stay, as they please."

The treaty of Febr. 14, 1833, 7 Stat. 417, confirmed the selection of land authorized by the 1826 treaty (Art. VIII), and Article III thereof provided for a patent in fee simple to be issued to the "Creek Nation." Article IV made it unmistakably clear that the land ceded under this treaty in what is now Oklahoma was for the benefit and use of the entire Creek people, for it provided:

"It is hereby mutually understood and agreed between the parties to this treaty, that the land assigned to the Muskogee Indians, by the second article thereof, shall be taken and considered the property of the whole Muskogee or Creek nation, as well of those now residing upon the land, as the great body of said nation who still remain on the east side of the Mississippi; and it is also understood and agreed that the Seminole Indians of Florida, whose removal to this country is provided for by their treaty with the U. S. dated May 9th, 1832, shall also have a permanent and comfortable home on the lands hereby set apart as the country of the Creek nation; and they (the Seminoles) will hereafter be considered a constituent part of said nation, but are to be located on some part of the Creek country by themselves—which location will be selected for them by the commissioners who have signed these articles of agreement or convention." (II Kapp. 390.)

The 1826 treaty did not, at least by its terms, contemplate a removal of the entire tribe west, but the 1832 treaty discloses a purpose to recognize those who migrated to the west as the main governing body of the tribe since provision was made for enabling indi-

MU003671

vidual chiefs and heads of families wishing to do so to remain east and select tracts in their aboriginal land which was reserved for that purpose in said treaty of 1832. This purpose was confirmed by the treaty of 1833, which was made with the Creek Nation at Fort Gibson in Indian Territory, and in which the territory ceded by the United States was assigned to the whole Muskogee or Creek Nation—those residing east and those residing west of the Mississippi. Thereafter, all dealings of the Federal Government were made with the Creeks in Oklahoma, and we find no treaties, contracts or other transactions with those members of the tribe who remained east, or that defendant ever recognized those remaining east as the Creek Nation.

There are other instances by which the United States recognized the tribal government of the Creeks in Oklahoma, notably the Act of April 26, 1906, 34 Stat. 137, section 28 of which "continued in full force and effect for all purposes, authorized by law" the Creek tribal government. We are of the opinion the petitioner in this case has the exclusive right to prosecute the claim here asserted. In fact, the Perdido Band does not really question the right of petitioner to maintain the action, for, as before stated, it asked that the members of the Creek Nation be awarded the amount prayed for, insisting, however, that the award be for the benefit of all Creek descendants and not confined to those enrolled under the various agreements with the Creek Nation, confirmed by Acts of Congress.

This Commission decided in the Loyal Creek case, Docket No. 1, and the Western Cherokee case, Docket No. 24, that an "identifiable group," under the Indian Claims Commission Act, must have a common claim, and that a common suit for individual claims does not

create an identifiable group. It is plain from the statements in the amended motion and the allegations of the petition accompanying it that the Perdido Band has no common claim, and is therefore not an "identifiable group" under said Act.

Furthermore, the Perdido Band is in reality asking us to determine the individual Indians who may participate in any award that may be made. They pray in their petition that the members of the Perdido Band be declared entitled to share in the recovery or that a Commission be created to make a roll of the living descendants of the original Creek Nation in order to determine who shall be entitled to share in any recovery. Counsel for applicants mistake the powers of the Indian Claims Commission. The Act authorizes us to determine claims of Indian tribes, bands or identifiable groups. We have no power to determine the membership of the groups who may successfully prosecute their claims, for that is an administrative function over which we have no control.

For the reasons stated above, the amended motion of the Perdido Band must be denied.

The Commission now has under advisement for decision only the issue of fact and law relating to the petitioner's right to recover. (Sec. 22(b) of Rules of Procedure). Ordinarily, we would postpone the determination of the amended motion of the Perdido Band until after we had determined that issue, but for fear longer delay might cause embarrassment to the Band because of the expiration of the time for filing claims on August 13, 1951, we concluded an earlier determination of the amended motion proper.

Dated this 4th day of June, 1951.

# EXHIBIT H

**Appeals Docket No. 14**

# In the United States Court of Claims

C. W. McGhee, Ruby Z. Weatherford, John V. Phillips and John Williams as Members of and on the Relation of the Creek Nation East of the Mississippi, Appellants

*v.*

The Creek Nation and The United States, Appellees

**BRIEF FOR THE APPELLEE, THE UNITED STATES**

WM. AMORY UNDERHILL,
*Assistant Attorney General.*

RALPH A. BARNEY,
*Attorney.*

MU003701



# INDEX

| | Page |
|---|---|
| I. The Facts | 1 |
| II. The Issue | 4 |
| III. Argument | 4 |
|     A. Exclusive right to sue | 4 |
|     B. Appellants are not a tribe, band, or other identifiable group of Indians | 10 |
|     C. Jurisdiction of Commission | 16 |
| Conclusion | 19 |

## CITATIONS

*Cases:*

| | |
|---|---|
| *Choctaw Nation* v. *United States*, decided Oct. 2, 1951 | 10 |
| *Cook* v. *Cook*, decided Dec. 3, 1951 | 4 |
| *Gritts* v. *Fisher*, 224 U. S. 640 | 10 |
| *Kohpay* v. *Chapman*, 190 F. 2d 666 | 12 |
| *Loyal Creek Indians* v. *United States*, 1 Ind. Cls. Comm'n 122 | 13 |
| *Lowe* v. *Fisher*, 223 U. S. 95 | 10 |
| *Mayflower Hotel Stockholders Protective Committee* v. *Mayflower Hotel Corp.*, 73 F. Supp. 721 (1947) | 14, 15 |
| *Montoya* v. *United States*, 180 U. S. 261 | 17 |
| *Red Lake Indians* v. *United States*, 1 Ind. Cls. Comm'n, 575, 589 | 11 |
| *Scanlon* v. *Snow*, 2 App. D. C. 137 | 14 |
| *Tully* v. *United States*, 32 C. Cls. 1 | 17 |
| *Wallace* v. *Adams*, 204 U. S. 415 | 10, 16 |

*Statutes and Treaties:*

| | |
|---|---|
| Act Feb. 8, 1887, 24 Stat. 390 | 9 |
| Act Mar. 1, 1901, 31 Stat. 861 | 13 |
| Act Aug. 13, 1946, 60 Stat. 1049, secs. 9 and 10, | 4, 5, 6, 7, 8, 9, 12, 17 |
| Treaty Aug. 7, 1790, 7 Stat. 35 | 8 |
| Treaty June 29, 1796, 7 Stat. 56 | 8 |
| Treaty June 16, 1802, 7 Stat. 68 | 8 |
| Treaty Nov. 14, 1805, 7 Stat. 96 | 8 |
| Treaty Aug. 9, 1814, 7 Stat. 120 | 1, 3, 11 |
| Treaty Aug. 24, 1835, 7 Stat. 474 | 2 |
| Treaty Nov. 23, 1838, 7 Stat. 574 | 2 |
| Treaty Jan 4, 1845, 9 Stat. 821 | 2 |
| Treaty June 13, 1854, 11 Stat. 599 | 2 |
| Treaty June 14, 1866, 14 Stat. 785 | 2, 13 |

*Miscellaneous:*

| | |
|---|---|
| Hearings on S. 2731, 73d Cong., 1st sess., p. 40 | 17 |
| 13 Fletcher Cyclopedia, Corporations, sec. 5972 | 14 |

(I)

MU003702

# In the United States Court of Claims

Appeals Docket No. 14

C. W. McGhee, Ruby Z. Weatherford, John V.
Phillips and John Williams as Members of
and on the Relation of the Creek Nation East
of the Mississippi, appellants

*v.*

The Creek Nation and The United States,
appellees

## BRIEF FOR THE APPELLEE, THE UNITED STATES

### I. The Facts

Insofar as they relate to this appeal the facts
are not in dispute. Prior to 1812 the Creek In-
dians were living east of the Mississippi River.

In that year they joined with Britain for its sec-
ond war with the United States. On August 9,
1814, a treaty of peace, amity, and cession was
signed at Fort Jackson. It is the land ceded by this
treaty that is the basis of the case now pending be-
fore the Indian Claims Commission in which the
Intervenors seek to join. As the result of a series
of treaties thereafter concluded with the Creek
Nation it ceded all of its lands east of the Missis-
sippi River and acquired a new domain in what is
now Oklahoma.

(1)

MU003703

The majority of the Creeks went West, but many stayed behind and continued to live in or around their old homes.[1] Those who moved West took with them their form of government and were recognized by the United States as "The Creek Nation."[2] Those who remained in the East abandoned their tribal relationships; and they never continued a tribal government recognized by the United States and they entered into no treaties or other political arrangements with the United States[3] or with other Indian tribes or groups, and only recently organized themselves, apparently for the purpose of this suit.[4]

On January 29, 1948, "The Creek Nation" filed its claim with the Commission. The evidence is in, the case has been briefed, argued and submitted. It is now awaiting decison. On January 5, 1951, the appellants, then calling themselves "The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians" filed a motion to intervene which was objected to by "The Creek Nation," the original petitioner, and by the Government as the defendant. An amended motion to intervene

[1] Provision was made for a reservation for each out of the lands ceded. Opinion of Commission, appellants' brief, p. 166.

[2] See treaties of August 24, 1835, 7 Stat. 474; November 23, 1838, 7 Stat. 574; January 4, 1845, 9 Stat. 821; June 13, 1854, 11 Stat. 599; and June 14, 1866, 14 Stat. 785.

[3] In their brief they say: "Furthermore, the fact that the Federal Government had no dealings with those east of the Mississippi, as a group, is equally of no significance, *since the latter*, unlike the Creeks in Oklahoma, *had no organization, occupied no bounded grant of territory and were not under the guardianship of the Federal Government*." [Italics supplied.] Br. p. 152. See also Br. p. 155.

[4] Op. Commission, appellants' Br. p. 168. In their brief appellants say they "have recently joined together for their common benefit * * *." *Id.* p. 137.

was filed and presented to the Commission and on June 4, 1951, an order[5] was made by the Commission denying The Perdido Band the right to intervene. From that order the appellants, now calling themselves the "Creek Nation East of the Mississippi" appeal.

According to their brief[6] their "basic premise is that the injury inflicted by the United States in 1814 was to the Creek nation as then constituted and that the right to recover therefor belongs to that nation, to be enjoyed by all its members." No contention is made that the claim filed by "The Creek Nation" is improper, nor has it been suggested that the case was improperly tried; in fact, it was specifically stated before the Commission that there was no desire to reopen the case. In its opinion[7] the Commission said:

> The Perdido Band is not asking for an award independently of that sought in the above case; on the contrary, they are supporting the pending claim. What they are demanding is that they and all other descendants of members of the original Creek Nation be recognized as having the right to participate in any award that might be made in the above case even though they are not enrolled as members of the petitioner, Creek Nation, as now constituted.

Thus it appears that appellants actually are seeking only to have it determined that they are entitled to participate in any judgment ultimately awarded in this case. This is not the function of the Indian Claims Commission.

[5] Appellants' Br. p. 163.

[6] *Id.* p. 139.

[7] Appellants' Br. p. 165.

MU003704

4

## II. The Issue

On the foregoing facts this appeal presents to this Court a single but important question of law concerning the administration of the Indian Claims Commission Act. The issue may be formulated this way:

Where a claim is filed in the name of an historic Indian tribe by the group commonly recognized by the United States, may individuals who claim a right to share with and participate in any recovery intervene in the action?

The Government contends that under the law and the Rules of the Commission the intervention sought is unauthorized and that the practice ought not to be countenanced nor permitted in the interests of orderly procedure.[8]

## III. Argument

The appellants present their argument under three main contentions. We will follow this arrangement.

### A. *Exclusive right to sue.*

Section 10 of the Indian Claims Commission Act provides as follows:

Any claim within the provisions of this Act may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the represen-

---

[8] In this connection we think the words of Mr. Justice Frankfurter in the recent case of *Cook* v. *Cook,*   U. S. (decided Dec. 3, 1951) are applicable: "I am not one of those who think that procedure is just folderol or noxious moss. Procedure—the fair, orderly and deliberative method by which claims are to be litigated—goes to the very substance of law."

5

tative of all its members; but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians, unless fraud, collusion, or laches on the part of such organization be shown to the satisfaction of the Commission.

To make this statute effective the Commission, under its "power to establish its own rules of procedure,"[9] has provided in Rule 1 as follows:

(b) Claims by Indian tribes, bands, or groups which have tribal organizations recognized by the Secretary of the Interior as having authority to represent such tribe, band, or group shall be filed and presented by the duly appointed or elected officers of such organization, except as provided in paragraph (c) of this section.

(c) Where by virtue of fraud, collusion, or laches on the part of a recognized tribal organization a claim has not been presented (or has not been included as part of a presented claim), any member of such tribe, band, or group may file claim on behalf of all the other members of such tribe, band, or group upon complying with the provisions of section 8 (b).

(d) Claims on behalf of any unorganized tribe, band, or other identifiable group may be filed by any member of such tribe, band or identifiable group as the representative of all its members.

Rule 8 reads as follows:

Sec. 8. *Capacity.* (a) Petitions filed by any tribal organization recognized by the Secre-

---

[9] Act Aug. 13, 1946, sec. 9.

MU003705

6

tary of the Interior as having authority to represent a tribe, band, or group need not aver the capacity of such organization to sue except to the extent required to show the jurisdiction of the Commission. When the United States desires to raise an issue as to the capacity of such a recognized tribal organization to sue, it shall do so by specific negative averments, which shall include supporting particulars.

(b) If a petition is filed by one or more members of a tribe, band, or other identifiable group having a tribal organization which is recognized by the Secretary of the Interior because the tribal organization has failed or refused to take any action authorized by the act, the petition shall be verified and shall aver that the petitioner is a member of the tribe, band, or group. The petitioner shall also set forth with particularity the efforts of the petitioner to secure from the duly constituted and recognized officers of said tribal organization such action as he desires and the reasons for his failure to obtain such action (such as fraud, collusion, or laches) or the reasons for not making such effort.

(c) Petitions filed by one or more members on behalf of an unorganized tribe, band, or other identifiable group shall be verified and shall aver (1) that the petitioner or petitioners are members of the tribe, band, or group (2) a description of the unorganized tribe, band, or group of sufficient comprehension to identify the tribe, band, or group on whose behalf the petition is filed.

On January 29, 1948, "The Creek Nation" filed this case before the Indian Claims Commission. It was alleged that "The Creek Nation" was a tribe within the meaning of the Indian Claims

7

Commission Act and it was further alleged that the attorney who filed the suit was authorized to do so by a contract approved by the Secretary of the Interior. The defendant, recognizing the historic fact that a group of Indians known as "The Creek Nation" has existed since the first settlement in southeastern United States, and still exists today, took no exception to the filing of the claim.

The case had been fully tried, briefed, argued, and submitted for decision to the Commission when, on January 5, 1951, the appellants, calling themselves "The Perdido Friendly Creek Indian Band of Alabama and Northwest Florida," sought to intervene in the case. Admittedly [10] they were not an organized group of Indians recognized by the Secretary of the Interior; they charged no fraud, collusion, or laches on the part of the petitioners in the filing of the case; they made no complaint concerning the manner in which the case was presented to the Commission, and they specifically denied any desire to reopen the case;[11] apparently all they wanted was an adjudication by the Commission that the persons who composed the so-called "Perdido Band" had the right to participate in the distribution of any award.

As between the petitioner—"The Creek Nation" —and the appellants, there can be no question that the former met the requirements of section 10 of the

[10] Appellants' Br. p. 152.  In the Amended Motion for Leave to Intervene it is said (p. 2): "Said Perdido Band has not yet been recognized by the Secretary of the Interior."

[11] Amended Motion to Intervene (p. 14): "13. Applicants do not seek to alter or expand in any way in this proceeding the claim of the Creeks against the United States * * *.  They do not seek to re-open the record for the taking of additional evidence on these issues * * *."

8

act. The United States has consistently recognized the duly elected or appointed officials of "The Creek Nation" as having authority to represent the Creek Indians both prior [12] and subsequent [13] to their removal west of the Mississippi River. We believe that in enacting section 10 the Congress intended to extend the recognition previously accorded to the existing tribal organization into the field of Indian claims.

The reasons are both obvious and practical. In authorizing the recognized tribal organizations to bring the action the Congress had some assurance that tribal claims would be presented and it would avoid a multiplicity of suits by a variety of groups each contending that it was the true representative of the tribe. That is now what has happened in this case.

Appellants now seek to divert the inquiry of the Commission from a determination of whether the Creek Indians have a recognized claim against the United States to a determination of whether "The Creek Nation" or the "Creek Nation East of the Mississippi" has the right to present this claim. They say:[14]

> Their amended motion and petition raised this question and presented an issue which the Commission should have determined, probably, in the light of the foregoing decision, by granting appellants' motion and taking evidence on the issue presented by its petition and the answers to be filed to it by the other parties as to

---

[12] See treaties of August 7, 1790, 7 Stat. 35; June 29, 1796, 7 Stat. 56; June 16, 1802, 7 Stat. 68; November 14, 1805, 7 Stat. 96, etc.

[13] See fn. 2, *supra*.

[14] Br. p. 159.

9

"petitioner's right to maintain this action for the claim of 'the Creek nation'."

The purpose of section 10 clearly was to avoid such excursions into secondary questions if that could be done without harm to the tribe. The contingencies provided by Congress were where fraud, collusion, or laches was shown on the part of the recognized organization. None of these conditions have been suggested by the appellants, nor have they complied with the rules of the Commission. Since the case was filed on January 29, 1948, laches certainly cannot be charged, nor is it suggested that fraud or collusion exists. It seems clear, therefore, that both under the statute and the rules of the Commission the intervenors are not entitled, as against the recognized organization of the Creek Nation, to maintain this action.

The question of whether appellants and other Creeks did or did not lose their rights in the claim by not emigrating to Oklahoma [15] was not before the Commission and is not before the Court now. The Commission has no power to determine the manner in which any award will be disbursed or the persons entitled to receive it. Section 22(a) of the act provides merely that when the report of the Commission has been filed with Congress "there is hereby authorized to be appropriated such sums as are necessary to pay the final determination of the Commission."

The contention by appellants that the rights of those Creeks who did not remove to Oklahoma have been fully preserved by the Act of February 8, 1887, 24 Stat. 390, as amended, does not aid appel-

---

[15] Appellants' Br. p. 146.

lants now. On the contrary, assuming the position to be legally correct—concerning which we express no opinion—it proves that it is wholly unnecessary for them to intervene to protect their rights.

Since the Commission has no authority to determine the names of persons who would be entitled to participate [16] in any distribution, the mere fact that the appellants were made parties to the proceeding would not determine their right to participate. This Court has just recently pointed out that as long as Indian funds are tribal in character Congress has full power to legislate concerning citizenship and to deal with such property without infringing on individual rights. *Choctaw Nation* v. *United States*, decided Oct. 2, 1951.

And so it is in this case. We do not know, nor do we pretend to say, what disposition Congress will make of any judgment which might be rendered in favor of the Creeks. But we do know that under *Wallace* v. *Adams*, 204 U. S. 415; *Gritts* v. *Fisher*, 224 U. S. 640, and *Lowe* v. *Fisher*, 223 U. S. 95, the Congress is free to make such disposition of any such judgment as may seem best to it, without in any way making the Government liable to appellants.

### B. *Appellants are not a tribe, band, or other identifiable group of Indians.*

At the present stage of the proceedings appellants have no standing before the Commission or this Court. Admittedly they are not enrolled members of the Creek Nation. They are merely an aggregation of individuals who *claim* to be Creek

---

[16] This is now apparently admitted by appellants. See Br. p. 159.

Indians, descendants of Creeks who were members of the Creek Nation of Indians on August 9, 1814, when the lands were ceded to the United States. Thus we have the situation of an aggregation of people who *say* they are Creek Indians seeking to enter a lawsuit without an adjudication that any of them is, in fact, a Creek Indian. Thus this case differs from the *Red Lake* case, No. 18-A, decided by the Commission on September 17, 1951, and cited in appellants' brief.[17] There the Commission found as a fact that the individual petitioners were enrolled members of the Pembina Band. The Commission, therefore, held that they had authority to maintain the action on behalf of an historic band which no longer maintained a separate tribal existence but whose members were identified. The language of the decision is:[18]

> As heretofore stated, the Pembina Band of Indians was recognized as a separate and distinct band of Chippewa Indians and was dealt with as such by the Government at the time the 1863 treaty was negotiated. The record shows that some years thereafter the United States officials moved the members of the band and settled them on a portion of the White Earth Reservation. They were listed separately on the census rolls at that reservation as Pembina Indians until 1923—the 1922 roll showing 519 of them. But apparently due to a change in the method of making the census rolls, no separate roll appears to have been maintained of these Indians as Pembina Indians after 1922. However, regardless of how these Pembina Indians were listed on the census rolls after 1922, we believe the evidence

---

[17] P. 155.

[18] 1 Ind. Cls. Comm'n pp. 575, 589.

MU003708

shows quite conclusively there is a group of Pembina Indians now living who are descendants of members of the Pembina Band that was a party to the October 2, 1863, treaty out of which the present claim arose, and they can be identified and have a group claim which they are entitled to have determined by this Commission. The existence of such a group having been established, and our conclusion is that it has been, we do not consider it necessary for jurisdictional purposes to determine who are all the individual members of said group. (Indians of California v. United States, Docket No. 31.) The plaintiffs have alleged in the petition and satisfactorily established by the evidence that the named individual plaintiffs, Rosetti Villebrun and Katherine Carl Barrett, are members of this group of Pembina Indians who are descendants of the original members of the Pembina Band and they are therefore entitled, under Section 10 of the Act, to maintain this action in a representative capacity on behalf of themselves and all other members of the claimant group.

This is not the case now under consideration. Intervenors have never been identified as members of the Creek Nation, and the Commission is without jurisdiction to determine that they are members of the Creek Nation entitled to participate in any judgment. As to this point, a somewhat analogous situation arose in *Kohpay* v. *Chapman, Secretary of the Interior*.[19] There the plaintiff sued for her pro rata distribution of the Osage tribal funds on the ground that she was an Osage Indian although her name did not appear on the approved roll. The court of appeals, in affirming

[19] 190 F. 2d 666.

the district court and denying the relief sought, held that enrollment was a prerequisite to participation in the distribution, and that the plaintiff must first apply to the Secretary of the Interior for enrollment:

> Then under the *Jump case* [73 App. D. C. 141, 117 F. 2d 769] if the appellant considers the action of the Secretary arbitrary or capricious, he may apply to the federal courts for relief. The relief which the appellant requests here flows as a natural consequence of having her name on the roll, but we cannot grant the requested relief in a mandamus suit which itself by-passes the steps which must be taken.

The principle is the same here. In the absence of a previous determination that appellants are Creek Indians they quite obviously have no right to prosecute this action. The Commission does not have jurisdiction to determine the question of membership in an Indian tribe. This is a question which Congress has always reserved to itself.

The Congress has never recognized the Creek Indians, who failed to go West, as an entity. Thus the case differs from that of the Loyal Creeks,[20] who were recognized by the Creek Nation and the United States in the Treaty of June 14, 1866, 14 Stat. 785, and the agreement between the Creek Nation and the United States of March 8, 1900, ratified by Act of Congress of March 1, 1901, 31 Stat. 861, and whose identity was determined by the roll prepared in accordance with the provisions of the treaty of 1866. In the present case there has been no recognition by Congress and there has

[20] 1 Ind. Cls. Comm'n p. 122.

been no identification of the persons who compose the group.

This disposes of the argument that appellants have a common claim. We quite agree that a claim for tribal lands under the Indian Claims Commission Act is a common claim, and we have so recognized that fact in this case in the suit filed by "The Creek Nation." The difficulty with appellants' position is that the persons seeking to intervene have not shown themselves capable of maintaining the action for that common claim.

The situation is completely analogous to a stockholders' suit on behalf of a corporation. Admittedly under proper circumstances a stockholder may sue on behalf of a corporation, *but he must be a stockholder.* [21] The case of *Scanlon* v. *Snow,* 2 App. D.C. 137, is quite analogous to the present situation. The court in its statement of facts said: [22] "In the course of the testimony, or at the end of it, a petition was filed on behalf of Charles E. White, asking to be made a party complainant, which was agreed to and allowed. He claimed to be a stockholder and adopted the averments of the bill."

[21] See generally 13 Fletcher Cyclopedia, Corporations, sec. 5972. In the case of *Mayflower Hotel Stockholders Protective Committee* v. *Mayflower Hotel Corp.,* 73 F. Supp. 721 (1947), Judge Holtzoff apparently considered the matter so well settled he did not consider it necessary to cite any authority for his statement: "In view of the fact that a stockholders' suit may be brought solely by persons who were stockholders of the corporation at the time that the cause of action accrued and who are still stockholders at the time of the institution of the suit, the plaintiff, Mayflower Hotel Stockholders Protective Committee, has no right to bring this action, since the Committee is not and never has been a stockholder, insofar as appears from the allegations of the complaint."
[22] P. 146.

Mr. Justice Morris, in delivering the opinion of the Court, said: [23]

It is very clear to us that the petitioner White has no standing in this case. * * * In his petition filed in this cause, Mr. White alleged that he was a stockholder of the present company; but in the stipulation entered into with reference to the petition and which served for an answer to it, this allegation was explicitly denied, as well as the other allegations of the petition, and no proof whatever was taken to overcome this denial. On the contrary, the proof adduced on behalf of complainants showed conclusively that he was not a stockholder in fact, whether he was entitled so to be or not. And the dismissal of his bill, as already stated, would seem to indicate that he was not entitled to any interest whatever in the new organization. His petition, therefore, in this cause was very properly dismissed.

With the exception of a previous determination that White had no interest in the corporation the facts in that case and the present one are the same. Admittedly the names of appellants are not on the rolls of the Creek Nation. They are not, therefore, recognized members of the nation and, hence, are not entitled to prosecute this action.

It may be that some tribunal of competent jurisdiction may determine that they are legally members of the Creek Nation and, therefore, entitled to participate in an award if there is one. But the Indian Claims Commission has no jurisdiction to determine that question. That is a matter for Congress or such tribunal as Congress may

[23] P. 147.

MU003710

16

create.[24]  Since the appellants admittedly are not recognized by the administrative or legislative arm of the Government, they cannot, collectively, be said to be a "tribe, band, or other identifiable group" within the meaning of the Indian Claims Commission Act.

### C. *Jurisdiction of Commission*

Under this heading appellants say that the Commission must determine "not only whether a claim exists against the United States and in favor of some one, but whether the group suing is, in fact, the injured group or has otherwise acquired title to the claim."[25]

The defendant might be willing to concede that this position was correct if there were two recognized groups competing with each other for the right to maintain this action. But that is not this case.

The appellants have not been recognized by anyone. As a matter of fact they do not pretend to say just who they are. They say[26] that their "rolls are open to all those who can prove lineal descent from the members of the original Creek nation." They thus seek to usurp the functions of Congress. Congress may, or may not, adopt this criterion for "membership" in a reconstituted Creek Nation; but the appellants certainly have no authority to define membership in the Creek Nation and to determine that all who come within this definition constitute "The Creek Nation" or even an "identifiable group" within the meaning of the Indian

---

[24] *Wallace* v. *Adams,* 204 U.S. 415.
[25] Appellants' Br. p. 157.
[26] Br. p. 139.

17

Claims Commission Act. Certainly, unless the Commission and this Court are to restrict the term "other identifiable group" to those groups which have received recognition by some branch of the Government or by the Indians themselves,[27] the term "identifiable group" is meaningless and amounts to nothing more than an aggregation of persons voluntarily associating themselves together and giving themselves a name. This was not the intention of the authors of the Indian Claims Commission Act.

During the 74th Congress three bills were introduced to create an Indian Claims Commission,[28] all of which authorized the Commission to investigate claims "of any Indian tribe, band, or other *communal* group of American Indians." Hearings were held on both H. R. 7837 and S. 2731. In the hearings on S. 2731 considerable discussion ensued concerning the meaning of the words "or other communal group." The following colloquy between Senator Steiwer and the Commissioner of Indian Affairs makes it clear that the claimants must not only have a historic identity, but that their claim must be of the "common" or "group" type:[29]

Senator Steiwer. * * * While I have interrupted, may I ask what is the significance of the word "communal" in line 12.

Mr. Collier. It simply means a community. It is an attempt to go beyond the limitations of the meaning of "band" which has been imposed by this single definition, and to take a

---

[27] *Montoya* v. *United States,* 180 U.S. 261, 265; *Tully* v. *United States,* 32 C. Cls. 1.
[28] S. 2731; H. R. 6655, and H. R. 7837.
[29] Hearings on S. 2731, 73d Cong., 1st sess., p. 40.

MU003711

18

simple *group of Indians who have a common interest, who have suffered a common injury,* but who may not heretofore have been recognized by any branch of the Government.

\*        \*        \*        \*        \*

Mr. Collier. Yes; because I doubt if there is a case anywhere where an Indian has a claim that he cannot find another Indian that has that kind of claim. We do not want these innumerable, heterogenous Indian claims put on the doorstep of the court if we can help it. *Some qualifying word—maybe "communal" is not the right word—which indicates a historic identity, or an identity of habitat, makes the thing a communal group, a group with historic identity, and not just a detached group of people who got together and made out they were a group so as to get into this court.*

Senator Steiwer. The essential thing is that they have a common claim, is it not?

Mr. Collier. Yes; a common claim of a group character. [Italics supplied.]

Thus it appears that Commissioner Collier recognized that the group must have a "historic identity" and that he did not have in mind "just a detached group of people who got together and made out they were a group so as to get into this court."

19

### CONCLUSION

For all of these reasons we say that the order of the Commission dated June 4, 1951, denying appellants leave to intervene in this case was correct and should be affirmed.

WM. AMORY UNDERHILL,
*Assistant Attorney General.*

RALPH A. BARNEY,
*Attorney*

JANUARY 1952

☆ U. S. GOVERNMENT PRINTING OFFICE: 1951    981403    871

MU003712

# EXHIBIT I

AGREEMENT BETWEEN
THE NATIONAL PARK SERVICE, U. S. DEPARTMENT OF THE INTERIOR
AND THE POARCH BAND OF CREEK INDIANS OF ALABAMA
FOR THE ASSUMPTION BY THE TRIBE OF CERTAIN RESPONSIBILITIES
PURSUANT TO THE NATIONAL HISTORIC PRESERVATION ACT (16 U.S.C. 470)

WHEREAS, sovereign Indian tribes are uniquely suited to make decisions about historic resources on tribal lands; and

WHEREAS, enhancing the role of Indian tribes in the national historic preservation partnership will result in a stronger and better national effort to identify and protect historic and cultural resources for future generations of all Americans; and

WHEREAS, Section 101(d)(2) of the National Historic Preservation Act provides that, "A tribe may assume all or any part of the functions of a State Historic Preservation Officer in accordance with subsections (b)(2) and (b)(3), with respect to tribal lands;" and

WHEREAS, for the purposes of this agreement tribal lands means all lands within the exterior boundaries of the Poarch Band of Creek Indians Reservation and any dependent Indian communities formally recognized as such by the Department of the Interior; and

WHEREAS, in accordance with Section 101(d)(2)(A), the chief governing authority of the Poarch Band of Creek Indians has requested approval to assume certain of those functions; and

WHEREAS, in accordance with Section 101(d)(2)(B), the Poarch Band of Creek Indians has designated a tribal preservation official to administer the tribal historic preservation program; and

WHEREAS, in accordance with Section 101(d)(2)(C), the Tribe has provided to the Secretary of the Interior acting through the National Park Service a plan that describes how the functions the tribes propose to assume will be carried out; and

WHEREAS, the National Park Service, on behalf of the Secretary, has reviewed the Tribe's plan for conformance with the following applicable Federal regulations: 36 CFR 60 and 36 CFR 61; and has determined that the plan meets the requirements of those regulations; and

WHEREAS, the National Park Service, on behalf of the Secretary, has reviewed the Tribe's plan and has determined in accordance with Section 101(d)(2)(D)(i) that the Poarch Band of Creek Indians is fully capable of carrying out the functions specified in the Tribe's plan; now, therefore,

THE NATIONAL PARK SERVICE AND THE POARCH BAND OF CREEK INDIANS OF ALABAMA DO HEREBY AGREE AS FOLLOWS:

1. The Poarch Band of Creek Indians assumes responsibility on tribal lands for the following functions set out in Section 101(b)(3) of the Act:

A. Direct and conduct a comprehensive, Reservation-wide survey and maintain an inventory of historic and culturally significant properties;

B. Identify and nominate eligible properties to the National Register of Historic Places and otherwise administer applications for listing historic properties on the National Register;

C. Develop and implement a comprehensive, Reservation-wide historic preservation plan;

D. Advise and assist, as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities;

E. Cooperate with the Secretary, the Advisory Council on Historic Preservation, and other Federal agencies, State agencies, local governments, and organizations and individuals to ensure that historic properties are taken into consideration at all levels of planning and development;

F. Provide public information, education and training, and technical assistance in historic preservation;

G. Consult with the appropriate Federal agencies in accordance with Section 106 of the Act on:

> i. Federal undertakings that may affect historic and culturally significant properties on tribal lands;

> ii. the content and sufficiency of any plans to protect, manage, or to reduce or mitigate harm to such properties;

H. Cooperate with local governments in the development of local historic preservation programs and assist local governments in becoming certified pursuant to subsection (c) of the Act;

I. Advise and assist in the evaluation of proposals for rehabilitation projects that may qualify for Federal assistance, such as the historic preservation income tax credits.

2. In accordance with the Tribe's plan noted above, the Alabama State Historic Preservation Officer (SHPO) retains no responsibility on tribal land for the functions in Section 101(b)(3).

3. The Poarch Band of Creek Indians will consider nominations to the National Register of Historic Places in accordance with 36 CFR 60. The Tribe's process is set out in the Tribe's plan and includes review of nominations by the Historic Preservation Office, by the Poarch Band of Creek Indians Cultural Resources Board, and by the Tribal Council. The Cultural Resources Board will have access to appropriately qualified individuals in carrying out its review of nominations.

4. Because all Poarch Band of Creek Indians tribal land is under the direct control of the Tribal Council, the Tribal Historic Preservation Officer, in accordance with 36 CFR 60, will provide written notice to the Tribal Council of his intent to bring a National Register nomination before the Cultural Resources Board and the Tribal Council for consideration. The notice shall be sent at least 30 but not more than 75 days before the meeting of the Cultural Resources Board, unless the Tribal Council agrees to an expedited review period. In submitting a nomination to the Keeper of the National Register, the Tribal Historic Preservation Officer shall also forward to the Keeper all comments received by the Tribe concerning that nomination. Because Poarch Band of Creek Indians tribal land includes no privately owned property, the provisions of the Act and of 36 CFR 60 concerning private owner objections to nominations are not applicable.

5. The Tribe will carry out its responsibilities for review of Federal undertakings pursuant to Section 106 of the Act in accordance with the regulations (36 CFR Part 800) of the Advisory Council on Historic Preservation. In the event that the Tribe seeks to substitute its own review procedures for those established by the Council, such substitution is subject to a separate negotiation with the Council, pursuant to Section 101(d)(5) of the Act.

6. As directed by Article 25 of the Poarch Band of Creek Indians Historic Preservation Code, the Tribal Historic Preservation Office, relying on its special knowledge, training, and experience, will evaluate the significance of, and impact on, all properties surveyed within the reservation. This will be done with regard to historic, architectural, archeological, anthropological, religious, and cultural considerations. The Historic Preservation Office will, as it deems proper and as it deems needed, consult with recognized authorities meeting the Secretary of the Interior's Professional Qualifications Standards.

7. The Tribal Historic Preservation Officer will, in accordance with Section 101(d)(4)(C), provide for the appropriate participation in the historic preservation program by the Tribe's traditional cultural authorities, and for consultation with representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation, and for consultation with the interested public.

Concerning the involvement of traditional cultural authorities, the Tribe has officially recognized William Day, William Bailey, and Gayle Thrower as official spokespersons in matters concerning tribal culture and historic preservation. These three individuals also serve as staff of the Tribe's Historic Preservation Department. In addition, the Preservation Officer will periodically solicit and take into account comments on the program from all those individuals and groups who may be affected by the program's activities, as the tribe deems appropriate and consistent with the practice of other tribal programs. In any case where an action arising pursuant to the Act may affect the traditional lands of another Tribe, the Preservation Officer will, on an as-needed basis, seek and take into account the views of that Tribe.

8. As of the date of this Agreement, there is no land within the Reservation boundaries that is not held in trust for the Tribe or owned by a non-tribal member. In the event that this condition changes, the Tribal Historic Preservation Officer will, in accordance with Section 101(d)(2)(D)(iii), ensure that, for properties neither owned by tribal members nor held in trust for the Tribe by the Secretary of the Interior, the property

owners are aware that they may request the participation of the State Historic Preservation Officer, along with the Tribal Historic Preservation Officer, in decisions pursuant to the Act that may specifically affect their property.

9. As directed by the Poarch Band of Creek Indians Historic Preservation Code, the Tribal Historic Preservation Office shall prepare and submit to the Tribal Council an annual report on historic preservation and educational activities carried out under its authority, a copy of which will be provided to the National Park Service at the end of each calendar year. Included in that report, and specifically under the authority of this agreement, the Tribal Historic Preservation Office will report the number of properties surveyed and added to the tribe's inventory and the number of Federal undertakings reviewed pursuant to Section 106 of the National Historic Preservation Act. The National Park Service is authorized to use this information and similar data from other Tribes assuming formal responsibilities under section 101(d) of the Act to report annually to the Administration, the Congress, and other interested parties on the national accomplishments of this program.

10. As of the date of this agreement, the Poarch Band of Creek Indians' Tribal Historic Preservation Officer is William Day. The Tribe will notify the National Park Service whenever there is a vacancy in the position and whenever a successor is designated by the Tribe.

11. The National Park Service will, in accordance with Section 101(d)(2)(A) of the Act foster communication, cooperation, and coordination among the Tribe, the State Historic Preservation Officer, and Federal agencies in the administration of the national historic preservation program. All such efforts by NPS will be on an as-needed basis and will be based on consultation with the Tribe to ensure that tribal values are fully respected.

12. The National Park Service, upon execution of this agreement, will notify all Federal Preservation Officers, the Advisory Council on Historic Preservation, and the Alabama State Historic Preservation Officer, that the Poarch Band of Creek Indians has assumed formal responsibility on tribal lands for all of the functions set out in Item 1 above. In particular, such notice shall make clear that the Tribe has assumed the role of the State Historic Preservation Officer on tribal lands for the purposes of consultation on Federal undertakings pursuant to Section 106 of the National Historic Preservation Act.

13. The National Park Service will consult with the Poarch Band of Creek Indians to determine what technical assistance the Tribe needs and wants in order to enhance its participation in the national historic preservation program. Based on that consultation, NPS will make available to the Tribe such technical assistance as is appropriate and feasible. Nothing in this Agreement requires the National Park Service to provide financial assistance to the Tribe to carry out the functions it has assumed under this agreement. Only a separate grant agreement, cooperative agreement, or contract obligates the National Park Service to provide funding for tribal activities.

14. The National Park Service, pursuant to Sections 101(d)(2) and 101(b)(2) of the Act, and in direct consultation with the Tribe, will carry out a periodic review of the Tribe's program pursuant to the Act, to ensure that the Tribe is carrying out the program consistent with this agreement. The review will be a collegial process that involves both NPS and the Tribe in a mutual evaluation and assessment of the program. Generally, such a review will occur every four years.

15. The Poarch Band of Creek Indians may terminate this agreement for any reason by providing the National Park Service sixty days' written notice of such termination. The National Park Service may terminate this agreement upon determining that the Tribe has not carried out its assumed responsibilities in accordance with this agreement, the Act, or any other applicable Federal statute or regulation. Unless circumstances warrant immediate action, NPS will not terminate the agreement without first providing the Tribe a reasonable and appropriate opportunity to correct any deficiencies.

16. This agreement may be amended by the mutual consent of the Poarch Band of Creek Indians and the National Park Service.

17. This agreement shall become effective upon signature by the Director of the National Park Service or his designee, which signature shall not occur until after the Chairman of the Poarch Band of Creek Indians has signed the agreement.

FOR THE NATIONAL PARK SERVICE:

_____ 06/10/99
Director                Date

FOR THE POARCH BAND OF CREEK INDIANS:

_____ Date 5-24-99
Chairman

# EXHIBIT J

**POARCH BAND OF CREEK INDIANS OFFICE OF CULTURAL
AND HISTORIC PRESERVATION
FIELD METHODOLOGY**

*E.L.E.*

Approval

*4-13-99*

Date

(1 of 6)

**POARCH BAND OF CREEK INDIANS OFFICE OF CULTURAL AND HISTORIC PRESERVATION**

<u>**FIELD NOTES**</u>

Day notes should be taken every day the crew is in the field regardless of the situation or type of fieldwork.  These notes should be taken only on the front of the page.  The first page of the day notes must include the following information.

> Site name, number, project, and date
> Crew members
> Objectives

A narrative description should be given of each crew member of the field activity during the course of the day.  When surveying, note the transect assignments, approximate acreage covered, lengths and orientation of transects, and areas where tests were not excavated and why.  Also, note any and all important finds, in terms of artifacts found and whether they were found in a shovel test.  The exact locations of sites will be noted and plotted on the appropriate quad immediately.  Similarly, note the vegetation, ground cover, terrain, and slope.  If defining a site, sketch a site map.  This map will include positive and negative tests, artifact counts for these tests.  Site maps will always include pertinent natural and manmade features, a scale, north arrow, date, and site name and number.

<u>**UNIT NOTES**</u>

Unit notes must include the following;

> Site name and number and date
> Excavation Unit number and coordinates

When a unit is opened record:

a)   grid location
b)   location of unit datum and measurement of line level above ground surface
c)   depths of ground surface in four corners and center
d)   method of excavation
e)   locations of, and rationales for, unit extensions

For each level record the following:

a)   level number and depth below datum (surface or unit datum)
b)   excavation techniques (include screening technique)
c)   draw plan views and profiles and note any changes in stratigraphy
d)   feature locations and types
e)   the Munsell soil colors and texture
f)   the strata number or letter
g)   artifacts found
h)   inclusions
i)   whether or not soil or float samples were taken
j)   draw profiles and plan views

(2 of 6)

Approval
4-13-99
Date

## SURVEY METHODOLOGY

The survey methodology will vary under most circumstances.  Under most circumstances, shovel tests and parcels will be spaced at 30m intervals.

At the start of a new parcel, the Project Manager or Crew Chief will determine the proper orientation of the parcels.  In most instances, the parcels will be orientated in a north/south or east/west direction.  However, parcels may follow natural or manmade features such as roads or natural levees.  While surveying, it is important for the crew members to stay within sight of one another or in radio contact.

Shovel tests are to be excavated with a spade or "round-headed" shovel, and will measure 30 x 30 cm in diameter.  The depths of these shovel tests will generally be 30 cm.  All shovel tests are to be screened with 1/4" mesh hand-held screens, or troweled or checked by hand for the presence of artifacts.

When a positive shovel test is excavated, bag the artifact and label bag with the proper transect number, shovel test number or grid coordinate, date, and site designation.  In case of a surface find, the location of the find must be noted on the bag, along with the site designation and other relevant information.  Surface scatters located during survey are to be flagged and left in the field until site definition can be conducted.

## SITE DEFINITION

Site definition's procedures will be undertaken at each positive shovel test or surface find in order to determine the extent of subsurface and surface artifact deposits.  A site datum will be established at the location of a positive shovel test, or in the approximate center of surface scatter.  Shovel tests are to be excavated in 10 m intervals from the datum.  The shovel tests will be excavated until two negative shovel tests have been excavated.  If the surface scatter continues beyond this point, the shovel test line will be extended to the edge of the scatter.

A surface scan for artifacts is to be conducted at every positive locale in order to determine the presence or absence of surficial artifacts.  Only diagnostic artifacts are to be collected during a general surface collection.  Dense patches of artifacts will noted on the site map.  Also, a 2 x 2 m collected during a 2 x 2 m collection.  Label the bad and place the 2 x 2 m area on the site map.  Recovery of five or more artifacts is evidence for a site.  Less than five artifacts represents an isolated find.  A 50 x 50 cm test unit is to be excavated during site definition. This unit will be excavated in 10 cm arbitrary levels, and continued until two culturally sterile levels have been excavated.  Munsell colors and depths will be taken of all sites.  Black and white photographs and color slides will be taken of one wall profile.

*E.H.*
Approval
4-13-99
Date

(3 of 6)

A detailed map will be drawn of the site. All shovel test, the 50 x 50 cm unit, the 2 x 2 m surface collection, and extent of surface scatter will be shown on the map. Positive shovel tests will be shown as an filled in circle on the map. Negative shovel tests will be shown with an open circle. The extent of the surface scatter will be shown with a dotted line. The 50 x 50 cm unit will be shown as a filled in square, while the 2 x 2 m collection will be shown as an open square.

During site definition, photographs should be taken of the four cardinal directions from datum. If these are important cultural or natural features they will be photographed as well and this information will be recorded on the site map and in the field notes. A "Site Bag" will be kept at each site. All bags (e.g. shovel test bags, 50 x 50 cm level bags, general surface collection, etc.) will be kept in the site bag. The site bag will be labeled with the appropriates site number, the date the site was defined, and the number of bags inside.

## EXCAVATION METHODOLOGY

The placement of excavation units on site can be determined through random selection or high probability selection. In the former, grid locations are chosen randomly. During high probability selection, the placement of the units is determined by the likelihood of recovering artifacts or exposing features.

One the units have been selected and laid our on the grid, the units must be enclosed with nylon string. Elevations of all four corners and of the center of the unit will then be taken with transit and recorded in the field notes and on the level form. Opening photographs are necessary. All photographs should be recorded in the photo-log.

Once the opening photographs have been taken, a unit datum will be established. This datum should be placed in the highest corner of the unit. The unit datum is a fixed elevation, usually shot with the transit, used to determine the depths of each level. If the unit is placed on level ground, then the datum can be positioned in the northeast corner (where the unit designation is taken). A string will be strung from the unit datum. A line level will then be placed on the string approximately half way up the string, then take a measurement with a folding rule from the string to the ground as a measurement below datum.

Two crew members will excavate a single unit. One person in charge of screening while the other digs. The excavator will work in conjunction with the screener in filling out the level form and accompanying notes. Excavations should proceed in 10 cm (or less) levels within natural strata. Levels of 20 cm may be used under certain circumstances. The level should be ten halted if there is a soil color or texture change. The level form should include the appropriate information (including the reason for the halting at a specified depth).

*EIP*

Approval

*4-13-99*

Date

The level bag must include the following information:
>       Project name
>       Site number
>       Grid coordinates
>       Level number and depth
>       Date
>       Excavator Initials

It is necessary to take photographs when a new stratum or feature is encountered. All photographs will be recorded in the photo-log. A plan view (sketch of the floor) will be drawn at the end of each level or the first appearance of a feature. The plan view should include a scale. Munsell colors and soil textures will be included on the plan view. Place a key on the plan view. Elevations will be taken at the top of each new strata with the transit.

Before beginning the plan views, record the following information in the upper right hand corner of the graph paper:
>       Site name and/or number
>       Your initials
>       The date
>       Excavation unit designation
>       Depth of plan view
>       North arrow
>       The scale (if you usually write the ratio (e.g. 1:10), be sure to also draw a bar
>       indication 1 cm = 10 cm)

Draw the outline of the unit on graph paper. Outline any features that are recognizable in the floor of the unit. Lay one folding rule parallel to one of the walls. Hold a plumb bob over the point being measured. Use the second tape to measure the distance from the point to the first folding rule to establish x and y coordinates of the point. Plot the point on the graph paper. Record the Munsell color, soil type, and texture for every different soil in the plan view.

A profile should be drawn at the end of the excavation.

Set up a paper level over the area to be profiled. Mark this line on graph paper, and measure and record the elevation of this line in relation to unit datum. Set one folding rule above the area to be profile with the "O" aligned with one edge of the profile. Outline the visible strata with the point of a trowel. Measure the depth of the level line of the ground surface, the interface of each of the strata, and the base of the unit at the corner of the area profiled. Mark these points on the graph paper. Repeat the process at regular intervals (as measured on the folding rule at the top of the profile). Take spot coordinates on individual artifacts, lenses, etc. Connect the dots to delineate the strata.

*E.C.*

Approval

4-13-99

Date

## FEATURES

Features should be assigned a feature number in the field.  In some cases, they may be assigned a catalogue number as well.  When a feature is encountered, the feature should be photographed, planned (in relation to the unit), and Munsell readings and elevations should be taken.  A decision will be made at this time as to excavate, or leave the feature in tact.  No excavation will undertaken until such a decision is made final by the Office of Cultural and Historic Preservation (see Poarch Band of Creek Indians Archaeological and Resources Code).  Under most circumstances the feature should be cross-sectioned and profiled.  The excavator will fill out a separate form for the feature.  A center line should be drawn across the feature and center string strung across the feature at approximately 2 cm above the ground surface.  Once the first half of the feature has been taken out, a profile sketch will be made.  The second half of the feature will then be excavated.  The soil from the feature should be screened separately or floated.  After the feature has been removed, a final elevation should be taken.  AGAIN!  **THE POARCH BAND OF CREEK INDIANS TRIBAL ARCHAEOLOGICAL AND HISTORIC RESOURCES CODE EMPHASIZES AVOIDANCE AND PRESERVATION OF FEATURES RATHER THAN EXCAVATION.**

Soil will be screened through 1/4" wire mesh screen.  A bag will be labeled before any soil is screened for a particular level.

Once sterile soil has been reached, a profile sketch will be made of two separate but adjacent wall.  Photographs will be taken and recorded in the phot-log.  Notes on the unit will be finalized.

## HUMAN REMAINS

If human remains are encountered on the surface of the site, they are **not** to be collected.  Similarly, if you find them while digging a shovel test, backfill without disturbing them.  If you find them while excavating a unit, cover them up and do not dig any further.  Document the site, and place red field flags in a circle 2 m from the remains or burial.

Under no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to **any** examination or testing.  Burial sites take precidence over any project or program plan.

Do not open any additional holes.

Approval

4-13-9 9

Date

# EXHIBIT K



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road · Atmore, Alabama 36502
Tribal Offices: (251) 368-9136 · Administrative Fax: (251) 368-4502
www.poarchcreekindians-nsn.gov

April 4, 2012

George Thompson, Jr.
Mekko, Hickory Ground
P.O. Box 903
Henryetta, OK 74437

Re:   **Reinterment at Hickory Ground**

Dear Mekko Thompson:

I write to you to provide additional information regarding the re-internment at Hickory Grounds. As you know, our tribal Nations have been in good faith discussions regarding the issue of re-interment since May 2006. Over the past five years, we have had numerous formal and informal discussions including large delegation meetings of the principals on at least five occasions. Throughout this time, our Tribe has attempted to address your delegation's concerns and demonstrated our commitment to finding a mutually agreeable resolution by, among other things, amending our original plans for a memorial garden and interpretative center in the northern half of the property in favor of leaving the area in a natural state, developing security plans for the area of re-interment, and proposing to fully participate in joint preservation efforts throughout this region. Most significantly, both our Nations agreed to preserve the Hickory Ground ceremonial site in perpetuity and jointly participated in these critical efforts.

The last official meeting of our delegations was in September 2010, and we have attempted to coordinate a follow-up meeting on several occasions since that time. You responded to our last proposal in March 2011 and expressed a desire to schedule another official meeting. Although our Nations' delegations intended to meet last August, we were unable to do so due to scheduling conflicts. Nonetheless, your delegation visited the site in any event, and introduced a new member of your delegation, John Beaver, Muscogee Nation Museum Director and Curator, to Robert Thrower, our Tribal Historic Preservation Officer. Since that time, on your behalf, Mr. Beaver has been communicating with Mr. Thrower regarding the final inventory and potential follow-up visits.

Given the five and a half years of good faith negotiations and the recent productive exchanges between Mr. Beaver and Mr. Thrower regarding the final inventory, we were disappointed to learn that the Muscogee Nation/Hickory Ground delegation sought to introduce a resolution at the National Congress of American Indians Annual Convention this past November, which did not name us but clearly related to our land. We were further dismayed to hear that, despite continued communications from your delegate Mr. Beaver with our THPO, you appeared in front of the Senate Committee on Indian Affairs during a roundtable discussion in early March with the same allegations. You indicated during those comments that you wished to take

*Seeking Prosperity and Self Determination*

possession of the remains. In all of our discussions, you have never requested that we allow the Muscogee Nation or Hickory Ground to take possession of the remains.

We regret that there appears to have been a breakdown in our communications and we hope that these recent actions are not indicative of a more adversarial approach on the part of the Muscogee Nation. We continue to stand prepared to continue a good faith and cooperative approach.

In furtherance of a good faith approach, we wanted to inform you that we have obtained the final inventory and are currently preparing for re-interment. With the hope that we can continue to work together regarding re-interment and restore the relationship between our sister Nations, we welcome your participation in this process. Please let us know as soon as possible if you would like to join us.

Best regards,

Buford L. Rolin
Tribal Chairman
Poarch Band of Creek Indians

cc:   George Tiger, Muscogee Nation Principal Chief
      John Beaver, Muscogee Nation Museum Director/Curator
      Marcella Giles, Attorney for Muscogee Nation & Hickory Ground
      Poarch Band of Creek Indians Tribal Council
      Robert Thrower, Poarch Band of Creek Indians THPO
      Venus McGhee Prince, Poarch Band of Creek Indians Attorney General

# EXHIBIT L





# Muscogee (Creek) Nation

*George P. Tiger*
*Principal Chief*

*Executive Office*

*Roger Barnett*
*Second Chief*

April 13, 2012

*VIA U.S.P.S and Facsimile (251) 368-4502*

Buford L. Rolin, Tribal Chairman
Poarch Band of Creek Indians
5811 Jack Springs Road
Atmore, Alabama  36502

Re:   Hickory Ground

Dear Chairman Rolin:

I am in receipt of your letter dated April 4, 2012 addressed to Mekko Thompson and copied to me and other individuals. I would like to thank you for keeping me apprised during this sensitive cultural matter.

In the past, Second Chief, Roger Barnett and I have met with the Poarch Band of Creek Indians as Representatives of the National Council for the Muscogee (Creek) Nation. Now, we would like to meet with you as Chief and Second Chief to discuss past and future negotiations and communications between your delegation and the Muscogee Nation/Hickory Ground delegation.

As you are aware, we both are newly elected, and we are requesting the opportunity to have a discussion from Tribal Leader to Tribal Leader. We are aware that time is of the essence for this sensitive issue, and we are willing to meet with you in Alabama.

Please call me to discuss arranging a meeting, and if you would like for us to come to Alabama or if we could make arrangements for you to visit the Muscogee (Creek) Nation. I look forward to seeing you and hope that we can meet as soon as possible.

Sincerely,

George Tiger
Principal Chief

*P O Box 580 Okmulgee, OK 74447-0580 1-800-482-1979*

# EXHIBIT M

06/18/2012  16:10    918652    2                    BROWN PRINTING                                      PAGE  05



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136 • Administrative Fax: (251) 368-4502
www.poarchcreekindians-nsn.gov

April 17, 2012

George Tiger
Principal Chief
Muscogee Nation
P.O. Box 580
Okmulgee, OK 74447-0580

George Thompson, Jr.
Mekko, Hickory Ground
P.O. Box 903
Henryetta, OK 74437

**Re:   Reinterment at Hickory Ground**

Dear Principal Chief Tiger and Mekko Thompson:

Thank you for your response by letter dated April 13, 2012 regarding Hickory Ground, which was brought to my attention this morning. When we did not immediately hear from you in response to our April 4th letter, we assumed that you did not wish to participate in the reinterment process. Last week we proceeded with the reinterment of our ancestors' remains and associated funerary objects in the manner to which we agreed during our prior discussions. We will preserve the area of reinterment in perpetuity. We welcome you to visit the ceremonial site and area of reinterment and hope that we will work together on further preservation efforts. Please contact me if you would like to visit and/or discuss future communications.

Best regards,

Buford L. Rolin
Tribal Chairman
Poarch Band of Creek Indians

cc:     Roger Barnett, Muscogee Nation Second Chief
        John Beaver, Muscogee Nation Museum Director/Curator
        Marcella Giles, Attorney for Muscogee Nation & Hickory Ground
        Poarch Band of Creek Indians Tribal Council
        Robert Thrower, Poarch Band of Creek Indians THPO
        Venus McGhee Prince, Poarch Band of Creek Indians Attorney General

*Seeking Prosperity and Self Determination*

# EXHIBIT N



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136 • Administrative Fax: (251) 368-4502
www.poarchcreekindians-nsn.gov

November 8, 2010

George Thompson, Jr.
Mekko, Hickory Ground
P.O. Box 903
Henryetta, OK  74437

Alfred Berryhill
Second Chief, Muscogee Nation
P.O. Box 580, Highway 75 & Loop 56
Okmulgee, OK 74447

**Re:    Reinterment at Hickory Ground**

Dear Mekko Thompson and Chief Berryhill:

Thank you for your letter dated October 8, 2010. Our Tribal Council and I were also greatly encouraged by our September 9th meeting. At the same time, we are now somewhat discouraged by the decision to require reinterment in place for all human remains and associated funerary objects for Hickory Ground.

Our proposal at the September 9th meeting consisted of two parts:

(1)    Reinterment. We proposed to reinter the remains and funerary objects in a pristine area to the northern end of our trust property at Hickory Ground and in a natural fashion (i.e., wrapped in muslin cloth and no markers or the like). We emphasized that we believed that this approach was an appropriate compromise.

(2)    Joint Preservation Efforts. We proposed a joint effort to locate and purchase significant areas of land within the State of Alabama in order to reinter any remains and associated funerary objects from all tribal towns that may be repatriated to either of our Tribes. We could also potentially place a joint THPO office at one of the sites to coordinate our joint efforts.

We were hopeful that a compromise could be reached on the issue of reinterment on Hickory Ground, so that we could pursue the joint preservation efforts. We believe the joint preservation efforts could set historical precedent for both of our Nations and could be followed or joined by other tribes. We are extremely excited about the possibility of working together now and in the future.

We respect the beliefs and customs of the Tusteneggi. However, we cannot agree that reinterment in place at this point in time is the best way to honor our ancestors. We plan to prepare for reinterment in the northern part of our trust property and, as always, welcome your participation in this process. As you mention, we would also like to schedule a planning session with Dr. Cottier and Auburn University to obtain the final inventory pursuant to NAGPRA and take possession of the remains and associated funerary objects. Please let us know your availability for such a meeting during December and January.

*Seeking Prosperity and Self Determination*

We know that these conversations about such sensitive issues are difficult ones. But we are guided by the fundamental idea that in the end we are sister Nations and we must work together for the benefit of our peoples past, present and future. We appreciate your continuing willingness to work with us, and we are optimistic that we can reach an accord. We look forward to seeing you soon.

Best regards,

Buford L. Rolin
Tribal Chairman
Poarch Band of Creek Indians

cc:     Poarch Band of Creek Indians Tribal Council
        Robert Thrower, Poarch Band of Creek Indians THPO

# EXHIBIT O



FOR IMMEDIATE RELEASE                          CONTACT:      Sharon Delmar
                                                            251-368-9136
                                                            sdelmar@pci-nsn.gov

### POARCH CREEK RESUMES DEVELOPMENT OF WETUMPKA PROPERTY

**Poarch Creek Indian Nation, Alabama –** October 31, 2012 - The Poarch Band of Creek Indians has resumed its development plans for a hotel and casino on land it owns in Wetumpka, Alabama.  This decision comes after suspending construction of the project in a show of good faith so that leadership from Poarch Creek and the Muscogee Nation in Oklahoma could once again meet to discuss the concerns of both tribes.  Poarch Creek made the decision to resume construction after meeting in Oklahoma this week with elected leaders of the Muscogee Creek Nation and traditional leaders of Hickory Ground Town (a traditional Indian town within the Muscogee Nation). After careful consideration of the Muscogee Nation's views, Poarch Creek believes the decision to move forward with its plans represents a fair and balanced approach to the development and preservation of the property.

Tribal Council Member Arthur Mothershed remarked, "We have been extremely careful to plan a development that is culturally sensitive while ensuring the economic well-being of our Tribal members, our community, and our State. It is a balanced, reasonable approach for using land that we own, which has been met with increased opposition from some in Oklahoma. Now, we are being faced with demands to remove ancestral remains that have already been reinterred.  We can ensure that no more remains will be excavated.  It has been almost eight years since any remains have been unearthed.  We cannot change the fact that remains were found and removed.  Those remains are now reinterred and we cannot support disturbing those remains again."

The Poarch Band of Creek Indians is the only federally recognized Indian tribe in Alabama. Its tribal members have lived continuously in the region for centuries, specifically near present day Atmore, Alabama, since the early 1800's.  As a recognized sovereign nation, Poarch Creek is under no legal obligation to negotiate with any other government about the use of its own land. However, out of respect for their shared cultural and familial ties, Poarch Creek leadership began conversations with the Muscogee Nation about the development of the Wetumpka property in 2006. Discussions continued for several years, but opposition by some members of Hickory Ground and Muscogee Nation to Poarch Creek's plans to develop the Wetumpka site reached a crescendo when Poarch Creek announced its plans to build a hotel and casino on the property this summer.

"We are indeed saddened by the outcome of this recent trip to Oklahoma made by representatives of our Tribal Council," said Buford L. Rolin, Poarch Creek's Tribal Chairman. "Since 2006, we have reached out to the Muscogee Nation with the hope that they would be open to understanding the facts about the 21st century conditions of what was once Hickory Ground Town and would recognize that our development in Wetumpka does not alter that. Unfortunately we have reached an impasse."

Wetumpka is one of several Alabama communities that originated on the site of Hickory Ground Town, a historic Creek Indian community that, at one time, covered more than 1000 acres. While both the Poarch Creek and the Muscogee Nation have cultural ties to the land, it was the Poarch Creek that purchased approximately 34 acres of the original site in 1980.

At the time of the sale, the land had been used for agricultural purposes and was zoned for commercial use. The Poarch Creek had limited financial resources and had to apply for a grant to buy the property. Poarch Creek invited the Muscogee Nation to partner with it on the grant application, but the Muscogee Nation did not commit before the grant deadline.

"We have taken great effort to make sure the original Hickory Ground ceremonial site is preserved, and the remains that were removed in earlier years have been reinterred at Hickory Ground Town in a manner previously agreed to by traditional leaders in Oklahoma.  The remaining acreage located on the northern part of Hickory Ground will be preserved in a pristine, natural state for posterity," said Robert McGhee, who heads the Tribe's Governmental Affairs Office and is a Poarch Tribal Council Member.

The Tribe is in compliance with applicable federal laws, including historic preservation laws, pertaining to the property.  The expansion, in no way, compromises the site as construction plans do not call for any further excavation. Despite Muscogee claims to the contrary, there will be no expansion in other areas at the Hickory Ground site.

The development originally included a cultural center as well as a hotel and casino, but Poarch Creek modified the plans after Muscogee Nation and Hickory Ground representatives expressed concerns about the site on which the center would be located. Poarch Creek leadership is now reviewing those plans and has made a commitment to build a center on a nearby site as it moves forward with the hotel and casino development.

Poarch Creek's Tribal Council will also set aside appropriate acreage of pristine land that has never been subject to agricultural use or development that can be used by Poarch Creek, as well as by other Tribes who may be facing sensitive issues of reinterment. The Tribal Council is establishing a historical and cultural preservation fund that will be made available to other tribes to support their preservation efforts.

Chairman Rolin said, "We respect the past, acknowledge the present, and recognize the challenges of the future. This development is a reasonable approach to land use; and no one cares more about the sanctity of our land and the well-being of our people and our neighbors than we do."

####

# EXHIBIT P



# POARCH BAND OF CREEK INDIANS

5811 Jack Springs Road • Atmore, Alabama 36502
Tribal Offices: (251) 368-9136
www.poarchcreekindians-nsn.gov

Dear Tribal Leader,

As the leader of one sovereign nation to another, I am writing to make sure that you have accurate information concerning the development of the Poarch Band of Creek Indians' Wetumpka, Alabama trust land. Poarch Creek has taken the utmost care to preserve our tribal history and culture while undertaking projects that assure the financial stability of our Tribal government and jobs for our people.

Development of Poarch Creek trust lands near Wetumpka is the subject of an increasingly belligerent misinformation campaign run by a handful of individuals from Hickory Ground town and the Muskogee Nation in Oklahoma. These men have made violent threats toward our tribal members, employees, customers and property. They have also attempted to intimidate, threaten, and humiliate our Tribal leadership at national gatherings in Indian Country.

One of the leaders of this group was arrested on Poarch Creek trust property last year after he threatened to burn down our casino. He was subsequently convicted of disorderly conduct and trespassing in an Alabama state court. Even after this incident, this individual and other members of his group have harassed and accosted Poarch Creek tribal leaders at multiple national Indian gatherings. Clearly, these are threats to our reputation and our safety that we take very seriously.

Attached is a Fact Sheet to help clarify this issue. If you would like to discuss any of these issues or have additional questions, I and other Members of the Poarch Creek Council would be happy to talk more with you.

We think it is important to remember that, first and foremost, no one is more aware of the importance of preserving Poarch's history and culture than we are. We remain committed to the integrity of our Tribe and are actively involved in ensuring the future of Indian Country. We are proud that Chief Calvin McGhee helped craft the Declaration of Indigenous Purpose and that he had the honor of presenting this document to President Kennedy. Former Chairmen Buford L. Rolin and Eddie Tullis continue to provide leadership roles throughout Indian Country in their work on Healthcare, Aging, and Sovereignty. Our Tribal Council Vice Chairman Robbie McGhee serves on the boards of the Native American Rights Fund, the Center for Native American Youth, the National Indian Child Welfare Association and our entire Tribal Council continuously advocates to strengthen national tribal Indian policy on issues related to education, VAWA, health care, child welfare, taxation, trust lands protection and other areas of importance to all Tribes.

In closing, we remain hopeful that these individuals who are now involved in unproductive and divisive activities will come to understand that our strength, as sovereign Indian nations, depends on our ability to work together on solving the problems and meeting the challenges that affect us all while maintaining the crucial tenets of sovereignty and self-determination. It's a dangerous road for all of Indian country to take when one sovereign seeks to enforce its will on the trust lands of another.

Sincerely,

*Stephanie A. Bryan*

Stephanie A. Bryan, Tribal Chair
Poarch Band of Creek Indians

*Seeking Prosperity and Self Determination*

**Fact Sheet: Poarch Band of Creek Indians' Wind Creek Development In Wetumpka, Alabama**

- Many years ago the Poarch and Muscogee Creek Tribes were separated by historical events. Today, we are separate sovereign nations with completely separate lands.

- We, the Poarch Band of Creek Indians, have continually lived on our Alabama Tribal lands and survived years of poverty.

- The Poarch Band's Wetumpka trust property (approximately 34 acres) is a small portion of what had been a large Indian town called Hickory Grounds. The land had been farmed and developed by others for decades.

- When the property came up for sale, we had no gaming operation and few resources. However, we believed that we should make every effort to purchase the property because it was an opportunity to regain some of our historical lands, protect our ancestors and history, and provide for our people and our communities.
  - o We asked the Muscogee Nation to jointly apply for a grant to purchase the property. They did not respond.
  - o The land was in a part of the country that had been farmed and developed for well over a century.
  - o In fact, the current town of Wetumpka, Alabama is built on what was once the Indian town of Hickory Ground.
  - o We still believed that the site was historically significant as a center of Creek Indian trade, government, and economic development.

- Unbeknownst to us, a small part of the property we acquired was the site of Creek Ceremonial Grounds. The Ceremonial Grounds have never been disturbed, remain protected, and we have memorialized and preserved the site to this day.
  - o Northern 17 acres of our trust property is preserved in perpetuity as a memorial to the historical significance of the site.
  - o Remains found within the Ceremonial Grounds were never removed.
  - o In accordance with Poarch Creek Tribal Law and consistent with the Muskogee Tribe's Constitution, remains found outside the Ceremonial Grounds were interred adjacent to the Ceremonial Grounds with prayer and ceremony.
  - o The previously disturbed and fragmented remains found scattered across the other 17 acres have been reinterred with dignity and honor.

- In the 1990's, Alabama archeologists asked to study the site and we agreed. At the time:
  - There was no visible evidence of a burial ground.
  - The site was eroding because of farming and lack of maintenance.
  - We had limited finances and limited technology.
  - When evidence was discovered, the archeologists' work stopped and their discoveries were stored for several years. The remains and funerary objects were reinterred according to Indian tradition in April of 2013.

- The Tribe is in compliance with all applicable federal historic and cultural preservation laws pertaining to the property.

- Poarch Creek is, and was, under no legal obligation to negotiate with any other sovereign Indian nation about the use of our own land. However, out of respect for our shared cultural and familial ties, Poarch began discussions with the Muscogee about planned development of the Wetumpka property in 2006.

- Since 2006, Poarch regularly reached out to the Muscogee Nation in the hopes that its leadership would be open to understanding the 21st century conditions of the Poarch land in Wetumpka. Negotiations continued for several years, but the Muscogee Nation's opposition to Poarch Creek's plans to develop the land reached a crescendo when plans were announced to expand the existing gaming facility into a resort on the property in the summer of 2012.

- We have continued to be open to dialogue with the Muscogee elected leadership and have expressed our desire for a good relationship between the two nations.

- We are encouraged that these efforts are making a difference as evidenced by the visit of over 150 Muscogee tribal members to our Wind Creek Wetumpka resort. They visited the memorial site, were served refreshments, and shared pleasant conversation with Poarch tribal members.

- The Wind Creek Wetumpka development protects our past and helps provide for the future of our tribal members.

# EXHIBIT Q



*Preserving America's Heritage*

November 14, 2006

Mr. Brad Mehaffy, REM
NEPA Compliance Officer
National Indian Gaming Commission
1441 I Street, N.W., Suite 9100
Washington, D.C. 20005

REF:   *Proposed Approval of a Management Contract for the Expansion of Existing Gaming*
       *Facility by the Poarch Band of Creek Indians*
       *Wetumpka, Alabama*

Dear Mr. Mehaffy:

On October 3, 2006, the Advisory Council on Historic Preservation (ACHP) received the additional
documentation regarding the referenced undertaking. ACHP requested this information in response to
your notification that the National Indian Gaming Commission (NIGC) was reviewing the Poarch Band
of Creek Indians' (Poarch Band) proposed management contract for expansion of the existing gaming
facility on Hickory Ground, a property listed in the National Register of Historic Places. Based upon this
documentation, it is apparent that activities undertaken by the Poarch Band prior to the completion of the
review required by Section 106 of the National Historic Preservation Act (NHPA) have adversely affected
the National Register-listed property.

According to the documentation provided, the Poarch Band sponsored extensive investigations and
ultimately data recovery at Hickory Ground between 1988 and the present. The investigations included
archaeological site identification surveys within the approximately 16-acre trust property and the
approximately 5-acre tract of fee land. As a result, a multi-component archaeological site, Hickory
Ground, was delineated, boundaries expanded, and finally, extensive archaeological data recovery was
undertaken, including the removal of numerous human burials. As we understand, the recovered remains,
artifacts, and site documentation are in various stages of analysis and curation by the Poarch Band's
consultants.

Regrettably, the archaeological surveys and data recovery were not carried out in compliance with
Section 106 of the NHPA. Since the Section 106 process must be initiated by a Federal agency prior to
the initiation of project activities, it is unclear why the applicant, a tribe with a tribal historic preservation
office approved by the National Park Service pursuant to Section 101(d)(2) of the NHPA, proceeded with
project planning and archeological investigations. As you know, the Federal agency must consult with the
State Historic Preservation Officer (SHPO), any Indian tribes that attach religious and cultural
significance to historic properties affected by the undertaking, and other appropriate stakeholders, and
provide adequate notification to the public in carrying out the steps of the Section 106 review.

ADVISORY COUNCIL ON HISTORIC PRESERVATION

1100 Pennsylvania Avenue NW, Suite 809 • Washington, DC 20004
Phone: 202-606-8503 • Fax: 202-606-8647 • achp@achp.gov • www.achp.gov

Based on the information provided, there was no Federal agency review of the archaeological investigations carried out by the Poarch Band; no consultation with the Alabama SHPO prior to excavation of the portion of the site on fee lands, and no consultation with any other Indian tribe, particularly the Muscogee Creek Nation. The initial notification of the ACHP (see 36 CFR 800.6(a)(1)) did not occur until after the destruction of the site. Furthermore, there is no indication that the public has been notified about the nature of the undertaking and its effects on historic properties (36 CFR 800.3(e)).

In your correspondence, you indicate that the Poarch Band completed more than 90% of the archeological data recovery within the area of potential effect for the proposed project. In the initial letter to the ACHP regarding this project, you invited us to participate in consultation to resolve the potential adverse effects of the undertaking. You have also indicated that NIGC intends to invite the Alabama SHPO to participate in any further Section 106 consultation, and have outlined steps NIGC will take to complete the Section 106 review process for any areas where there has been no land disturbance. NIGC has indicated that it proposes to develop a memorandum of agreement with all parties following consultation.

Please note, however, that Section 110(k) of the NHPA requires that

Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant who, with intent to avoid the requirements of section 106 of this Act, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, allowed such significant adverse effect to occur, unless the agency, after consultation with the Council, determines that circumstances justify granting such assistance despite the adverse effect created or permitted by the applicant (16 U.S.C. 470h-2(k)).

While NIGC has provided documentation regarding archaeological work conducted to date, we have no indication of NIGC's views regarding the applicability of Section 110(k) and no record of the views of the Alabama SHPO and others, specifically the Muscogee Creek Nation regarding this matter. In accordance with Section 800.9(c)(2) of the ACHP's regulations, NIGC must determine whether or not the Poarch Band's actions were undertaken with the intent to avoid the requirements of Section 106. If NIGC determines that this did occur, NIGC should notify the ACHP and provide documentation specifying the circumstances under which the adverse effects to the historic property occurred and the degree of damage to the integrity of the historic property. This documentation must include any views obtained from the applicant, SHPO, and other parties known to be interested in the undertaking. Within thirty days of receiving such information, unless otherwise agreed to by NIGC, the ACHP will provide the agency with its opinion as to whether circumstances justify NIGC granting its approval to the applicant and any possible mitigation of the adverse effect. If, after considering the views of the ACHP, NIGC determines to grant its approval, NIGC should consult further with the ACHP and other consulting parties to conclude a memorandum of agreement for treatment of the remaining effects to historic properties resulting from the project.

Should you have any questions or wish to discuss this matter further, please contact Valerie Hauser, Native American Program Coordinator at 202-606-8530, or by email at vhauser@achp.gov.

Sincerely,

. Klima
tor
Office of Federal Agency Programs