IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| MUSCOGEE (CREEK) NATION,<br>a federally recognized<br>Indian tribe, et al., | ) ) ) ) | |
|     Plaintiffs, | ) ) | |
|     v. | ) ) ) | CIVIL ACTION NO.<br>2:12cv1079-MHT<br>(WO) |
| POARCH BAND OF CREEK<br>INDIANS, a federally<br>recognized Indian tribe,<br>et al., | ) ) ) ) ) | |
|     Defendants. | ) | |

OPINION

This dispute concerns the use and ownership of a
34-acre tract of land south of Wetumpka, Alabama.  The
land sits at Hickory Ground, the last capital of the
Creek Nation before the Tribe was forced from the eastern
United States in the 1830s, an exodus known as the Trail
of Tears.  Burial sites and ceremonial grounds dot the
area, which in 1980 was placed on the National Register
of Historic Places as a site of national significance.
Today the land is held by the United States Department

of the Interior in trust for Poarch Band of Creek Indians ("PBCI"), and it is the location of PBCI's Wind Creek Wetumpka casino and hotel.  The excavation of the land and the construction and operation of the Wind Creek Wetumpka are the subject of this litigation.

The three plaintiffs who bring this suit are the Muscogee (Creek) Nation; the Hickory Ground Tribal Town, which is now located in Oklahoma; and George Thompson, the chief, or "Mekko," of the tribal town.  They filed the original complaint in this suit in 2012.  In the operative second amended complaint, filed in March 2020 after the case had been stayed pending unsuccessful settlement negotiations, the plaintiffs have named three groups of defendants.  The "Federal Defendants" consist of the Interior Department, the National Park Service, the Bureau of Indian Affairs, and the officials who head each of those entities.  The "Tribal Defendants" consist of PBCI; the PCI Gaming Authority, a commercial enterprise of PBCI that operates the Wind Creek Wetumpka; various officials on the PBCI Tribal Council and the

Board of PCI Gaming Authority, who are sued in their official capacities; and the PBCI Tribal Historic Preservation Officer, who is sued in his official capacity.  The "Individual Defendants" consist of former and current members of the PBCI Tribal Council, who are sued in their individual capacities.  The plaintiffs have also sued Auburn University, which has not moved to dismiss the plaintiffs' second amended complaint.[1]

The second amended complaint raises eleven claims, most of them alleging violations of federal statutes: the Indian Reorganization Act, or IRA, 25 U.S.C. § 5101; the Native American Graves Protection and Repatriation Act, or NAGPRA, 25 U.S.C. § 3001; the Archaeological Resources Protection Act, or ARPA, 16 U.S.C. § 470aa; the Religious

---

1.  There is one other defendant in this case: Martin Construction, Inc., a company that helped build the Wind Creek Wetumpka.  The company is named on the plaintiffs' NAGPRA and outrage claims; it is not wholly clear from the second amended complaint whether any of the other claims are also brought against the company.  Martin Construction filed a notice of bankruptcy in April 2020. *See* Notice of Bankruptcy (Doc. 198).  Because the filing of such notice imposed an automatic stay of the proceedings against Martin Construction, *see* 11 U.S.C. § 362, this opinion does not further address the company.

Land Use and Institutionalized Persons Act, or RLUIPA, 42 U.S.C. § 2000cc; the Religious Freedom Restoration Act, or RFRA, 42 U.S.C. § 2000bb; and the National Historic Preservation Act, or NHPA, 54 U.S.C. § 300101. Some of these claims are denominated as dependent on the court's resolution of the plaintiffs' IRA claim, the first count of their complaint. The plaintiffs also bring common-law counts of unjust enrichment, promissory estoppel, and the Alabama tort of outrage, the last of which they say applies only if the court rules in their favor on the IRA claim. This tort-of-outrage claim is the only count brought against the Individual Defendants. With these claims, the plaintiffs seek, *inter alia*, to have Hickory Ground taken out of trust for PBCI and placed in a constructive trust for them, to have federal preservation grants to PBCI for the site ceased, to prevent the Tribal and Federal Defendants from undertaking any further clearing or construction on the Hickory Ground site, and to require that the Tribal Defendants "cause the Hickory Ground Site to be returned

**4**

to the condition it was in prior to the construction of the casino resort." Second Amended Complaint (Doc. 79) at 76-79. They do not seek damages, except from the Individual Defendants for the tort-of-outrage claim if applicable.

This case is now before the court on the separate motions of the Federal Defendants, the Tribal Defendants, and the Individual Defendants to dismiss the plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1362 (federal-law claims brought by Indian Tribes), 1367 (supplemental jurisdiction), and 25 U.S.C. § 3013 (NAGPRA). As explained below, the court finds that the Tribal Defendants, including the tribal officials named in their official capacities, are immune from this suit and must be dismissed. Without the Tribal Defendants present, the remaining claims cannot be adjudicated under the precepts of Rule 19 of the Federal Rules of Civil Procedure. The Tribal Defendants' motion to dismiss will

5

accordingly be granted, the motions of the Federal and Individual Defendants will be denied as moot, and this suit will be dismissed.

## I. FACTUAL BACKGROUND

The court at this stage must accept as true the factual allegations of the second amended complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). According to those allegations, Hickory Ground is a site of longstanding cultural, religious, and political importance for the Muscogee (Creek) Nation, believed to date back to the nation's original tribal town "at the time of the beginnings." Second Amended Complaint (Doc. 190) at ¶ 46. Perhaps most importantly for present purposes, the area contained ceremonial grounds and a number of burial sites and individual graves, some within the ceremonial grounds and some beneath the family homes of the dead. These graves held human remains and funerary objects of deep significance to the plaintiffs, and the graves were situated in specific places within Hickory

Ground based on the position held by the deceased individual in the town's governance structure.

The plaintiffs explain that it is their "long-established religious belief that burial and ceremonial grounds are sacrosanct and must not be entered, let alone disturbed, without the proper religious protocol." *Id.* at ¶ 55. In accordance with these religious beliefs, the plaintiffs hold "that their ancestors must be left at peace in their final resting places with their possessions," and that the plaintiffs "owe a religious duty to their ancestors to care for the graves and bodies of the deceased." *Id.* at ¶¶ 56-57.

PBCI acquired Hickory Ground in 1980 with funding from a federal preservation grant, subject to a 20-year protective covenant requiring preservation of the property. In 1984, the Interior Department took the land into trust for PBCI, following the recognition of PBCI's tribal status by the United States government earlier

that year.  *See* Trust Deed (Doc. 203-2) at 1.[2]  Shortly
after the protective covenant expired in July 2000, PBCI
began excavating the site alongside archaeologists from
Auburn University to gather information about the
cultural artifacts buried at Hickory Ground prior to
development of the area.  The excavation was completed
in 2011.

In the meantime, the Alabama Historical Commission
and others began in 2001 to write letters to the Interior
Department and the Bureau of Indian Affairs raising
concerns about potential disturbance of the cultural
artifacts at Hickory Ground in the course of PBCI's
excavation.  The City of Wetumpka, the Alabama
Preservation Alliance, and an individual member of the
Creek Nation filed suit against PBCI in 2001, making many
of the same allegations reiterated in the present suit,
including that the then-planned excavation and clearing

_____

2. The trust deed is appropriate for the court to
review at this stage because it is "central to the
plaintiff's claims and is undisputed in terms of
authenticity." *Maxcess, Inc. v. Lucent Techs., Inc.*, 433
F.3d 1337, 1340 n.3 (11th Cir. 2005).

of the site would violate NAGPRA, ARPA, and the NHPA.
*See generally* First Amended Complaint (Doc. 20), *City of Wetumpka v. Norton*, No. 01-cv-1146-WHA (M.D. Ala. Nov. 9, 2001).  The suit was dismissed with prejudice shortly thereafter by request of the plaintiffs.  *See* Order (Doc. 22) at 1, *City of Wetumpka*, No. 01-cv-1146-WHA (M.D. Ala. Nov. 21, 2001) (Albritton, C.J.).

According to the operative complaint in this case, the plaintiffs here were first notified of the excavation sometime in 2006.  *See* Second Amended Complaint (Doc. 190) at ¶ 137.  The plaintiffs then "engaged in a years-long effort to persuade [PBCI] not to excavate and desecrate the remains of Plaintiffs' ancestors and other cultural items and to return any cultural items already excavated from Hickory Ground to their original resting place." *Id.* at ¶ 139.  The plaintiffs also contacted the National Park Service about their concerns.

Negotiations between the plaintiffs and PBCI ultimately failed in 2011.  The following year, PBCI reinterred many of the cultural artifacts removed from

Hickory Ground at other locations. PBCI notified plaintiffs Muscogee (Creek) Nation and Mekko Thompson[3] of the planned reburials by letter on April 4, 2012, but completed the reburials before the plaintiffs responded nine days later. *Id.* at ¶¶ 153-58. In July 2012, PBCI announced plans to develop what is now the Wind Creek Wetumpka. The plaintiffs filed the present suit that December. Construction was completed on the Wind Creek Wetumpka in 2014, during the pendency of this litigation, and the casino and resort have been operational since then. In March 2020, as noted above, the plaintiffs filed the operative second amended complaint after the case had been stayed pending unsuccessful settlement negotiations.

## II. MOTION-TO-DISMISS STANDARD

In considering a defendant's motion to dismiss, the court accepts the plaintiff's allegations as true, *see*

---

3.   As both the plaintiffs and the Tribal Defendants use this honorific when identifying plaintiff Thompson in their briefing, the court does the same.

*Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993). The court may draw "reasonable inferences" from the facts alleged in the complaint. *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

The defendants in this case also move to dismiss many of the plaintiffs' claims for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). A motion under Rule 12(b)(1) can present

either a facial or a factual attack to the court's jurisdiction. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). When resolving a facial attack under Rule 12(b)(1), as when resolving a Rule 12(b)(6) motion, the court must assume the truth of the allegations in the complaint. *See id.* If the motion instead depends on the resolution of disputed facts, however, the court must provide the parties an opportunity for discovery and a hearing before deciding the motion. *See id.*

Finally, the Tribal Defendants have moved to dismiss the entirety of the second amended complaint under Rule 12(b)(7), on the ground that PBCI is an indispensable party to the litigation but is immune from suit. In such motions, the burden is on the movant to show the necessity of the relevant party and the nature of the interests that will be unprotected in the party's absence. *See W. Peninsular Title Co. v. Palm Beach County*, 41 F.3d 1490, 1492 (11th Cir. 1995) (per curiam). As with a motion under Rule 12(b)(6), the court must assume the truth of

the factual allegations in the complaint. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359 (3d ed. 2020). But the court is not limited to the complaint, and the parties may present evidence outside the pleadings. *See id.* A dismissal under Rule 12(b)(7) is without prejudice. *See id.*

## III. DISCUSSION

The court begins and ends its analysis with the Tribal Defendants' motion to dismiss. The Tribal Defendants named in the second amended complaint are immune from the claims made here: PBCI and PCI Gaming Authority because they enjoy sovereign immunity from unconsented suit, and the tribal officials under the doctrine announced in *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997). In the absence of any tribal representatives among the defendants, the plaintiffs' remaining claims cannot be adjudicated without serious prejudice to the interests of PBCI. Accordingly,

13

pursuant to Rule 19(b) of the Federal Rules of Civil Procedure, the suit must be dismissed.

### A.   Immunity of the Tribal Defendants

The Tribal Defendants move to dismiss all of the claims against them as barred by sovereign immunity.  As to the claims against PBCI and the PCI Gaming Authority, the Tribal Defendants are plainly correct, and the claims must be dismissed.   Tribes are "separate sovereigns pre-existing the Constitution."   *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).   As "domestic dependent nations," they maintain "historic sovereign authority" subject only to Congress's power to abrogate their sovereign rights.   *Id.* (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991)).   Among the incidents of tribal sovereign authority, Tribes such as PBCI enjoy immunity against unconsented suits absent express congressional

override of that immunity.  *See Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1287 (11th Cir. 2015).

This case is unusual in that Tribes are present as both plaintiffs and defendants.  Although tribal sovereign immunity bars suits brought by States against unconsenting Tribes absent congressional authorization, *see Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 755-56 (1998), it does not appear that either the Supreme Court or the Eleventh Circuit Court of Appeals has decided whether sovereign immunity may be asserted in suits brought by one Tribe against another.  *Cf. Caddo Nation of Okla. v. Wichita & Affiliated Tribes*, 786 F. App'x 837, 840-41 (10th Cir. 2019) (assuming sovereign immunity applied to suit between Tribes absent waiver). But since "an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity," *Kiowa Tribe*, 523 U.S. at 754, and considering that Tribes are not subject to the "'mutuality of ... concession' that 'makes the States' surrender of immunity from suit by sister States

plausible,'" *id.* at 756 (alteration in original) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 782 (1991)), the court does not see why inter-tribal litigation should be exempt from the principles of sovereign immunity that govern all other suits against Tribes.

As such, PBCI is entitled to have the claims against it dismissed on the basis of tribal sovereign immunity. Furthermore, the Eleventh Circuit has held that PBCI's immunity is shared by PCI Gaming Authority "because it operates as an arm of the Tribe." *PCI Gaming Auth.*, 801 F.3d at 1287. The plaintiffs' argument to the contrary--that PBCI and PCI Gaming Authority received delegated federal authority and thereby became subject to the APA's general immunity waiver when they signed an agreement with the National Park Service in 1999 to undertake certain duties prescribed by the National Historic Preservation Act--is wrong. The APA waives the immunity of federal agencies and the officers and employees thereof from suits seeking non-monetary relief.

5 U.S.C. § 702.  PBCI did not turn itself into a federal agency by signing a contract with one.

The primary case the plaintiffs marshal in support of their theory, *Caddo Nation of Oklahoma*, is not on point.  There, the defendant Tribe had expressly waived its immunity and consented to suit in the agreement it signed with the Department of Housing and Urban Development.  *See* 786 F. App'x at 840 n.4.  No consent to suit appears in PBCI's agreement with the National Park Service, nor does the complaint contain factual allegations that PBCI has otherwise consented to suit. *See* NPS Agreement (Doc. 190-1) at 115-19.  "[T]he Supreme Court has made it plain that waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed."  *Furry v. Miccosukee Tribe of Indians*, 685 F.3d 1224, 1234 (11th Cir. 2012) (quoting *Sanderlin v. Seminole Tribe*, 243 F.3d 1282, 1286 (11th Cir. 2001)).  There is no such unequivocal waiver here, so PBCI and PCI Gaming Authority may assert their sovereign immunity.

17

Whether the tribal officials named as defendants in their official capacities are immune from suit is a more complicated question.   In general, suits for equitable relief against officers in their official capacities are not barred by sovereign immunity under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908).   The Tribal Defendants argue that *Young* is inapplicable here because the plaintiffs "seek not to stop ongoing violations of federal law, but to adjudicate the legality of discrete past acts," and because the specific nature of the plaintiffs' claims implicates "special sovereignty interests" that exempt them from *Young* under the doctrine of *Coeur d'Alene*.   Br. in Supp. Tribal Defs.' Mot. to Dismiss (Doc. 202) at 23.

The first of these arguments misconstrues either the plaintiffs' complaint or the distinction drawn by the *Young* doctrine between retrospective and prospective claims.   While it is true that this suit arises from things that happened in the past--the taking of Hickory Ground into trust for PBCI, the excavation of the land,

the construction of the Wind Creek Wetumpka--the relief that the plaintiffs request is forward-looking and equitable.  They ask that the defendants be enjoined from continuing to excavate Hickory Ground or operate the Wind Creek Wetumpka, and that they be required to return to the plaintiffs the cultural items removed from Hickory Ground and restore the land itself into the condition it was in before the excavations began.  They say that the defendants are engaging in an ongoing violation of federal law by retaining the excavated cultural items and continuing to operate the Wind Creek Wetumpka.  And they do not ask for money damages from the official defendants for these alleged violations.

As the Supreme Court has explained and the Tribal Defendants have acknowledged, this is "ordinarily sufficient to invoke the *Young* fiction." *Coeur d'Alene*, 521 U.S. at 281.  Most suits, including equitable ones, arise from events that have already occurred.  The fact of past harm makes clear the likelihood of future harm. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 712 (1977).

The *Young* doctrine does not require an official defendant not to have done anything wrong yet; it requires that the plaintiff seek to prevent future or ongoing wrongdoing, regardless of what happened in the past. That is what the plaintiffs seek here, and their suit against the official defendants accordingly falls within the boundaries of *Ex parte Young*.

Still, not all suits that meet the general prerequisites of the *Young* doctrine may be heard. As relevant here, the Supreme Court recognized in *Coeur d'Alene* that certain suits that impose on "special sovereignty interests" in important sovereign-owned lands are subject to sovereign immunity whether they are brought against the sovereign directly or by naming officials of the sovereign entity in their official capacities. *Coeur d'Alene*, 521 U.S. at 281. In *Coeur d'Alene*, for instance, the imposition was an action seeking relief that the Court found to be "the functional equivalent of quiet title," *id.* at 282--the suit sought to establish the Tribe's "entitlement to the exclusive

use and occupancy and the right to quiet enjoyment of"
certain submerged lands in Lake Coeur d'Alene that the
State claimed as its own, *id.* at 264-65.  As the Court
explained, "[t]he suit would diminish, even extinguish,
the State's control over a vast reach of lands and waters
long deemed by the State to be an integral part of its
territory."   *Id.* at 282.   A suit seeking such
"far-reaching and invasive relief" is for all practical
purposes a suit against the sovereign itself, and as such
it is barred by sovereign immunity unless the sovereign
consents.  *Id.*

*Coeur d'Alene* was, of course, an "unusual case"
establishing a "narrow exception" to *Young*.   Pls.'
Response to Tribal Defs.' Notice of Supplemental Auth.
(Doc. 220) at 3 (quoting *Curling v. Sec'y of State*, 761
F. App'x 927, 933-34 (11th Cir. 2019)).  But this case
fits within that exception.  The plaintiffs' suit seeks
to divest PBCI more or less completely of its control
over Hickory Ground.  It seeks orders from the court
requiring PBCI to dismantle the Wind Creek Wetumpka,

restore Hickory Ground, "to the greatest extent possible, to its pre-excavation and pre-construction condition," which would include "returning the excavated cultural items to their original burial locations," abstain from "any further ground disturbing, clearing, grading, leveling, or construction activity" at Hickory Ground, and placing the land in constructive trust for the plaintiffs "as relief for Poarch's breach of its promises to the Muscogee (Creek) Nation." Second Amended Complaint (Doc. 190) at 76-79. Beyond that, the plaintiffs' IRA claim seeks to convert Hickory Ground from reservation land held by the Interior Department in trust for PBCI into a parcel owned by the Tribe in fee simple. Not only would this prevent PBCI from operating a casino there, but it would transform the nature of the Tribe's relationship to Hickory Ground, changing it from one of sovereign ownership of tribal territory to an everyday property interest that might be held by a private individual or corporation. This "goes to the heart of [PBCI]'s sovereign and proprietary interests"

and is every bit as invasive as the relief sought in *Coeur d'Alene*. *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 996 (9th Cir. 2020).

In effect, the plaintiffs ask the court to order PBCI to cease the activities it currently carries out at Hickory Ground, alter the site drastically at the plaintiffs' direction to transform it back into the condition in which they desire it to remain, and then leave the land alone. These remedies might not literally revoke PBCI's title to Hickory Ground. *See* Pls.' Response to Tribal Defs.' Notice of Supplemental Auth. (Doc. 220) at 2. But they would do everything short of that, providing the plaintiffs "*de facto* beneficial ownership" of the site and divesting PBCI "of its right to use what is, after all, *its* land." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453 (1988) (emphasis in original).

Moreover, as in *Coeur d'Alene*, the particular lands addressed by this suit bear special significance to the sovereign defendant. In *Coeur d'Alene*, the plaintiffs

sought to end the State's control of certain "submerged lands, lands with a unique status in the law." *Coeur d'Alene*, 521 U.S. at 283. As the Court explained, the history of American and English law makes clear that navigable waters and the land beneath them carry special "importance ... to state sovereignty." *Id.* So too does Hickory Ground carry special importance to the sovereignty of PBCI. The Tribe has owned the land for 40 years, and the casino it operates there is a major driver of its economy. *See* Second Amended Complaint (Doc. 190) at ¶¶ 202, 211. And PBCI has significant historical connections to Hickory Ground as well. According to the Interior Department's memorandum acknowledging PBCI's tribal status, which is cited in the plaintiffs' complaint, *see id.* at ¶ 63, the Tribe consists of the descendants of members of the Creek Nation who remained in Alabama after the Trail of Tears, *see* U.S. Dep't of the Interior, Proposed Finding for Federal Acknowledgement of the Poarch Band of Creeks of Alabama 1-3 (Dec. 29, 1983). Hickory Ground is central

to the history of the Creek Nation in Alabama; the site "was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836." Application for Historic Preservation Funds (Doc. 190-1) at 4.

This land, long owned by PBCI, is a vital part of both the Tribe's history and its present economy. No matter the phrasing of the plaintiffs' complaint or how the defendants they name are therein denominated, PBCI's sovereign interest in its ownership and use of Hickory Ground cannot be placed in jeopardy before this court without the Tribe's consent. As a result, the Tribal Defendants--including the tribal officials named in their official capacity--must be dismissed from this suit.

### B. Required Joinder of Parties

Rule 19 of the Federal Rules of Civil Procedure governs the mandatory joinder of parties to a suit. Certain entities whose rights or obligations are implicated by a particular suit must be joined to that

litigation if feasible.  An entity becomes a "required party" under Rule 19(a) if "the court cannot accord complete relief" in the entity's absence or if proceeding on the action without that entity would "impair or impede the person's ability to protect their interest" or leave an existing party "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a).  If such a "required party" cannot be joined to the suit, the court must evaluate, based on various equitable factors, whether it is appropriate for the suit to proceed without the party involved. *See* Fed. R. Civ. P. 19(b).  As noted above, the burden lies with the party seeking dismissal on Rule 19 grounds to demonstrate the necessity of the party's presence and the interests that will be damaged in the party's absence.

"[P]ragmatic concerns, especially the effect on the parties and the litigation, control" the analysis of whether a party is required under Rule 19(a). *Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Eng'rs*, 859

F.3d 1306, 1316 (11th Cir. 2017) (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003)).  The Tribal Defendants argue persuasively that they are required parties to this litigation.  As they accurately describe the suit's "overarching objective," it is "to deprive PBCI of jurisdiction and control over part of its reservation, to order it to expend substantial resources ..., and to literally dismantle one of its major economic engines." Br. in Supp. Tribal Defs.' Mot. to Dismiss (Doc. 202) at 86.  Proceeding without any of the Tribal Defendants would seriously impair the Tribe's ability to protect its interest in continuing to operate its casino on its land, an interest not shared by the Federal Defendants who would remain in the suit.  The Eleventh Circuit has found considerably lesser threats of interest-impairment than this to make a party required under Rule 19(a).  *See, e.g.*, *Fla. Wildlife Fed'n*, 859 F.3d at 1317.  And the court could not afford complete relief without the Tribe or any of its representatives present.  No injunction

running against the Federal Defendants could force the Tribe to stop operating the Wind Creek Wetumpka or to tear it down, nor could the court grant such relief against the Individual Defendants, who again are sued only in their individual capacities for monetary relief on the tort-of-outrage claim.

The plaintiffs do not meaningfully contest that the Tribal Defendants as a group are required parties under Rule 19. They say instead that the interests of PBCI itself and PCI Gaming Authority could appropriately be represented by the tribal officials named as official-capacity defendants. *See* Pls.' Response to Tribal Defs.' Mot. to Dismiss (Doc. 212) at 105 (arguing that "Poarch and PCI Gaming are adequately represented by the tribal official defendants"). But as discussed above, the tribal officials too enjoy sovereign immunity and will be dismissed from this suit. Without either the

Tribe or its officials in this case, the interests of PBCI will not be adequately protected.[4]

When a required party cannot be joined to a suit, the court must weigh the relevant equities, including four specific factors set forth in Rule 19(b), to determine whether the suit can move forward without the party. In this case, the Supreme Court's decision in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), all but answers the question whether the suit can proceed

_____

4. There is one exception in this suit to the general insufficiency of the remaining defendants to protect the Tribal Defendants' interests: the plaintiffs' tort-of-outrage claim against the Individual Defendants in their individual capacities. Rule 19 speaks of the parties required for an "action" to proceed, not particular claims, and it mandates dismissal of the "action" in certain instances when these required parties cannot be joined. Fed. R. Civ. P. 19(a)(1)(B), (b). But the Supreme Court has explained that a "civil action" may "comprise[] fewer claims than were included in the complaint." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559 (2005). In any event, whether or not Rule 19 would require the plaintiffs' tort-of-outrage claim to be dismissed with the other claims, the plaintiffs have expressly made the viability of their outrage claim contingent on first succeeding on their claim under the IRA. *See* Second Amended Complaint (Doc. 190) at ¶ 200. As such, because the court will dismiss the plaintiffs' IRA claim, it will treat their tort-of-outrage claim as voluntarily withdrawn.

without the Tribal Defendants present.  As the Court held, "[a] case may not proceed when a required-entity sovereign is not amenable to suit." *Id.* at 867.  "[W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Id.*

Among the factors enumerated in Rule 19(b), the difficulties raised by proceeding with a suit that implicates an absent sovereign's interests--rather than the interests of a non-sovereign absent party--go most directly to whether a judgment rendered in the sovereign's absence could "prejudice that person or the existing parties."  Fed. R. Civ. P. 19(b)(1); *see also Pimentel*, 553 U.S. at 869.  As explained above, a judgment rendered in the absence of the Tribal Defendants could nevertheless all but entirely demolish PBCI's control over part of its tribal land.  Furthermore, there do not appear to be any circumscribed remedies the plaintiffs could seek against the other defendants that would

eliminate the burden on PBCI's interests. *See* Fed. R. Civ. P. 19(b)(2). A ruling against the Federal Defendants on the plaintiffs' IRA claim would make PBCI's further operation of the Wind Creek Wetumpka illegal; a ruling against them on the plaintiffs' NAGPRA or ARPA claim would require the federal government to do what it could to force PBCI to tear down the Wind Creek Wetumpka and restore the site to its pre-excavation status. *See* Second Amended Complaint (Doc. 190) at ¶¶ 261(b), 282(b).

Whether the judgment would be "adequate" without the Tribal Defendants present--the factor set forth in Rule 19(b)(3)--turns on the "public stake in settling disputes by wholes, whenever possible." *Pimentel*, 553 U.S. at 870 (quoting *Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 111 (1968)). This longstanding dispute between the Muscogee (Creek) Nation and PBCI over control of the human remains and cultural items once interred at Hickory Ground could not be resolved as a whole without the Tribe or any of its representatives present. And while it is true that dismissing this suit

31

may leave the plaintiffs no forum for at least some of their claims--the consideration raised by Rule 19(b)(4)--this is sometimes the necessary consequence of the obligations imposed on courts and litigants by Rule 19. *See Pimentel*, 553 U.S. at 872. Moreover, the disposition of the present suit does not mean that all hope is lost for these plaintiffs. As noted above, a dismissal for failure to join a required party is without prejudice. A narrower suit seeking more limited relief--such as the return of the bodies and funerary objects buried at Hickory Ground to the descendants of the deceased--may not trigger the same sovereign interests that preclude this litigation from proceeding, particularly if such a suit were directed at specific tribal officials responsible for PBCI's ongoing control of those bodies and artifacts. In any event, the immunity of sovereigns against unconsented suits does not bend to the injustice of claims unheard.

## IV. CONCLUSION

For all of these reasons, the court concludes that the Tribal Defendants are required parties to this suit, that they cannot be joined to it, and that the suit may not proceed in their absence.  Accordingly, the court will grant the Tribal Defendants' motion to dismiss, deny as moot the motions to dismiss of the Federal and Individual Defendants, and dismiss this action without prejudice.[5]

In so concluding, the court does not question that the plaintiffs have grave historical, cultural, and religious interests in the treatment of Hickory Ground and those who were buried there.  But so too does PBCI, as a sovereign entity, have serious interests in not having its capacity to exercise dominion over its lands adjudicated in a federal court without its presence and consent.  Whether these plaintiffs or other descendants of the people once interred at Hickory Ground could bring

---

5.  As noted above, this dismissal will not include the claims against Martin Construction, the company that has filed a notice of bankruptcy in this case.

a suit seeking more limited remedies is not before the court today.  All the court now finds is that the sweeping relief sought here implicates so deeply the sovereign interests of PBCI that the claims against the Tribe and its officials may not proceed without PBCI's consent, and that this litigation cannot proceed without PBCI's presence or the presence of its representatives.

                          * * *

    A separate judgment will issue.

    DONE, this the 15th day of March, 2021.

                            ____/s/ Myron H. Thompson____
                            UNITED STATES DISTRICT JUDGE