The Honorable Myron H. Thompson

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MUSCOGEE (CREEK) NATION, a federally recognized Indian tribe, HICKORY GROUND TRIBAL TOWN, and MEKKO GEORGE THOMPSON, individually and as traditional representative of the lineal descendants of those buried at Hickory Ground Tribal Town in Wetumpka, Alabama.

Plaintiffs,

v.

STEPHANIE A. BRYAN, individually and in her official capacity as Chair of the Poarch Band of Creek Indians Tribal Council; ROBERT R. MCGHEE, individually and in his official capacity as Vice Chair of Poarch Tribal Council and board member of PCI Gaming Authority; AMY BRYAN GANTT, in her official capacity as Treasurer of the Poarch Band of Creek Indians Tribal Council; CHARLOTTE MECKEL, in her official capacity as Secretary of the Poarch Band of Creek Indians Tribal Council; DEWITT CARTER, in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; SANDY HOLLINGER, individually and in her official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; KEITH MARTIN, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; ARTHUR MOTHERSHED, individually and in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council; JUSTIN STABLER, in his official capacity as At Large member of the Poarch Band of Creek Indians Tribal Council and board member of PCI Gaming Authority; BUFORD ROLIN, an individual; DAVID GEHMAN, an individual; GARVIS SELLS, an individual; BILLY BAILEY, in his official capacity as Acting Poarch Band of Creek Indians Tribal Historic Preservation Officer; TIMOTHY A. MANNING, in his official capacity as Chair of the board of the PCI Gaming Authority; TERESA A. POUST, in her official capacity as board

2:12-cv-1079-MHT-CSC

THIRD AMENDED
COMPLAINT AND
SUPPLEMENTAL
COMPLAINT

1

member of the PCI Gaming Authority; BRICE MCGHEE, in his
official capacity as board member of the PCI Gaming Authority;
EDDIE L. TULLIS, individually and in his official capacity as
board member of the PCI Gaming Authority; RACHEL HARRIS
in her official capacity as board member of the PCI Gaming
Authority; THE DEPARTMENT OF THE INTERIOR; BRYAN
NEWLAND, in his official capacity as Assistant Secretary of
Indian Affairs; DEB HAALAND, in her official capacity as
Secretary of the United States Department of the Interior;
CHARLES F. SAMS III in his official capacity as Director of the
National Park Service; and AUBURN UNIVERSITY;

Defendants.

## INTRODUCTION

1.      The elected leaders of the Poarch Band of Creek Indians Tribal Council, the Directors of the PCI Gaming Authority, and the Poarch Historic Preservation Officer (collectively the "Poarch Officials") are engaged in ongoing violations of the federal laws that protect *Oce Vpofv* ("Hickory Ground" in the Muscogee (Creek) Nation's language). Hickory Ground is protected by federal law because it is a sacred, historical, and religious/ceremonial site.

2.      In addition to continuing to violate federal law, Poarch Officials continue to violate the agreement the Poarch Officials signed with Defendant National Park Service ("NPS") in 1999 (the "NPS Agreement"). The NPS Agreement requires the Poarch Officials to uphold specific historic preservation duties on an ongoing basis.

3.      Plaintiffs' lawsuit seeks to remedy the harms resulting from the Poarch Officials' ongoing violations of federal law and the NPS Agreement.

4.      The Hickory Ground Site includes much of historic Hickory Ground. It is a sacred and historic site located in Wetumpka, Alabama. It is sacred to the Plaintiffs: It is part of the Muscogee (Creek) Nation's historic treaty lands, one of 44 historic Muscogee Tribal Towns, a significant capital of the Muscogee (Creek) Nation's before the Tribe was forcibly removed from Alabama, and a historic ceremonial ground and burial site. Direct ancestors of the current members of Hickory Ground Tribal Town lived, died, and are buried there.

5.      Since removal in the 1830s, Hickory Ground Tribal Town has been located on the Muscogee Reservation in Indian Territory (what is now known as the State of Oklahoma).

6.      When the Poarch Band of Creek Indians ("Poarch") acquired the original Hickory Ground Site, Poarch Officials claimed they were buying this culturally significant site to protect it from development, and they repeatedly promised to preserve it.

7.      Eventually, Poarch Officials broke these promises and desecrated the holy Site, removing at least 57 bodies of Plaintiffs' ancestors and thousands of associated funerary objects and cultural items to build a casino.[1] The other Defendants violated statutory, common law, and contractual obligations when they enabled and/or failed to stop Poarch Officials from destroying this important historic site and traditional burial ground.

8.      In 1980, the Hickory Ground Site was placed on the National Register of Historic Places because it is a sacred site that significantly contributes to the preservation of American history and culture.

9.      After the Hickory Ground Site was placed on the National Register, Poarch Officials drafted a four-page application seeking historic preservation funds to allow Poarch to purchase the Site, on the promise that Poarch's "[a]cquisition would prevent development on the property." Poarch Application for Historic Preservation Grant Re U.S. Department of the Interior (HCRS [Heritage Conservation and Recreation Service]) letter 712 at 2 (2/12/1980) ("Grant Application"), attached hereto as Exhibit A.

10.      At that time, in 1980, Poarch was not a tribe. Instead, Poarch Officials drafted and submitted this application as a corporate entity known as "Creek Nation East of the Mississippi, Inc." This corporate entity was headquartered in Atmore, Alabama.

---

[1] The Native American Graves Protection and Repatriation Act defines "associated funerary objects" to mean:

> [O]bjects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later, and both the human remains and associated funerary objects are presently in the possession or control of a Federal agency or museum, except that other items exclusively made for burial purposes or to contain human remains shall be considered as associated funerary objects.

25 U.S.C. § 3001(3)(A). The term "cultural items" includes "associated funerary objects." *See id.* at § 3001(3).

11.    The corporation known as "Creek Nation East of the Mississippi, Inc." was awarded the requested historic preservation funds and purchased the Hickory Ground Site in fee simple, as any non-sovereign private landowner would purchase lands.

12.    In their application for federal funds, Poarch Officials represented to the Muscogee (Creek) Nation, the federal government, and the Alabama State Historical Commission that Poarch would use the funds to purchase Hickory Ground to *save it* from being developed, and that the Poarch Officials would protect the site "*without* excavation." Grant Application, Ex. A at 2.

13.    In violation of their promises and commitments, Poarch Officials excavated and continue to excavate the Hickory Ground Site for the development, renovations and expansions of a $246 million casino resort called Wind Creek Wetumpka.

14.    Poarch Officials exhumed at least 57 human burials and mistreated the human remains.

15.    Some remains, and numerous archaeological artifacts, associated funerary objects, and cultural items have never been reburied and continue to be mishandled and improperly stored by Poarch Officials and Defendant Auburn University ("Auburn"), and both the Poarch Officials and Auburn continue to unlawfully prevent and obstruct Plaintiffs' requested repatriation.

16.    Upon information and belief, not all of the remains and archaeological resources were excavated and many still remain under the Poarch casino and related infrastructure.

17.    The Poarch Officials' construction of a casino over Plaintiffs' sacred burial grounds, Poarch Officials' removal of Plaintiffs' ancestors from what was intended to be their final resting place, and Poarch Officials' ongoing mistreatment of the remains and artifacts has caused, and continues to cause, harm to the Plaintiffs, in violation of the laws of the United States and Alabama, as well as the laws and cultural mores of the Muscogee (Creek) Nation.

18.    Both federal statutes and the NPS Agreement impose upon the Department of the Interior ("Interior"), including the Bureau of Indian Affairs ("BIA") and the NPS, and their respective officials (listed in Paragraphs 55 to 59, *infra*) (collectively the "Federal Defendants") obligations to protect Plaintiffs' rights, including but not limited to duties to provide notice and consultation and obtain consent prior to allowing such damage to burials and sacred sites to occur.

19.    The Poarch Officials also have statutory, contractual, and common law duties to protect Plaintiffs' rights and to avoid damaging their sacred burial grounds.

20.    The actions of all Defendants have caused, and continue to cause, irreparable harm to the Plaintiffs, who bring this lawsuit to remedy past damage and ongoing harm.

21.    Poarch Officials promised their purchase would prevent development at the sacred Hickory Ground Site. They should be held to their word.

## THE PARTIES

**Plaintiffs**

22.     Plaintiff Muscogee (Creek) Nation is a federally recognized Indian Tribe located on the Muscogee Reservation, in Oklahoma, with over 100,000 tribal citizens. Before its people were forced to move to Indian Territory, the Muscogee (Creek) Nation existed as a confederacy of Tribal Towns throughout what is now the southeastern United States. For thousands of years before non-Indian contact, they inhabited what is now Alabama, Georgia, and northern parts of Florida.

23.     Plaintiff Hickory Ground Tribal Town is a traditional Tribal Town and ceremonial ground of the Muscogee (Creek) Nation that is now located on the Muscogee Reservation, in Henryetta, Oklahoma. Before the Muscogee (Creek) Nation's removal from Alabama, Hickory Ground Tribal Town was located in what is now Wetumpka, Alabama.

24.     Membership in Hickory Ground Tribal Town is matrilineal, meaning that membership transfers from generation to generation through one's mother.

25.     Although tombstones are not marked with headstones depicting names and dates as is common in Euro-American culture, the modern-day members of Hickory Ground Tribal Town are the direct descendants, through their mothers and their mothers' mothers, of the individuals buried at the sacred ceremonial ground. The members of the modern Hickory Ground Tribal Town are directly tied historically, culturally, and lineally to the Hickory Ground Site in Wetumpka.

26.     Plaintiff George Thompson is the Mekko (chief) of Hickory Ground Tribal Town. He has held that lifetime position for 48 years. He is a citizen of the Muscogee (Creek) Nation domiciled on the Muscogee Reservation in Oklahoma, and he brings this suit individually and as the traditional representative of all the lineal descendants of those buried at the Hickory Ground Site under the Muscogee (Creek) Nation traditional matrilineal Tribal Town kinship system.

**Poarch Tribal Council Defendants**

27.     Poarch is a group that was first recognized as an Indian tribe by the United States in 1984, 48 FED. REG. 24083 (June 11, 1984), after claiming to descend from a "settlement of 'half-bloods'"[2] who lived in Tensaw, Alabama. *See generally* Poarch Federal Acknowledgement Memo., (1983), *available at* https://www.bia.gov/sites/bia.gov/files/assets/as-ia/ofa/petition/013_prchcr_AL/013_pf.pdf ("Federal Memo"), attached hereto as Exhibit B.[3]

28.     This group never was, and is not, a Muscogee (Creek) Tribal Town.

29.     The Muscogee (Creek) Nation did not, and does not, have "bands."

30.     When applying to become a tribe in the 1980s, Poarch did not claim to descend from any historic Muscogee Tribal Town or particular political sovereign. Instead, Poarch Officials claimed that Poarch's members are descendants of individuals who fought alongside the United States under General Andrew Jackson and relinquished their citizenship in the Muscogee (Creek) Nation so they could stay behind and avoid removal on the Trail of Tears. Federal Memo, Ex. B at 4, 24.

31.     Under President Andrew Jackson's direction, the United States forcibly removed the Muscogee (Creek) Nation and its Tribal Towns, including Hickory Ground, from Alabama in the early 1800s. Everyone who was a legitimate member of Hickory Ground in the 1830s was forcibly removed by the United States and taken to Indian Territory, where the Muscogee Reservation is today.

32.     Poarch's ancestors helped General Andrew Jackson fight against the Muscogee

---

[2] The outdated term "half-bloods" in this excerpt from Poarch's petition for federal recognition refers to individuals who possessed half Indian, half non-Indian blood as of the mid-1800s.

[3] As Judge Hull noted during the September 25, 2025 oral argument before the Ninth Circuit Court of Appeals, Poarch "wasn't even a sovereign entity until 1980, and [has] no historical background to have this special historical site. . . ." Tr. at 24:40 – 25:05. Plaintiffs, in the claims set forth herein, are not challenging Poarch's federal recognition.

(Creek) Nation in Alabama, and in exchange they were allowed to stay in Alabama, on the condition they renounce their tribal citizenship because *all* tribal governments and tribal citizens were forcibly removed from the area. *See* Federal Memo, Ex. B at 2, 14, 60, 88 of 131.

33.    The Poarch Officials' ancestors who stayed behind received land grants from the United States in recognition of their having fought alongside General Andrew Jackson, and against the Muscogee (Creek) Nation, in the Creek War of 1813. Federal Memo, Ex. B at 88 (noting that the Poarch were individually "granted the land … in terms of a reward for some kind of service to Andrew Jackson in the Creek War").

34.    These land grants were exclusively in the Atmore/Tensaw Alabama area, as the Poarch never had a historic presence in the Wetumpka area. Federal Memo, Ex. B at 2 ("Federal, State, and county records clearly identify a group of half-blood and mixed-blood Creeks as having lived in the same general vicinity in southwestern Alabama within an eighteen-mile radius for a time period beginning in the late 1700's to the present.").

35.    Defendants Stephanie A. Bryan, Robert R. McGhee, Amy Bryan Gantt, Charlotte Meckel, Dewitt Carter, Sandy Hollinger, Keith Martin, Justin Stabler, and Arthur Mothershed are members of the Poarch Tribal Council and officials of Poarch (the "Tribal Council Officials"). They are sued in their official capacities for ongoing violations of federal and state law for which Plaintiffs seek mandamus, declaratory, and injunctive relief. Certain Tribal Council Officials are also sued in their individual capacities and in their official capacities as board members of the PCI Gaming Authority.

**Gaming Officials Defendants**

36.    PCI Gaming Authority is a commercial enterprise of Poarch that is at least partly responsible for the gaming development and operations at the Hickory Ground Site.

9

37.     PCI Gaming Authority is the principal gaming entity of Poarch, and it runs the Wind Creek Casino and Hotel in Wetumpka.

38.     On information and belief, Defendants Timothy Manning, Teresa E. Poust, Brice McGhee, Eddie L. Tullis, Rachel Harris, Robert McGhee, and Justin Stabler (the "Gaming Officials") are members of the PCI Gaming Authority Board. They are sued in their official capacities for ongoing violations of federal and state law for which Plaintiffs seek mandamus, declaratory, and injunctive relief. Eddie L. Tullis and Robert R. McGhee are also sued in their individual capacities.

**Poarch Tribal Historic Preservation Officer**

39.     Defendant Billy Bailey is the Tribal Historic Preservation Officer for Poarch ("Poarch THPO" and collectively with the Tribal Council Officials and the Gaming Officials, the "Poarch Officials"). He is sued in his official capacity for violations of federal and state law for which Plaintiffs seek mandamus, declaratory, and injunctive relief.

**Individual Defendants**

40.     Defendants Buford Rolin, David Gehman, Stephanie A. Bryan, Robert R. McGhee, Sandy Hollinger, Keith Martin, Arthur Mothershed, Garvis Sells, and Eddie Tullis are sued in in their personal and individual capacities ("Individual Defendants").

41.     Mekko Thompson, personally and as the traditional representative of all the lineal descendants of those buried at Hickory Ground, seeks monetary relief, and equitable relief as the court determines appropriate, for unjust enrichment and the tort of outrage that they committed against Mekko Thompson personally and as the traditional representative of the lineal descendants of those buried at Hickory Ground harmed by the Individual Defendants.

42.     Eddie Tullis is personally liable for his conduct starting no later than 1980 when he

served as Chair of the Poarch and continuing through his tenure on the Board of the PCI Gaming Authority until the present.

43.     Arthur Mothershed is personally liable for his conduct starting no later than 2005 when he was elected as a Tribal Council Member.

44.     Stephanie Bryan is personally liable for her conduct starting no later than 2006 when she was elected as Vice Chair and continuing through her tenure as Chair from 2014 until the present.

45.     Robert McGhee is personally liable for his conduct starting no later than 2006 when he served as Tribal Administrator and continuing through his tenure as Tribal Council Member until the present.

46.     Keith Martin is personally liable for his conduct starting no later than 2006 when he was elected as a Tribal Council Member and continuing until the present.

47.     Timothy Manning is personally liable for his conduct starting no later than 2006 when he served as Accounting Director and continuing through his tenure as a Tribal Council Member until the present, including his service as on the Board for PCI Gaming Authority.

48.     David Gehman is personally liable for his conduct starting no later than 2007 when he was re-elected as a Tribal Council Member and continuing at least until he lost re-election for Tribal Council member in 2016.

49.     Garvin Sells is personally liable for his conduct starting no later than 2008 when he was re-elected as a Tribal Council Member and continuing at least through his tenure as a Tribal Council Member.

50.     Sandy Hollinger is personally liable for her conduct starting no later than 2011 when she was elected as a Tribal Council Member and continuing through her tenure as Tribal

Council Member until the present.

51.    The start of Buford Rolin's personal liability starts at least in 1980 and through 2016 when he:

a.    personally assured Plaintiffs, including Mekko Thompson, that Hickory Ground would be preserved as a sacred ceremonial and burial site;

b.    knowingly authorized excavation and early development plans that laid the foundation for the desecration of the Hickory Ground Site;

c.    oversaw the acquisition of the Hickory Ground Site in 1980 and the Tribe's eventual recognition in 1984, which was based on their misrepresentations, concealments, and blatant lies regarding Poarch's history and their future intentions;

d.    approved early excavation plans, allowing human remains and associated funerary objects to be removed without consulting Plaintiffs or obtaining their consent; and

e.    started the desecration of and construction over the Hickory Ground Site.

52.    Monetary damages are attributable to the Individual Defendants because their actions were not within the scope of their discretionary authority and violated clearly established federal, state and tribal laws.

**Federal Defendants**

53.    Defendant United States Department of the Interior ("Interior") is responsible for administration and management of federal lands, historic places, and Indian Affairs.

54.    The National Park Service ("NPS") and Bureau of Indian Affairs ("BIA") are agencies of the United States government, within Interior. Among other things, the NPS

administers and oversees historic preservation grants and delegations of historic preservation responsibilities. The BIA is responsible for, among other things, administering and overseeing archaeological activities on Indian lands and taking land into trust on behalf of Indian tribes.

55.    Defendant Bryan Newland is the Assistant Secretary for Indian Affairs within the Department of the Interior and is sued in his official capacity.

56.    Defendant Charles F. Sams III is the Director of the National Park Service within the Department of the Interior and is sued in his official capacity.

57.    Defendant Deb Haaland is Secretary of the United States Department of the Interior and is sued in her official capacity. Collectively, the Defendants listed in Paragraphs 55–57 are referred to herein as "Federal Officials."

58.    Collectively, the Defendants listed in Paragraphs 53–57 are referred to herein as the "Federal Defendants."

**Auburn University**

59.    Defendant Auburn University ("Auburn") is an educational institution in the State of Alabama that receives federal funding and, on information and belief, continues to exercise, and has exercised, possession or control over cultural items excavated at Hickory Ground, including possession or control of human remains and associated funerary objects at the time of the filing of this Third Amended Complaint.

## JURISDICTION AND VENUE

60.    Plaintiffs' claims arise under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*; the Indian Reorganization Act, 25 U.S.C. §§ 5101, *et seq.* (formerly 25 U.S.C. §§ 461 *et seq.*); the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 100101 *et seq.* (formerly 16 U.S.C. §§ 470 *et seq.*); the Native American Graves Protection and Repatriation Act of 1990 ("NAGPRA"), 25 U.S.C. §§ 3001 *et seq.*; the Archeological Resources Protection Act ("ARPA"),

16 U.S.C. §§ 470aa *et seq.*; the Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1301–1304; the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 28 U.S.C. § 1361 (mandamus); federal common law; and supplemental state law claims.

61.    Plaintiffs also seek their reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the NHPA, 54 U.S.C. § 307105.

62.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction); *id.* § 1361 (action to compel a governmental officer to perform his duty); § 1362 (jurisdiction over civil actions brought by Indian tribes arising under the laws of the United States); § 1367 (supplemental jurisdiction over state law claims forming part of the same claim or controversy); 25 U.S.C. § 3013 (jurisdiction over actions alleging violations of NAGPRA); and 54 U.S.C. § 307105 ("any interested person" may enforce NHPA).

63.    Pursuant to 28 U.S.C. § 1391(b)(2) & (e), venue is proper in this Court because this action relates to lands located within this judicial district and a substantial part of the events or  omissions giving rise to the claims occurred in this judicial district.

64.    Federal Defendants, and the Poarch Officials when acting under delegated federal authority, have waived their sovereign immunity against civil actions alleging harm arising from the actions or failures to act as required by law of federal agencies and their officers and employees and seeking relief other than monetary damages. 5 U.S.C. § 702.

65.    The Court also has jurisdiction over the Federal Officials in their official capacities because they are federal governmental officials against whom Plaintiffs seek declaratory and injunctive relief only in relation to continuing violations of federal law. *See Ex parte Young*, 209

U.S. 123 (1908).

66.     The Court has jurisdiction over the Tribal Council Officials (listed in Paragraph 35), the Gaming Officials (listed in Paragraph 38), and the Poarch THPO in their official capacities because they are tribal officials against whom the Plaintiffs seek declaratory and injunctive relief only in relation to continuing violations of federal law. *See Ex parte Young*, 209 U.S. 123 (1908).

67.     Plaintiffs' claims against the Poarch Officials do not implicate any "special sovereignty interests" pursuant to the exception to the *Ex parte Young* doctrine that the Supreme Court carved out in *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997).

68.     Hickory Ground does not constitute an "essential attribute of [Poarch's] sovereignty" and Poarch's acquisition of the sacred site was not "infused with a public trust" that the sovereign must respect, both of which are required for the *Coeur d'Alene* "special sovereignty interest" exception to apply. *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 890 (11th Cir. 2024) (internal citations omitted).

69.     As the Eleventh Circuit Court of Appeals noted, "there is substantial reason to doubt whether Hickory Ground is an '[e]ssential attribute of sovereignty' that is 'infused with a public trust' like the submerged lands in *Coeur d'Alene*. Unlike state jurisdiction over submerged lands, the Poarch Band's regulatory jurisdiction over Hickory Ground does not result exclusively from its sovereignty. The Poarch Band acquired Hickory Ground in fee simple in 1980, as any private party would acquire land." *Rollin*, 119 F.4th at 891 (internal citations omitted).

70.     Moreover, Hickory Ground is not a part of Poarch's historic territory or homelands. Poarch's historic territory and homelands are limited to the Atmore and Tensaw area in southwestern Alabama. Federal Memo, Ex. B at 2 (Poarch has "lived in the same general vicinity in southwestern Alabama within an eighteen-mile radius for a time period beginning in the late

1700's to the present."); *see also id.* at 3 (Poarch is "a community which developed in the latter part of the 18th century in the Alabama-Tensaw River area in what is now southwestern Alabama.").

71.     Nowhere in the 131-page Federal Memo from the Deputy Assistant Secretary – Indian Affairs to the Assistant Secretary – Indian Affairs documenting Poarch's historic territory and background is there any mention of Poarch having any ancestral lineage or cultural connection to Hickory Ground (or *Oce Vpofv* in Muscogee); instead, historic documentation limits Poarch to southwestern Alabama. *See* Federal Memo, Ex. B at 12 ("The Poarch Band of Creek Indians is located in three hamlets near modern-day Atmore, Alabama" and Poarch "established a community at Tensaw in what is now southwestern Alabama in the late eighteenth century"); *id.* at 13 (Poarch's existence has historically "been limited to a relatively small area, i.e., within a radius of eighteen (18) miles."); *id.* at 103 (the "ancestors of the [Poarch] have lived in the area surrounding modern Atmore for approximately 150 years.").

72.     Poarch's modern-day members have no ancestral lineage or cultural connection to Hickory Ground/*Oce Vpofv. See* Federal Memo, Ex. B.

73.     Poarch has no treaty territory, and thus Poarch has no claim that Hickory Ground is a part of its historical treaty territory. Poarch has no treaty territory because Poarch never signed a treaty with the United States.

74.     Poarch never signed any treaties with the United States because, prior to the late twentieth century, Poarch had no political organization or sovereignty, and Poarch did not exercise any governmental authority over anyone or anything. *See* Federal Memo, Ex. B at 88 of 131 ("There was no formal political organization among the Indian settlements [of individuals who now call themselves 'Poarch'] in the nineteenth century nor in much of the 20th century, in the

sense of an established, named leadership position or regular body such as a council.").

75.     The Muscogee (Creek) Nation signed four treaties that specifically mention and/or recognize that Hickory Ground (or "Ocheobofau" or "Oce Vpofv") was historically within the Muscogee (Creek) Nation's sovereign territory, specifically (1) the 1796 Treaty of Colerain; (2) the 1814 Treaty of Fort Jackson; (3) the 1825 Treaty of Indian Springs; and (4) the 1832 Treaty of Cussetah. Poarch is not a signatory to any of these treaties because Poarch did not exist as a sovereign government when these treaties were signed.

76.     Poarch conducts Indian gaming at the Hickory Ground Site under IGRA; Poarch's acquisition of the Hickory Ground Site was not to "protect common use of public resources." *Rollin*, 119 F.4th at 891.

77.     "Although the casino on Hickory Ground serves a commercial purpose, that enterprise does not implicate concerns about public access to natural resources such that the Officials can claim Plaintiffs' claims against them implicate 'special sovereignty interests.'" *Id.*

78.     This Court has jurisdiction over the Individual Defendants because they committed the tortious actions alleged in this complaint in this judicial District.

79.     The Court has jurisdiction over Auburn under NAGPRA, 25 U.S.C. §§ 3001 *et seq.*, and ARPA, 16 U.S.C. §§ 470aa *et seq.*, because Auburn receives federal funds and, on information and belief, exercised, and continues to exercise, possession and/or control over remains and cultural items that Auburn excavated from Hickory Ground.

## GENERAL ALLEGATIONS

**A.     History Of Hickory Ground.**

80.     For millennia before the Removal Treaty of 1832, the Muscogee (Creek) people inhabited all of what is now Alabama. The Muscogee (Creek) Nation was composed of Tribal Towns, including the Tribal Town called *Oce Vpofv* by the Muscogee (Creek) people, and known as "Hickory Ground Tribal Town" by English speakers.

81.     Hickory Ground is of major importance in the history of the Muscogee (Creek) Nation, Hickory Ground Tribal Town, and the United States. It served as a significant capital for the Muscogee (Creek) Nation before removal.

82.     Tribal Town affiliation is matrilineal, and the current members of Hickory Ground Tribal Town on the Muscogee Reservation in Oklahoma are the lineal descendants of the ancestors buried at the historic Hickory Ground in Wetumpka, Alabama. Because membership in Hickory Ground is matrilineal, current day members trace their lineage directly back to their relatives buried at Hickory Ground through their mothers, their mothers' mothers, their mothers' grandmothers, and so on.

83.     Each Tribal Town is led by its Mekko, or chief. Mekko George Thompson is the *kosa mekko* of Hickory Ground, and has been since 1977. He is known as *kosa mekko*, or Coosa Chief, because Hickory Ground dates back to the first Tribal Town at the time of the beginnings, known as *kosa* or Coosa.

84.     Hickory Ground is located on the east bank of the Coosa River, south of the present-day Wetumpka and approximately two miles north of Fort Toulouse.

85.     Under the terms of the Removal Treaty, the Muscogee (Creek) Nation was forced to cede all of its land east of the Mississippi River, including Hickory Ground, and a new reservation for the Muscogee (Creek) Nation was established west of the Mississippi River. 7 Stat.

366, Arts. I & XIV (1832). To stay with their Tribe, the members of the Muscogee (Creek) Nation were required to remove to what is now Oklahoma and leave behind their ancient villages and the many generations of their ancestors who were buried there.

86.     None of the historic members of Hickory Ground Tribal Town were permitted to stay behind in their ancestral lands in Alabama. The entire Tribal Town was removed, forcibly.

87.     The historic Hickory Ground Tribal Town, like all Tribal Towns of the Muscogee (Creek) Nation, contains a ceremonial ground (square ground), council house, plaza, burial sites, and individual graves containing human remains and associated funerary objects of the ancestors of the Plaintiffs. Hickory Ground has profound cultural and religious importance to the Plaintiffs.

88.     The Hickory Ground Site is a state-registered archaeological site (1EE89) and is listed on the National Register of Historic Places. Hickory Ground was placed on the National Register of Historic Places in 1980, after the Alabama State Historic Commission applied for its placement on the Register.

89.     In the Muscogee (Creek) culture and religion, there are specific burial places for those who held particular positions in Tribal Town traditional governance, and specific governance structures over Tribal Towns, including burials within those Tribal Towns.

90.     For example, Hickory Ground Mekkvlke are buried under the Mekkvlke arbor in the ceremonial grounds.

91.     It was a common practice to bury family members who did not have a position in the ceremonial grounds in the earth underneath a family's home.

92.     The map of archaeological features at the Hickory Ground Site on the next page shows human burials concentrated under the arbors in the square ground and under house structures:



Kelly Ervin, *A Comparative Spatial Analysis of Two Communities from the Hickory Ground Site in Wetumpka, Alabama* 26 (Auburn University Thesis, December 13, 2014).

93.    It is the Plaintiffs' long-established religious belief that burial and ceremonial grounds are sacrosanct and must not be entered, let alone disturbed, without the proper religious protocol.

94.    It is also the Plaintiffs' long-established religious belief that their ancestors must be left at peace in their final resting places with their possessions (funerary objects), and are not to be disturbed, mistreated, or disrespected in any manner.

95.    Plaintiffs, as the living lineal descendants and next of kin of the deceased, owe a religious duty to their ancestors to care for the graves and bodies of the deceased and to follow traditional religious protocol in doing so.

96.    In the Muscogee (Creek) traditional religion, certain protocols must be followed in all burials. These protocols are based on Tribal Town and Clan religion and tradition. In Muscogee culture, an individual's "Clan" is a cultural identification one inherits from one's mother. One's Clan identity informs and impacts all aspects of one's life, from societal roles and duties, observance of religious ceremonies, and family/kinship relations.

97.    Because the *mekko* is the chief and religious/ceremonial leader of the town, the *mekko* ultimately decides all Tribal Town issues, including treatment of the dead.

98.    It is viewed as heinous and extremely disrespectful in the Muscogee (Creek) traditional religion for any persons not belonging to the Muscogee (Creek) Nation or Tribal Town to exhume or rebury Muscogee (Creek) ancestors and their funerary objects, especially where those persons mistreat the remains and perform invented and non-traditional ceremonies accompanying reburial.

**B.    Poarch Bought Hickory Ground With Federal Preservation Grant Funds After Promising To Preserve The Sacred Muscogee Site.**

99.    Poarch obtained the Hickory Ground Site in 1980 with $165,000 in federal preservation grant funds and a $165,000 donation from the landowner.

100.    In the same year, pursuant to standard terms of federal preservation grant awards, a protective covenant was placed on the property for 20 years.

101.    Poarch had never occupied Hickory Ground prior to 1980. *See* Federal Memo, Ex. B at 2, 3, 16, 64, 65 of 131.

102.    Poarch Officials represented to the Alabama Historic Commission, the Muscogee (Creek) Nation and the United States that its purpose in acquiring the Hickory Ground Site  was to preserve the historic property for the benefit of all Creek Indians, including the "existing Hickory Ground tribal town in Oklahoma," and to preserve the Site "without excavation." Grant Application, Ex. A at 2.

103.    The Muscogee (Creek) Nation and Hickory Ground Tribal Town were the intended third-party beneficiaries of the Poarch Officials' agreement to preserve Hickory Ground.

104.    In their application for the $165,000 federal preservation grant to purchase the Hickory Ground Site, the Poarch Officials (then calling their organization the "Creek Nation East of the Mississippi, Inc."), stated that "Hickory Ground (site no. 1-Ee-89) is of major importance in the history of the Muscogee (Creek) Nation. It has supplied many of the important leaders in Creek history." *Id.* at 1. "Hickory Ground was involved in nearly all the major historic events in the southeast before the removal of Creeks from Alabama in 1836," including significant battles fought by Andrew Jackson. *Id.* at 1–2.

105.    In the section of its Federal Preservation Grant Application titled "The Use of the Land," Poarch Officials unequivocally represented and promised that "[a]cquisition of the property

is principally a protection measure. Acquisition will prevent development on the property…. [P]lans will be developed to minimize continued destruction of the archaeological resources." *Id.* at 2. "The property will serve as a valuable resource for cultural enrichment of Creek people…. The Creek people in Oklahoma pride in heritage and ties to original homeland can only be enhanced. **There is still an existing Hickory Ground tribal town in Oklahoma. They will be pleased to know their home in Alabama is being preserved…. The Hickory Ground site will continue to enhance their understanding of their history, without excavation**." *Id.* (emphasis added).

106.    In the section of Poarch's Federal Preservation Grant Application titled "Specific Standards of Protection," Poarch Officials stated that the site "will be maintained almost entirely by minority groups," including the Creek Nation Foundation, Inc. in Oklahoma, representing the Muscogee (Creek) Nation in Oklahoma. *Id.* at 3. "[T]he property will be jointly owned by both groups of Creeks." *Id.* An attorney for the Creek Nation Office of Justice in Oklahoma would handle the legal matters for the Muscogee (Creek) Nation. *Id.* at 4. A trained anthropologist would "act as an advisor to the tribal councils on plans for permanent protection of the site." *Id.* "Specific end products of the project is to provide protection for a particularly important site in Creek History…. **Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home**." *Id.* at 3 (emphasis added). "**Destruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people**." *Id.* at 5 (emphasis added). "In order to halt the destruction planned for the site and to insure [sic] against future destruction, funds for acquisition of fee simple title are requested. As the landowner is very much interested in developing the property for commercial purposes it is felt acquisition of fee simple title is **necessary to prevent destruction of the site**." *Id.* at 3 (emphasis added).

107.    Poarch Officials corresponded with representatives of the Muscogee (Creek) Nation regarding their preservation plans for the Hickory Ground Site. During these communications, Poarch Officials promised to protect the Hickory Ground Site and preserve the Site for future generations of Muscogee people. Plaintiffs relied on these promises.

108.    Additionally, in a 1983 Congressional hearing in which both the Chief of the Muscogee (Creek) Nation and Poarch Chairman Eddie Tullis testified regarding a bill governing disbursement of Indian Claims Commission awards, the Defendant Eddie Tullis testified that Poarch was "in ownership of one of the last historical sites of the Creek nation before the removal to Oklahoma," and further, that Poarch "propose[d] to use part of this money to make that site, not only available to all of our people, but to the general public as well." *A Bill to Provide for the Disposition of Certain Undistributed Judgment Funds Awarded the Creek Nation: Hearings on S. 1224 Before the Select Comm. On Indian Affairs*, 98th Cong. 21–22 (1983) (statement of Eddie Tullis, Poarch Chairman).

109.    Defendant Eddie Tullis' written testimony that was submitted to Congress and included in the hearing record added more detail to this proposal: "Preservation of a historical site: Along with [Poarch's] effort to join the mainstream of American life there is a strong desire among our people to preserve and share our unique history. To this end our tribe has acquired titled [sic] to 'Hickory Ground', one of the most important Creek historical sites. We propose to use fifty percent of the proceeds of S. 1224 to preserve and to present to both Indian and non-Indian this unique and historical site." *Id.*

110.    Relying on Poarch Officials' unqualified assurances that they would perpetually protect the Hickory Ground Site, the Muscogee (Creek) Nation did not object to Poarch's acquisition of the Site, either in fee or trust.

24

111.    It would have been extraordinarily difficult, if not impossible, for Poarch to have acquired the federal preservation funds necessary to purchase the Hickory Ground Site had the Muscogee (Creek) Nation objected to the acquisition. Because Poarch was not a tribe at the time, and because the Muscogee (Creek) Nation was and is the only tribe with historic sovereign ties to the sacred site, the Muscogee (Creek) Nation's acquiescence was critical and essential to Poarch's acquisition of the Hickory Ground Site.

112.    In reliance on the repeated promises from Poarch Officials that they would protect the Hickory Ground Site from destruction and desecration, the Muscogee (Creek) Nation refrained from objecting to Poarch's application to the Office of Federal Acknowledgment ("OFA"), wherein Poarch asked the federal government to make it a tribe.

113.    An objection from the Muscogee (Creek) Nation to Poarch's application for federal recognition would have significantly lessened the chance that Interior and the Office of Federal Acknowledgment ("OFA") would have decided to grant Poarch the federal recognition it was seeking. Instead of objecting to Poarch's application, and in reliance on Poarch Officials' promises to preserve the burials and cultural resources at the Hickory Ground Site, the Muscogee (Creek) Nation wrote a letter advocating for Poarch's federal recognition.

114.    Interior and the OFA relied on the Muscogee (Creek) Nation's letter to conclude that Poarch should be recognized as a tribe. *See* Federal Memo, Ex. B at 3 of 131 (citing as justification for granting Poarch federal recognition the fact that "[i]n August of 1983, the recognized Muscogee (Creek) Nation of Oklahoma formally established a government-to-government relationship with the Poarch Band of Creeks and supported the group's petition for recognition . . . .") (citing letter from Muscogee (Creek) Nation Chief Claude Cox).

115.    The Muscogee (Creek) Nation would never have written such a letter of support,

nor would the Nation have acknowledged Poarch as a "government" had the Nation known that Poarch's promises to protect the Hickory Ground Site were false, misleading, and fraudulent.

116.    Poarch Officials' promises to protect the Hickory Ground Site—made in the Grant Application, in testimony before Congress, and to Muscogee (Creek) Nation leaders throughout the 1980s and after—were misleading and fraudulent. Poarch Officials' promises were fraudulent because the Poarch Officials who promised to protect Hickory Ground never intended to keep their promises and knew it was more likely than not that the Muscogee (Creek) Nation would rely on the false promises they made.

## C.    Interior Unlawfully Takes The Hickory Ground Site Into Trust For Poarch.

117.    On June 11, 1984, the Department of the Interior, in reliance on the Muscogee (Creek) Nation's letter in support of Poarch, extended federal recognition to the Poarch Band of Creek Indians. 49 Fed. Reg. 24083 (June 11, 1984).

118.    Effective April 12, 1985, the United States wrongfully accepted legal title to a majority of the Hickory Ground Site in trust for the benefit of Poarch, 50 Fed. Reg. 15502 (April 18, 1985); 50 Fed. Reg. 19813 (May 10, 1985), purportedly pursuant to the Indian Reorganization Act of 1934 ("IRA").[4]

119.    Under the Indian Reorganization Act, a tribe must have been "under federal jurisdiction" in 1934 in order for Interior to have authority to take land into trust for the tribe. *See Carcieri v. Salazar*, 555 U.S. 379 (2009).

120.    The Solicitor for the Department of the Interior has construed "under federal jurisdiction" to involve a two-part inquiry into whether (1) the United States took actions reflecting federal obligations, duties, responsibility for, or authority over a tribe in or before 1934, and (2)

___

[4] Some portions of the Hickory Ground Site, however, are not in trust and instead continue to be owned by Poarch and others in fee.

that relationship continued through 1934. Sol. Op. M-37029, *available at* https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37029.pdf.[5]

121.    Poarch Officials and the federal government have correctly and repeatedly recognized that Poarch was not under federal jurisdiction in 1934 within the meaning of the Indian Reorganization Act.

a.    In 2005, Poarch Officials submitted a letter through their legal counsel to the National Indian Gaming Commission ("NIGC") stating that "the federal government clearly ended its relationship with Poarch Creek following removal [in 1832]. . . . [T]he historical record amply demonstrates that the federal government terminated the government-to-government relationship with the Creek in Alabama through a broad course of dealings that included express statements by top federal officials disclaiming any federal relationship with the Tribe - and that this termination of federal recognition extended back almost 150 years prior to Poarch Creek regaining federal recognition in 1984." Letter from William Perry, Sonosky, Chambers, *et al.*, to Katherine Zebell, NIGC, at pp. 10–11 (June 3, 2005), attached as Exhibit C hereto.

b.    The Department of the Interior Solicitor's Office, Division of Indian Affairs, stated in 2008 that it "does not believe that the Poarch Creek Band ever had a government-to-government relationship with the United States until it was [recognized in 1984].… [T]he **record simply does not support the Band's existence as a separate tribal entity with a governmental relationship with the United States**." Letter from David Bernhardt, Solicitor, Department of the Interior, to Phil

---

[5] Sol. Op. M-37029 was withdrawn by Sol. Op. M-37055 (March 9, 2020) but subsequently reinstated by Sol. Op. M-37070 (April 27, 2021).

Hogen, Chairman, NIGC, p. 1 (June 13, 2008) (emphasis added), attached as Exhibit D hereto.

c.   The NIGC in 2008 agreed that, after the Muscogee (Creek) Nation's removal from Alabama in the 1830s, "the United States specifically and repeatedly disclaimed any relationship with the Poarch Band" until 1984. Letter from Penny J. Coleman, Acting General Counsel, NIGC, to David Bernhardt, Solicitor, Department of the Interior p. 2 (July 30, 2008), attached as Exhibit E hereto.

d.   In 1951, in seeking to intervene in proceedings relating to compensation from the United States for lands ceded in past treaties with the Muscogee (Creek) Nation, Poarch (then calling itself the "Perdido Friendly Creek Indian Band of Alabama and Northwest Florida Indians") stated that it was "but a **newly formed** band of descendants of the original Creek nation." Perdido Band Memo. in Supp. of Mot. to Intervene, p. 4 (01/05/1951) (emphasis added), attached as Exhibit F hereto.

e.   Later that year, Chairman Calvin McGhee and Secretary Ruby Weatherford signed a resolution changing the name of the band to the "Creek Nation East of the Mississippi." Ex. A to Mot. to Change Record Name of One of Movants for Leave to Intervene (8/29/1951), attached as Exhibit G hereto.

f.   Poarch (by this time going by the name Creek Nation East of the Mississippi, Inc.) stated in November 1951 in a United States Court of Claims appellate brief that "they possessed no territory and were **not dealt with by the United States as a group**" since removal. Creek Nation East of the Mississippi, Inc.'s Appellate Br. re Intervention in Muscogee (Creek) Nation ICC Case, p. 137 (11/6/1951) (emphasis added), attached as Exhibit H hereto.

g.  The brief also stated that "**the Federal Government had no dealings with those east of the Mississippi**, as a group," who, "unlike the Creeks in Oklahoma, had no organization, occupied no bounded grant of territory and **were not under the guardianship of the Federal Government**." *Id.* p. 152 (emphasis added).

h.  In 1952, the United States submitted an appellate brief in the United States Court of Claims stating that "those [Creeks] who remained in the East [after removal] abandoned their tribal relationships; and **they never continued a tribal government recognized by the United States and they entered into no treaties or other political arrangements with the United States** … and only recently organized themselves, apparently for the purpose of this suit." U.S. Appellate Br. Opposing Creek Nation E. of the Mississippi, Inc.'s Intervention in Muscogee (Creek) Nation ICC Case, p. 2 (Jan. 1952) (emphasis added and footnote omitted), attached as Exhibit I hereto.

i.  The United States' 1952 brief also stated that the Creeks who remained east of the Mississippi "are not recognized by the administrative or legislative arm of the Government…." *Id.* at 16.

j.  The Court of Claims found that the United States had "no occasion for further dealings with [those Creeks who remained east of the Mississippi] since 1832." *McGhee v. Creek Nation*, 122 Ct. Cl. 380, 391 (1952), *cert. denied*, 344 U.S. 856 (1952).

122.  When a tribe is not "under federal jurisdiction" under the IRA, Interior has no authority to take land into trust for that tribe.

123.  Because Poarch was not "under federal jurisdiction" within the meaning of the IRA,

the Hickory Ground Site is not properly held in trust for Poarch.

**D.    Poarch Officials Request Delegation Of Federal Historic Preservation Responsibilities, And Then Begin To Desecrate Hickory Ground.**

124.    The 20-year protective covenant on the Hickory Ground Site expired in July 2000.

125.    The year before the covenant expired, Poarch Officials requested that the NPS delegate historic preservation responsibilities to Poarch on "all lands within the exterior boundaries of [Poarch's] Reservation," which included a significant portion of the Hickory Ground Site. The NPS agreed.

126.    The National Park Service's June 10, 1999 Agreement with the Poarch Band of Creek Indians (the "NPS Agreement"), attached hereto as Exhibit J, requires that:

  a.    Poarch Officials follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800 *et seq.* (NPS Agreement § 5), which mandates consultation with any tribe that attaches religious and cultural significance to a historic site (*see* 16 U.S.C.S. §§ 470a(d)(6), 470f; 36 C.F.R. § 800.1 *et seq.*);

  b.    The Poarch THPO "will, in accordance with Section 101(d)(4)(C) [of the NHPA], provide for … consultation with representatives of any other tribes whose traditional lands may have been within the Poarch Band of Creek Indians Reservation," and "will periodically solicit and take into account comments on the program from all those individuals and groups who may be affected by the program's activities" (NPS Agreement § 7);

  c.    "In any case where an action arising pursuant to the Act may affect the traditional lands of another Tribe, the [Poarch THPO] will, on an as-needed basis, seek and take into account the views of that Tribe." NPS Agreement § 7.

30

127.    The National Park Service could not and would not have delegated the historic preservation duties to Poarch without the Poarch Officials' agreement to undertake the enumerated duties.

128.    The Hickory Ground Site is in the traditional lands of the Muscogee (Creek) Nation.

129.    The Hickory Ground Site contains the ceremonial grounds and burials of members of the Hickory Ground Tribal Town.

130.    The Hickory Ground Site holds unique religious significance to Mekko Thompson and the present-day members of Hickory Ground Tribal Town now located on the Muscogee Reservation in Oklahoma.

131.    Plaintiffs were and continue to be the intended third-party beneficiaries of the NPS Agreement.

132.    The NHPA allows for a tribe to assume all or part of the functions of a State Historic Preservation Officer with respect to tribal land, *see* 54 U.S.C. § 302702, but this grant of federal administrative authority is conditional. Section 302702 incorporates by reference 54 U.S.C. § 302302, which makes the agency's reevaluation of such a tribal program mandatory not less than every four years, and furthermore requires disapproval of the program if, at any time, the Secretary determines that a major aspect of the program is not consistent with the agency's historic preservation program regulations and obligations.

133.    NPS must terminate the Agreement if Poarch does not "carr[y] out its assumed responsibilities in accordance with this agreement, the Act, or any other applicable Federal statute or regulation." NPS Agreement § 15; *see also* 54 U.S.C. § 302108.

134.    At the time the National Park Service approved of and executed the NPS Agreement with Poarch, Poarch's Office of Cultural and Historic Preservation Field Methodology had a policy

that "[u]nder no circumstances are the burials on the Poarch Creek Indians Reservations, or lands under their control, to be excavated, nor are they to be subjected to **any** examination or testing. Burial sites take precedence over any project or program plan." Poarch Field Methodology Policy, p. 6 (April 1999) (emphasis in original), attached hereto as Exhibit K.

135.    The Poarch Field Methodology Policy also emphasized: "AGAIN! **THE POARCH BAND OF CREEK INDIANS TRIBAL ARCHAEOLOGICAL AND HISTORIC RESOURCES CODE EMPHASIZES AVOIDANCE AND PRESERVATION OF FEATURES RATHER THAN EXCAVATION**." *Id.* (emphasis in original).

136.    On information and belief, after the National Park Service delegated historic preservation responsibilities to Poarch, Poarch Officials reversed these policies with respect to the Hickory Ground Site.

137.    The National Park Service should have conducted reviews of the Poarch Officials' compliance with the NPS Agreement and the NHPA in 2004, 2008, 2012, 2016, 2020, and 2024. The NPS did not conduct any such reviews.

138.    If it had, the National Park Service would have discovered that the Poarch Officials violated the NPS Agreement and other federal laws, and furthermore, NPS would have discovered that the Poarch Officials continue to violate these laws.

139.    On October 5, 2023, Principal Chief David Hill of the Muscogee (Creek) Nation sent a letter to NPS Director Charles F. Sams III, and a separate letter to Secretary Deb Haaland, attached here as Exhibits L and M, respectively (and referred to herein as "Sams NPS Letter" and "Haaland NPS Letter"). Both letters demanded that Interior and NPS terminate the NPS Agreement with Poarch based on Poarch's failure to comply with the Agreement's terms.

140.    For instance, in the letter to Secretary Haaland, Chief Hill wrote: "I write to demand

that the DOI take agency action to terminate the June 10, 1999 Agreement Between the National Park Service, U.S. Department of the Interior and the Poarch Band of Creek Indians of Alabama for the Assumption by the Tribe of Certain Responsibilities Pursuant to the National Historic Preservation Act (16 U.S.C. 470) (the "NPS Agreement") . . . ." Haaland NPS Letter, Ex. M at 1.

141.    Chief Hill reminded both Director Sams and Secretary Haaland that "the Secretary may *only* enter into such an agreement if the agreement obligates the signatory tribe to provide for appropriate participation by 'representatives of other Indian tribes whose traditional land is under the jurisdiction of the Indian tribe assuming responsibilities,' among other things." Sams NPS Letter, Ex. L at 2 (quoting 54 U.S.C. § 302704); Haaland NPS Letter, Ex. M at 2 (quoting 54 U.S.C. § 302704).

142.    The letters document a few examples of the ways in which the Poarch Officials and Individual Defendants have violated, and continue to violate, the terms of the NPS Agreement and the NHPA duties they willingly assumed. Sams NPS Letter, Ex. L at 3; Haaland NPS Letter, Ex. M at 3. Ultimately, the letters demand that Interior and NPS terminate the NPS Agreement. *Id.*

143.    The Federal Defendants are well-aware that Poarch Officials have violated, and continue to violate, the NPS Agreement. *See* Letter from Director Klima, Advisory Council on Historic Preservation, to Brad Mehaffy, National Environmental Protection Agency Compliance Officer (Nov. 14, 2006) (herein referred to as "ACHP Letter"), Ex. N at 1 ("[I]t is apparent that activities undertaken by the Poarch Band prior to the completion of the review required by Section 106 of the National Historic Preservation Act (NHPA) have adversely affected the National Register-listed property.").

144.    The Federal Defendants and Poarch Officials acting under federal delegated authority did not consult with the Muscogee (Creek) Nation prior to authorizing any excavation at

the Hickory Ground Site; actively avoided consulting with the Muscogee (Creek) Nation regarding the reburial of the human remains and associated funerary objects; and did not meaningfully consult with the Muscogee (Creek) Nation regarding the construction of the casino resort, and made no adjustments to plans in response to the adverse effects the construction would clearly have on the Hickory Ground Site.

145.    As the ACHP noted, "the archaeological surveys and data recovery were not carried out in compliance with Section 106 of the NHPA." ACHP Letter, Ex. N at 1

146.    Furthermore, the ACHP questioned whether "Poarch Band's actions were undertaken with the *intent* to avoid the requirements of Section 106." ACHP Letter, Ex. N at 2 (emphasis added).

147.    When the ACHP was finally notified of Poarch's excavation activities in 2006, it opined that the actions undertaken by Poarch Officials had "adversely affected the National Register-listed property," and that "the archaeological surveys and data recovery were not carried out in compliance with Section 106 of the NHPA." ACHP Letter, Ex. N at 1.

148.    The Advisory Council concluded that Section 106 had been violated because:

> [T]here was no Federal agency review of the archaeological investigations carried out by the Poarch Band … [and] no consultation with any other Indian tribe, particularly the Muscogee Creek Nation. The initial notification of the ACHP (*see* 36 CFR 800.6(a)(1)) did not occur until after the destruction of the site. Furthermore, there is no indication that the public has been notified about the nature of the undertaking and its effects on historic properties (36 CFR 800.3(e)).

*Id.* at 2.

> Since the Section 106 process must be initiated by a Federal agency *prior to* the initiation of project activities, it is unclear why the applicant, a tribe with a tribal historic preservation office approved by the National Park Service pursuant to Section 101(d)(2) of the NHPA, proceeded with project planning and archaeological investigations.

*Id.* at 1 (emphasis added).

149.     Chief Hill sent the Sams NPS Letter and the Haaland NPS Letter, Exhibits L and M, on October 5, 2023.

150.     On October 19, 2023, Jennifer Talken-Spaulding, the Bureau Cultural Anthropologist from the Office of Tribal Relations & American Cultures and Tribal Historic Preservation Program, wrote an email to Chief Hill acknowledging that the Federal Defendants had received the Sams NPS Letter and the Haaland NPS Letter, stating: "I just wanted to acknowledge that the NPS Tribal Historic Preservation Program has received your request.  We are reviewing the information and are in communication with Director Sams and other appropriate offices."

151.     Since this email from Ms. Talken-Spaulding, there has been no communication from any of the Federal Defendants regarding the Muscogee (Creek) Nation's demand that Interior and NPS terminate the NPS Agreement with Poarch. The Muscogee (Creek) Nation has requested that the Federal Defendants inform the Nation as to whether the Federal Defendants are still engaged in agency decision-making, or whether they are denying the Nation's request, or whether they will move forward with terminating the NPS Agreement. The Federal Defendants have not provided any information in response to the Nation's inquiries. The Federal Defendants have not confirmed that they undertook the required review in 2024, or that they have determined whether Poarch is or is not in compliance with the NPS Agreement and the NHPA.

152.     Each time Interior and NPS fail to review Poarch's compliance (or rather, the Poarch Officials' ongoing lack of compliance with the NPS Agreement), Plaintiffs are injured and harmed by the failure of these federal agencies to uphold the NHPA, a law passed for the purpose of protecting historic, sacred sites like the Hickory Ground Site.

**E.    Poarch Builds A Casino Resort Over A Muscogee (Creek) Sacred Site.**

153.    After Poarch Officials secured delegation of historic preservation responsibilities from the Federal Defendants, Poarch Officials caused a significant portion of the Hickory Ground Site to be destroyed to make way for its second casino resort (Poarch already had one in Atmore, Alabama).

154.    At the direction of Poarch Officials, archaeologists affiliated with Auburn conducted a Phase III archaeological survey of the Hickory Ground Site, which involves excavation (or other methods of exploration) of a portion of a site for purposes of data recovery and site mitigation.

155.    On information and belief, excavations for the Phase III archaeological survey of the Hickory Ground Site commenced in the years following the NPS's delegation of historic preservation responsibilities to Poarch, and ended in 2011.

156.    Phase III excavations are designed to record the data that a site contains before a project proceeds and the archaeological information and resources of the site are lost.

157.    Collecting this data involves the archaeologists disturbing remains, funerary objects, and additional cultural items through the excavation of soil over a significant portion of the site. After the items are excavated and collected, they are taken to a laboratory where they are washed and analyzed. Analysis for the funerary objects and other cultural materials and soil may also include Accelerator Mass Spectrometry dating (carbon-14 dating), chemical analysis, organic residue analysis, and other examinations.

158.    Not all cultural items are removed during a Phase III excavation and before construction. Generally, the task of Phase III investigators is to record archaeological information about the site before development. Archaeologists remove some material, but other cultural items

are left at the site. This means that the construction at the Hickory Ground Site likely destroyed many cultural items forever.

159.    Moreover, on information and belief, human remains and cultural items still lie beneath the casino and its associated improvements.

160.    Investigations commissioned by Poarch Officials concluded at least as early as 1990 that well defined and undisturbed cultural remains, including human burials, were abundant at the Hickory Ground Site.

161.    To perform the phase III excavation, Auburn, at the behest of Poarch, obtained at least one archaeological permit, if not more, under ARPA. At least some, if not all, of these permits required that the permittee:

    a.    Abide by the "Archaeological Resources Protection Act … and its regulations … and interdepartmental regulations (25 CFR 261) as to Indian lands";

    b.    Abide by "the Native American Graves Protection and Repatriation Act of 1990 [and] the regulations for the curation of Federally-owned and administered archaeological collections (36 CFR 79)";

    c.    Follow special permit conditions requiring that any:

> Excavation or removal of any Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony must be preceded by consultation or, in the case of tribal lands, consent of the appropriate Indian tribe or Native Hawaiian organization. Consultation should be conducted with the lineal descendants, tribal land owners, Native American representatives, and traditional religious leaders of all Indian tribes and Native Hawaiian organizations that can reasonably be assumed to be culturally associated with the cultural items[;]

    and

    d.    "[W]ithin approximately 6 weeks of the conclusion of field work," submit "a

preliminary report of work performed under th[e] permit, illustrated with representative photographs and listing new and significant collected materials" to the BIA.

United States Department of the Interior, Federal Archeological Permit, Issued to Auburn University through Mar. 20, 2003 ("Auburn ARPA Permit"), attached hereto as Exhibit W at 1-2.

162.    Poarch Officials and Auburn did not comply with the prerequisite conditions listed in the permit/s.

163.    Poarch Officials and Auburn did not consult with, or obtain consent from, the Muscogee (Creek) Nation, Hickory Ground Tribal Town, or Mekko Thompson, the recognized traditional religious leader of Hickory Ground Tribal Town, before commencing the Phase III excavation at the Hickory Ground Site.

164.    Nor did Poarch Officials or Auburn submit the required report of work performed under the permits to the BIA.

165.    Likewise, none of the Federal Defendants consulted with, or obtained consent from, the Muscogee (Creek) Nation, Hickory Ground Tribal Town, or Mekko Thompson prior to granting each permit allowing the Phase III excavation to take place.

166.    Nor did Interior "ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit," as the permit stated Interior would do. Auburn ARPA Permit, Ex. W at 1.

167.    Each Poarch Individual Defendant knew of the sacred and cultural significance of Hickory Ground to Plaintiffs and was aware that their actions would cause significant harm. Despite this knowledge, they personally misrepresented and fraudulently concealed the degree of desecration their actions would cause at the Hickory Ground Site.

168.    Due to the large amount of monies Poarch derived from the casino it built on top of the Hickory Ground Site, Poarch was able to build one of the most successful tribal gaming empires in the United States, with 11 casinos across the United States. Poarch's casinos in Alabama now earn them over two billion dollars ($2,000,000,0000) per year. In January 2019, Poarch purchased a casino near Bethlehem, Pennsylvania for $1.3 billion. Poarch generates more gaming revenue than 95% of other tribes in the United States. Under the Tribe's Revenue Allocation Plan, 20% of the net gaming funds are allocated to approximately 2,200 Poarch citizens, including the Individual Defendants.

169.    In 2008, Arthur Mothershed, an Individual Defendant and Tribal Council Member, recognized that the growth of gaming directly increases the monetary gain of Poarch tribal members, including the Individual Defendants.  Mothershed stated: "Over the last several years our birthday checks [individual tribal member distributions] have grown. This has been a function of improved business operations. As our Gaming revenues grow these checks can grow as well." Arthur Mothershed, *Vote Arthur Mothershed June 7, 2008*, POARCH CREEK NEWS, May 2008, at 22–23,                                         https://pci-nsn.gov/pcn/2008_05_may.pdf [https://web.archive.org/web/20250114182151/https://pci-nsn.gov/pcn/2008_05_may.pdf].

**F.    To Make Way For Its Casino Resort, Poarch Officials Desecrate The Muscogee (Creek) Human Remains And Associated Funerary Objects.**

170.    The graves at Hickory Ground are abundant and unmarked, as the Muscogee religious practice was, traditionally, to not use headstones or markers on Muscogee graves.

171.    According to Auburn's archeologists who performed initial archaeological investigations at the Hickory Ground Site on behalf of Poarch Officials, "[i]n almost all tested areas evidence of well defined and undisturbed cultural remains were discovered." Sheldon et al., *Additional Archaeological Investigations of the Hickory Ground Site*, p. 27 (1990). "[I]t is virtually

impossible to undertake any construction activities without a high probability of seriously damaging the many irreplaceable archaeological deposits, artifacts, and human graves remaining at Hickory Ground." Declaration of Craig Sheldon, p. 3 (9/27/2001).

172.    At least 57 sets of human remains along with their associated funerary objects were exhumed during the Phase III excavation.

173.    These human remains represent the direct lineal ancestors of Hickory Ground Tribal Town members. Under Muscogee (Creek) tradition and religion, Mekko George Thompson, as Chief of Hickory Ground Tribal Town, represents those members, including in decisions on the appropriate actions to take with regard to the remains.

174.    Numerous other artifacts were removed from the Site.

175.    On information and belief, Poarch Officials, and the Individual Defendants, directed that the cultural items from the Hickory Ground Site be stored in a manner that caused, and is continuing to cause, further damage to the items.

176.    On information and belief, some cultural items, including human remains, are still in storage.

177.    On information and belief, the containers and buildings in which the items were stored (and in which some items, including human remains, are still stored) did not (and still do not) have proper ventilation, did not (and still do not) have appropriate temperature controls, improperly separated (and continue to improperly separate) associated funerary objects from the human remains with which they were buried, and did not (and still do not) otherwise meet minimum curatorial standards.

178.    This manner of storage can cause mold and accelerate decomposition, and it is currently causing mold and accelerating decomposition.

179.    This manner of storage is viewed as abhorrent in the Muscogee (Creek) religion.

180.    Over 7,000 archaeological features, representing historic and ancient Muscogee (Creek) buildings, houses, ceremonial locations, and other sacred locations, were recorded during the Phase III excavation and then destroyed by the excavation and construction of the casino.

181.    The remains, artifacts, and cultural items removed from the Site were subjected to archaeological examination.

182.    In the Muscogee (Creek) religion, archaeological examination violates the sanctity of tribal ancestors and destroys the ancestors' spiritual existence until they are put back at peace using appropriate religious protocol.

183.    In the Muscogee (Creek) religion, the soil that surrounds a body is considered part of the body, because as the remains decompose, they are absorbed into the soil. Thus, removing the soil from around the body is akin to removing a limb in the Muscogee (Creek) religion.

184.    On information and belief, Poarch Officials failed to instruct Auburn to treat the soil surrounding human remains as part of the body during the excavation by removing the surrounding soil along with the bones.

185.    As a result, the excavations and subsequent construction resulted in parts of the bodies being permanently removed from the remains and spread across undisclosed locations.

186.    The casino resort was likely built on top of these body parts.

187.    Poarch and the Individual Defendants undertook the majority of these construction activities *after* Plaintiffs filed a complaint emphasizing the religious and cultural importance of the Site, notifying all Defendants of violations of applicable law, and requesting immediate injunctive relief to halt these activities. *See* Dkt. Nos. 1 & 57.

188.    On information and belief, Poarch Officials and the Individual Defendants

intentionally failed to maintain adequate records of inadvertent discovery of cultural items during construction activities.

189.    On information and belief, Poarch Officials and the Individual Defendants intentionally violated laws by failing to stop activity when cultural items were discovered.

190.    Constructing a building on a site prevents non-invasive analysis of whether remains are still present under the building, and the Individual Defendants were aware of this while they were overseeing the construction on top of the Hickory Ground Site.

**G.    Plaintiffs Repeatedly Request That The Hickory Ground Site Be Preserved As Poarch Officials Promised.**

191.    On information and belief, Poarch Officials first notified the Muscogee (Creek) Nation of the Phase III excavation in 2006.

192.    By that time, some human remains from the Hickory Ground Site had already been exhumed and archaeologically examined as part of the Phase III excavation that was just beginning to gear up.

193.    Beginning in 2006, Plaintiffs engaged in a years-long effort to persuade Poarch Officials not to excavate and desecrate the remains of Plaintiffs' ancestors and other cultural items and to return any cultural items already excavated from Hickory Ground to their original resting place.

194.    This leader-to-leader effort is the traditional way that the Muscogee (Creek) Nation and Hickory Ground Tribal Town attempt to resolve disputes.

195.    This effort to negotiate methods for enforcing the common law and statutory protections of Plaintiffs' rights regarding Hickory Ground eventually failed in 2011.

196.    The Poarch Officials and Individual Defendants personally misrepresented and fraudulently concealed the degree of desecration at the Hickory Ground Site that would be suffered

from the excavation and casino construction in an effort to delay Plaintiffs' actions until the excavation and construction could be completed.

197.    Nonetheless, Mekko George Thompson, on behalf of himself and the other Plaintiffs, sent a letter dated March 12, 2008, to the Director of the National Park Service relaying eight allegations regarding NAGPRA violations arising from disturbance and/or removal of human remains and funerary objects from the Hickory Ground Site.

198.    These allegations were based upon the personal observations of Mekko Thompson and other members of Hickory Ground made during their visits to the Hickory Ground Site.

199.    In an April 21, 2009, letter from Interior to Auburn, which copied Plaintiff Mekko Thompson, Interior conveyed its determination that Plaintiff Mekko Thompson's claims and allegations of violations under NAGPRA "have not been substantiated," based on eight factual findings and legal conclusions.

200.    Interior's declination to address Mekko Thompson's alleged NAGPRA violations was based largely on Interior's incorrect determination that Poarch retained legal interest in the "NAGPRA items from the Hickory Ground site" based on the fact that Interior had previously placed the land in trust for Poarch.

201.    But ARPA requires that "[a]rchaeological resources excavated or removed from Indian lands remain the property of the Indian or Indian tribe having rights of ownership over such resources." *See* 43 C.F.R. § 7.13.

202.    Furthermore, the NPS previously admitted that NAGPRA does apply to the Defendants' actions at the Hickory Ground Site, and further that those actions require the Federal Defendants to ensure compliance. *See* ACHP Executive Director's Report, Ex. O at 9 ("The Council, therefore, requested the views of NPS who has been delegated the responsibilities of the

Secretary of the Interior under NAGPRA. In response to the Council's question of whether the provisions of NAGPRA apply, NPS states that they do.").

203.    Before the 2009 letter from Interior, Poarch Officials and Federal Defendants represented to the Plaintiffs that putting the land into trust would protect the Site and prevent its destruction. The 2009 letter revealing that Plaintiffs had been deceived was a new application of Interior's unauthorized decision to take the Hickory Ground Site into trust for Poarch.

204.    Interior's 2009 determination that it was not required to take action to protect the cultural items and human remains at the Hickory Ground Site was the first time that Interior's decision to take Hickory Ground Site into trust caused Plaintiffs cognizable, actionable injury and harm.

205.    Of course, under NAGPRA, Poarch never had either ownership or the right of control over the disposition of the excavated human remains and associated funerary objects. 25 U.S.C. §§ 3002(a), (c)(2)-(3). Mekko Thompson, as the representative of all lineal descendants of the ancestors buried at Hickory Ground under the Muscogee (Creek) traditional kinship structure, has ownership and right of control over the disposition of such remains and objects.

206.    Plaintiffs repeatedly requested that the remains of their ancestors and associated funerary objects be reinterred in their original resting places, that no further exhumations occur, that the construction and excavation stop, and that the Hickory Ground Site be preserved in a natural state.

207.    The Poarch Officials refused all these requests.

208.    Upon information and belief, Poarch Officials and the Individual Defendants never intended to comply with Plaintiffs' requests and never intended to protect the Hickory Ground Site. The statements Poarch Officials made professing a promise to protect the Hickory Ground

44

Site from excavation were intentionally misleading and fraudulent.

209.    The Poarch Officials and each Individual Defendant knowingly violated clearly established laws for their own unjust enrichment.

210.    That fact that the Poarch Officials and each Individual Defendant knew of the sacred and cultural significance of Hickory Ground to Plaintiffs, including Mekko Thompson, and knew that their unlawful actions would cause significant harm to Plaintiffs, including Mekko Thompson, renders their actions egregious and outrageous.

**H.    Poarch Officials Intentionally Exclude The Muscogee (Creek) Nation And Hickory Ground From Decisions About Their Ancestors' Reburial And Conduct The Alleged Reburial In Secret.**

211.    After the years-long excavations were completed, and with the knowledge that Plaintiffs' religion required the cultural items to be placed in their original and intended final resting place, and with the knowledge that the Muscogee individuals Poarch exhumed could only be properly reinterred under Mekko George Thompson's guidance and exclusive direction, Poarch Officials and the Individual Defendants hurriedly reburied most of those remains and cultural items *away from* their final resting places in 2012, without Mekko Thompson's participation or consent.

212.    Poarch Officials and the Individual Defendants did so while avoiding having any Muscogee (Creek) or Hickory Ground Tribal Town members present for the reburial.

213.    Poarch Officials and the Individual Defendants accomplished this by unilaterally deciding to rebury the remains in April 2012 without consulting with the Muscogee (Creek) Nation or Mekko Thompson. Although the Poarch Officials and the Individual Defendants sent an "invitation" to Muscogee (Creek) Nation and Mekko Thompson, this invitation was not sent with the intention that Plaintiffs would be allowed to participate in the reburial of their relatives. Poarch's invitation was sent with the intention to fraudulently conceal the unlawful actions of the

Poarch Officials and Individual Defendants.

214.    On Wednesday, April 4, 2012, Defendant Buford Rolin (then Chair of Poarch) sent letters via hardcopy mail to the P.O. Box addresses for Mekko Thompson and the Muscogee (Creek) Nation Principal Chief. None of the Poarch Officials sent an email. None of the Poarch Officials phoned the Principal Chief of the Nation or Mekko Thompson. None of the Poarch Officials sent a text message to the Principal Chief or Mekko Thompson. None of the Poarch Officials used facsimile to inform the Principal Chief or Mekko Thompson. The only effort the Poarch Officials made to "invite" the Principal Chief and Mekko Thompson to participate in the reburial were letters mailed through the U.S. postal system, sent to P.O. boxes.

215.    The letters stated that Poarch Officials "hope that we" (Mekko Thompson, the Muscogee (Creek) Nation, and Poarch) can "work together regarding re-interment," and asked that Mekko Thompson and the Principal Chief "[p]lease let us know as soon as possible if you would like to join us" for the reburial. April 2012 Buford Rolin Letter to Mekko Thompson attached as Exhibit P hereto.

216.    The letters made no mention of the date of reinterment, nor did the letters provide any requested deadline for a response. The letters included no language indicating the reburial would be immediate or imminent.

217.    The Principal Chief of the Muscogee (Creek) Nation at that time, George Tiger, did not receive the letter; Chief Tiger only learned of it after Mekko Thompson brought a copy to his office.

218.    Once Principal Chief Tiger learned about the letter, representatives of the Muscogee (Creek) Nation immediately called Defendant Buford Rolin's office and Poarch's attorney.

46

219.    On Friday, April 13, 2012, the Principal Chief of the Muscogee (Creek) Nation, on behalf of the Muscogee (Creek) Nation and Mekko Thompson, sent a response to Defendant Buford Rolin via facsimile and mail (attached hereto as Exhibit Q) requesting a "Tribal Leader to Tribal Leader" discussion "as soon as possible."

220.    On Tuesday, April 17, 2012, Rolin sent another hardcopy letter (attached hereto as Exhibit R) to Mekko Thompson and the Principal Chief of the Muscogee (Creek) Nation, stating that "[w]hen we did not immediately hear from you in response to our April 4th letter, we assumed you did not wish to participate in the reinterment process" and that "[l]ast week we proceeded with the reinterment" of the remains and objects "in the manner to which we agreed during prior discussions."

221.    In other words, after six years of negotiations, Poarch Officials sent ambiguous letters to Muscogee (Creek) Nation and Mekko Thompson stating that they intended to rebury the remains and objects at some unidentified date in the future. Poarch Officials then unilaterally reinterred the remains and objects without waiting for a response. The Poarch Officials conducted the reinterment *less than 10 days* after sending the letters to Mekko Thompson and Chief Tiger via the United State Postal Service.

222.    The reinterment did not return the Muscogee individuals to their final resting place or original graves. Instead, Poarch Officials unilaterally chose a location that best suited their needs and desires, and not the cultural or religious requirements of the individuals they exhumed or their descendants.

223.    NAGPRA does not permit the individuals who intentionally and unlawfully exhume Native remains to unilaterally decide where and how to reinter them. Under NAGPRA, the Poarch Officials continue to have unlawful custody of Mekko Thompson's relatives, as they

have been removed from their sacred final resting place, and the Poarch Officials continue, to this day, to refuse to repatriate them to the Muscogee (Creek) Nation and Mekko Thompson.

224.    The Poarch Officials and Individual Defendants intentionally and unlawfully deprived Mekko Thompson of the chance to have any authority or control over the reinterment of his relatives, despite knowing that such a deprivation would cause irreparable and traumatic harm to the Plaintiffs, including Mekko Thompson.

225.    The Poarch Officials' ongoing failure to grant Mekko Thompson his right to rebury his relatives under Muscogee culture and religions violates the plain letter law of NAGPRA and constitutes an ongoing violation of federal law under *Ex parte Young*.

226.    Poarch Officials and Individual Defendants effectuated the reburials in April of 2012 because they knew construction was about to commence, and they intended to deceive the federal government and the public into believing that the reburial occurred with Plaintiffs' participation and consent, and in accordance with proper religious and cultural protocols.

227.    The Poarch Officials and Individual Defendants intentionally violated the law by reburying Plaintiffs' ancestors in the hopes that doing so would eliminate the opportunity for a federal court to enjoin the reburial, and ultimately lower the chances that a preliminary injunction would be issued to stop their planned construction and future operations of their casino.

228.    At no point did any Plaintiff agree to reinterment away from the remains' and associated funerary objects' original resting place. Accordingly, Plaintiffs' relatives have not been repatriated and violations of NAGPRA remain ongoing.

229.    At the time of the reburial, Poarch was aware that Mekko Thompson and the Muscogee (Creek) Nation wanted the remains and associated funerary objects to be reinterred in their original resting place.

230.    For example, in a letter to the Muscogee (Creek) Nation and Mekko Thompson in November 2010 (attached hereto as Exhibit S), Defendant Buford Rolin acknowledged that "the beliefs and customs of the [Hickory Ground ceremonial grounds leadership]" required "reinterment in [the original resting] place," and that Hickory Ground Tribal Town had requested reburial in such places.

231.    At the time of the reburial, Poarch Officials and Individual Defendants were aware that the remains and associated funerary objects that they were reburying would have to be exhumed again if the remains and objects were to be reinterred in their original resting place.

232.    During reinterment, Poarch Officials and Individual Defendants performed ceremonies viewed as abhorrent in the Muscogee (Creek) religion because they violate religious protocol, further desecrating and disrespecting the remains of Mekko Thompson's ancestors.

233.    Poarch Officials and Individual Defendants have maliciously withheld from Plaintiffs an inventory documenting how many of Mekko Thompson's relatives Poarch reburied in April 2012, or intentionally violated the law by not creating such an inventory.

234.    Subsequent to 2012, individual members of present-day Hickory Ground Tribal Town visited the Site and witnessed the storage of cultural items excavated from the Hickory Ground Site stored haphazardly in a shed on the Site near Poarch's casino. Poarch Officials and the Individual Defendants have not reburied everyone and everything they unlawfully exhumed from the Hickory Ground Site.

235.    Individual members of Hickory Ground Tribal Town and citizens of the Muscogee (Creek) Nation have visited the facilities where Auburn continues to house Muscogee individuals and associated funerary objects excavated at Poarch's request from the Hickory Ground Site. The remains are stored in deplorable conditions that are not consistent with established standards for

preserving cultural items and are accumulating mold.

236.    The ongoing mistreatment of these Muscogee relatives and associated funerary objects is traumatizing and continues to cause Plaintiffs, including Mekko Thompson, significant emotional distress, trauma, agony, and heartache.

237.    Poarch Officials and Individual Defendants continue to ask, instruct, and insist that Auburn not repatriate the Muscogee relatives currently at Auburn to the Muscogee (Creek) Nation and Mekko Thompson.

238.    The first Native American United States Poet Laureate, Joy Harjo, a lineal descendant of the Muscogee individuals the Poarch Officials exhumed, has stated publicly about her visit to Auburn:

> In the fall of 2023, I was invited to Auburn University by the Southern Humanities Review on behalf of the Witness Prize, a prize I juried. I requested a meeting with the NAGPRA officer of the university in charge of the Hickory Ground and other remains held on campus from other digs. When we met in his office on campus, he informed me that because of the appeal [then pending before the Eleventh Circuit] he could not speak directly about the Hickory Ground case. We spoke generally about NAGPRA. He offered to allow me into the room where the remains and items were being held on campus along with remains from other digs. I had been properly cautioned about going into the presence of the remains, which I took seriously. What I have been taught by elders is that our remains carry memory. Each cell contains a spiral of stories that belong to ancestors and to descendants. What is buried is meant to remain buried. There is no word or concept in the Mvskoke language for what the Poarch Band did when they unearthed that which was never [to] be returned to the surface. When I went into the room in which our relatives' bones were stored, I turned immediately to flee. I almost couldn't breathe. I paused though because I wanted to be a witness to help tell the story. I heard the roar of disturbance, the voices of the ancestors, and understood how they needed to be reinterred, for harmony. When graves are disturbed, there can be widespread disturbance that can cause illness, societal upset, and other disruption. I promised I would help them return home, to restore harmony by telling the story.

Joy Harjo, *On Behalf of the Ancestors*, Indian Country Today (Mar. 5, 2024), https://ictnews.org/opinion/on-behalf-of-the-ancestors.

239.    On or about July 11, 2012, just three months after Poarch Officials and the Individual

Defendants hastily reburied some of Plaintiffs' relatives, Poarch Officials announced plans to construct a $246 million casino resort on the Hickory Ground Site.

240.    Poarch Officials and Individual Defendants unlawfully and fraudulently pressed forward with casino construction beginning in October 2012, issuing a press release ("Poarch Press Release"), attached hereto as Exhibit T, in which Defendant Arthur Mothershed stated "we are being faced with demands to remove ancestral remains that have already been reinterred . . . We cannot change the fact that remains were found and removed. Those remains are now reinterred and we cannot support disturbing those remains again."

241.    Defendant Robert McGhee falsely stated that the remains "have been reinterred at Hickory Ground Town [sic] in a manner previously agreed to by traditional leaders in Oklahoma." Poarch Press Release, Ex. T.

242.    After the Press release stated that the Poarch Tribal Council would set aside acreage "that can be used by *Poarch Creek*, as well as by other Tribes who may be facing sensitive issues of reinterment" (emphasis added), Defendant Buford Rolin stated in the press release that "no one cares more about the sanctity of *our* land and the well-being of *our* people and *our* neighbors more than we do." Poarch Press Release, Ex. T (emphasis added).

243.    In response to continuing objections from the Plaintiffs to the desecration of their sacred site and their ancestors' burial sites, Defendant Stephanie Bryan mailed a letter to tribal leaders nationwide.

244.    On information and belief, this letter was sent in 2013.

245.    The letter states that "no one is more aware of the importance of preserving *Poarch's* history and culture than we are . . ." "It's a dangerous road for all of Indian country to take when one sovereign seeks to enforce its will on the trust lands of another." Bryan 2013 Letter,

attached hereto as Exhibit U.

246.    In the letter Defendant Stephanie Bryan attached a "fact sheet" full of egregious lies, such as: "Unbeknownst to us, a small part of the property we acquired was the site of Creek Ceremonial Grounds. The Ceremonial Grounds have never been disturbed, remain protected, and we have memorialized and preserved the site to this day."  Bryan 2013 Letter, Ex. U.

247.    The letter states that there "was no visible evidence of a burial ground." "When evidence was discovered, the archeologists' [sic] work stopped and their discoveries were stored for several years. The remains and funerary objects were reinterred according to Indian tradition in April of 2013." Bryan 2013 Letter, Ex. U.

248.    The letter also falsely states that "[Poarch] is in compliance with all applicable federal historic and cultural preservation laws pertaining to the property." *Id.*

249.    The letter falsely states that Poarch Officials are "under no legal obligation to negotiate with any other sovereign Indian nation" about the excavation of another tribe's ancestors on Poarch's trust lands. *Id.*

250.    The letter falsely states that it was "consistent with the Muskogee [sic] Tribe's [sic] Constitution" to reinter the remains away from their original resting places "with prayer and ceremony." *Id.*

251.    The letter falsely states that the "Wind Creek Wetumpka development protects our past." *Id.*

252.    The letter also misrepresents the importance, quality, and quantity of the archaeological resources at the Hickory Ground Site, falsely suggesting that they were not well-preserved or significant. *Id.*

253.    The letter falsely states that the remains were "reintered [sic] with dignity and

honor." *Id.*

254.    The letter makes no mention of the Phase III excavation or removal of human remains or funerary objects pursuant to the Phase III excavation. *Id.*

255.    The statements by the Poarch Officials and Defendants Mothershed, McGee, Rolin, and Bryan were knowingly false and fraudulent. The statements highlight the outrageous disrespect with which the Poarch Officials and Individual Defendants treated the religious and cultural beliefs of the Plaintiffs.

256.    These statements by the Poarch Officials and Individual Defendants were made with full knowledge that the Hickory Ground Site is sacred to Plaintiffs, especially Mekko Thompson, and that desecration of the Hickory Ground Site would cause significant emotional distress.

257.    The conduct of the Poarch Officials and Individual Defendants was extreme, outrageous, intentional, and reckless.

258.    The conduct of the Poarch Officials and Individual Defendants was for their own personal monetary gain, through the lucrative revenues produced from constructing and expanding a casino, which would increase salaries of the Poarch Officials and direct payments to tribal members, including the Individual Defendants.

**I.    Hickory Ground Today And The False Promise Of Preservation.**

259.    In 1988, the Hickory Ground Site looked like this:



Figure 1. Aerial View of 1EE89. Photo Taken in 1988.

Cameron Wallace Gill, *Ceramic Analysis of Proto-Historic Domestic Structures from 1EE89: A Transitional Culture on the Coosa* 2 (Dec. 13, 2010) (Auburn University Thesis).

    260.    The Hickory Ground Site looked like this in 2011 (see next page):



Google Earth Image (02/11/2011).

261.    The Hickory Ground Site looked like this by September 2012:



Google Earth Image (9/23/2012).

262.    Today, the Hickory Ground Site looks like this:



Google Earth Image (10/31/2023).

263.    The numerous archaeological features and cultural items found throughout the Site are shown on the next page:



Kelly Ervin, *A Comparative Spatial Analysis of Two Communities from the Hickory Ground Site in Wetumpka, Alabama* 26 (Dec. 13, 2014) (Auburn University Thesis).

264.    The archaeological features and cultural items relative to the casino resort are shown below:



*Id.* at 28.

265.    Upon information and belief, as a result of the Poarch Officials' and Individual Defendants' destruction of the Hickory Ground Site, direct financial distributions to Poarch tribal

members, including the Individual Defendants and their family members, started in 2005 at $100 per year, and have increased to $300 per year in 2006, to over $10,000 per year in 2012, to over $18,000 in 2013, to over $21,000.00 per year in 2014. Upon information and belief, these payments are higher now, in 2024.

266.    Upon information and belief, other direct financial benefits to the Individual Defendants, including their family members, include General Welfare Exclusion Act payments and $100,000.00 in college scholarships.

267.    Upon information and belief, the Individual Defendants were and knew they would be unjustly enriched through increased compensation in salaries and bonuses as a result of their unlawful and outrageous personal conduct, including, through intentional misconduct, reckless behavior, fraud and misrepresentations, the excavation of Plaintiffs' ancestors and the desecration of the Hickory Ground Site to construct a multi-million dollar casino resort on top of Plaintiffs' most sacred burial and ceremonial site in order to gain profit, with knowledge that it would cause irreparable harm in the form of emotional and spiritual distress to Plaintiffs, in particular Mekko Thompson.

268.    Poarch Officials continue to lie and fraudulently misrepresent that their April 2012 reburial of Plaintiffs' relatives was done with Plaintiffs' consent and guidance. The Poarch Officials' and Individual Defendants' ongoing and continuing lies and fraudulent misrepresentations cause and inflict harm and significant distress on all Plaintiffs, but especially Mekko Thompson who is forced to continue to fight for his right to rebury his relatives in accordance with his religion.

**J. Poarch Officials Perform Additional Construction Without Consultation, In Violation Of Federal Law And The NPS Agreement**

269.    On September 6, 2022, Defendant Stephanie Bryan (now Chair of Poarch) emailed

a letter to Muscogee (Creek) Nation Principal Chief David Hill, informing him that Poarch

Officials planned to commence additional construction at the Hickory Ground Site within 7 to 12

days.

270.    On September 9, 2022, Chief Hill mailed a letter in response, stating:

> We are especially concerned that neither the language nor the timing of the letter
> leaves any room for dialogue or to address the concerns of Muscogee (Creek)
> Nation . . . [P]lanning for this project has undoubtedly been underway for many
> months . . . Rather than giving meaningful notice, it appears that Poarch
> intentionally kept silent about your planned construction. To put it plainly, the letter
> does not provide us with the information necessary to assess where the work is
> being done and whether it will cause further disturbance to the burial grounds of
> our ancestors . . . We therefore request that you cease all new construction until
> Poarch provides us with, and we have a reasonable time to review, more
> information about the project including detailed construction plans and utility
> changes.

271.    On that same day (September 9, 2022), counsel for Plaintiffs emailed counsel for

the Poarch Officials, requesting that the Poarch Officials send the following to Plaintiffs:

- A map of the proposed construction, including the placement of the relocated utility lines.
- A timeline of the proposed construction, including the projected start date.
- Detailed construction plans showing the location of all additions to the casino to be made in this project.
- Detailed drawings showing the location and depth of any excavation and installation of new foundations.
- Detailed drawings showing where the utility lines will be relocated, the excavation for such relocated lines, and the depth and width of that excavation.
- The report from Poarch's THPO concluding that the area affected by the construction activity (including any access or staging areas) is free of any historic or archaeological items, and all maps, studies or other materials relied upon by the THPO or Poarch in reaching that conclusion
- An accurate topographical map that pre-dates the original construction.
- Any existing surveys of the area encompassing the proposed construction.
- The results of any shovel tests done to confirm that the construction area lacks cultural items (as that term is defined in the Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001 et seq.).
- Information about any cut or fill that has previously been done on the riverbank.
- A description of the process the Poarch Officials propose to follow in the event of an inadvertent discovery of unanticipated cultural items, human remains (regardless of the level of disturbance of the soil matrix), and/or intact archaeological deposits

that still may exist are encountered during construction.

272.    Given the tragedy that occurred the last time Poarch Officials engaged in construction at the Hickory Ground Site, and given the Poarch Officials' ongoing duty and obligation to consult with Plaintiffs as required by the NPS Agreement, the NHPA, NAGPRA, and other federal laws, Plaintiffs' request for this information was more than reasonable.

273.    The Poarch Officials refused to provide Plaintiffs with any of this information. The Poarch Officials also refused the Muscogee (Creek) Nation's request to cease all new construction pending the Nation's ability to review the information and engage in consultation, as required by federal law and the NPS Agreement.

274.    Although the Poarch Officials did permit Chief David Hill to visit the Hickory Ground Site where the new construction would be taking place, the Poarch Officials refused to provide Chief Hill and the Muscogee (Creek) Nation with the information requested above in Paragraph 271, and when Chief Hill visited, they did not provide him access to any individuals who could answer his questions regarding the construction the Poarch Officials were prepared to commence.

275.    In February 2023, Plaintiffs received reports that during the last week of January or the first week of February 2023, cultural resources, including possible human remains, were discovered and excavated from the new construction at the Hickory Ground Site.

276.    On March 1, 2023, Chief Hill wrote a letter to Defendant Stephanie Bryan, requesting that Poarch Officials immediately stop all construction and engage in consultation. Chief Hill wrote: "Every day that you continue to construct the Hickory Ground site, you violate federal law."

277.    On March 7, 2023, Defendant Stephanie Bryan wrote back to Chief Hill, stating the

Poarch Officials were confident no human remains had been disturbed and they would not stop their ongoing construction at the Hickory Ground Site.

278.    On March 15, 2023, Chief Hill wrote back to Defendant Stephanie Bryan, reiterating the Nation's demand that the Poarch Officials cease the ongoing construction, and further, that the Poarch Officials send the Nation the previously requested information, including any evidence or documentation the Poarch THPO relied on to conclude that no human remains or cultural resources would be disturbed. Chief Hill wrote: "we are unaware of any archeological reports that document a survey having been completed prior to construction. Please confirm whether such a report exists, and if one does, we ask that you send it to us. Finally, we request a copy of your Preservation Plan for the Hickory Ground site."

279.    The Poarch Officials never provided the Muscogee (Creek) Nation with any of the requested information regarding their 2023 construction, and instead, completed the construction without ever offering Plaintiffs an opportunity to engage in meaningful, substantive consultation.

280.    Although the Poarch Officials never permitted Plaintiffs to view the construction site once construction commenced (or undertake any other steps to verify that cultural items and human remains would not be disturbed), Plaintiffs were able to obtain some photos of the Poarch Officials' 2023 construction at the sacred and historic Hickory Ground Site, including the following, taken in the spring of 2023:





281.    Previous archeological surveys conducted by Auburn confirmed that the entire Hickory Ground Site contains human remains and thousands of cultural items such that there is no section of the Site that does not contain significant cultural resources below the surface. All of the resources and cultural items at the Hickory Ground Site are protected under federal law and cannot be removed or altered absent consultation with Plaintiffs and their consent.

282.    The 2023 construction further demonstrates the Poarch Officials' and Individual Defendants' callous disregard for the pain and suffering their ongoing desecration causes Plaintiffs—especially Mekko Thompson and all members of Hickory Ground Tribal Town—as well as the Poarch Officials' and Individual Defendants' ongoing disregard for their obligations under federal law.

**K. Plaintiffs' Religious Rights Have Been and Continue to be Substantially Burdened.**

283.    The Hickory Ground Site is a unique and irreplaceable religious site for Plaintiffs. The Site holds profound spiritual significance for the Plaintiffs, serving as a sacred location for religious practices, ceremonies, and prayers that cannot be replicated elsewhere. Plaintiffs' ability to practice their religion is directly tied to their ability to access, maintain, and protect Hickory Ground in accordance with their religious beliefs.

284.    Hickory Ground is also sacred because the remains of Plaintiffs' ancestors were ceremonially buried there and because the Site continues to hold such remains. The ceremonial grounds are considered holy, and their sanctity is integral to Plaintiffs' religious practices.

285.    Under Plaintiffs' religion, they owe a spiritual and religious duty to care for the graves and bodies of their ancestors. Living tribal members—descendants of the deceased—are religiously obligated to ensure that their ancestors are buried and remain undisturbed in accordance with their religious protocol.

286.    Plaintiffs believe that their ancestors cannot be at peace unless their remains are properly buried and cared for according to traditional Muscogee (Creek) religious protocol. The disruption and desecration of burial grounds cause ongoing spiritual harm that cannot be rectified without Plaintiffs' participation in the reburial and restoration of the Site.

287.    Plaintiffs' religion strictly prohibits unauthorized entry or alteration of ceremonial grounds. Religious protocol requires cleansing rituals and prior authorization before anyone can access or modify these sacred sites.

288.    In the Muscogee (Creek) religion, archaeological examination violates the sanctity of ancestors. Such actions disrupt the ancestors' spiritual existence, causing perpetual unrest, until they are put back at peace using appropriate religious protocol.

66

289.    As a result, the excavations and subsequent construction resulted in parts of the bodies, including bones and the surrounding soil, being permanently removed and spread across undisclosed locations. This act has caused irreparable harm to Plaintiffs' spiritual obligations and religious beliefs.

290.    Construction of the casino resort, including buildings, parking lots, and other facilities, likely occurred directly over the burial grounds and remains of Plaintiffs' ancestors, compounding the desecration of the sacred Site.

291.    Alcohol consumption near ceremonial grounds is considered sacrilegious and is strictly prohibited in the Muscogee (Creek) religion. The casino's continuous sale and consumption of alcohol on top of these sacred grounds desecrate the Site and violate Plaintiffs' religious beliefs.

292.    Plaintiffs' religious exercise has been substantially burdened by:

a.    The excavation of the Hickory Ground Site, which disrupted sacred burial grounds and removed Plaintiffs' ancestors' remains;

b.    The construction of the casino, buildings, parking lots, and other facilities over Hickory Ground;

c.    The exclusion of Plaintiffs from participating in the handling, treatment, and reburial of their ancestors' remains and funerary objects;

d.    The failure of unqualified and unauthorized persons reburying the bodies to observe the required protocol as provided by the appropriate ceremonial leader, Mekko Thompson; and

e.    The removal of soil surrounding human remains during excavation, which was not treated as part of the body in violation of Plaintiffs' religious beliefs.

293.    Plaintiffs' religious exercise continues to be substantially burdened by:

a.    Plaintiffs being prevented from fulfilling their ongoing religious obligations to their ancestors to ensure that their bodies are left at peace in their original resting places and treated with respect according to the proper religious protocol;

b.    The ongoing access to the ceremonial grounds by unauthorized persons who fail to follow required religious rituals and protocol;

c.    The continued presence of prohibited substances and activities, such as alcohol consumption, intoxicated patrons and other casino activities unsuitable for sacred sites and religious practices.

## COUNT I: VIOLATION OF THE INDIAN REORGANIZATION ACT
### (Department of the Interior and Secretary Deb Haaland)

294.    Plaintiffs re-allege, for purposes of Count I, all of the allegations contained in Paragraphs 1–293.

295.    Count I is brought against the Department of the Interior and Secretary Deb Haaland, in her official capacity.

296.    This count is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to challenge the Department of the Interior's unlawful decision to take the Hickory Ground Site into trust for the benefit of the Poarch Band and the ongoing violation of law through Interior continuing to hold the land into trust.

297.    Under the IRA, a tribe must have been "under federal jurisdiction" in 1934 in order for Interior to have authority to take land into trust for the tribe and to hold land into trust for a tribe. 25 U.S.C. §§ 5108 and 5129. *See also Carcieri v. Salazar*, 555 U.S. 379 (2009).

298.    At the time of the IRA's enactment in 1934, the Poarch Band was not "under federal

jurisdiction" as defined by the IRA because the Poarch Band had no government-to-government relationship with the United States in 1934.

299.    Because Poarch was not under federal jurisdiction in 1934, the Secretary did not have authority to take the Hickory Ground Site into trust for Poarch. Thus, the trust transaction was unlawful, *ultra vires*, and void *ab initio*.

300.    Because Poarch was not under federal jurisdiction in 1934, Interior and the Secretary are committing an ongoing violation of the IRA by continuing to hold the land into trust.

301.    The Hickory Ground Site is properly considered fee land owned by Poarch that is subject to state, not federal, law.

302.    Given the Poarch Officials' representations to the Muscogee (Creek) Nation that Poarch would always protect the Hickory Ground Site, Plaintiffs had no reason to believe they would be harmed by Interior's acceptance of the Hickory Ground Site in trust for Poarch in 1985.

303.    The Department of the Interior's decision to take the Hickory Ground Site into trust constitutes an agency action that is (1) in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right; and (2) is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

304.    Interior's actions are arbitrary and capricious because the agency failed to properly apply the statutory requirement under the IRA regarding federal jurisdiction in 1934, disregarded or misinterpreted historical evidence demonstrating the lack of a government-to-government relationship with Poarch as of 1934, and took action inconsistent with its own prior findings and admissions regarding Poarch's lack of federal recognition prior to 1984.

305.    Plaintiffs' IRA claim is subject to equitable tolling because the Department of Interior's decision to take the Hickory Ground Site into trust for the benefit of Poarch was

predicated on material misrepresentations and fraudulent concealment by Poarch and Defendant Buford Rolin.

306.     Poarch Officials, including Tullis and Rolin, knowingly and intentionally misrepresented Poarch's historical status and relationship with the federal government and falsely represented to Plaintiffs that the Hickory Ground Site would be preserved as a sacred site for the benefit of the Muscogee (Creek) Nation. Poarch Officials and the Individual Defendants misrepresented and/or concealed their excavation of the burial grounds and their desecration of the sacred Site for the purpose of developing gaming facilities.

307.     In 2001, the BIA investigated a possible ARPA violation when Poarch began construction activities within the boundaries of the Hickory Ground Site. However, due to intentional and fraudulent misrepresentations made by Poarch Officials, BIA could not verify damages had occurred at the archaeological site.

308.     The Federal Defendants failed to conduct the reviews required under the ARPA permits Interior issued, as well as the NPS Agreement every four years, whether due to reliance upon Poarch's misrepresentations or the Federal Defendants' own willful violation of the law. This failure further concealed the nature of the excavation of the burial grounds and desecration of the Hickory Ground Site.

309.     Due to no fault of Plaintiffs, Poarch Officials, Individual Defendants, and the Federal Defendants failed to notify or consult with Plaintiffs about the excavation of the Hickory Ground Site in violation of the law, which concealed the Department of Interior's role in the excavation, including but not limited to the Federal Defendants' failure to ensure compliance with permits issued by Interior for the excavation.

310.     Plaintiffs were first injured by Interior's decision to take the Hickory Ground Site

70

into trust for Poarch on April 21, 2009, when the Federal Defendants relied on Interior's decision to take the Site into trust as a justification for failing to act and prohibit the violations of NAGPRA taking place at the Site.

311.    This Court should declare that Interior lacked authority to take land into trust because Poarch was not "under federal jurisdiction" in 1934, and therefore Interior's taking of the Hickory Ground Site into trust for Poarch was void *ab initio*.

312.    Moreover, Interior continues to hold the land in trust, which constitutes an ongoing violation of law.

313.    Because the trust transaction is void, the Hickory Ground Site is not trust land. Instead, Poarch retains fee simple title to the Hickory Ground Site. *See Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 891 (11th Cir. 2024) ("the Poarch Band would hold Hickory Ground in fee simple like any owner of private property, as it did before the Secretary decided to hold it in trust.").

314.    Because Interior is continuing to violate federal law by holding land in trust on behalf of Poarch, Interior's actions constitute an ongoing violation of the IRA.

### ***OPERATIVE COUNTS IF THIS COURT RULES IN FAVOR OF PLAINTIFFS ON COUNT I AND DETERMINES INTERIOR LACKED AUTHORITY TO TAKE THE HICKORY GROUND SITE INTO TRUST FOR POARCH***

315.    Counts II-VII of this Complaint present claims that are applicable only if the Court determines that the Department of the Interior lacked authority to take the Hickory Ground Site into trust for Poarch or that continuing to hold the land in trust is an ongoing violation of the IRA.

### COUNT II: UNJUST ENRICHMENT (ALABAMA COMMON LAW)
### (Poarch Officials in Their Official Capacities)

316.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

71

317.    Count II is brought against the Tribal Council Officials, Gaming Officials, and Poarch THPO, only, in their official capacities.

318.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of state law by the Poarch Officials.

319.    If Plaintiffs succeed on Count I of this Third Amended Complaint, then the Officials can claim no "special sovereignty interest" with regard to the remaining claims Plaintiffs have brought against them. *See* September 25, 2024 Oral Arg. Tr. 34:39-35:10 (counsel for Poarch answering: "I would agree with your point, your honor, if they succeeded on the IRA claim, the special sovereignty interest would not apply. I would agree with that."); *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 891 (11th Cir. 2024).

320.    Under Alabama common law, a claim for unjust enrichment exists where one party has unjustly retained a benefit to the detriment of another, and such retention is inequitable under the circumstances.

321.    Poarch Officials Tullis and Rolin unjustly enriched themselves by acquiring the Hickory Ground Site at no cost to Poarch and without objection from Plaintiffs based on promises that they would perpetually protect the Site. Instead of preserving the Site in accordance with their promises, Poarch Officials and Individual Defendants unjustly enriched themselves by destroying a large part of the Site to make way for a multi-million-dollar casino resort that generates hundreds of millions of dollars in gambling and resort revenues for themselves and Poarch each year.

322.    In their application for federal preservation grant funds, Poarch Officials Tullis and Rolin expressly represented that Poarch's acquisition of the Hickory Ground Site would result in the "existing Hickory Ground tribal town in Oklahoma…. know[ing] their home in Alabama is being preserved," "without excavation;" that Poarch would provide "permanent protection of the

site;" and that "Hickory Grounds may also be a place where Creeks from Oklahoma may return and visit their ancestral home." Poarch Officials warned that "[d]estruction of archaeological resources in Alabama … destroy[s] the cultural history of Creek people." These statements were fraudulent and misleading.

323.    Poarch Officials Tullis and Rolin continued to promise the Muscogee (Creek) Nation they would protect the Hickory Ground Site prior to Poarch's federal recognition.

324.    Poarch's bid for federal recognition was accompanied by a proposal to take Hickory Ground into trust as part of Poarch's initial reservation.

325.    Had the Muscogee (Creek) Nation known that Poarch Officials, including Tullis and Rolin, would desecrate Hickory Ground, the Nation would have taken steps to prevent Poarch from acquiring the land and would have opposed Poarch's bid for federal recognition.

326.    In justifiable reliance on Poarch Officials' Tullis's and Rolin's promises in the Grant Application, including promises that Poarch would provide "permanent protection of the site," "without excavation," so that "Creeks from Oklahoma may return and visit their ancestral home," and in reliance on the additional promises Poarch Officials Tullis and Rolin made in other conversations and communications, the Muscogee (Creek) Nation did not object to Poarch's acquisition of the Hickory Ground Site in fee or in trust. Instead, the Muscogee (Creek) Nation supported Poarch's bid for federal recognition.

327.    Interior noted, in its Memo accompanying the decision to grant Poarch federal recognition, that it was relying in part on the Muscogee (Creek) Nation's support of Poarch as a basis for granting Poarch recognition as a tribe. *See* Federal Memo, Ex. B at 3 of 131.

328.    Thus, Poarch Officials not only acquired the Hickory Ground Site at no cost, they also gained the benefit of the Muscogee (Creek) Nation's support in their federal recognition bid

and the Nation's lack of objection to Poarch acquiring the Hickory Ground Site.

329.    The Tribal Council Officials, Gaming Officials, and Poarch THPO further unjustly enriched themselves by expediting the construction and opening of the casino, thereby receiving inequitable enrichment, through (1) knowingly and intentionally breaching the NPS Agreement by not providing notice to, or consulting with, Plaintiffs or involving the Plaintiffs in any way regarding the exhumation or reburial of their deceased family members; and (2) continuing construction after Plaintiffs repeatedly demanded that Poarch Officials cease all plans for development of the Site and return the human remains, associated funerary objects, and other cultural items to their original resting places.

330.    The Tribal Council Officials, Gaming Officials, and Poarch THPO once again unjustly enriched themselves when they rushed to complete their new 2023 construction at the Hickory Ground Site while refusing to provide Plaintiffs with the information and time necessary to engage in meaningful consultation, as required by federal law, specifically NAGPRA and the NHPA, as well as the NPS Agreement the Officials signed with NPS.

331.    Poarch Officials knew that they would not have obtained the preservation funds, the Muscogee (Creek) Nation's support and lack of objection to acquisition of the Site, or the NPS's Agreement to entrust them with historic preservation responsibilities if they had disclosed that they would desecrate, damage and destroy large portions of the Site and excavate 57 or more human burials.

332.    It would be inequitable for the Poarch Officials, who individually benefited from acquiring the Hickory Ground Site (at no cost) based on their promises of permanent protection, to profit to the tune of billions of dollars in gambling revenues (and millions, collectively, among the Poarch Officials) by breaching those promises and irreparably harming those who trusted that

they would keep their promises.

333.     The Poarch Officials continue to be unjustly enriched, in violation of state law, because, instead of providing permanent protection of the Site as promised, the Poarch Officials are operating a casino resort that is generating hundreds of millions of dollars in gaming and resort revenues while human remains, cultural items, and associated funerary objects remain displaced from their intended resting places.

334.     The Court should impose equitable remedies, among other things, requiring the Tribal Council Officials, Gaming Officials, and Poarch THPO to abide by their promises and restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition.

## COUNT III: UNJUST ENRICHMENT (ALABAMA COMMON LAW)
### (Poarch Individual Defendants in Their Individual Capacities)

335.     Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293 and 321–26.

336.     Under Alabama common law, a claim for unjust enrichment exists where one party has unjustly retained a benefit to the detriment of another, and such retention is inequitable under the circumstances.

337.     Count III is brought against the Individual Defendants.

338.     Each of the Poarch Individual Defendants personally engaged in conduct that unjustly enriched themselves through:

> a.     Misrepresentations and false promises to protect the Hickory Ground Site as a sacred ceremonial ground and burial ground;
>
> b.     Desecration of the Plaintiffs' sacred burial grounds at the Site;
>
> c.     The removal, misuse and improper reburial of Plaintiffs' ancestors' remains

and funerary objects;

d.    The obstruction of Plaintiffs' and Mekko Thompsons' rights to participate in the reburial through intentional misrepresentations and/or concealment of their intentions to quickly rebury Mekko Thompson's ancestors so they could personally gain from the start of casino operations;

e.    The development, construction and operation of the Wind Creek Wetumpka Casino Resort on the Site; and

f.    The ongoing obstruction of Plaintiffs' and Mekko Thompson's right to repatriate the cultural items and relatives unlawfully excavated from the Hickory Ground Site.

339.    Each Poarch Individual Defendant:

a.    Had knowledge of the cultural and religious importance of the Site to Plaintiffs and that their actions would cause Plaintiffs substantial harm;

b.    Personally participated in decisions to excavate and disturb the burial grounds in violation of clearly established laws and despite having made promises to Plaintiffs that the Site would be preserved and having received repeated requests by the Plaintiffs to preserve the Site;

c.    Personally knew that the cultural resources at the Hickory Ground Site rightfully belonged to Plaintiffs and were the remains of Mekko Thompson's ancestors;

d.    Personally misrepresented and fraudulently concealed the degree of desecration of the Hickory Ground Site that would be suffered from their planned excavation and casino construction;

e.    Failed to follow clearly established laws, including APRA and NAGRPA, established to protect and preserve the Site; and

f.    Personally used deceit, concealment and misrepresentations to evade enforcement of the applicable laws.

340.    The actions of the Individual Defendants were not within the scope of their discretionary authority and violated clearly established federal, state, and tribal laws.

341.    Each Individual Defendant received significant financial benefits for their unlawful actions, including through:

a.     direct distributions from casino revenues;

b.    salaries, salary increases, bonuses and increased employee benefits; and

c.    other direct or indirect increase of personal compensation through their increased personal status and influence;

342.    Equity and good conscience require the Individual Defendants disgorge the benefits they unjustly obtained through the destruction and desecration of the Hickory Ground Site. Their actions are unconscionable and continue to cause ongoing harm to Plaintiffs.

## COUNT IV: PROMISSORY ESTOPPEL (ALABAMA COMMON LAW)
### (Poarch Officials in Their Official Capacities)

343.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

344.    Count IV is brought against the Tribal Council Officials, Gaming Officials, and Poarch THPO only, in their official capacities.

345.    This count is brought pursuant to *Ex parte Young*, as it seeks prospective injunctive and declaratory relief to prevent ongoing violations of state law by the Poarch Officials.

346.    If Plaintiffs succeed on Count I of this Third Amended Complaint, then the

Officials can claim no "special sovereignty interest" with regards to the remaining claims Plaintiffs have brought against them. *See* September 25, 2024 Oral Arg. 34:39–35:10 (counsel for Poarch answering: "I would agree with your point, your honor, if they succeeded on the IRA Claim, the special sovereignty interest would not apply. I would agree with that."); *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 891 (11th Cir. 2024).

347.    Under Alabama common law, promissory estoppel applies where: (1) a defendant made a promise: (2) the defendant reasonably expected to induce action or forbearance on the part of the plaintiff; (3) the promise did induce action or forbearance; and (4) injustice can only be avoided by enforcing the promise.

348.    Poarch Officials promised Plaintiffs that:

a.    They would preserve the Hickory Ground Site for the benefit of Plaintiffs;

b.    The Hickory Ground Site would remain undisturbed and free from excavation; and

c.    The Hickory Ground Site would be used for Creek cultural enrichment and preserved as a sacred Site.

349.    The Poarch Officials continue to promise to protect and preserve the Hickory Ground Site every four years when their NPS Agreement is renewed.

350.    The Muscogee (Creek) Nation relied on the Poarch Officials' promise to its detriment in not objecting to Poarch's acquisition of the property, either in fee or trust, and in supporting Poarch's federal recognition.

351.    Poarch Officials were aware that, had the Muscogee (Creek) Nation known that Poarch would not protect the Hickory Ground Site as they promised and would instead destroy Plaintiffs' sacred burial grounds and religious Site, the Muscogee (Creek) Nation would have

objected immediately to Poarch's acquisition of the land in any status (fee or trust) and made efforts to prevent Poarch's federal recognition.

352.    The Poarch Officials breached their promises by:

a.    excavating the Hickory Ground Site and desecrating Plaintiffs' ancestors' burial sites;

b.    continuing interference with the repatriation and reburial of the Plaintiffs' ancestors' remains, funerary objects and cultural resources excavated from the Hickory Ground Site;

c.    constructing and continuing operation of the Wind Creek Wetumpka Casino Resort on the Site; and

d.    continuing failure to preserve and protect the Site in accordance with their prior commitments.

353.    Poarch Officials continued to breach their promises again in 2023, when they commenced new construction and expansion at the Hickory Ground Site without consulting Plaintiffs or obtaining their consent.

354.    As a result of the Poarch Officials' actions, Plaintiffs have suffered and continue to suffer significant harm, including:

a.    the destruction and ongoing desecration of a Site of profound cultural and religious significance;

b.    the inability to properly repatriate and rebury Plaintiffs' ancestors' remains, associated funerary objects and cultural items;

c.    spiritual and emotional harm caused by the desecration of burial grounds and the obstruction of Plaintiffs' access to their ancestors' remains, associated

funerary objects and cultural items in their final resting places; and

d.    loss of access to the Hickory Ground Site for traditional practices and ceremonies (ceremonies that are not possible in the presence of alcohol being served).

355.    The injustice of the Poarch Officials enriching themselves by breaking their promises and thereby causing irreparable harm to the Muscogee (Creek) Nation, Hickory Ground Tribal Town, and Mekko Thompson can only be avoided by enforcing those promises. *See Beatty v. Kurtz*, 27 U.S. 566, 584–85 (1829); *Bessemer Land & Sykes v. Payton*, 441 F. Supp. 2d 1220, 1224 (M.D. Ala. 2006); *Improv. Co. v. Jenkins*, 111 Ala. 135, 148 (Ala. 1895).

356.    The Court should impose equitable remedies, among other things, requiring the Tribal Council Officials, Gaming Officials, and Poarch THPO to abide by their promises and restore the property, to the greatest extent possible, to its pre-excavation and pre-construction condition.

## COUNT V: OUTRAGE (ALABAMA COMMON LAW)
### (Plaintiff Mekko Thompson Against Poarch Individual Defendants)

357.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

358.    Plaintiff Mekko Thompson, individually and as the traditional representative of all the lineal descendants of those buried at the Hickory Ground Site, is the only Plaintiff asserting a claim under this Count.

359.    Count V is brought against the Individual Defendants in their individual capacities.

360.    Under Alabama law, outrage occurs where the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.

361.    Each Individual Defendant, by extreme and outrageous conduct, intentionally and recklessly caused extreme emotional and spiritual harm to Mekko Thompson through his or her actions regarding the Hickory Ground Site.

362.    Each Poarch Individual Defendant, knowing that Hickory Ground and the human remains and associated funerary objects buried there were sacred in the culture and traditional religion of Mekko Thompson, intentionally and outrageously caused the desecration of the Hickory Ground Site by ordering that the bodies and associated funerary objects buried there be exhumed, disassociated, dismantled, analyzed, and reinterred in a manner considered abhorrent in the Muscogee (Creek) traditional religion.

363.    Mekko Thompson was robbed of the promise he relied upon—that the Individual Defendants would always protect the Hickory Ground Site so that it would "be a place where Creeks from Oklahoma may return and visit their ancestral home" and so that the members of Hickory Ground Tribal Town would "know their home in Alabama is being preserved."

364.    As the living descendant of the deceased, Mekko Thompson owes a moral and religious duty to his ancestors under Plaintiffs' traditional religion to care for the graves and bodies of the deceased. Failing in that duty is considered to be a failure to one's ancestors, Tribal Town, Clan, and culture. As traditional chief of Hickory Ground Tribal Town, Mekko Thompson has a heightened responsibility to fulfill this duty on behalf of all Hickory Ground Tribal Town members. The Individual Defendants' desecration of Mekko Thompson's deceased family members at Hickory Ground has caused and is continuing to cause Mekko Thompson abject pain, sorrow, anguish, torment, suffering, helplessness, grief, and anger.

365.    The Individual Defendants placed the remains of Mekko Thompson's deceased family members in newspaper and plastic bins and left them in a non-air conditioned shed through

numerous hot Alabama summers. The Individual Defendants even authorized the bodies of infants to be exhumed.

366.    Bodies of Mekko Thompson's deceased family members were left exhumed, exposed, ill-attended, and disregarded for years before the Individual Defendants wrongfully reinterred them without appropriate protocols in a random location away from their final resting place, and without allowing Mekko Thompson to participate. Some remains, associated funerary objects, and cultural items have not been reinterred and are still being stored in this manner.

367.    For several years, the Individual Defendants intentionally concealed what was happening to Mekko Thompson's ancestors from Mekko Thompson. The fact that such a terrible tragedy occurred without his knowledge has imposed an enduring feeling of helplessness and fear in Mekko Thompson that this will happen again. Mekko Thompson, as chief of Hickory Ground Tribal Town, has not been able to assure the children and young people of the Tribal Town, or other related Clan members or Tribal Towns, that the Individual Defendants will be held accountable for their egregious actions, or that the Individual Defendants will not commit similar atrocities in the future.

368.    The Individual Defendants further caused emotional distress to Mekko Thompson by exhibiting blatant carelessness about the religious, historical, and cultural importance of the Hickory Ground Site to Plaintiffs, and by affirmatively and repeatedly lying about what happened at the Site. It would have been unthinkable to Mekko Thompson that the Individual Defendants would commit such a sacrilege against the ancestors of any people or the desecration of any people's hallowed ground.

369.    Mekko Thompson trusted the Individual Defendants, who claim to be Creek people, to understand the Muscogee (Creek) members' religious and cultural duties to their ancestors.

Mekko Thompson trusted the Individual Defendants to protect Hickory Ground forever, just as they promised to do.

370.    Instead, each Individual Defendant intentionally prevented Mekko Thompson, and Plaintiffs generally, from fulfilling Plaintiffs' duties to their deceased family members and sacred grounds, and caused Mekko Thompson the irreparable anguish of knowing that his ancestors were wrenched from what was intended to be their final resting places, disrespected, and grotesquely mistreated.

371.    Each Individual Defendant, having notice of the Hickory Ground Site's religious and cultural significance to Mekko Thompson specifically through having been served with Mekko Thompson's Complaint in 2012, proceeded with construction on the Hickory Ground Site, without consulting with or obtaining consent from Mekko Thompson.

372.    Each Individual Defendant desecrated, or caused their construction company or other agent, to desecrate Mekko Thompson's ancestors' remains by dismembering them through removing and discarding soil—part of those ancestors' bodies.

373.    Each Individual Defendant also failed to stop construction even after cultural items were discovered, intentionally desecrating gravesites of extreme religious and cultural importance to Mekko Thompson.

374.    Each Individual Defendant, through his or her own actions or by his or her agents, engaged in reburial practices that violated Mekko Thompson's religious beliefs and sacred protocols, further desecrating the remains.

375.    Each Individual Defendant, through his or her own actions or by his or her agents, mispresented his or her intentions and actions to Mekko Thompson and the public, including falsely claiming that Mekko Thompson himself agreed to the desecration and reburial process.

376.     In 2023, Individual Defendants Stephanie Bryan, Robert McGhee, Sandy Hollinger, Keith Martin, Arthur Mothershed, and Eddie Tulls, perpetrated this harm once again. By refusing to engage in meaningful consultation with Plaintiffs as required by federal law and the NPS Agreement, and by refusing to provide Plaintiffs with documentation to demonstrate how new, additional construction would not further disrupt and destroy the sacred Hickory Ground Sacred Site, these Individual Defendants once again made Mekko Thompson endure the unconscionable trauma of knowing that the most sacred and holy place his family and Nation have ever inhabited was being bulldozed and destroyed to make way for a new casino expansion. These actions also gave new credence to Mekko Thompson's enduring feeling of helplessness and fear that this will happen again (and continue to happen).

377.     The Individual Defendants' intentional, extreme, and outrageous behavior continues to cause Mekko Thompson emotional distress so severe that no reasonable person should be expected to endure it. The harm and emotional distress from the Individual Defendants' wrongful actions is, and will be, continuing until the Individual Defendants cease treating the Hickory Ground Site in such a violent and disrespectful manner.

378.     The actions of the Individual Defendants were not within the scope of their discretionary authority and violated clearly established federal, state and tribal laws.

379.     Mekko Thompson does not seek monetary damages against any of the Poarch Officials or Federal Defendants in their official capacities. Mekko Thompson seeks monetary and punitive damages against the Individual Defendants in their individual capacities for the tort of outrage that they personally committed against him.

380.     This Court should order the Individual Defendants to pay compensatory and punitive damages to Mekko Thompson for the extreme emotional distress they have caused him

to suffer.

## COUNT VI: VIOLATION OF THE INDIAN GAMING REGULATORY ACT
### (Poarch Officials in Their Official Capacities)

381.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

382.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials.

383.    If Plaintiffs succeed on Count I of this Third Amended Complaint, then the Officials can claim no "special sovereignty interest" with regards to the remaining claims Plaintiffs have brought against them. *See* September 25, 2024 Oral Arg. 34:39–35:10 (counsel for Poarch answering: "I would agree with your point, your honor, if they succeeded on the IRA Claim, the special sovereignty interest would not apply. I would agree with that."); *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 891 (11th Cir. 2024).

384.    Under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, Class II and Class III gaming activities are only lawful when conducted on "Indian lands" as defined by the Act. 25 U.S.C. § 2710(b) and (d).

385.    Indian lands are defined in 25 U.S.C. § 2703(4) to include

    a.    Lands within the limits of an Indian reservation; and

    b.    Lands held in trust by the United States for the benefit of an Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

386.    If Count I is granted, the trust acquisition of the Hickory Ground Site for Poarch

will be null and void, and the Site will not qualify as "Indian lands" under IGRA.

387.    The Poarch Officials are responsible for managing and facilitating gaming operations at the Wind Creek Wetumpka Casino Resort, which operates on the Hickory Ground Site.

388.    The ongoing gaming activities at Wind Creek Wetumpka Casino Resort constitute violations of IGRA because the gaming activities are being conducted on lands that do not qualify as "Indian lands" under IGRA.

389.    The Poarch Officials' ongoing violations of IGRA harm Plaintiffs by perpetuating the desecration of the Hickory Ground Site, a sacred location of profound cultural and religious significance to Plaintiffs.

390.    Plaintiffs seek prospective relief to prevent ongoing violations of IGRA by the Poarch Officials, including a declaration that the Hickory Ground Site does not qualify as "Indian lands" under IGRA and an injunction prohibiting the Poarch Officials from continuing to operate or authorize gaming activities at the Wind Creek Wetumpka Casino Resort.

## COUNT VII: VIOLATION OF ALABAMA STATE GAMBLING LAWS
### (Poarch Officials in Their Official Capacities)

391.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

392.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of state law by the Poarch Officials.

393.    If Plaintiffs succeed on Count I of this Third Amended Complaint, then the Officials can claim no "special sovereignty interest" with regards to the remaining claims Plaintiffs have brought against them. *See* September 25, 2024 Oral Arg. 34:39–35:10 (counsel for Poarch answering: "I would agree with your point, your honor, if they succeeded on the IRA Claim, the

special sovereignty interest would not apply. I would agree with that."); *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 891 (11th Cir. 2024).

394.    Laws of the State of Alabama, including Article IV, Section 65 of the Alabama Constitution and Title 13A, Chapter 12, Article 2 of the Alabama Code of Laws, prohibit unlawful gaming in the State of Alabama.

395.    If Count I is granted, the trust acquisition of the Hickory Ground Site for Poarch will be null and void and, accordingly, the Site is not eligible for Indian gaming under IGRA and is thus subject to the laws of the State of Alabama.

396.    The Poarch Officials are operating and authorizing the continued operation of the Wind Creek Wetumpka Casino Resort, which engages in gambling activities that are unlawful under Alabama law.

397.    The gambling activities operated and authorized by the Poarch Officials at the Wind Creek Casino Resort include the operation of electronic gaming machines and other games of chance, which are prohibited under Alabama law unless explicitly authorized by constitutional amendment or statute.

398.    The Poarch Officials' ongoing violations of Alabama gaming laws harm Plaintiffs by perpetuating the desecration of the Hickory Ground Site, a sacred location of profound cultural and religious significance to Plaintiffs.

399.    Plaintiffs seek prospective relief to prevent ongoing violations of Alabama gambling laws, including a declaration that the Hickory Ground Site is subject to the State of Alabama's prohibition of unauthorized gambling activities and an injunction prohibiting the Poarch Officials from continuing to operate or authorize gaming activities at the Wind Creek Wetumpka Casino Resort.

## *OPERATIVE COUNTS IF THIS COURT RULES AGAINST PLAINTIFFS ON COUNT I*

400.    Counts VIII–XI of this Complaint present claims that are applicable if the Court determines that the Department of the Interior had authority to, and properly did, take the Hickory Ground Site into trust for Poarch.

### COUNT VIII: UNJUST ENRICHMENT (FEDERAL COMMON LAW)
### (Poarch Officials in Their Official Capacities)

401.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

402.    Count VIII is brought against the Poarch Officials in their official capacities.

403.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief sought for this count does not implicate any of Poarch's special sovereignty interests under *Coeur d'Alene*.

404.    Because the elements of unjust enrichment under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 316–342 above without repeating them here.

### COUNT IX: UNJUST ENRICHMENT (FEDERAL COMMON LAW)
### (Individual Defendants in Their Individual Capacities)

405.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

406.    Count IX is brought against the Individual Defendants, in their individual capacities.

407.    Because the elements of unjust enrichment under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 316–342 above without repeating them here.

## COUNT X: PROMISSORY ESTOPPEL (FEDERAL COMMON LAW)
### (Poarch Officials in Their Official Capacities)

408.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

409.    Count X is brought against the Tribal Council Officials, Gaming Officials, and Poarch THPO in their official capacities.

410.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief sought for this count does not implicate any of Poarch's special sovereignty interests under *Coeur d'Alene*.

411.    Because the elements of unjust enrichment under both federal and Alabama common law are substantially the same, Plaintiffs specifically incorporate the allegations in Paragraphs 343–356 above without repeating them here.

### *OPERATIVE COUNTS REGARDLESS OF RULING ON COUNT I*

412.    Counts XI through XXII present claims that apply regardless of how the Court rules on Count I, which relates to the authority of the Department of the Interior to take the Hickory Ground Site into trust for Poarch.

## COUNT XI: VIOLATION OF THE NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT
### (Federal Defendants and Poarch Officials Acting Under Delegated Federal Authority)

413.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

414.    Plaintiffs bring Count XI against the Department of the Interior and the Federal Officials in their official capacities, and the Poarch Officials, acting under delegated federal authority.

415.    NAGPRA confers jurisdiction to federal courts over "any action brought by any person alleging a violation of this Act." 25 U.S.C. § 3013.

416.    The following paragraphs allege multiple independent violations of NAGPRA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

417.    This count is also brought pursuant to *Ex parte Young* and 5 U.S.C. § 702, because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Federal Officers and the Poarch Officials (in their exercise of delegated federal authority).

418.    NAGPRA, 25 U.S.C. § 3001–3013, and its implementing regulations, 43 C.F.R. Part 10, impose obligations on Federal agencies to protect Native American human remains, funerary objects, sacred objects, and objects of cultural patrimony.

419.    NAGPRA requires consent from the Muscogee (Creek) Nation, as *parens patriae* representative of the lineal descendants at the Hickory Ground Site and as the tribe with the closest cultural and religious connection to the Site, prior to excavation of Native American cultural items from the Hickory Ground Site. *See* 25 U.S.C. 3002(c)(2) and 43 C.F.R. 10.3.[6]

420.    As a lineal descendant himself, as well as the traditional kinship system representative of other lineal descendants, Mekko Thompson has the right to custody of the human remains and associated funerary objects at the Hickory Ground Site, as well as any and all taken from the Site and now stored elsewhere. *See* 25 U.S.C. § 3002; 43 C.F.R. §§ 10.6, 10.14.  As the tribe most closely culturally and religiously affiliated with the Hickory Ground Site, the Muscogee

---

[6] The governing NAGPRA regulations were updated subsequent to Plaintiffs' filing of the Second Amended Complaint, Dkt. 190. Citations to the regulations in the Third Amended Complaint are to the regulations that were in place in 2012, and in 2020, as those were the regulations governing Defendants' conduct at the time the previous complaints were filed. Plaintiffs reserve the right to cite to the updated regulations to the extent they are relevant to any of the Defendants' ongoing violations of NAGPRA.

(Creek) Nation has the right to custody over all other cultural items at the Site, as well as any and all taken from the Site and now stored elsewhere. *Id.*

421.    As delegees of federal functions, the Tribal Council Officials, Gaming Officials, and Poarch THPO are performing the delegated functions as federal actors, and are liable as federal officials.

422.    The Federal Defendants and Poarch Officials violated NAGPRA by:

a.    Failing to engage in meaningful consultation with Plaintiffs, who are the lineal descendants and cultural affiliates of the human remains and cultural items excavated at the Hickory Ground Site;

b.    Failing to present proof of consultation or consent to the Federal agency responsible for issuing the required permits;

c.    Delegating authority to Poarch to conduct activities on the Hickory Ground Site without ensuring compliance with NAGPRA's protections for cultural items and burial sites;

d.    Issuing excavation permits that allowed for the disturbance and removal of sacred objects, associated funerary objects, and human remains without obtaining proper consent from or engaging in meaningful consultation with Plaintiffs;

e.    Excavating burial sites and removing cultural items from the Hickory Ground Site without obtaining a valid permit;

f.    Reburying remains and funerary objects in a manner that violated NAGPRA's procedural requirements;

g.    Failing to enforce NAGPRA's safeguards regarding the excavation, removal, and reburial of cultural items and remains;

h.      Permitting the continued desecration of burial grounds and sacred sites without taking appropriate action to restore or protect the Hickory Ground Site in compliance with NAGPRA; and

i.      Failing to create a Phase III inventory or report regarding the cultural items recovered or destroyed at the Hickory Ground Site.

423.    The Federal Defendants and Poarch Officials violated NAGPRA and continue to violate NAGPRA by failing to give custody of (1) the human remains and associated funerary objects excavated at the Hickory Ground Site to Mekko Thompson; or of (2) the other cultural items found at the Site to the Muscogee (Creek) Nation as required by 25 U.S.C. § 3002 and 43 C.F.R. § 10.3.

424.    The NPS and Poarch Officials also violated NAGPRA by failing to establish a preservation program for the protection of historic properties that ensures that the agency's procedures for compliance with Section 106 of the NHPA "provide for the disposition of Native American cultural items from Federal or tribal land in a manner consistent with section 3(c) of [NAGPRA]." 54 U.S.C. § 306102. NPS failed to do this as recently as 2011. The Poarch Officials continue to fail to do this.

425.    Furthermore, on information and belief, the Federal Defendants and Poarch Officials violated NAGPRA by failing to follow its mandatory procedures regarding inadvertent discoveries of cultural items. On information and belief, no report of such discoveries was made to the appropriate officials, and even if there were such reports, the Federal Defendants and Poarch Officials failed to stop the construction activity and take reasonable steps to protect the cultural items before resuming activity. *See* 25 U.S.C. § 3002(b)–(c) and 43 C.F.R. § 10.4.

426.    Had the Federal Defendants and Poarch Officials complied with the consultation

requirements of NAGPRA, they would have been informed that the Muscogee (Creek) religion requires the following:

    a.   That no destructive scientific study take place on the cultural items, as such testing violates the Muscogee (Creek) religious beliefs that the dead should remain undisturbed;

    b.   That, if disturbance is absolutely unavoidable, all parts of the human remains, including the surrounding soils, be removed and held together during excavation;

    c.   That, if disturbance is absolutely unavoidable, the excavated remains and funerary objects be stored together in a certain fashion;

    d.   That, if disturbance is absolutely unavoidable, Mekko Thompson, as religious and ceremonial leader of Hickory Ground, prescribe removal and reburial procedures that must be followed for the cultural items under Muscogee (Creek) religious protocol, including protocol for bundling of the remains and funerary objects;

    e.   That, if disturbance is absolutely unavoidable, Mekko Thompson and other representatives of the Muscogee (Creek) Nation be present during handling of any remains or funerary objects, for any purpose, to ensure that such treatment conformed with, to the greatest extent possible, the Muscogee (Creek) religion.

427.   Had the Defendants complied with NAGPRA, the Muscogee (Creek) Nation would have refused consent for the excavation of the Hickory Ground Site.

428.   If the Federal Defendants and Poarch Officials had consulted with Plaintiffs as they were required to do under NAGPRA, they could have avoided tragedies such as the permanent separation of body parts from the human remains of Plaintiffs' deceased family members.

429.   Further, if Federal Defendants and Poarch Officials had followed NAGPRA's

procedures for inadvertent discoveries, further tragedies such as the permanent loss of remains and other cultural items could have been avoided.

430.    The Federal Defendants and Poarch Officials have caused irreparable harm to Plaintiffs, including the desecration of burial grounds, disturbance of sacred cultural items, and interference with Plaintiffs' cultural and spiritual practices.

431.    NAGPRA gives this Court the "authority to issue such orders as may be necessary to enforce" the statute. 25 U.S.C. § 3013.

### COUNT XII: VIOLATION OF THE NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT
### (Poarch Officials in Their Official Capacities)

432.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

433.    Plaintiffs bring Count XII against the Poarch Officials in their official capacities.

434.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief sought pursuant to this count does not implicate any of Poarch's special sovereignty interests under *Coeur d'Alene*.

435.    NAGPRA confers jurisdiction to federal courts over "any action brought by any person alleging a violation of this Act." 25 U.S.C. § 3013.

436.    The Poarch Officials are subject to NAGPRA for activities affecting burial sites and cultural items.

437.    NAGPRA requires tribes to consult with appropriate lineal descendants, tribes, or cultural affiliates before conducting activities that disturb burial sites or cultural items.

438.    Tribes must also comply with the requirements of 25 U.S.C. § 3005 and 43 C.F.R. 10.6.

439.    Sections 5 and 7 of the NPS Agreement likewise require Poarch Officials to consult with Indian tribes on whose traditional lands the planned activity will occur, along with associated individuals and groups who would be affected by Poarch Officials' activities on such lands.

440.    Poarch Officials are violating NAGPRA and its implementing regulations by:

a.    refusing to consult with Plaintiffs regarding their NAGPRA and historic preservation duties with regard to the Hickory Ground Site, despite the fact that the NPS Agreement requires them to do so on an ongoing basis.

b.    refusing to return and obstructing the return of cultural items and human remains excavated from the Hickory Ground Site to Plaintiffs, the rightful cultural affiliates under 25 U.S.C. § 3005.

441.    The Poarch Officials' actions are an ongoing violation of law that has caused and continues to cause irreparable harm to Plaintiffs.

## COUNT XIII: VIOLATION OF THE NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT
### (Auburn University)

442.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293

443.    Plaintiffs bring Count XIII against Auburn University.

444.    NAGPRA confers jurisdiction to federal courts over "any action brought by any person alleging a violation of this Act." 25 U.S.C. § 3013.

445.    Auburn University is a federally funded institution that is subject to NAGPRA's requirements regarding the possession, inventory, and repatriation of human remains, funerary objects, sacred objects, and objects of cultural patrimony.

446.    NAGPRA requires institutions in possession of cultural items or human remains to:

a.    Consult with lineal descendants, tribes, or cultural affiliates regarding the

95

appropriate treatment and repatriation of such items;

b.    Provide a complete inventory of items in their possession; and

c.    Ensure the expeditious return of items to their rightful owners or cultural affiliates.

447.    Auburn violated NAGPRA by:

a.    Failing to follow requirements and protocols required by the permit or permits Auburn obtained during its excavation activities at the Hickory Ground Site;

b.    Excavating and retaining possession of human remains, associated funerary objects, sacred objects and objects of cultural patrimony from the Hickory Ground Site without receiving consent from or consulting with Plaintiffs;

c.    Failing to provide Plaintiffs with a complete and accurate inventory of the human remains and cultural items in Auburn's possession;

d.    Preventing and obstructing the return of cultural items and remains to Plaintiffs; and

e.    Mishandling and improperly storing remains and archaeological artifacts in deplorable, harmful conditions;

f.    Permitting research and curation activities involving the remains and cultural items without obtaining consent from Plaintiffs; and

g.    Conducting excavations without the required permit/s.

448.    There are still Muscogee (Creek) burials, associated funerary objects, and other cultural items in storage at Auburn.

449.    Auburn University's active participation in excavation activities at the Hickory

96

Ground Site, along with its continued possession of cultural items and remains, have caused irreparable harm to Plaintiffs by preventing them from fulfilling their religious and cultural duties to the ancestors and by interfering with Plaintiffs' rights to repatriate their relatives and consult under NAGPRA.

## COUNT XIV: VIOLATION OF THE ARCHEOLOGICAL RESOURCES PROTECTION ACT
### (Federal Defendants and Poarch Officials Acting Under Delegated Federal Authority)

450.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

451.    Plaintiffs bring Count XIV against the Department of the Interior and the Federal Officials in their official capacities, and the Poarch Officials, acting under delegated federal authority.

452.    Under ARPA, "[n]o person may excavate, remove, damage, or otherwise alter or deface, or attempt to excavate, remove, damage, or otherwise alter or deface any archaeological resource located on public lands or Indian lands unless such activity is pursuant to a permit issued under [16 U.S.C. § 470cc]." 16 U.S.C. § 470ee; *see also* 25 C.F.R. § 262.3(a).

453.    16 U.S.C. § 470cc(c), 25 C.F.R. § 262.5, 25 C.F.R. § 262.7, and the permits obtained by Auburn to excavate at the Hickory Ground Site require that, at least 30 days before issuing the permit, the Federal land manager notify all Indian tribes which may consider the site as having religious or cultural importance if the permit may result in harm to, or destruction of, any religious or cultural site, as determined by the Federal land manager.

454.    The Federal Defendants never notified the Muscogee (Creek) Nation prior to issuing any permits to Poarch or Auburn, despite having knowledge that the Hickory Ground Site has significant religious and cultural importance to the Muscogee (Creek) Nation.

455.     The Federal Defendants, internally, admitted that ARPA applies and that they are responsible for enforcing ARPA's provisions with respect to Hickory Ground. As the ACHP documented:

> *Why might this be of concern to the BIA?* …. The property remains subject to the Archeological Resources Protection Act of 1979 (ARPA) because of its trust status. ARPA is a criminal statute that prohibits anyone from excavating, removing, or damaging archeological resources on Indian trust lands without a federally issued permit. The BIA is responsible for enforcing APRA on Indian trust lands.

*See* ACHP Briefing Statement for the Assistant Secretary – Indian Affairs (Oct. 1, 2001), Ex. V at 1.

456.     The following Paragraphs allege multiple independent violations of ARPA and conduct which is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedures Act, 5 U.S.C. § 706.

457.     On information and belief, the Federal Defendants, and Poarch Officials acting under the delegated federal authority, falsely represented that no religious or cultural site would be harmed or destroyed by the proposed work at the Hickory Ground Site, in violation of ARPA, 25 C.F.R. § 262.5(c), and the NPS Agreement.

458.     ARPA also requires consent from the Muscogee (Creek) Nation, as *parens patriae* of the lineal descendants of those buried at the Site and as the Tribe with the closest cultural and religious connection to the Site, prior to excavation of Native American cultural items from the Hickory Ground Site. *See* 25 C.F.R. §§ 262.5(d), 262.8(a).

459.     The Federal Defendants did not notify, consult with, or get consent from the Muscogee (Creek) Nation prior to issuing the ARPA permits from 2003 to 2011, and did not ensure that the Poarch Officials notified, consulted with, or obtained consent from the Muscogee (Creek) Nation, in violation of ARPA, the permit conditions, the NPS Agreement, and the Federal

98

Defendants' trust responsibility to the Muscogee (Creek) Nation.

460.    The Poarch Officials acting under the delegated federal authority did not notify, consult with, or obtain consent from the Muscogee (Creek) Nation, in violation of ARPA, the permit conditions, the NPS Agreement, and the federal government's trust responsibility to the Muscogee (Creek) Nation.

461.    The Federal Defendants did not notify, consult with, or get consent from the Muscogee (Creek) Nation prior to issuing the ARPA permits for the 2023 construction at the Hickory Ground Site.

462.    Even if it were legal to issue such permits without the Muscogee (Creek) Nation's consent (it is not):

a.    Poarch did not meet the conditions precedent of those permits;

b.    The Federal Defendants issued permits allowing excavation of the Hickory Ground Site without verifying that the conditions precedent were met;

c.    Neither the Poarch Officials acting under delegated federal authority nor the Federal Defendants notified or consulted with the Muscogee (Creek) Nation to discuss its interests, including ways to avoid or mitigate potential harm or destruction, prior to the Federal Defendants issuing the permits, in violation of ARPA;

d.    The activities pursuant to the permits were inconsistent with a management plan— specifically, the NPS Agreement and Poarch's agreement to preserve the Hickory Ground Site "without excavation";

e.    The Poarch Officials acting under federal delegated authority failed to curate the archaeological resources in accordance with 36 C.F.R. § 79;

f.  The Federal Defendants and Poarch Officials acting under federal delegated authority did not "ensure that the work was conducted in accordance with statutory and regulatory requirements and any terms and conditions stipulated in the permit."

*See* 16 U.S.C. § 470cc(b)(4); 43 C.F.R. § 7.7; 25 U.S.C. § 3002(c).

463.  Furthermore, on information and belief, Poarch (and/or Auburn at the behest of Poarch) obtained some permits under section 470cc of Title 16, but such permits did not cover the full time period during which the Phase III excavations were performed. Nor did all of the permits cover the full time period during which Poarch conducted further construction during 2023, when Poarch excavated, removed, damaged, or otherwise altered or defaced the Hickory Ground Site to construct a casino expansion.

464.  Thus, the Federal Defendants and Poarch Officials acting under federal delegated authority also violated ARPA by causing the excavation, removal, damage, alteration and defacement of archaeological resources at the Hickory Ground Site without a valid permit, because Poarch failed to meet the permit conditions precedent. The Federal Defendants and Poarch Officials violated ARPA as recently as 2023.

465.  Because the above ARPA provisions are incorporated into NAGPRA, this Court has the "authority to issue such orders as may be necessary to enforce" those provisions. 25 U.S.C. § 3013.

466.  This Court also has authority to issue relief under the APA, 5 U.S.C. § 702, because Plaintiffs are suffering a legal wrong because of agency action.

## COUNT XV: VIOLATION OF THE ARCHEOLOGICAL RESOURCES PROTECTION ACT
### (Poarch Officials in Their Official Capacities)

467.  Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

468.    Plaintiffs bring Count XV against the Poarch Officials in their official capacities.

469.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief sought in this count does not implicate any of Poarch's special sovereignty interests under *Coeur d'Alene*.

470.    ARPA imposes obligations to ensure that any excavation or disturbance of archaeological resources is conducted in accordance with valid permits and in consultation with cultural affiliated tribes.

471.    Under ARPA, any archaeological resources excavated from Indian lands are to remain the property of the Indian tribe having rights of ownership over such resources. *See* 43 C.F.R. § 7.13.

472.    Plaintiffs have the rights of ownership of the cultural resources excavated from the Hickory Ground Site.

473.    ARPA prohibits a person from transporting or receiving any archaeological resource if the resource was excavated or removed from lands without a valid permit or if such excavation or removal violated any rule, regulation, ordinance or permit in effect.  16 U.S.C. § 470ee.

474.    The Poarch Officials continue to violate ARPA by:

a.    Conducting excavation activities at the Hickory Ground Site without obtaining valid permits as required under 16 U.S.C. § 470cc, including construction activities starting as recently as 2023;

b.    Failing to consult with Plaintiffs, who are the culturally affiliated tribe with the resources at the site;

c.      Engaging in activities that desecrate burial sites and remove archaeological resources without appropriate safeguards;

d.      Refusing to preserve and return the removed resources in compliance with ARPA's requirements;

e.      Failing to mitigate harm by restoring, to the extent possible, the Hickory Ground Site to the condition it was in before the wrongful excavation and construction of the casino resort;

f.      Acting in a manner that undermines the preservation of the archaeological integrity of the Hickory Ground Site; and

g.      Transporting, receiving and having custody of archaeological resources that were excavated illegally or in violation of a permit issued under ARPA;

475.    The Poarch Officials continue to falsely represent that no religious or cultural site has been or is harmed or destroyed by the work Poarch Officials have done and continue to do at the Hickory Ground Site, in violation of ARPA, 25 C.F.R. § 262.5(c), the NPS Agreement, and the Poarch Officials' agreement to preserve Hickory Ground.

476.    Poarch Officials' actions have caused and continue to cause irreparable harm to Plaintiffs from the destruction and desecration of the burial sites and archaeological resources at the Hickory Ground Site, and the continued obstruction of the return of human remains and cultural resources to Plaintiffs.

## COUNT XVI: VIOLATION OF THE ARCHEOLOGICAL RESOURCES PROTECTION ACT
### (Auburn University)

477.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

478.    Plaintiffs bring Count XVI against Auburn University.

102

479.    Auburn violated ARPA by:

a.    Conducting the excavation and removal of archaeological resources, including human remains and funerary objects, from the Hickory Ground Site without ensuring compliance with valid permits under 16 U.S.C. § 470cc;

b.    Conducting excavations without the required permit/s;

c.    Failing to consult with Plaintiffs, who are culturally affiliated with the resources excavated from the Hickory Ground Site;

d.    Participating in activities that desecrated burial sites and destroyed archaeological resources;

e.    Continuing to retain possession of and curate archaeological resources without compliance with ARPA's procedural requirements; and

f.    Failing to preserve and return the removed human remains and cultural resources to Plaintiffs.

480.    Auburn's actions have caused and continue to cause irreparable harm to Plaintiffs from the destruction and desecration of the burial sites and archaeological resources at the Hickory Ground Site, and the continued failure to repatriate human remains and cultural resources to Plaintiffs that Auburn unlawfully exhumed and transported from the Site.

## COUNT XVII: VIOLATION OF THE NATIONAL HISTORIC PRESERVATION ACT
### (Federal Defendants and Poarch Officials Acting under Delegated Federal Authority)

481.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

482.    Plaintiffs bring Count XVII against the Department of the Interior and the Federal Officials in their official capacities, and the Poarch Officials, acting under delegated federal authority.

103

483.    The Hickory Ground Site is subject to protection under the NHPA because it is listed as a historic property on the National Register of Historic Places.

484.    On information and belief, the Hickory Ground Site currently includes tribal land (reservation lands, 54 U.S.C. § 300319), and federally-controlled land (trust land, 54 U.S.C. § 306101) as defined in the NHPA, as well as fee lands.

485.    The Federal Defendants are responsible for delegations of their historic preservation responsibilities, including consulting with tribes whose aboriginal land may be affected by such delegation. 54 U.S.C. § 302702. Despite any such delegation, the NPS and BIA retain all non-delegable responsibilities arising from the trust relationship between the United States and the Muscogee (Creek) Nation. *See* 36 C.F.R. § 800.2(c)(2)(ii)(B)-(C).

486.    When the NPS delegates its authority, the delegee carries out the delegated responsibilities on behalf of the NPS. The Poarch Officials' assumption of responsibility under the NHPA pursuant to federal law means that Poarch Officials act as *de facto* federal agency officials with respect to the delegated responsibilities.

487.    The actions (or inactions) of the Federal Defendants and Poarch Officials acting under federal delegated authority regarding the Hickory Ground Site are an "undertaking" within the meaning of 54 U.S.C. § 300320, for reasons including but not limited to:

   a.  Poarch received federal financial funding from NPS to carry out its historic preservation responsibilities. *See, e.g.*, 2011 Preservation Grant Announcement, *available at* https://www.bia.gov/as-ia/opa/online-press-release/americas-great-outdoors-salazar-announces-44-million-grants-historic (awarding Poarch over $30,000). Poarch continues to receive these grants;

   b.  The excavation and construction at the Hickory Ground Site required prior BIA

approval under ARPA, the excavation permit conditions, NAGPRA, and the trust responsibilities arising therefrom. Furthermore, the gaming at the Hickory Ground Site required the approval of gaming ordinances by Interior.

488.    The NHPA requires Interior to consult with "any Indian tribe . . . that attaches religious and cultural significance to" a historic property. 54 U.S.C. § 302706(b).

489.    This consultation duty extends through the entire NHPA Section 106 process. *See* 36 C.F.R. §§ 800.2, 800.4(a)(4), 800.4(d)(2), 800.5(a), 800.5(d)(2), 800.6.

490.    The NHPA requires Interior to "take into account the effect of [any] undertaking" on any National Register-listed site, in consultation with all tribes that "attach[] religious and cultural significance" to the site. 54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.5.

491.    Poarch Officials, acting under federal delegated authority, are required to do the same under the NPS Agreement.

492.    36 C.F.R. § 800.6 required Interior and Poarch Officials (through the NPS Agreement) "to seek ways to avoid, minimize, or mitigate the adverse effects" of the casino project on the Site through, in part, (1) consulting with the Muscogee (Creek) Nation and (2) inviting the ACHP to participate in the Section 106 process.

493.    The Federal Defendants and Poarch Officials acting under delegated federal authority violated NHPA by:

   a.    Failing to meaningfully consult with Plaintiffs, who attach religious and cultural significance to the Hickory Ground Site, as required under 54 U.S.C. § 302706 and 36 C.F.R. Part 800;

   b.    Failing to comply with NHPA's procedural safeguards during the phase III excavation, including Section 106 reviews;

c.      Failing to take into account the effect of their actions, including approving permits for excavation and construction and approving gaming operations, on the historic property, as required by 54 U.S.C. § 306108;

d.      Failing to invite the ACHP to participate in the Section 106 process regarding Poarch's planned activities prior to those activities being undertaken, as required by the NHPA;

e.      Failing to avoid, minimize, or mitigate the adverse effects to the Hickory Ground Site prior to commencement of the Phase III excavation, the reburial of human remains and associated funerary objects, or the construction of a gaming facility; and

f.      Allowing the continued desecration and destruction of the Hickory Ground Site without taking corrective action to protect its historic and cultural significance.

494.   Moreover, the NPS has never consulted with the Muscogee (Creek) Nation regarding the continued delegation to Poarch of federal historic preservation responsibilities, despite the continuing threat to Muscogee (Creek) religious and cultural sites caused by the continuing delegation. These failures violate 54 U.S.C. §§ 302702 & 302706, the NPS Agreement, and the NPS's trust responsibilities to the Muscogee (Creek) Nation.

495.   The NPS further violated the NPS Agreement and the NHPA by failing to perform the required reviews of Poarch's performance under the Agreement and by failing to perform required reviews of the threats to the Hickory Ground Site. *See* NPS Agreement Section 14; 54 U.S.C. § 302108. These reviews are required to take place once every four years, most recently, in 2024. NPS's failure to undertake the required review constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and thus a

violation of the NHPA and the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A).

496.    Poarch Officials' failure to notify and consult with Plaintiffs or take into account Plaintiffs' views on their planned actions that would affect the traditional lands (i.e., the Hickory Ground Site) of the Muscogee (Creek) Nation violates the responsibilities Poarch Officials assumed under Section 7 of the NPS Agreement.

497.    Poarch Officials' failure to follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800, including their failure to consult with the appropriate federal agencies in accordance with Section 106, violates the responsibilities Poarch Officials assumed under Sections 1(G) and 5 of the NPS Agreement.

498.    Had the NPS timely performed evaluations of Poarch's compliance with the NPS Agreement, it would have "determine[d] that a major aspect of [the tribal] program is not consistent with" the NHPA, obligating the Secretary to "disapprove the program and suspend in whole or in part any contracts or cooperative agreements . . . until the program is consistent with [the NHPA]." 54 U.S.C. § 302302(b); *see* also NPS Agreement § 15.

499.    The excavation of, and construction of a casino resort at, the Hickory Ground Site and the reburial of excavated human remains and associated funerary objects had numerous foreseeable adverse effects, including but not limited to violations of the Muscogee (Creek) religion, physical destruction and desecration of part of a Muscogee (Creek) sacred site; a change of the character of the property's use or of physical features within the Site's setting that contribute to its historic significance; and introduction of visual, atmospheric, and audible elements that diminish the integrity of the Site's significant historic features. 36 C.F.R. § 800.5(a).

500.    To the extent that Federal Defendants have concluded that any effects of the Phase III excavation, construction, or reburial would be acceptable or adequately mitigated, such

conclusion represents a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and thus a violation of the NHPA and the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A).

501.    The Federal Defendants and Poarch Officials acting under delegated federal authority likewise failed to follow Section 106 of the NHPA in accordance with the regulations codified at 36 C.F.R. § 800 concerning Poarch's 2023 construction at the Hickory Ground Site, including its failure to consult with the appropriate federal agencies in accordance with Section 106, which violated the responsibilities Poarch Officials assumed under Sections 1(G) and 5 of the NPS Agreement.

502.    Had the Federal Defendants and Poarch Officials acting under delegated federal authority timely consulted the Muscogee (Creek) Nation regarding the planned activities at the Hickory Ground Site, destruction of a holy site of cultural and religious significance to the Nation could have been avoided, or, even if the activities had continued, Plaintiffs could have at the very least instructed the Federal Defendants and Poarch Officials regarding how to treat the cultural items excavated at the Site to avoid further mistreatment of the sacred cultural items in violation of the law and the Muscogee (Creek) religion.

503.    Had the Federal Defendants and Poarch Officials acting under delegated federal authority timely involved the ACHP prior to excavation and construction of a casino resort over the Hickory Ground Site, the ACHP would have alerted the Federal Defendants and Poarch Officials of the dire effects of the planned undertaking on the Hickory Ground Site and the necessity of consulting with the Muscogee (Creek) Nation.

504.    Section 110(k) of the NHPA prohibits a Federal agency from granting "assistance to an applicant who, with intent to avoid the requirements of Section 106, has intentionally

significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed such significant adverse effect to occur." 36 C.F.R. § 800.9(c).

505.    Poarch Officials "intentionally significantly adversely" affected the Hickory Ground Site, over which it was delegated federal historic preservation responsibilities, with intent to avoid the requirements of Section 106, and they had the legal power to prevent such adverse effects but instead allowed the adverse effects to occur.

506.    Interior has continued to award federal preservation grants to Poarch in violation of Section 110(k) of the NHPA. *See, e.g.*, 2019 Preservation Grant Announcement, *available at* https://www.nps.gov/orgs/1207/shpo_thpo_2019.htm (awarding Poarch nearly $55,000); 2018 Preservation Grant Announcement, *available at* https://www.nps.gov/orgs/1207/interior-and-national-park-service-announce-more-than-60-million-in-historic-preservation-grants-to-states-and-tribes.htm (awarding Poarch over $56,000); 2011 Preservation Grant Announcement, *available at* https://www.bia.gov/as-ia/opa/online-press-release/americas-great-outdoors-salazar-announces-44-million-grants-historic (awarding Poarch over $30,000). Interior continues to award these grants to Poarch, despite Poarch's ongoing violations of the NHPA and the NPS Agreement.

507.    Each unlawful ordering of a preservation grant to Poarch, the Poarch Officials, and/or the Poarch THPO constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and thus a violation of the NHPA and the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A).

## COUNT XVIII: VIOLATION OF THE NATIONAL HISTORIC PRESERVATION ACT
### (Poarch Officials in Their Official Capacities)

508.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

109

509.    Plaintiffs bring Count XVIII against the Poarch Officials in their official capacities.

510.    This count is brought pursuant to *Ex parte Young* because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief sought in this count does not implicate Poarch's special sovereignty interests under *Coeur d'Alene*.

511.    Poarch Officials continue to violate the NHPA by:

a.    Continuing to permit activities that physically destroy and desecrate portions of the Hickory Ground Site, in violation of 36 C.F.R. § 800.5(a);

b.    Failing to seek ways to avoid, minimize, or mitigate harm to the Hickory Ground Site, as required under 36 C.F.R. § 800.6;

c.    Failing to develop a plan that ensures the protection of sacred and historic sites located on Poarch's reservation, including the Hickory Ground Site, as required by the NPS Agreement, section 1(C);

d.    Failing to cooperate with the ACHP to ensure that the Hickory Ground Site is taken into consideration at all levels of Poarch's planning and development, as required by the NPS Agreement, section 1(E);

e.    Failing to periodically solicit and take into account comments on Poarch's historic preservation program from Plaintiffs, as required by the NPS Agreement, section 7; and

f.    Failing to take into account the Muscogee (Creek) Nation's views with regard to how Poarch Officials' actions affect the Hickory Ground Site, as required by the NPS Agreement, section 7.

512.    Plaintiffs have been and continue to be irreparably harmed by the continued

destruction and desecration of the Hickory Ground Site, which holds deep cultural, spiritual, and historical significance to them.

### COUNT XIX: PORTIONS OF NAGPRA AND ARPA, AS-APPLIED AND IF MISAPPLIED, BURDEN PLAINTIFFS' RELIGION UNDER THE FIRST AMENDMENT AND RFRA
### (Federal Defendants and Poarch Officials Acting Under Delegated Federal Authority)

513.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

514.    Plaintiffs bring Count XIX against the Department of the Interior and the Federal Officials in their official capacities, and the Poarch Officials, acting under delegated federal authority.

515.    The First Amendment of the United States Constitution protects Plaintiffs' rights to freely exercise their religion without undue interference by the government or its agents.

516.    The Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq.* ("RFRA"), prohibits federal governmental actions, or actions taken under federal authority, that substantially burden a person's exercise of religion unless the burden furthers a compelling governmental interest and is the least restrictive means of achieving that interest. RFRA's protections encompass tribal religious beliefs. *See* American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq.*

517.    Poarch Officials, in their official capacities, are subject to RFRA and the First Amendment because they act under federal delegated authority through agreements, funding, and grants, including delegation of federal responsibilities under the NHPA. Their actions fall within the definition of "government" under 42 U.S.C. § 2000bb-2(1).

518.    NAGPRA and ARPA are laws that directly regulate religion and religious practice by establishing rules governing whether intentional removal or excavation of Native American cultural items from federal or tribal lands can take place and requiring consultation with tribes if

and when certain federal actions implicate tribal religious beliefs or practice. If such excavation *can* take place, NAGPRA establishes a priority preference regarding who should be given the excavated cultural items.

519.    The Federal Defendants are responsible for implementing and enforcing NAGPRA and ARPA and ensuring compliance with constitutional and statutory protections for religious freedom.

520.    The Poarch Officials, acting under delegated federal authority and the color of federal law, are responsible for enforcing portions of NAGPRA and ARPA pursuant to their federal responsibilities delegated under the NPS Agreement.

521.    The application of NAGPRA and ARPA by Federal Defendants and Poarch Officials has substantially burdened Plaintiffs' religious exercise by:

    a.    Permitting the excavation and removal of Plaintiffs' ancestors' remains and funerary objects from the Hickory Ground Site;

    b.    Allowing the desecration of sacred burial grounds and ceremonial sites without consulting with Plaintiffs;

    c.    Preventing Plaintiffs from performing required religious protocols to care for their ancestors and sacred sites;

    d.    Authorizing the reburial of Plaintiffs' ancestors' remains and funerary objects without adhering to Plaintiffs' religious practices and preventing a proper burial adhering to such practices;

    e.    Enforcing federal laws, including the misapplication of ARPA and NAGPRA, in a manner that burdens Plaintiffs' religious exercise; and

    f.    Failing to consider less restrictive means that would allow Plaintiffs to

fulfill their religious obligations.

522.    If ARPA and NAGPRA are interpreted or applied to allow any tribe other than the Muscogee (Creek) Nation to provide consent for the excavation or removal of cultural items at the Hickory Ground Site, or to prioritize ownership of cultural items to entities other than Plaintiffs, such interpretations or applications:

      a.    Impose substantial burdens on Plaintiffs' religious exercise without further a compelling governmental interest;

      b.    Fail to use the lease restrictive means of achieving a governmental interest; and

      c.    Violate RFRA and the First Amendment as applied to Plaintiffs.

523.    If the requirement of consent of the "appropriate Indian tribe" under ARPA and the related provisions in NAGPRA are interpreted to allow any tribe other than the Muscogee (Creek) Nation to provide consent for the excavation or removal of cultural items with respect to the Hickory Ground Site, such interpretations and applications:

      a.    Do not further a compelling governmental interest, or even rational basis, justifying the attendant burden on Plaintiffs' religion;

      b.    Fail to use the least restrictive means to further the governmental interest; and

      c.    violate the First Amendment as applied to Plaintiffs and irreconcilably conflict with RFRA.

524.    If NAGPRA and the related provisions in ARPA are interpreted to provide higher priority of ownership of the excavated cultural items to any entity or person other than Mekko Thompson or the Muscogee (Creek) Nation under 25 U.S.C. § 3002(a)(2), such interpretations and

applications:

    a.    Do not further a compelling governmental interest, or even rational basis, justifying the attendant burden on Plaintiffs' religion;

    b.    do not use the least restrictive means to further the governmental interest;

    c.    Violate the First Amendment as applied to Plaintiffs, who have an inviolable religious and cultural right to the remains and other cultural items, and

    d.    Irreconcilably conflict with RFRA.

525.    The designation of the Hickory Ground Site as trust land held by the United States on behalf of Poarch further compounds the religious infringement of ARPA and NAGPRA. This is exacerbated when federal decision-making and enforcement authority under these statutes is delegated to the same entity or individuals violating the exercise of religious freedoms.

526.    Plaintiffs have suffered substantial burdens on their religious exercise as a result of the Federal Defendants' and Poarch Officials' applications of ARPA and NAGPRA, including but not limited to:

    a.    The inability to properly bury their ancestors' remains and funerary objects;

    b.    The ongoing desecration of their sacred ceremonial and burial grounds; and

    c.    The denial of access to the Hickory Ground Site to perform required religious practices.

527.    Federal Defendants and Poarch Officials acting under federal delegated authority cannot demonstrate that the substantial burden on Plaintiffs' religious exercise furthers a compelling governmental interest or is the least restrictive means of achieving such an interest.

### COUNT XX: VIOLATION OF THE FIRST AMENDMENT AND RFRA
### (Federal Defendants and Poarch Officials Acting Under Delegated Federal Authority)

528.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in

Paragraphs 1–293.

529.    Plaintiffs bring Count XX against the Department of the Interior and the Federal Officials in their official capacities, and the Poarch Officials, acting under delegated federal authority.

530.    The First Amendment of the United States Constitution protects Plaintiffs' rights to freely exercise their religion without undue interference by the government or its agents.

531.    The Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq.*, prohibits federal governmental actions, or actions taken under federal authority, that substantially burden a person's exercise of religion unless the burden furthers a compelling governmental interest and is the least restrictive means of achieving that interest. RFRA's protections encompass tribal religious beliefs. *See* American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq.*

532.    Poarch Officials, by their federally delegated authority under the NPS, are federal actors for purposes of the First Amendment and RFRA, 42 U.S.C. § 2000bb-2(1).

533.    Hickory Ground is a sacred site of unique and irreplaceable religious significance to Plaintiffs. The Site includes ceremonial grounds, burial sites, and the remains of Plaintiffs' ancestors, all of which are integral to Plaintiffs' religious practices.

534.    Plaintiffs' religious beliefs require that they:

    a.    Care for their ancestors' remains in accordance with traditional protocols;

    b.    Preserve the sanctity of burial and ceremonial grounds;

    c.    Prevent unauthorized activities or substances, including alcohol, from desecrating sacred spaces; and

    d.    Access and maintain the Hickory Ground Site for religious ceremonies and practices.

535.    The Federal Defendants' and Poarch Officials' past and ongoing actions substantially burden Plaintiffs' religious exercise by:

a.    Allowing desecration of burial grounds and ceremonial spaces, including actions that violate Plaintiffs' religious protocols for caring for buried ancestors and maintaining the sanctity of ceremonial grounds;

b.    Preventing Plaintiffs from fulfilling their sacred duty to ensure proper burial of their ancestors' remains and associated funerary objects;

c.    Allowing unauthorized individuals to access ceremonial grounds without following proper religious protocols, thereby desecrating the Site;

d.    Permitting and promoting gambling, alcohol consumption, and other prohibited activities on or near sacred ceremonial grounds, in direct violation of Plaintiffs' religious beliefs;

e.    Authorizing and facilitating the desecration of burial grounds and ceremonial sites through excavation and construction activities;

f.    Authorizing the reburial of Plaintiffs' ancestors' remains and funerary objects without adhering to Plaintiffs' religious practices and preventing a proper burial adhering to such practices; and

g.    Allowing the continued desecration, and failing to mitigate excavation activities, including failing to restore the grounds to pre-construction and pre-excavation conditions, which prevents Plaintiffs from accessing the Hickory Ground Site to perform religious practices.

536.    The desecration and disruption caused by the Federal Defendants' and Poarch Officials' actions, including the removal, mishandling, and improper reburial of Plaintiffs'

116

ancestors' remains, have placed Plaintiffs' ancestors in a state of unrest and have caused ongoing spiritual harm to Plaintiffs.

537.    By delegating federal authority to Poarch Officials through agreements, grants, and other mechanisms, the Federal Defendants have enabled actions that violate Plaintiffs' religious rights. These delegations and failures to intervene and terminate the legal authority that Poarch Officials continue to exercise and violate perpetuates substantial burdens on Plaintiffs' religious exercise.

538.    These ongoing actions force Plaintiffs to choose between abandoning their religious beliefs and enduring the continued desecration of their sacred Site, imposing an undue and unlawful burden on their religious exercise.

539.    The Federal Defendants and Poarch Officials acting under federal delegated authority cannot demonstrate that these substantial burdens further a compelling governmental interest or represent the least restrictive means of achieving such an interest, as required under RFRA and the First Amendment.

### COUNT XXI: VIOLATION OF THE ICRA
### (Poarch Officials in Their Official Capacities)

540.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

541.    Plaintiffs bring Count XXI against the Poarch Officials acting in their official capacities.

542.    This count is brought pursuant to Ex parte Young because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief requested in this count does not implicate any of Poarch's special sovereignty interests under Coeur d'Alene.

117

543.    The Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1302(a)(1), provides that no Indian tribe shall make or enforce any law prohibiting the free exercise of religion.

544.    Poarch Officials, in their official capacities, are subject to ICRA as officials exercising the powers of an "Indian tribe."

545.    Hickory Ground is a sacred site of unique and irreplaceable religious significance to Plaintiffs. The Site includes ceremonial grounds, burial sites, and the remains of Plaintiffs' ancestors, all of which are integral to Plaintiffs' religious practices.

546.    Upon information and belief, some remains, cultural items, associated funerary objects, and numerous archaeological artifacts have never been reburied and continue to be mishandled and improperly stored by Poarch, and Poarch continues to unlawfully prevent and obstruct Plaintiffs' requested repatriation.

547.    Plaintiffs' religious beliefs prohibit certain activities, including gambling, alcohol consumption, and unauthorized access to ceremonial grounds, from taking place on or near sacred sites. Such activities desecrate the Hickory Ground Site and prevent Plaintiffs from fulfilling their religious obligations.

548.    Plaintiffs' religious beliefs require that they:

    a.    Care for their ancestors' remains in accordance with traditional protocols;

    b.    Preserve the sanctity of burial and ceremonial grounds;

    c.    Prevent unauthorized activities or substances, including alcohol, from desecrating sacred spaces; and

    d.    Access and maintain the Hickory Ground Site for religious ceremonies and practices.

549.    The ongoing actions of Poarch Officials in their official capacities substantially

burden Plaintiffs' religious exercise by:

  a. Preventing Plaintiffs from accessing the Hickory Ground Site to perform essential religious practices;

  b. Desecrating burial grounds and ceremonial spaces, including actions that violate Plaintiffs' religious protocols for caring for buried ancestors and maintaining the sanctity of ceremonial grounds;

  c. Receiving and retaining possession of Plaintiffs' ancestors' remains and associated funerary objects and preventing Plaintiffs from fulfilling their sacred duty to ensure proper burial of their ancestors' remains and associated funerary objects;

  d. Allowing unauthorized individuals to access ceremonial grounds without following proper religious protocols, thereby desecrating the Hickory Ground Site;

  e. Permitting and promoting gambling, alcohol consumption, and other prohibited activities on or near sacred ceremonial grounds, in direct violation of Plaintiffs' religious beliefs;

  f. Desecrating burial grounds and ceremonial sites through continued excavation and construction activities;

  g. Ongoing desecration of the Site despite knowledge of its sacred nature, including failing to preserve and restore the grounds to pre-construction and pre-excavation conditions, which prevents Plaintiffs from accessing the Hickory Ground Site to perform required religious practices;

  h. Ongoing mistreatment of the remains and artifacts in Poarch's custody; and

  i. Enacting tribal laws that substantially burden Plaintiffs' religious rights by

promoting and authorizing certain activities in (a) through (h).

550.    The desecration and disruption caused by Defendants' actions, including the removal, mishandling, and improper reburial of Plaintiffs' ancestors' remains, have placed Plaintiffs' ancestors in a state of unrest and have caused ongoing religious and spiritual harm to Plaintiffs.

551.    These ongoing actions force Plaintiffs to choose between abandoning their religious beliefs and enduring the continued desecration of their sacred Site, imposing an undue and unlawful burden on their religious exercise.

552.    The Indian Civil Rights Act prohibits the enforcement of tribal actions or laws that infringe upon Plaintiffs' religious freedoms. By permitting and engaging in activities that desecrate Hickory Ground, Poarch Officials have violated ICRA.

553.    Unless enjoined by this Court, Poarch Officials will continue and are continuing to engage in the conduct described above, resulting in ongoing and future violations of Plaintiffs' rights under ICRA.

## COUNT XXII: VIOLATION OF THE RFRA
### (Poarch Officials in Their Official Capacities)

554.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1-293.

555.    Plaintiffs bring Count XXII against the Poarch Officials acting in their official capacities.

556.    This count is brought pursuant to Ex parte Young, because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief requested in this count does not implicate any of Poarch's special sovereignty interests under Coeur d'Alene.

557.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, et seq., prohibits federal governmental actions, or actions taken under federal authority, that substantially burden a person's exercise of religion unless the burden furthers a compelling governmental interest and is the least restrictive means of achieving that interest. RFRA's protections encompass tribal religious beliefs. See American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, et seq.

558.    Poarch Officials, in their official capacities, are subject to RFRA because they acted under federal delegated authority through agreements, funding, and grants, including delegation of federal responsibilities under the NHPA. Their actions fall within the definition of "government" under 42 U.S.C. § 2000bb-2(1).

559.    Hickory Ground is a sacred site of unique and irreplaceable religious significance to Plaintiffs. The Site includes ceremonial grounds, burial sites, and the remains of Plaintiffs' ancestors, all of which are integral to Plaintiffs' religious practices.

560.    Upon information and belief, some remains, cultural items, associated funerary objects, and numerous archaeological artifacts have never been reburied and continue to be mishandled and improperly stored by Poarch, and Poarch continues to unlawfully prevent and obstruct Plaintiffs' requested repatriation.

561.    Plaintiffs' religious beliefs prohibit certain activities, including gambling, alcohol consumption, and unauthorized access to ceremonial grounds, from taking place on or near sacred sites. Such activities desecrate the Hickory Ground Site and prevent Plaintiffs from fulfilling their religious obligations.

562.    Plaintiffs' religious beliefs require that they:

      a.     Care for their ancestors' remains in accordance with traditional protocols;

      b.     Preserve the sanctity of burial and ceremonial grounds;

c.      Prevent unauthorized activities or substances, including alcohol, from desecrating sacred spaces; and

d.      Access and maintain the Hickory Ground Site for religious ceremonies and practices.

563.    The ongoing actions of Poarch Officials in their official capacities substantially burden Plaintiffs' religious exercise by:

a.      Preventing Plaintiffs from accessing the Hickory Ground Site to perform essential religious practices;

b.      Desecrating burial grounds and ceremonial spaces, including actions that violate Plaintiffs' religious protocols for caring for buried ancestors and maintaining the sanctity of ceremonial grounds;

c.      Receiving and retaining possession of Plaintiffs' ancestors' remains and associated funerary objects and preventing Plaintiffs from fulfilling their sacred duty to ensure proper burial of their ancestors' remains and associated funerary objects;

d.      Allowing unauthorized individuals to access ceremonial grounds without following proper religious protocols, thereby desecrating the Hickory Ground Site;

e.      Permitting and promoting gambling, alcohol consumption, and other prohibited activities on or near sacred ceremonial grounds, in direct violation of Plaintiffs' religious beliefs;

f.      Desecrating burial grounds and ceremonial sites through continued excavation and construction activities;

g.      Ongoing desecration of the Site despite knowledge of its sacred nature,

122

including failing to preserve and restore the grounds to pre-construction and pre-excavation conditions, which prevents Plaintiffs from accessing the Hickory Ground Site to perform required religious practices; and

    h.    Ongoing mistreatment of the remains and artifacts in Poarch's custody.

564.    The desecration and disruption caused by Defendants' actions, including the removal, mishandling, and improper reburial of Plaintiffs' ancestors' remains, have placed Plaintiffs' ancestors in a state of unrest and have caused ongoing religious and spiritual harm to Plaintiffs.

565.    These ongoing actions make it impossible for Plaintiffs to fulfill their duties and practice ceremonies in accordance with their religious beliefs, all while enduring the continued desecration of their sacred Site, which in turn imposes an undue and unlawful burden on their religious exercise.

566.    The Poarch Officials cannot demonstrate that these substantial burdens further a compelling governmental interest or represent the least restrictive means of achieving such an interest, as required under RFRA.

567.    Unless enjoined by this Court, Poarch Officials will continue and are continuing to engage in the conduct described above, resulting in ongoing and future violations of Plaintiffs' rights under RFRA.

### COUNT XXIII: VIOLATION OF THE FIRST AMENDMENT
### (Poarch Officials in Their Official Capacities)

568.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1-293.

569.    Plaintiffs bring Count XXIII against the Poarch Officials acting in their official capacities.

570.    This count is brought pursuant to *Ex parte Young*, because it seeks prospective injunctive and declaratory relief to prevent ongoing violations of federal law by the Poarch Officials. The relief requested in this count does not implicate any of Poarch's special sovereignty interests under *Coeur d'Alene*.

571.    The First Amendment to the United States Constitution protects Plaintiffs' rights to freely exercise their religion without undue interference by the government or its agents.

572.    Poarch Officials, in their official capacities, acted under color of federal law and pursuant to federal delegated authority through agreements, funding, and grants, including delegation of federal responsibilities under the NHPA. Their actions therefore constitute governmental action subject to the First Amendment.

573.    Hickory Ground is a sacred site of unique and irreplaceable religious significance to Plaintiffs. The Site includes ceremonial grounds, burial sites, and the remains of Plaintiffs' ancestors, all of which are integral to Plaintiffs' religious practices.

574.    Upon information and belief, some remains, cultural items, associated funerary objects, and numerous archaeological artifacts have never been reburied and continue to be mishandled and improperly stored by Poarch, and Poarch continues to unlawfully prevent and obstruct Plaintiffs' requested repatriation.

575.    Plaintiffs' religious beliefs prohibit certain activities, including gambling, alcohol consumption, and unauthorized access to ceremonial grounds, from taking place on or near sacred sites. Such activities desecrate the Hickory Ground Site and prevent Plaintiffs from fulfilling their religious obligations.

576.    Plaintiffs' religious beliefs require that they:

      a.    Care for their ancestors' remains in accordance with traditional protocols;

b. Preserve the sanctity of burial and ceremonial grounds;

c. Prevent unauthorized activities or substances, including alcohol, from desecrating sacred spaces; and

d. Access and maintain the Hickory Ground Site for religious ceremonies and practices.

577. The ongoing actions of Poarch Officials in their official capacities substantially burden Plaintiffs' free exercise of religion protected by the First Amendment by:

a. Preventing Plaintiffs from accessing the Hickory Ground Site to perform essential religious practices;

b. Desecrating burial grounds and ceremonial spaces, including actions that violate Plaintiffs' religious protocols for caring for buried ancestors and maintaining the sanctity of ceremonial grounds;

c. Receiving and retaining possession of Plaintiffs' ancestors' remains and associated funerary objects and preventing Plaintiffs from fulfilling their sacred duty to ensure proper burial of their ancestors' remains and associated funerary objects;

d. Allowing unauthorized individuals to access ceremonial grounds without following proper religious protocols, thereby desecrating the Hickory Ground Site;

e. Permitting and promoting gambling, alcohol consumption, and other prohibited activities on or near sacred ceremonial grounds, in direct violation of Plaintiffs' religious beliefs;

f. Desecrating burial grounds and ceremonial sites through continued excavation and construction activities;

g.    Ongoing desecration of the Site despite knowledge of its sacred nature, including failing to preserve and restore the grounds to pre-construction and pre-excavation conditions, which prevents Plaintiffs from accessing the Hickory Ground Site to perform required religious practices; and

h.    Ongoing mistreatment of the remains and artifacts in Poarch's custody.

578.    The desecration and disruption caused by Defendants' actions, including the removal, mishandling, and improper reburial of Plaintiffs' ancestors' remains, have placed Plaintiffs' ancestors in a state of unrest and have caused ongoing religious and spiritual harm to Plaintiffs.

579.    These ongoing actions make it impossible for Plaintiffs to fulfill their duties and practice ceremonies in accordance with their religious beliefs, all while enduring the continued desecration of their sacred Site, which in turn imposes an undue and unlawful burden on their religious exercise.

580.    Unless enjoined by this Court, Poarch Officials will continue and are continuing to engage in the conduct described above, resulting in ongoing and future violations of Plaintiffs' rights under the First Amendment.

## COUNT XXIV: VIOLATION OF THE RFRA
### (Auburn University)

581.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1–293.

582.    Plaintiffs bring Count XXIV against Auburn University.

583.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, et seq., prohibits federal governmental actions, or actions taken under federal authority, that substantially burden a person's exercise of religion unless the burden furthers a compelling governmental interest and is

the least restrictive means of achieving that interest. RFRA's protections encompass tribal religious beliefs. *See* American Indian Religious Freedom Act, 42 U.S.C. §§ 1996, *et seq.*

584.    Auburn University falls within the definition of "government" under 42 U.S.C. § 2000bb-2(1) because it acted under color of federal law by:

> a.    Participating in federally regulated excavation activities authorized by federal agencies acting pursuant to ARPA and NAGPRA, including effectuating the excavation of human remains and cultural items from the Hickory Ground Site;

> b.    Assuming custody of human remains and cultural items excavated from the Hickory Ground Site under federal statutes, including NAGPRA, and deciding the disposition and repatriation of those items in accordance with federal law; and

> c.    Receiving federal funding and grants related to these federally regulated activities, thereby subjecting it to federal law and RFRA's requirements.

585.    Hickory Ground is a sacred site of unique and irreplaceable religious significance to Plaintiffs, encompassing ceremonial grounds, burial sites, and the remains of Plaintiffs' ancestors.

586.    Upon information and belief, some remains, cultural items, associated funerary objects, and numerous archaeological artifacts have never been reburied and continue to be mishandled and improperly stored by Auburn, and Auburn continues to unlawfully prevent and obstruct Plaintiffs' requested repatriation.

587.    Plaintiffs' religious beliefs require that they:

> a.    Care for their ancestors' remains in accordance with traditional protocols;

> b.    Preserve the sanctity of burial and ceremonial grounds;

> c.    Prevent unauthorized activities or substances, including alcohol, from desecrating sacred spaces; and

    d.    Access and maintain the Hickory Ground Site for religious ceremonies and practices.

588.    Auburn has substantially burdened Plaintiffs' religious exercise by:

    a.    Participating in the excavation of Plaintiffs' ancestors' remains and funerary objects without consulting Plaintiffs or obtaining their consent;

    b.    Failing to follow ARPA and NAGPRA's consultation and repatriation requirements in a manner that respects Plaintiffs' religious obligations and priorities;

    c.    Continuing to retain custody of human remains, associated funerary objects, and cultural items excavated from the Hickory Ground Site, thereby preventing Plaintiffs from fulfilling their religious obligations to return these items to their proper resting places; and

    d.    Ongoing mistreatment of the remains and artifacts in Auburn's custody, including allowing the remains of Plaintiffs' ancestors to remain in plastic bins and accumulate mold.

589.    The desecration and disruption caused by Auburn's actions, including its ongoing possession and control of Plaintiffs' ancestors' remains and sacred items, have placed Plaintiffs' ancestors in a state of unrest and have caused ongoing religious and spiritual harm to Plaintiffs.

590.    Auburn's actions make it impossible for Plaintiffs to fulfill their duties and practice ceremonies in accordance with their religious beliefs, all while enduring the continued desecration of their sacred Site, which in turn imposes an undue and unlawful burden on Plaintiffs' religious exercise.

591.    Auburn cannot demonstrate that these substantial burdens on Plaintiffs' religious exercise of religion further a compelling governmental interest or represent the least restrictive

means of achieving such an interest, as required under RFRA.

## COUNT XXV: VIOLATION OF THE FIRST AMENDMENT
### (Auburn University)

592.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in Paragraphs 1-293.

593.    Plaintiffs bring Count XXV against Auburn University.

594.    The First Amendment to the United States Constitution protects Plaintiffs' rights to freely exercise their religion without undue interference by the government.

595.    Auburn University is subject to the First Amendment because it acted under color of federal law and pursuant to federal delegated authority by:

    a.    Participating in federally regulated excavation activities authorized by federal agencies acting pursuant to ARPA and NAGPRA, including effectuating the excavation of human remains and cultural items from the Hickory Ground Site;

    b.    Assuming custody of human remains and cultural items excavated from the Hickory Ground Site under federal statutes, including NAGPRA, and deciding the disposition and repatriation of those items in accordance with federal law; and

    c.    Receiving federal funding and grants related to its participation in these federally regulated activities, which subjected it to federal laws affording religious protections.

596.    Hickory Ground is a sacred site of unique and irreplaceable religious significance to Plaintiffs, encompassing ceremonial grounds, burial sites, and the remains of Plaintiffs' ancestors.

597.    Upon information and belief, some remains, cultural items, associated funerary objects, and numerous archaeological artifacts have never been reburied and continue to be mishandled and improperly stored by Auburn, and Auburn continues to unlawfully prevent and

obstruct Plaintiffs' requested repatriation.

598.    Plaintiffs' religious beliefs require that they:

      a.    Care for their ancestors' remains in accordance with traditional protocols;

      b.    Preserve the sanctity of burial and ceremonial grounds;

      c.    Prevent unauthorized activities or substances, including alcohol, from desecrating sacred spaces; and

      d.    Access and maintain the Hickory Ground Site for religious ceremonies and practices.

599.    Auburn has substantially burdened Plaintiffs' free exercise of religion protected by the First Amendment by:

      a.    Participating in the excavation of Plaintiffs' ancestors' remains and funerary objects without consulting Plaintiffs or obtaining their consent;

      b.    Failing to follow NAGPRA's consultation and repatriation requirements in a manner that respects Plaintiffs' religious obligations and priorities;

      c.    Continuing to retain custody of human remains, associated funerary objects, and cultural items excavated from the Hickory Ground Site, thereby preventing Plaintiffs from fulfilling their religious obligations to return these items to their proper resting places; and

      d.    Mistreating on an ongoing basis the remains and artifacts in Auburn's custody, including allowing the remains of Plaintiffs' ancestors to remain in plastic bins and accumulate mold.

600.    The desecration and disruption caused by Auburn's actions, including its ongoing possession and control of Plaintiffs' ancestors' remains and sacred items, have placed Plaintiffs'

ancestors in a state of unrest and have caused ongoing religious and spiritual harm to Plaintiffs.

601.    Auburn's actions make it impossible for Plaintiffs to fulfill their duties and practice ceremonies in accordance with their religious beliefs, all while enduring the continued desecration of their sacred Site, which in turn imposes an undue and unlawful burden on Plaintiffs' religious exercise.

602.    Auburn cannot demonstrate that a substantial burden on Plaintiffs' religious exercise furthers a compelling governmental interest or is the least restrictive means of achieving such an interest.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Court:

(a) If Plaintiffs succeed with respect to Count I, enter a judgment declaring that Interior lacked authority to take the Hickory Ground Site into trust for Poarch, and an order in the nature of mandamus requiring that Secretary Haaland take the Hickory Ground Site out of trust, thereby returning the site to fee simple ownership;

(b) If Plaintiffs succeed with respect to Count II, enter an order in the nature of mandamus requiring the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction;

(c) If Plaintiffs succeed with respect to Count III, enter an order requiring disgorgement of any and all monetary gains the Individual Defendants have acquired as a result of their desecration of, including the construction and operation of a gaming casino at the Hickory Ground Site;

(d) If Plaintiffs succeed with respect to Count IV, enter an order in the nature of mandamus requiring the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction;

(e) If Plaintiff Mekko Thompson succeeds with respect to Count V, enter a judgment declaring that the Individual Defendants' actions constituted outrage, and an order awarding appropriate monetary damages to Mekko Thompson on behalf of himself and the lineal descendants of those buried at the Hickory Ground Site;

(f) If Plaintiffs succeed with respect to Count VI, enter a judgment declaring the operation of Indian gaming on the Hickory Ground Site to be unlawful and enjoin the Poarch Officials' gaming operations;

(g) If Plaintiffs succeed with respect to Count VII, enter a judgment declaring the operation of gaming on the Hickory Ground Site to be unlawful and enjoin the Poarch Officials' gaming operations;

(h) If Plaintiffs succeed with respect to Count VIII, enter an order in the nature of mandamus requiring the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction;

(i) If Plaintiffs succeed with respect to Count IX, enter an order requiring

132

disgorgement of any and all monetary gains the Individual Defendants have acquired as a result of their desecration of, including the construction and operation of a gaming casino at the Hickory Ground Site;

(j) If Plaintiffs succeed with respect to Count X, enter an order in the nature of mandamus requiring the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction;

(k) If Plaintiffs succeed with respect to Count XI:

  i.    Enter a judgment declaring that the Federal Defendants violated NAGPRA, and that, with respect to Federal Defendants and the Poarch Officials acting as federal officers under the NPS Agreement, their actions violated the Administrative Procedures Act;

  ii.   Issue an injunction requiring all the Federal Defendants and Poarch Officials to immediately engage in consultation with Plaintiffs regarding restoration of the Hickory Ground Site to its pre-construction condition;

  iii.  Issue an order requiring the Federal Defendants and the Poarch Officials to oversee the creation of a Phase III inventory report and send the report to Plaintiffs;

  iv.   Issue an order requiring Federal Defendants and the Poarch Officials to cooperate in and facilitate the immediate repatriation of all human remains and cultural items excavated from the Hickory Ground Site to Plaintiffs, per

guidance and instructions received from Mekko Thompson; and

v.    Issue an injunction prohibiting the Federal Defendants and the Poarch Officials from taking any action with respect to human remains or cultural resources taken from or located at the Hickory Ground Site absent explicit consent from the Muscogee (Creek) Nation.

(l) If Plaintiffs succeed with respect to Count XII:

i.    Enter a judgment declaring that the Poarch Officials violated NAGPRA;

ii.    Issue an injunction requiring all the Poarch Officials to immediately engage in consultation with Plaintiffs regarding restoration of the Hickory Ground Site to its pre-construction condition;

iii.    Issue an order requiring the Poarch Officials to oversee the creation of a Phase III inventory report and send the report to Plaintiffs;

iv.    Issue an order requiring the Poarch Officials to cooperate in and facilitate the immediate repatriation of all human remains and cultural items excavated from the Hickory Ground Site to Plaintiffs, per guidance and instructions received from Mekko Thompson; and

v.    Issue an injunction prohibiting the Poarch Officials from taking any action with respect to human remains or cultural items taken from or located at the Hickory Ground Site absent explicit consent from the Muscogee (Creek) Nation.

(m) If Plaintiffs succeed with respect to Count XIII:

i.    Enter a judgment declaring that Auburn violated NAGPRA;

ii.    Issue an order requiring Auburn to complete the Phase III inventory report

and send the report to Plaintiffs;

iii. Issue an order requiring Auburn to effectuate the immediate repatriation of all human remains and cultural items excavated from the Hickory Ground Site to Plaintiffs, per guidance and instructions received from Mekko Thompson; and

iv. Issue an injunction prohibiting Auburn from taking any action with respect to human remains or cultural items taken from or located at the Hickory Ground Site absent explicit consent from the Muscogee (Creek) Nation.

(n) If Plaintiffs succeed with respect to Count XIV:

i. Issue an injunction prohibiting the Federal Defendants and the Poarch Officials from taking any action with respect to human remains or cultural items taken from or located at the Hickory Ground Site absent consultation with and explicit consent from the Muscogee (Creek) Nation.

ii. Enter an order in the nature of mandamus requiring the Federal Defendants and the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Federal Officials and the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction;

(o) If Plaintiffs succeed with respect to Count XV:

i. Issue an injunction prohibiting the Poarch Officials from taking any action with respect to human remains or cultural items taken from or located at the Hickory Ground Site absent consultation with and explicit consent from the

Muscogee (Creek) Nation;

    ii.    Enter an order in the nature of mandamus requiring the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction;

(p) If Plaintiffs succeed with respect to Count XVI, issue an injunction prohibiting Auburn from taking any action with respect to human remains or cultural items taken from or located at the Hickory Ground Site absent consultation with and explicit consent from the Muscogee (Creek) Nation;

(q) If Plaintiffs succeed with respect to Count XVII:

    i.    Enter a judgement declaring that the Federal Defendants and the Poarch Officials have violated the NHPA;

    ii.    Issue an injunction prohibiting any further construction activities at the Hickory Ground Site;

    iii.    Enter an order in the nature of mandamus requiring the Federal Officials and the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Federal Officials and the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction; and

        iv.    Issue an order requiring the Secretary to terminate the NPS Agreement with Poarch.

(r)  If Plaintiffs succeed with respect to Count XVIII:

        i.    Enter a judgement declaring that the Poarch Officials have violated the NHPA;

        ii.    Issue an injunction prohibiting the Poarch Officials from engaging in any further construction activities at the Hickory Ground Site;

        iii.    Enter an order in the nature of mandamus requiring the Poarch Officials to restore the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition, and further, issue an order enjoining the Poarch Officials from engaging in any activities that violate Poarch's original promise to protect the Hickory Ground Site from excavation or destruction; and

        iv.    Issue an order terminating the NPS Agreement with Poarch.

(s)  If Plaintiffs succeed with respect to Count XIX:

        i.    Issue an order prohibiting any further burdening of Plaintiffs' religious exercise, including:

            i.    Prohibitions against any additional construction at the Hickory Ground Site; and

            ii.    Requirements for the restoration of the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition;

(t)  If Plaintiffs succeed with respect to Count XX:

i.   Issue an order prohibiting any further burdening of Plaintiffs' religious exercise, including:

    i.   Prohibitions against any additional construction at the Hickory Ground Site; and

    ii.   Requirements for the restoration of the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition;

(u) If Plaintiffs succeed with respect to Count XXI, Plaintiffs request that the Court issue declaratory and injunctive relief against the Poarch Officials, including:

    i.   Prohibitions against any construction, excavation, or development at the Hickory Ground Site;

    ii.   Requirements for the restoration of the Hickory Ground Site, to the greatest extent possible, to its pre-excavation and pre-construction condition;

    iii.   An injunction prohibiting Poarch Officials from engaging in activities at Hickory Ground that desecrate burial sites, ceremonial grounds, or otherwise infringe upon Plaintiffs' religious rights protected by the Indian Civil Rights Act; and

    iv.   An injunction requiring Poarch Officials to cease enforcement of any tribal laws or authorizations that permit or promote activities inconsistent with Plaintiffs' religious rights at Hickory Ground.

(v) If Plaintiffs succeed with respect to Count XXII, Plaintiffs request that the Court issue declaratory and injunctive relief against the Poarch Officials, including:

    i.   Prohibitions against any further excavation, construction, or desecration at

the Hickory Ground Site;

ii.    Requirements that Poarch Officials restore Hickory Ground, to the greatest extent possible, to its pre-excavation and pre-construction condition;

iii.    An order enjoining Poarch Officials from engaging in any activities that substantially burden Plaintiffs' religious exercise, including permitting gambling, alcohol consumption, or unauthorized access to sacred ceremonial grounds at Hickory Ground; and

iv.    An order terminating or prohibiting the continuation of any agreements or authorizations (including the NPS Agreement) that allow Poarch Officials to exercise federal delegated authority at Hickory Ground in violation of RFRA.

(w) If Plaintiffs succeed with respect to Count XXIII, Plaintiffs request that the Court issue declaratory and injunctive relief against the Poarch Officials, including:

i.    Prohibitions against any construction, excavation, or development at Hickory Ground that infringes Plaintiffs' free exercise of religion under the First Amendment;

ii.    Requirements for the restoration of Hickory Ground, to the greatest extent possible, to its pre-excavation and pre-construction condition;

iii.    An order enjoining Poarch Officials from engaging in activities that violate Plaintiffs' free exercise rights under the First Amendment, including permitting activities that desecrate burial sites and ceremonial grounds; and

iv.    An injunction prohibiting Poarch Officials from acting under federal delegated authority in a manner that burdens Plaintiffs' free exercise of

religion under the First Amendment.

(x) If Plaintiffs succeed with respect to Count XXIV, Plaintiffs request that the Court issue declaratory and injunctive relief against Auburn University, including:

    i.   An injunction prohibiting Auburn from continuing to possess, store, or otherwise control human remains, funerary objects, or cultural items from Hickory Ground in violation of Plaintiffs' religious exercise rights under RFRA;

    ii.   An order requiring Auburn to preserve and safeguard all human remains, associated funerary objects, and cultural items in its custody in a manner consistent with Plaintiffs' religious obligations;

    iii.   An injunction prohibiting Auburn from engaging in or permitting any practices that interfere with Plaintiffs' religious exercise rights in violation of RFRA; and

    iv.   An order requiring Auburn to repatriate all human remains, funerary objects, or cultural items taken or excavated from Hickory Ground to Plaintiffs within 90 days.

(y) If Plaintiffs succeed with respect to Count XXV, Plaintiffs request that the Court issue declaratory and injunctive relief against Auburn University, including:

    i.   An injunction prohibiting Auburn from continuing to possess, store, or otherwise control human remains, funerary objects, or cultural items from Hickory Ground in violation of Plaintiffs' free exercise rights under the First Amendment;

    ii.   An order requiring Auburn to preserve and safeguard all human remains,

associated funerary objects, and cultural items in its custody in a manner consistent with Plaintiffs' religious obligations;

iii.   An injunction prohibiting Auburn from engaging in or permitting any practices that interfere with Plaintiffs' free exercise rights under the First Amendment; and

iv.   An order requiring Auburn to repatriate all human remains, funerary objects, or cultural items taken or excavated from Hickory Ground to Plaintiffs within 90 days;

(z) Order all Defendants to pay for Plaintiffs' reasonable attorney's fees and costs for prosecuting this action; and

(aa)   Order such further relief as allowed under Fed. R. Civ. P. 54(c) and as this Court may deem just and equitable.


DATED this 24th day of September, 2025.


OF COUNSEL                                        s/ Stewart Davidson McKnight, III
Mary Kathryn Nagle                                Stewart Davidson McKnight, III (ASB-6258-G63S)
Attorney at Law                                   Email: dmcknight@dillardmcknight.com
P.O. Box 506                                      Dillard, McKnight, James & McElroy
McLean, VA 22101                                  2700 Highway 280
(202) 407-0591                                    Suite 110 East
*Counsel for Plaintiffs*                          Birmingham, AL 35223
(*Admitted Pro Hac Vice*)                         Tel: 205-271-1100
                                                  *Counsel for Plaintiffs*

141

**<u>Certificate of Service</u>**

I hereby certify that on September 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


<u>/s/ Stewart Davidson McKnight, III</u>
COUNSEL FOR PLAINTIFFS